**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>               Plaintiff,<br><br>        v.<br><br>TEMPUR SEALY INTERNATIONAL, INC.<br><br>and<br><br>MATTRESS FIRM GROUP INC.,<br><br>               Defendants. | **Case No.:** 4:24-cv-02508 |

**COMPLAINT FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY
INJUNCTION PURSUANT TO SECTION 13(B) OF THE FEDERAL TRADE
COMMISSION ACT**

Tempur Sealy's proposed $4 billion acquisition of Mattress Firm would combine the world's largest mattress supplier with the nation's largest mattress retailer. As noted in Tempur Sealy's deal documents, acquiring Mattress Firm would provide Tempur Sealy with "[m]aximum control over a critical retail channel partner" and let it "further build[] a competitive moat." Today, Mattress Firm is the single most important retail channel for mattress brands. It can drive massive volumes of sales through its unmatched consumer reach, and mattress brands jostle to access its floor space. Allowing Tempur Sealy to buy Mattress Firm would upend this competitive dynamic, giving Tempur Sealy enormous sway over the fate of its rivals. As noted by Tempur Sealy's CEO and Board Chairman, the company would use this control "to [e]liminate [f]uture [c]ompetition."

Given Tempur Sealy's history of using exclusionary deals to block rivals, this acquisition would further cement its dominance and deprive independent brands of the opportunity to engage in free and fair competition. Millions of Americans would be left paying the price. Because this

proposed acquisition may substantially lessen competition or tend to create a monopoly, it should be enjoined.

On July 2, 2024, with a 5-0 vote, the Federal Trade Commission found reason to believe that this proposed acquisition may substantially lessen competition or tend to create a monopoly in violation of the nation's antitrust laws. To assess the legality of the proposed acquisition, the Commission commenced an administrative proceeding and scheduled a full trial on the antitrust merits—where all parties will have the opportunity to conduct discovery and present testimony and other evidence.

Plaintiff Federal Trade Commission ("FTC" or "Commission") petitions this Court to enter a stipulated temporary restraining order and to grant a preliminary injunction enjoining Defendant Tempur Sealy from consummating its proposed acquisition (the "Proposed Acquisition") of Defendant Mattress Firm until after the FTC concludes the pending administrative proceeding. Absent action from this Court, Defendants will be free to consummate the Proposed Acquisition after 11:59 p.m. Eastern Time on July 7, 2024. The FTC seeks this provisional relief under Section 13(b) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 53(b).

The FTC requires the aid of this Court to pause Defendants' Proposed Acquisition until the Commission has had the chance to review the transaction's legality in the administrative proceeding. Unless this Court grants a preliminary injunction, Defendants will be free to consummate a transaction that may ultimately be found to violate the antitrust laws. The pause the FTC seeks from this Court is necessary to maintain the status quo and prevent interim harm during the pendency of the Commission's administrative proceeding.

## NATURE OF THE CASE

1.     Tempur Sealy International, Inc. ("Tempur Sealy") is the world's largest mattress manufacturer and supplier. Mattress Firm Group Inc. ("Mattress Firm") is the nation's largest

mattress retailer by revenue and is the most competitively significant route to market for Tempur Sealy and many of its competitors. With over 2,300 brick-and-mortar stores, Mattress Firm's overall mattress sales volume dwarfs every other mattress retailer. The company touts itself as "the only mattress retailer of scale," and is viewed as a critical retail channel by Tempur Sealy.

2.      Mattress Firm stores are ubiquitous, and the company benefits from greater brand recognition than any other mattress specialty store in the United States. Both Mattress Firm and Tempur Sealy have estimated that █ percent of all U.S. mattress shoppers visit Mattress Firm as part of their purchase journey.

3.      As a multi-vendor retailer, Mattress Firm offers a wide range of mattresses covering all but the most expensive price points. This includes what the mattress industry commonly refers to as premium mattresses—a category that sits above entry-level mattresses and is largely made up of mattresses other than the most expensive ones. Mattress Firm earns ███████ of its mattress sales revenue from the premium mattresses that it sells. Among all mattress retailers, Mattress Firm is by far the most important distribution channel for premium mattresses. These mattresses tend to have superior quality and enhanced features relative to entry-level mattresses, reputable brand names, and they appeal to consumers with a range of incomes who need to or are willing to invest more for enhanced comfort and wellness. A significant portion of premium mattress purchasers, for example, are labeled by Tempur Sealy as ███████ described by the company as ████████████████████████████████████ ████████████████████ Additionally, ███████ of customers who buy Tempur Sealy's premium Tempur-Pedic mattresses rely on financing to afford this infrequent purchase. Premium mattresses are sold predominantly through brick-and-mortar furniture stores and mattress specialty stores, the largest of which is Mattress Firm. Mattress Firm alone accounts for a

3

significant share of all U.S. premium mattress sales revenue and sells many times more of these types of mattresses as the next-largest multi-vendor mattress retailer.

4.     Mattress Firm's unique role led Tempur Sealy's CEO Scott Thompson to dub the retailer the "kingmaker"—a reference to the significant power that Mattress Firm enjoys over determining which mattress brands win out. For example, Purple Innovation, Inc. ("Purple"), a relatively recent entrant in the mattress industry, saw its revenue surge shortly after it began selling through Mattress Firm in 2017, and the company went public later that year. Similarly, Tempur Sealy got a significant boost in the market after it returned to selling through Mattress Firm in 2019 following a two-year absence, and by 2021 Tempur Sealy's overall U.S. sales revenue had grown over 50 percent. No other mattress retailer can impact the success of a premium mattress supplier to the same degree as Mattress Firm.

5.     By owning Mattress Firm, Tempur Sealy would wield significant power over its rivals and could cut or limit their access to this critical retail channel. Indeed, Tempur Sealy's desires to protect its dominance and suppress competition rank among the company's chief reasons for pursuing the Proposed Acquisition. On the front of a May 2022 presentation analyzing the Proposed Acquisition—codenamed Project Lima—Tempur Sealy's CEO wrote that acquiring Mattress Firm would enable Tempur Sealy to both "[e]liminate [f]uture [c]ompetition" and "[b]lock new [c]ompetition."

4



An earlier presentation made to Tempur Sealy's Board of Directors on the Proposed Acquisition states that acquiring Mattress Firm would "further build[] a competitive moat" and give Tempur Sealy "[m]aximum control over a critical retail channel partner."

6.      These documents are not one-off statements. Multiple high-ranking executives within Tempur Sealy have expressed a desire to eliminate and block rival mattress suppliers and brands from Mattress Firm post-acquisition. Those rival suppliers include Serta Simmons Bedding ("Serta Simmons"), the next-largest U.S. mattress supplier after Tempur Sealy, as well as Resident Home LLC ("Resident Home"), which supplies Nectar-brand mattresses. For instance, in reference to Mattress Firm's sales of Nectar mattresses, a Tempur Sealy vice president wrote "hopefully we buy [Mattress Firm] and take them off the floor." In a separate conversation about the Proposed

Acquisition's effect on Serta Simmons, a vice president of a Tempur Sealy subsidiary suggested that depending on Serta Simmons' competitive response, Tempur Sealy's CEO "will push them completely out the door at [Mattress] Firm."

7.      Post-acquisition, Tempur Sealy would have a strong financial incentive to do exactly what it has been planning to do: disfavor rival mattress suppliers to sell more of its own brands. The combined company would earn a much greater margin on each Tempur Sealy product sold at Mattress Firm than it would earn on a non-Tempur Sealy product. By favoring its own products at the expense of rival mattress suppliers, Tempur Sealy could generate hundreds of millions of dollars in additional revenue, while damaging competition in the market and inflating costs for everyday Americans. As a Mattress Firm salesperson summarized: "[W]hy would Tempur-Sealy be okay with us still selling [Serta Simmons], Purple, etc.? Logically, that's like Coca-Cola buying out a Pepsi distributor and still being okay with them selling Pepsi products."

8.      This would not be the first time that Tempur Sealy has sought to exclude rivals and undermine competition. On multiple occasions, Tempur Sealy has tried to oust existing brands and block new brands from Mattress Firm. In 2020, Tempur Sealy and Mattress Firm made an off-the-books "handshake" agreement that Mattress Firm would not carry mattresses from Casper Sleep Inc. ("Casper"), a relatively recent entrant. And in 2019 and 2021, Tempur Sealy also tried pressuring Mattress Firm to expel mattresses from Purple, which Tempur Sealy viewed as a competitive threat. Mattress Firm resisted Tempur Sealy's overtures at that time—but owning Mattress Firm would allow Tempur Sealy to deploy this playbook unilaterally.

9.      By purchasing Mattress Firm, Tempur Sealy would have the power to play both offense and defense against its competitors: it would be able to entrench its dominant position by

expanding the presence of its products in Mattress Firm stores, while simultaneously blocking its rivals' access.

10.     Multiple third-party investors analyzing the Proposed Acquisition have reached the same conclusion—namely, that Tempur Sealy would reap huge profits by disfavoring rival brands at Mattress Firm while growing its own presence. One investor laid out this thinking in an email to Tempur Sealy's CEO in 2018, writing that "it may be attractive to acquire Mattress Firm" in part because "removing Mattress Firm's retail distribution from the grasp of others would dramatically raise the barriers to entry in the industry and make it nearly impossible for rival brands to achieve scale."

11.     Tempur Sealy has myriad ways it could use its control over Mattress Firm to "[e]liminate [f]uture [c]ompetition" and "[b]lock new [c]ompetition." One approach would be expelling other premium mattress suppliers from Mattress Firm entirely and denying them any future access to Mattress Firm's floor space. Alternatively, Tempur Sealy could choose to disadvantage its rivals within Mattress Firm's stores by, for example, offering them fewer slots to display their products, increasing its share of the retail margin of rivals' products, assigning their products worse store placement, awarding lower sales associate commissions on non-Tempur Sealy products, or otherwise steering customers toward Tempur Sealy's own mattresses. Tempur Sealy could also deny its rivals access to a variety of benefits that Mattress Firm currently provides, including customer insights and product development assistance. Tempur Sealy would also gain access to a trove of competitively sensitive information on pricing and products of its rival mattress suppliers, data that it could then weaponize against its rivals. Regardless of which method Tempur Sealy uses to foreclose or otherwise disadvantage its rivals, Tempur Sealy would profit, competition would suffer, and consumers would be left paying more.

12.     Tempur Sealy's rivals would be left with limited alternatives. All other multi-vendor mattress retailers each sell only a fraction of the premium mattresses sold by Mattress Firm. Moreover, Tempur Sealy has already locked up access to many of the next-largest premium mattress retailers through anticompetitive agreements that forbid them from carrying particular mattress brands or require Tempur Sealy to occupy a dominant portion of the sales floor. For instance, Tempur Sealy contracted with ███████████████████████████ ████████ to prohibit ████████ stores from carrying any non-Tempur Sealy brands, except for ████████ in-house brands. As a result, all other mattress suppliers are blocked from selling through at least ████████ retail stores, including most (if not all) in Texas.

13.     Because Tempur Sealy would continue to have this incentive and ability (and indeed is planning) to limit or degrade rival mattress suppliers' access to Mattress Firm, the effect of the Proposed Acquisition "may be substantially to lessen competition or tend to create a monopoly" in the market for premium mattresses. 15 U.S.C. § 18. Rival mattress suppliers—American manufacturers with plants across the country, spanning Georgia, North Carolina, Ohio, and Wisconsin, to Arizona, Colorado, and Utah—could lose access to the most competitively significant distribution channel in the United States, impairing their ability to compete and potentially leading them to reduce output, close factories, and lay off workers. New entrants could see their chances of obtaining access to the industry's largest and most important mattress retailer disappear, thwarting their ability to grow and exert competitive pressure on Tempur Sealy. And Tempur Sealy would "further build[] a competitive moat" around its dominant position in the market for premium mattresses, sealing itself off from competition.

14.     Ultimately, everyday American families would pay the price. Tempur Sealy itself recognizes that working class, older adults with limited disposable income comprise a substantial

portion of buyers of premium mattresses. Indeed, many premium mattress purchasers rely on financing and installment plans to afford this large, infrequent purchase, including ███████ of Tempur-Pedic purchasers. The competitive harm that is likely to flow from the Proposed Acquisition threatens to make an already necessary but costly purchase even more expensive.

15.     There are no pertinent factors sufficient to offset the likelihood of competitive harm from the Proposed Acquisition. Respondents will be unable to demonstrate that the Proposed Acquisition would induce any entry or expansion by premium mattress suppliers or multi-vendor mattress retailers, let alone that such entry or expansion would be timely, likely, or sufficient in magnitude, character, and scope to deter or counteract the anticompetitive effects of the Proposed Acquisition. Respondents also will be unable to show any cognizable efficiencies of a nature, magnitude, and likelihood such that no substantial lessening of competition is threatened by the Proposed Acquisition. Moreover, none of the proposed remedies offered by Respondents, including a modest divestiture of retail stores and a commitment to reserve a small percentage of Mattress Firm's slots for third-party premium mattresses, are sufficient to alleviate the competitive harm.

16.     For all these reasons, on July 2, 2024, the Commission found reason to believe that the Proposed Acquisition may substantially lessen competition or tend to create a monopoly in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18, and Section 5 of the FTC Act, 15 U.S.C. § 45, or constitutes an unfair method of competition in violation of Section 5 of the FTC Act. On the same day, the Commission initiated an administrative proceeding to determine the antitrust merits of the Proposed Acquisition. The ongoing administrative proceeding provides a forum for all parties to conduct discovery, followed by a hearing before an Administrative Law Judge with up to 210 hours of live testimony. After reviewing the recommended decision of the

Administrative Law Judge, the Commission will issue a decision, which is then subject to review in a United States Court of Appeals.

17.     The parties have stipulated to entry of a temporary restraining order to preserve the status quo and protect competition while the Court considers the FTC's application for a preliminary injunction. Under this temporary restraining order, Defendants cannot consummate the Proposed Acquisition before the Court enters a scheduling order or 45 days of the parties' receipt of this Complaint, whichever comes first. The parties have agreed to engage in good faith negotiations to extend that temporary restraining order as part of negotiating a proposed scheduling order.

18.     Under Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), a court considering a grant of preliminary injunctive relief must weigh the equities and consider the FTC's likelihood of success in the administrative proceeding. The FTC is likely to succeed on its claim that the effect of the Proposed Acquisition may be to substantially lessen competition or tend to create a monopoly, in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18, and Section 5 of the FTC Act, 15 U.S.C. § 45, and that the Proposed Acquisition constitutes an unfair method of competition in violation of Section 5 of the FTC Act.

19.     The equities also weigh in favor of injunctive relief. Preliminary injunctive relief is necessary to preserve the status quo and protect competition during the Commission's ongoing administrative proceeding. Allowing the Defendants to consummate the Proposed Acquisition before the Commission assesses the Proposed Acquisition's potential anticompetitive effects is problematic for several reasons. It would frustrate the Commission's ability to remedy the anticompetitive effects of the Proposed Acquisition if it is found unlawful after a full trial on the merits and any subsequent appeals, would permit competitive harm to begin immediately in the

interim period prior to the Commission's decision, and would undermine the public's interest in effective enforcement of the antitrust laws.

## **JURISDICTION**

20.     The Court's jurisdiction arises under Section 13(b) of the FTC Act, 15 U.S.C. § 53(b) and under 28 U.S.C. §§ 1331, 1337, and 1345. This is a civil action arising under Acts of Congress protecting trade and commerce against restraints and monopolies and is brought by an agency of the United States authorized to bring this action.

21.     Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), provides in pertinent part:

Whenever the Commission has reason to believe:

(1)     that any person, partnership, or corporation is violating, or is about to violate, any provision of law enforced by the Federal Trade Commission, and

(2)     that the enjoining thereof pending the issuance of a complaint by the Commission and until such complaint is dismissed by the Commission or set aside by the court on review, or until the order of the Commission made thereon has become final, would be in the interest of the public –

the Commission by any of its attorneys designated by it for such purpose may bring suit in a district court of the United States to enjoin any such act or practice. Upon a proper showing that weighing the equities and considering the Commission's likelihood of ultimate success, such action would be in the public interest, and after notice to the defendant, a temporary restraining order or a preliminary injunction may be granted without bond….

22.     The Proposed Acquisition constitutes an acquisition subject to Section 7 of the Clayton Act, 15 U.S.C. § 18.

23.     Defendants are, and at all relevant times have been, engaged in activities in or affecting "commerce" as defined in Section 4 of the FTC Act, 15 U.S.C. § 44, and Section 1 of the Clayton Act, 15 U.S.C. § 12. Defendants are, and at all relevant times have been, engaged in commerce in the state of Texas.

24.     Defendants transact business in the Southern District of Texas and are subject to personal jurisdiction here. Mattress Firm is headquartered in Houston, Texas and operates multiple stores in and around Houston. Tempur Sealy operates multiple mattress retail stores in and around Houston and sells mattresses through numerous third-party retail stores in and around Houston.

25.     The FTC Act, 15 U.S.C. § 53(b), authorizes nationwide service of process, and personal jurisdiction exists where service is effected pursuant to federal statute. Fed. R. Civ. P. 4(k)(1)(C). Venue is proper in the Southern District of Texas under 28 U.S.C. § 1391(b) and (c) and 15 U.S.C. § 53(b).

## THE PARTIES AND THE PROPOSED ACQUISITION

26.     Plaintiff Federal Trade Commission is an administrative agency of the United States government established, organized, and existing pursuant to the FTC Act, 15 U.S.C. §§ 41 *et seq.*, with its principal offices in Washington, D.C.  The Commission is vested with authority and responsibility for enforcing, *inter alia*, Section 7 of the Clayton Act, 15 U.S.C. § 18, and Section 5 of the FTC Act, 15 U.S.C. § 45.

27.     Respondent Tempur Sealy is a publicly traded corporation headquartered in Lexington, Kentucky. Formed in 2013 by the merger of Tempur-Pedic International Inc. and Sealy Corp., Tempur Sealy is the world's largest manufacturer and supplier of mattresses. Tempur Sealy sells products in more than 100 countries, has over 70 manufacturing facilities located around the world, and employs more than 12,000 people. In 2023, Tempur Sealy generated nearly $5 billion dollars in global revenue, with more than $3.5 billion coming from the United States. Tempur Sealy sells mattresses in the United States under three principal brands: (1) Sealy, the number one U.S. brand by sales revenue; (2) Tempur-Pedic, the number two U.S. brand; and (3) Stearns & Foster, a leading innerspring brand. Tempur Sealy is also vertically integrated: it owns over 200 mattress retail stores in the United States. Approximately 85 percent of Tempur Sealy's U.S. sales

occur through third-party retailers, while about 15 percent are direct-to-consumer through Tempur Sealy's retail stores and online. Tempur Sealy has grown through acquisition. It has bought up seven firms in the mattress industry since 2018, including (a) Sherwood Bedding, a U.S. contract manufacturer of several mattress brands, including Mattress Firm's private-label mattresses, and (b) Sleep Outfitters, a U.S. mattress retailer with more than one hundred stores primarily located in Alabama, Kentucky, and Ohio.

**Tempur Sealy's Recent Acquisition History**

| | What's Going Well, History of Acquisitions* | |
|---|---|---|
| **Year** | **Business** | **Strategic Rationale** |
| 2021 | Dreams | Nearly doubled international segment and increased annualized global direct channel to over $1 billion |
| 2020 | Sealy UK | Significantly improved competitive position for Sealy in the UK and possibly continental Europe |
| 2020 | Sherwood Bedding ** | Entrance into private label category, creating a complete suite of product offerings in the US |
| 2019 | Sleep Outfitters | Entrance into multi-branded retailing in the US and protected market share in southeast US |
| 2019 | Bed Factory | Vertical integration for bedding product capabilities within Europe |
| 2018 | SOVA | Established premium bedding chain and protected market share in Sweden |
| 2018 | Comfort Revolution ** | Enabled nimble execution into alternative channels and gave full control of Sealy BIB products in the US |

28.     Respondent Mattress Firm is a privately owned mattress specialty retail chain headquartered in Houston, Texas. Through a series of acquisitions, Mattress Firm grew from 700 stores in 2010 to its current size of approximately 2,300 stores and now markets itself as the "only coast-to-coast, border-to-border mattress retailer" in the United States. Mattress Firm carries a

range of mattress brands from multiple suppliers, including Tempur Sealy, Serta Simmons, Purple, Resident Home, Kingsdown, Inc. ("Kingsdown"), King Koil, and Spring Air International ("Spring Air"), as well as two of its own private-label brands, Sleepy's and Tulo. Mattress Firm currently employs more than 8,000 people throughout its brick-and-mortar retail network, and it generated more than ███████ in revenue in 2022.

**Mattress Firm's Recent Acquisition History**



29.     Pursuant to an Agreement and Plan of Merger dated May 9, 2023, Tempur Sealy proposes to acquire all of the voting securities of Mattress Firm for approximately $4 billion. Post-acquisition, Tempur Sealy's shareholders would own approximately 83 percent of the combined firm.

## INDUSTRY BACKGROUND

**A.**      **Premium Mattress Suppliers Require Access to Brick-and-Mortar Retail Floor Space to Achieve and Maintain Profitability**

30.      Mattress suppliers are companies that sell mattresses to third-party retailers and, in some cases, directly to consumers through their own stores and websites. The three largest U.S. suppliers—Tempur Sealy, Serta Simmons, and Sleep Number Corporation ("Sleep Number")—own and operate the factories and equipment used to produce their mattresses. Some other suppliers, such as Casper and Resident Home, rely in whole or in part on third-party contract manufacturers to produce their mattresses.

31.      Mattresses are sold under several different brand and product names, and come in a range of different sizes, thicknesses, firmness levels, and types. The most common types of mattresses generally can be classified as: (a) innerspring; (b) foam; (c) hybrid, which contain both innersprings and foam; and (d) gel. Quality within each type can vary substantially. For instance, some mattresses may use a greater quality, configuration, or number of springs or contain higher quality or density foam.

32.      Premium mattresses are distinguished from other mattresses by their contents, quality, and customers. Some suppliers, such as Tempur Sealy, have brands that are predominantly premium mattresses. Other suppliers, such as Purple and Casper, are seeking to expand in the premium mattress market. For mattress suppliers, premium mattress sales generally yield the most revenue and margin on a per-unit basis. Several suppliers view expansion in the premium mattress market as key to achieving and maintaining profitability.

33.      To reach the vast majority of consumers, premium mattress suppliers must have access to brick-and-mortar retail floor space to showcase their products. Consumers have widely varying mattress preferences, and most consumers cannot determine whether they will find a

particular mattress comfortable and suitable for their needs without the opportunity to try out the mattress. In addition, a mattress is an expensive and infrequent purchase for many consumers, heightening the importance of trying products in-store before deciding what to buy. Tempur Sealy and Mattress Firm each have concluded that at least ██ percent of consumers want to try a mattress in a brick-and-mortar retail outlet before purchasing it.

34.     Retail sales associates figure prominently in the sale of premium mattresses at brick-and-mortar stores. Because customers purchase mattresses infrequently and the mattress itself may be hard to distinguish from the outside, retail sales associates play a critical role in explaining the features and qualities of premium mattresses and in helping customers decide which mattress to purchase. As one of Tempur Sealy's board members wrote, "[b]edding is sold not bought," and the salesperson is "[m]ore important than anything else."

35.     Retail sales data confirm that brick-and-mortar floor space is critical for selling premium mattresses. Approximately ███ of Mattress Firm's mattress sales revenue comes from premium mattresses, and the vast majority of those sales take place in-store. Although customers can also buy mattresses online through suppliers' websites and third-party retailers, most mattresses sold online tend to be basic or entry-level mattresses that fall in the lower price ranges. For instance, according to Mattress Firm's estimate, while Amazon sells the majority of mattresses priced ████████, it sells only a miniscule share of mattresses priced ███████. In other words, few consumers will purchase a premium mattress without first visiting a brick-and-mortar store.

36.     Attempts by mattress suppliers to bypass brick-and-mortar retail have not been successful. The advent of mattresses that could be compressed and rolled into a box for shipping led several "bed-in-a-box" mattress suppliers to emerge, most notably Casper, Purple, Resident Home, and Tuft & Needle (which was later acquired by Serta Simmons). At first, these suppliers

sold exclusively or primarily online, offering lengthy trial periods and generous return policies to induce consumers to purchase a mattress without first trying it in a store. But these suppliers eventually concluded that their web-driven businesses had plateaued and that they could not grow their premium sales in an online-only format. These suppliers began selling their products, particularly premium mattresses, through brick-and-mortar retail stores. Today, the most well-known bed-in-a-box brands all are sold in brick-and-mortar stores, illustrating the necessity of brick-and-mortar retail floor space.

**B.**   **To Entice Retailers to Carry and Display Their Products, Premium Mattress Suppliers Offer Retailers Financial Incentives and Seek to Limit Retail Price Competition**

37.    The overall floor space available for mattresses at each brick-and-mortar retailer is limited. Mattresses occupy a significant amount of retail floor space because of their size. Each retail store typically has a fixed number of "slots" available for mattresses, which are places on the floor where a mattress can be displayed and tested. Some retail stores may have five or fewer slots available, while the largest retail stores may have several dozen slots. Mattress suppliers often compete for slots by offering retailers various financial incentives, and, in some cases, by employing strategies intended to maintain high retail prices and high profit margins.

38.    In a typical contract between a mattress supplier and a retailer, the retailer will benefit financially depending on the volume of mattresses purchased from the supplier. Incentives may include (a) volume-based rebates, and (b) payment of a cooperative advertising ("co-op") allowance. A co-op payment commonly is structured as a fund paid by the supplier to the retailer on a recurring basis equal to a percentage of the retailer's purchases from the supplier, which the retailer can use to advertise the supplier's mattresses. For example, if the co-op percentage is ten percent and the retailer purchases $100,000 of mattress products, the supplier would pay (or credit) the retailer $10,000 for advertising.

39. Some contracts also guarantee the supplier a minimum volume of purchases and/or access to a minimum number of retail slots. For example, Tempur Sealy's 2019 contract with Mattress Firm guaranteed Tempur Sealy ███████ in annual net purchases and █ slots in each Mattress Firm store. In exchange, Mattress Firm received co-op allowances ranging from ███████ percent across Tempur Sealy brands, along with rebates ranging from █████ percent.

40. Mattress suppliers may also seek to limit price competition among retailers through two main strategies. First, they often assign their mattresses distinct product names that are exclusive to their largest retail customers, preventing consumers from cross-shopping across retailers. According to Mattress Firm, this practice allows ████████████████████ ███████████████████████████ Second, mattress suppliers often impose a Minimum Advertised Price ("MAP") and/or a Unilateral Pricing Policy ("UPP") that prohibit retailers from advertising or selling products below the prices set by the supplier. These policies effectively set a price floor and restrict retailer discounting. MAP and UPP pricing are common on premium mattress brands, including Tempur-Pedic, Stearns & Foster, and various Serta Simmons and Purple models. Some suppliers, including Tempur Sealy, police MAP and UPP violations vigorously through web price scraping and secret shopping.

## C. Tempur Sealy Leads a Highly Concentrated Field of Premium Mattress Suppliers

41. The premium mattress market is highly concentrated, with only three companies— Tempur Sealy, Serta Simmons, and Sleep Number—capturing ████████ of all U.S. sales revenue. Within the premium mattress market, the major brands have used mergers to consolidate, and today only a few suppliers enjoy scale. Although several new mattress suppliers, such as Casper and Purple, have emerged within the past decade, each of them has a substantially smaller share of premium mattress sales. Noting how significantly the market has consolidated, one

investor remarked in 2021, "[W]e still find it difficult to believe that the US anti-trust authorities gave the green light for Serta to combine with Simmons and then for Tempur to combine with Sealy. Outside tech, there aren't many sizable markets in the US where the two largest players [Tempur Sealy and Serta Simmons] have close to 70% share . . . ."

42.     Among the big three mattress suppliers, Tempur Sealy is the "undisputed market leader." Tempur Sealy's share of U.S. premium mattress sales revenue is nearly 50 percent. Its three principal mattress brands are among the largest in the United States. Sealy, the top U.S. brand by sales revenue, has mattresses that come in various types (such as innerspring or foam) and have many different product names, some of which are exclusive to various retailers. Tempur-Pedic, the number two U.S. brand by sales revenue, is a premium mattress brand comprised of proprietary memory foam, known as Tempur material. Tempur Sealy's third brand, Stearns & Foster, offers innerspring mattresses. Tempur Sealy sells all three brands to mattress retailers across the country, as well as directly to consumers through its retail stores and websites.

43.     Of Tempur Sealy's three main brands, the Tempur-Pedic brand is the company's crown jewel. Known for its proprietary memory foam technology, the Tempur-Pedic brand is the most highly recommended mattress brand in America and holds a "[d]ominant worldwide premium bedding market position." Tempur-Pedic is also one of the nation's most advertised mattress brands, accounting for 25 percent of all U.S. mattress advertising spend.

44.     One of Tempur Sealy's main competitors is Serta Simmons, the next-largest U.S. mattress supplier. Serta Simmons owns the third- and fourth-largest U.S. mattress brands by sales revenue—Beautyrest and Serta, respectively—as well as the Tuft & Needle brand. Its brands are sold as innerspring, foam, and hybrid mattresses, and range in price from under $1,000 to over $5,000. The company's combined share of U.S. premium mattress sales revenue is approximately

███ percent. Nearly all of Serta Simmons' mattress sales are to third-party retailers. In 2023, Serta Simmons entered and emerged from Chapter 11 bankruptcy, and the company has closed several manufacturing facilities across the country due to its recent economic struggles. Tempur Sealy has benefitted from Serta Simmons' factory closures and has expressed to investors that it hopes to reduce Serta Simmons' size even further, stating "[o]ur job is to get them to close as many factories as possible b[ecause] it makes it very difficult to reestablish . . . ."

45.     Another competitor is Sleep Number, the third-largest U.S. mattress supplier. Sleep Number is a vertically integrated company: it sells the mattresses it manufactures exclusively through its 672 directly owned retail stores (as of December 30, 2023) and its website. All of its stores are single-brand stores that do not carry mattresses from any other supplier. Sleep Number's beds are known for containing an adjustable air mattress, allowing the user to adjust the mattress's level of firmness, and range in price from under $1,000 to over $10,000. The company's share of U.S. premium mattress sales revenue is approximately ███ percent.

46.     Beyond the big three, Purple and Casper are the only other suppliers with more than a ███ percent share of the premium mattress market (based on 2022 sales revenue). Each has a market share well below ███ percent of U.S. premium mattress sales revenue.

**D.    Tempur Sealy Maintains Its Dominance by Leveraging Its Tempur-Pedic Brand to Block Rivals and Limit Competition**

47.     In 2013, Temper-Pedic and Sealy merged in a $1.3 billion deal. Since that acquisition, Tempur Sealy has pursued a web of tactics to cripple competing suppliers and entrench its dominant market position.

48.     One tactic includes leveraging the power of its Tempur-Pedic brand to grab scarce retail floor space from its rivals for its Sealy and Stearns & Foster brands. Tempur-Pedic is viewed by many mattress retailers as a must-have brand for their floors. As Tempur-Sealy itself notes,

"[e]very retailer wants Tempur-Pedic because it has 50% of the profit in the industry while being 7-8% of the units." Following the 2013 merger, Tempur Sealy began requiring new Tempur-Pedic retailers to also display a proportionate number of Sealy and Stearns & Foster mattresses on their floors, leaving little room for other mattress suppliers. Initially, pre-existing Tempur-Pedic retailers were exempted from this requirement and were free to decide for themselves whether to carry the Sealy and Stearns & Foster brands. But in 2022, Tempur Sealy launched an initiative named "kill grandpa" to eliminate the exemption held by the "grandfathered" retailers. In May 2023, Tempur Sealy estimated that "kill grandpa" accounted for more slot gains for Tempur Sealy mattresses than any other initiative.

49.     Tempur Sealy also leverages the power of its Tempur-Pedic brand to push retailers to carry exclusively or predominantly Tempur Sealy mattresses. Numerous retailers across the country are classified by Tempur Sealy as either "TSI-only," meaning they sell exclusively Tempur Sealy mattresses, or "TSI-dominant," generally meaning at least 75 percent of their mattress sales are Tempur Sealy products. No other mattress supplier has locked down a comparable number of independent retailers.

50.     In numerous contracts, Tempur Sealy forbids third-party retailers from selling and displaying mattresses from competing suppliers over a particular retail price point. Many contracts also expressly prohibit retailers from selling and displaying any mattresses supplied by Tempur Sealy's main competitors—i.e., Serta Simmons, Purple, Casper, and others. For example, ██████ ████████████████████ which operates ████████ stores, including ██████████, is a TSI-dominant retailer that is required to allocate at least ██ percent of its floor slots to Tempur Sealy and is prohibited from displaying any other brands except ████████ in-house brand.

51.     Tempur Sealy's efforts to entrench its dominant position have been enormously successful. The company's share of earnings among its primary competitors grew from 45 percent to 79 percent from 2019 to 2022, according to its internal estimate:



Reflecting the strength of its business, Tempur Sealy's stock price reached an all-time high earlier this year.

**E.     Mattress Firm Is Tempur Sealy's Most Important Battleground Against Competitors**

52.     Tempur Sealy views Mattress Firm as a key battleground in its dual effort to expand its own access to retail floor space and to lock out competitors. Because Mattress Firm's retail footprint dwarfs that of all other mattress specialty retailers and furniture stores, it is a critical retail channel for premium mattress suppliers. Over the past decade, the retailer has played a significant role in boosting sales of both Tempur Sealy and Purple. Recognizing Mattress Firm's importance, Tempur Sealy has sought on several occasions to kick Purple out of Mattress Firm stores and

successfully convinced the retailer to block another disruptor brand—Casper—from entering into its stores.

> **i.** **Mattress Firm's Unmatched Scale and Value Proposition Make It the "Kingmaker" for Premium Mattress Suppliers**

53. Mattress Firm's scale today is the product of rapid consolidation over the past 15 years. In 2010, the company owned approximately 700 brick-and-mortar stores. Since then, it acquired at least 13 other mattress specialty retailers, more than tripling in size. Most notably, after Mattress Firm had already become the nation's largest mattress retailer in 2016, it acquired the third-largest retailer, Sleepy's, adding more than 1,000 stores.

54. Through its aggressive acquisitions, Mattress Firm has become by far the most significant route to market for premium mattress suppliers. With approximately 2,300 stores, it is the only multi-vendor mattress specialty retailer with a national, brick-and-mortar store footprint. According to Tempur Sealy, "an estimated ███ of the U.S. population lives within ██ miles of a Mattress Firm store." Mattress Firm carries as much as ██████████ in inventory across its distribution centers, enabling same-day or next-day delivery to consumers. Reflecting its sweeping scale, Mattress Firm alone accounts for a significant share of all premium mattress retail sales.

55. Multiple premium mattress suppliers derive a substantial share of their overall wholesale revenue from sales through Mattress Firm. Tempur Sealy is among the most reliant on Mattress Firm, with nearly ██ percent of its wholesale mattress revenue coming from Mattress Firm sales. Serta Simmons and Purple likewise depend on Mattress Firm for a significant portion of their wholesale mattress sales. For premium mattress suppliers, no other third-party retailer can provide anywhere near the same volume of mattress sales revenue as Mattress Firm.

56. No other brick-and-mortar retailer possesses the same combination of scale, product assortment, reputation, and sales expertise as Mattress Firm. All other multi-vendor

mattress specialty retailers—such as Mattress Warehouse, Mancini's Sleepworld and Denver Mattress—are local or regional companies with a limited brick-and-mortar geographic presence and, in some cases, inferior delivery capabilities.

57.     Losing Mattress Firm as a customer can be hugely damaging to premium mattress suppliers, as illustrated by Tempur Sealy's breakup with Mattress Firm several years ago. Following a disagreement between Tempur Sealy and Mattress Firm on the allocation of revenue, Mattress Firm chose to stop selling Tempur Sealy mattresses in early 2017. Both companies suffered immensely. Mattress Firm ultimately was driven into bankruptcy. Tempur Sealy, meanwhile, lost over $700 million in annual Mattress Firm sales. Despite its attempts to drive sales through its existing retailers and by opening directly-owned stores, Tempur Sealy ultimately recaptured less than half of the revenue it lost from splitting with Mattress Firm. When Tempur Sealy reunited with Mattress Firm in mid-2019, its fortunes quickly improved: the company's overall U.S. sales revenue grew by more than 50 percent from 2019 to 2021.

58.     Mattress Firm's distinct importance as a distribution channel led Tempur Sealy's CEO to dub Mattress Firm the "kingmaker" of mattress suppliers, a term Mattress Firm executives have since adopted. In a draft presentation for credit ratings agencies, for example, Mattress Firm's CEO described the company as the "kingmaker."

59.     Indeed, Mattress Firm served as the kingmaker to Purple when it became one of Purple's first retail customers in 2017. Following Purple's initial deployment to ▉ Mattress Firm stores, Purple's business grew rapidly and it became a publicly traded company later that year. It is now the fourth-largest U.S. premium mattress supplier by revenue. One Mattress Firm executive remarked in 2021: "Purple is the most prominent 'disruptor brand' in the market. . . . [A]nd who made them such a dynamic disruptor[?] [W]e did. Look at their stock price since they come [sic]

onto our floors. Straight up, just like [Tempur Sealy]. That's the power of our border to border, coast to coast national brand food [sic] print and presence."

60.     Tempur Sealy's CEO repeatedly has acknowledged—and feared—Mattress Firm's ability to "king make" Purple. Upon learning that Mattress Firm would begin selling Purple mattresses in 2017, Tempur Sealy's CEO wrote in an email that "[Mattress Firm] is screwing up BIG on this. They need to kill this ASAP. You let these guys get capital and it is not good for anyone." Fearing Purple's ability to grow further by expanding to more Mattress Firm stores, Tempur Sealy's CEO warned Mattress Firm's CEO in 2021 that "[i]f [Mattress Firm] rolls it out, [P]urple stock goes to 50 [dollars per share], they raise $1B in equity[,] and then there's a real problem for everyone."

61.     Tempur Sealy's CEO also urged Mattress Firm not to floor Casper. A Mattress Firm executive wrote that Tempur Sealy's CEO "knows we can king make Casper, he told me directly to my face 10 months ago and coined the Mattress Firm king maker mantra while urging me… 'you are the king maker and you have a responsibility not to let those bad guys in.'"

### ii.     Tempur Sealy Repeatedly Has Blocked and Attempted to Block Other Mattress Brands from Accessing Mattress Firm's Stores

62.     Worried about Mattress Firm's kingmaking ability, Tempur Sealy has sought to suppress competition by restricting other premium mattress brands from accessing Mattress Firm stores. As one Tempur Sealy employee reflected: "[Tempur Sealy and Mattress Firm] need to productively work together to dominate the bedding industry. . . . I think of what we could have done together against the Disruptors if we hadn't broken up. I remember sitting in a meeting . . . in Houston strategizing on how to shut down Casper, Purple, [Tuft & Needle], etc. before they got any stronger."

63.     Since resuming its relationship with Mattress Firm in 2019, Tempur Sealy has, in fact, endeavored to "shut down" Casper, Purple, and other mattress brands by keeping them out of Mattress Firm stores. These prior efforts offer a preview of how Tempur Sealy would use its control over Mattress Firm to block rivals and harm competition.

64.     Tempur Sealy campaigned to exclude other brands from Mattress Firm as soon as it began negotiations to resume its relationship with the retailer in 2019. During negotiations, Tempur Sealy proposed that Mattress Firm eliminate both Purple and Intellibed—a premium mattress brand subsequently acquired by Purple—from its stores. Mattress Firm rejected both proposals, telling Tempur Sealy that "[w]e do not want to cede control of the floors to the vendors as that is not customer friendly."

65.     Tempur Sealy again sought to displace Purple in 2021. At the time, Mattress Firm wanted Tempur Sealy to invest in upgrading the layout of its retail stores. In response, Tempur Sealy circulated internally a "wish list" of potential asks, with the top item being "[r]emove Purple from the floors." Tempur Sealy's CEO wrote that the company's willingness to provide "store dollars" to Mattress Firm is "[d]ead if Purple is in play." Tempur Sealy and Mattress Firm ultimately did not reach an agreement to remove Purple.

66.     Tempur Sealy's efforts to exclude Casper from Mattress Firm's stores were more successful. In March 2020, when the COVID-19 pandemic hit, Tempur Sealy used the crisis as an opportunity to keep Casper out of Mattress Firm's stores. Like many retailers, Mattress Firm faced an immediate need to conserve cash at the onset of the pandemic and asked to defer payments to its mattress suppliers, including Tempur Sealy. After intense negotiations, the two companies agreed on a "framework" for deferring payments, including "[n]o Casper on floor while Frozen [accounts receivable] is outstanding."

67.     Later in 2020, Mattress Firm agreed to extend the exclusion of Casper in exchange for ███████ in cooperative advertising funds from Tempur Sealy. As part of the negotiations, Tempur Sealy requested an email from Mattress Firm's CEO memorializing the agreement. Mattress Firm's CEO declined, however, reasoning that "[i]t is in neither of our best interest, especially a future owner of [Mattress Firm] to have this documented in the files." Mattress Firm ultimately settled on a "handshake" agreement with Tempur Sealy not to carry Casper mattresses.

68.     Since entering this off-the-books deal, Mattress Firm has tried unsuccessfully to add Casper to Mattress Firm floors. Upon learning that Mattress Firm and Casper were in discussions in 2022, Tempur Sealy sought to enforce the "handshake" agreement by threatening Mattress Firm's business. Tempur Sealy's CEO instructed his executives to "please inform them that if Casper goes on the floor we will be rolling out 500 Sleep Outfitter stores in their market. . . . Our roll out will hurt there [sic] IPO and when their shareholders ask me why we rolled out stores I will tell them Casper issue they did not honor. . . . Someone will be fired."

## THE RELEVANT ANTITRUST MARKET

69.     Courts define relevant product and geographic markets to help determine which lines of commerce and which areas of the country may be harmed by a merger. In this case, the Proposed Acquisition may substantially lessen competition or tend to create a monopoly in the market for premium mattresses in the United States.

### A.     The Relevant Product Market is Premium Mattresses

70.     Premium mattresses comprise a distinct product market in which to evaluate the competitive effects of the Proposed Acquisition. As a category, premium mattresses sit above entry-level mattresses and is largely made up of mattresses other than the most expensive ones. The premium mattress market may include narrower markets that exclude, for example, the most expensive price points.

71.     Premium mattresses have several distinct characteristics, including:

72.     <u>Particular qualities and features:</u> Premium mattresses typically are characterized by superior quality and enhanced features relative to basic, entry-level mattresses. Compared to lower-end mattresses, premium mattresses tend to be manufactured with higher quality materials, feature improvements such as zone coils and zone toning for support, and offer enhancements such as cooling capabilities, adjustability options, and embedded technology. Moreover, premium mattresses are predominantly branded mattresses and, as such, are heavily advertised by both suppliers and retailers, with an emphasis on their enhanced sleep and wellness features. In addition, most premium mattresses are flat-pack mattresses and are not designed to be compressed and sold as a bed-in-a-box.

73.     <u>Distinct customers:</u> Premium mattress purchasers desire a mattress with enhanced quality or other features, may have particular sleep needs, and are willing to invest in a mattress that provides superior comfort, health benefits, and an overall better night's sleep. Premium mattress customers also typically want to touch and feel a mattress before buying one, and many want to compare multiple premium mattresses, leading them to purchase through brick-and-mortar retail stores. Tempur Sealy refers to these customers as "premium shoppers," "premium mattress buyers," and "premium consumers." Premium customers have a range of incomes: according to Tempur Sealy, ████████████████████ who ████████████████████████ ████████ comprise one of the two largest segments of premium mattress purchasers. To reach such purchasers, Tempur Sealy has instructed retailers to ████████████████████ ████████████████████████ pointing out that ████████ of Tempur-Pedic mattresses are purchased with financing.

74. <u>Distinct pricing</u>: Premium mattresses have distinct pricing. Many premium mattresses are subject to MAP and UPP policies, which are intended to keep retail prices high and shield those products from retail price competition. Lower-end mattress prices, on the other hand, typically are set by the retailer and can sometimes be discounted heavily by the retailer to drive sales.

75. <u>Industry Recognition</u>: Industry participants, including the parties themselves, recognize premium mattresses as a distinct market within the broader mattress industry. Many industry participants, including Tempur Sealy, use retail price to define premium mattresses. Tempur Sealy's President of U.S. Sales, for example, stated that Tempur-Pedic "is the dominant industry market share leader in the premium price point (+$2k) segment." One Tempur Sealy internal memorandum stated that "Tempur[-P]edic has always been a high end / premium brand that has dominated the premium segment (above $2K) with 50%+ market share in the US." Another Tempur Sealy memorandum observed that "Tempur[-P]edic has been dominate [sic] in the high-end, over $2,000, bedding market." Tempur Sealy's internal documents also reference "premium competitors," showing that Tempur Sealy views the set of competitors and competitive conditions in the premium mattress market as differentiated from the broader mattress industry. Mattress Firm and numerous other industry participants also use retail price to distinguish between mattress segments.

76. <u>Specialized vendors</u>: Mattress specialty stores, furniture stores, and department stores typically provide customers with the ability to test multiple premium mattress brands and employ knowledgeable salespeople who can guide customers in their search for the right product. While other types of vendors, such as big-box retailers, may sell lower-end mattresses, they do not sell many premium mattresses in their brick-and-mortar locations and they usually do not display

mattresses on their floors. Likewise, online retailers such as Amazon and Wayfair sell predominantly lower-end mattresses.

### B.    The Relevant Geographic Market is the United States

77.    The relevant geographic market in which to assess the competitive effects of the Proposed Acquisition is the United States. Mattress retailers in the United States source premium mattresses from suppliers across the country. Moreover, the competitive conditions for premium mattress manufacturing and sales in the United States are distinct from those in other countries. Tempur Sealy and other premium mattress suppliers have U.S.-specific marketing and business strategies for their mattresses, evaluate and set prices nationally, track U.S. market shares, and view U.S. customers as distinct from other regional or international customer bases.

### TEMPUR SEALY'S PROPOSED ACQUISITION OF MATTRESS FIRM MAY SUBSTANTIALLY LESSEN COMPETITION OR TEND TO CREATE A MONOPOLY

### A.    Tempur Sealy Would Have the Ability and Incentive to Substantially Lessen Competition or Tend to Create a Monopoly

78.    Upon acquiring Mattress Firm, Tempur Sealy would have both the ability and the incentive to suppress competition by limiting rival mattress suppliers' access to Mattress Firm. Indeed, Tempur Sealy's repeated attempts to use Mattress Firm to harm other suppliers demonstrates how the Proposed Acquisition would threaten competition.

79.    Post-acquisition, Tempur Sealy alone would dictate whether Mattress Firm would ever again offer a platform to rivals in the premium mattress market, or whether it would undermine competition by limiting or degrading rivals' access to Mattress Firm. By limiting rivals' access to Mattress Firm—a self-proclaimed "kingmaker" for premium mattress suppliers— Tempur Sealy would weaken or eliminate the competitive pressure that its key rivals pose in the premium mattress market, as well as block competition from future rivals. Faced with less competition, Tempur Sealy could raise prices, reduce quality, and cease innovating. The public

would bear the costs of reduced competition, with higher prices, less choice, lower quality, and abandoned efforts to innovate.

> **i.** **Tempur Sealy's Internal Documents Establish Its Ability and Incentive to Block and Eliminate Competition Post-Merger**

80.     Numerous Tempur Sealy internal documents, including several that concern the Proposed Acquisition, show that the combined firm would have the ability and incentive to limit rivals' access to Mattress Firm and plans to do so.

81.     Multiple executive-level presentations make clear that Tempur Sealy pursued the acquisition of Mattress Firm with the objective of harming competition. As discussed above, Tempur Sealy's CEO wrote that the Proposed Acquisition would enable Tempur Sealy to "[e]liminate [f]uture [c]ompetition" and "[b]lock new [c]ompetition." And a presentation to Tempur Sealy's Board of Directors explained that acquiring Mattress Firm would establish "[m]aximum control over a critical retail channel partner" and would "further build[] a competitive moat."



82.     One way that Tempur Sealy may limit competition post-acquisition is to substantially reduce the number of vendors and mattress products carried by Mattress Firm. In analyzing the Proposed Acquisition, Tempur Sealy's President of U.S. Sales outlined ███████ ████████████████████████████████████████████████ Tempur Sealy's CEO has long expressed the view that Mattress Firm would be better off with fewer mattress brands and products. He advised in an email to a Mattress Firm executive, for instance, that the retailer should pursue ██████████████████████████████████ And in a different email to a Mattress Firm board member, he explained that ███████████████████ Because Tempur Sealy is unlikely to reduce its own presence in Mattress Firm's stores, shrinking the number of mattress brands and products necessarily would come at the expense of other competitors.

83.     Another way that Tempur Sealy may limit competition is by expelling any brand that poses a threat. High-level executives within Tempur Sealy have explicitly discussed eliminating Serta Simmons and Nectar from Mattress Firm post-acquisition, as discussed earlier.

84.     Tempur Sealy could also use a variety of means to steer customers to Tempur Sealy products and away from its rivals. For instance, it could manipulate sales associate commissions to incentivize the sale of Tempur Sealy mattresses. Indeed, Mattress Firm has previously "artificially inflated associate earning on ███████████████████████████ to steer selling behavior toward them." Tempur Sealy could also manipulate Mattress Firm's mattress recommendation technology to artificially boost Tempur Sealy brands over its rivals, just as it has pressured Mattress Firm to do in the past. Indeed, two months before the announcement of the Proposed Acquisition, the parties held a workshop and prepared a joint statement that Mattress Firm would guide customers to Tempur-Pedic products: "Mattress Firm offers unparalleled expertise (& service) to guide guests to the best products (Tempur-Pedic) for their best sleep." And another presentation concerning the Proposed Acquisition states that acquiring Mattress Firm would provide Tempur Sealy with the "ability to create unique Tempur Sealy-focused experiences for consumers."

85.     Tempur Sealy's post-acquisition goals for Mattress Firm—set at the highest levels within Tempur Sealy—reflect the longstanding objective of Tempur Sealy's CEO to use Mattress Firm as a vehicle to block competition. Less than a year after he joined the company, he urged Tempur Sealy to become "closely tied together" with Mattress Firm so that the retailer would sell exclusively Tempur Sealy products and "quit building strong competitors under them."

### ii.     For Premium Mattress Suppliers, Mattress Firm Has Enormous Competitive Significance Due to Its Scale, Footprint, Consumer Reach, and Importance in Developing and Promoting Innovative Products

86.     Mattress Firm's unmatched scale and national brick-and-mortar footprint make it a critical retail channel for premium mattress suppliers. Tempur Sealy, Serta Simmons, and Purple each sell a substantial percentage of their premium mattresses through Mattress Firm. No other

retailer in the country can provide premium mattress suppliers with anywhere near a comparable volume of sales.

87.     Mattress Firm's scale and presence throughout the country, as well as its colossal advertising budget, makes the retailer "top-of-mind for consumers when they begin their mattress purchase journey." As one Mattress Firm executive wrote: "No one has more convenient, easy to find and access[] locations" than Mattress Firm. That same executive testified that "based on 35 years of experience and knowing just about every retailer across this country," "no other retailer is more trusted than Mattress Firm to help consumers find the right bed."

88.     Mattress Firm also plays an important role in product innovation. Using its unparalleled insight into consumer behavior, Mattress Firm has worked closely with ██████ ████████████████████████████████ to help them develop new mattress products and refine existing products to meet consumers' needs. For example, Mattress Firm: (a) collaborated with ████████████████████████████████████; (b) worked with ██████████████████████; and (c) provided ██████████████████████████████████ ██████████████████ One Mattress Firm executive urged the company to work more closely with ██████████ to launch new innovation, explaining "we have the best training, best retail foot print [sic], best field leadership, best marketing, best sales force, and best [customer experience] to launch new innovation."

89.     All of these factors make Mattress Firm by far the most competitively significant mattress retailer in the United States. Mattress Firm can provide premium mattress suppliers with a huge volume of sales revenue, widespread access to consumers, and the best product innovation support offered by any retailer.

90.     Because Mattress Firm's competitive significance is so great, owning it would give Tempur Sealy extraordinary sway over the fate of its rivals. Serta Simmons' former CEO called its business with Mattress Firm a matter of "life or death" for the company. One Mattress Firm director predicted that the Proposed Acquisition "would crumble [Serta Simmons] if they were pushed out." Meanwhile, a Tempur Sealy regional director predicted that Purple may not survive post-acquisition, using an exploding head emoji ("🤯") to describe the impact to Purple. By cutting off or otherwise disadvantaging rival mattress suppliers, Tempur Sealy could turn Mattress Firm from kingmaker to grim reaper.

        **iii.**    **Tempur Sealy Has Blocked Rivals from Many Other Mattress Retailers, and There Are No Comparable Substitutes to Selling Premium Mattresses through Mattress Firm**

91.     Should Tempur Sealy limit other premium mattress suppliers' access to Mattress Firm post-acquisition, those suppliers would likely be unable to replace the sales volume and opportunities that Mattress Firm provides. Mattress Firm sells many more times the number of premium mattresses as any other multi-vendor mattress retailer.

92.     Moreover, Tempur Sealy already has used its existing dominance to block or limit rivals' access to many other major retailers of premium mattress. Through a variety of agreements with those retailers, Tempur Sealy has: (a) secured a substantial number of slots for its own products; (b) converted some retailers to TSI-only or TSI-dominant status; and (c) prohibited some retailers from carrying mattresses supplied by particular competitors, including ███████████ ███████. The following are examples of commitments that Tempur Sealy has secured from retailers that, following Mattress Firm, sell among the largest volumes of premium mattresses:

- ████████████████████████████████████ is a furniture retailer with over 100 stores across the eastern and central United States. It has committed to carrying Tempur Sealy and "no other national brands (including Simmons, Serta, Purple or Casper)."



- ███████████████████████ is a mattress retailer with over 100 stores, including 18 in Texas. Tempur Sealy is guaranteed ██████ slots in each ██████ █████ store depending on its size, and ████████████ is prohibited from carrying ███████████████████.

- ████████████████████████████████████████████████ Tempur Sealy is guaranteed ████████ of the slots in each ██████████████████ store, and those stores are prohibited from carrying █████████████ except ████████ in-house brand.

- ████████████████████████████████████. The retailer recently converted from being TSI-Only to TSI-Dominant (committing ████████ percent of slots to Tempur Sealy), but in so doing, they assured Tempur Sealy that ███████████████████████████ ████████████.

93.     Tempur Sealy imposes such restrictions on mattress retailers by leveraging the power of its leading brands, especially Tempur-Pedic. In training presentations, Tempur Sealy instructs its salespeople to demand more slots from retailers, advising that ██████████████████ ██████████ and a ██████ that █████████████████████████████ to make them carry more Tempur Sealy products. Because few retailers can afford to stop carrying Tempur-Pedic products on their floors, Tempur Sealy would likely be able to maintain (and expand) its restrictive retailer contracts post-acquisition.

94.     The contractual restrictions imposed by Tempur Sealy on other mattress retailers cut off many paths to consumers via the wholesale channel. The absence of any other multi-vendor mattress retailer with anywhere near Mattress Firm's premium mattress unit sales, combined with Tempur Sealy's efforts to lock down many of the remaining retailers, could prove devastating to premium mattress suppliers foreclosed from Mattress Firm. For foreclosed suppliers, replacing Mattress Firm's premium mattress sales volume with sales through other retailers would be all but impossible.

95. Replacing premium mattress sales through Mattress Firm with direct-to-consumer sales also is not feasible. Although several premium mattress suppliers are vertically integrated companies with their own brick-and-mortar stores, growing sales through these stores poses at least two major challenges. First, building a network of retail stores is both costly and time consuming. Each new store may cost several hundred thousand dollars to open, forcing suppliers to grow gradually rather than all at once. Sleep Number, the mattress supplier with the greatest number of its own brick-and-mortar stores, took decades to reach its current size and has added fewer than 200 stores in the past 15 years—less than 10 percent of the footprint of Mattress Firm. Second, operating retail stores profitably can be an enormous challenge, even for suppliers that have done so for many years. Earlier this year, Purple's CEO stated publicly that running its own stores is the "toughest part" of the company's business and added that Purple will slow down new store openings until it can make sure its stores are profitable.

96. No other sales channel provides a substitute for premium mattress sales through Mattress Firm. Big-box and online-only mattress retailers' sales skew heavily toward lower-end products, because few consumers will purchase a premium mattress before trying it in-store.

97. The importance of Mattress Firm is best illustrated by the effects of the Tempur Sealy-Mattress Firm breakup. For a two-year period from 2017 through 2019, Tempur Sealy sold nearly zero mattresses through Mattress Firm. During this period, Tempur Sealy used several different tactics to try and recapture its lost Mattress Firm sales revenue. Tempur Sealy tried to grow its sales through its existing retailers, expand to new retailers, and sell directly to consumers by opening brick-and-mortar stores. Despite these efforts, Tempur Sealy could not recapture the majority of its lost revenue. The company reported to its lenders in 2019 that "[i]n the last 2 years,

[Tempur Sealy] recaptured approximately 34% of lost revenue." Of its lost revenue from mattress sales, Tempur Sealy recaptured just 46 percent, according to its internal analysis.

98.     Premium mattress suppliers cut off from Mattress Firm post-acquisition would likely fare even worse than Tempur Sealy did during its two-year breakup. Tempur Sealy has been able to leverage the strength of its Tempur-Pedic brand to grab many additional slots at retailers. No other premium mattress supplier has the necessary brand power to employ this tactic with the same success. Moreover, many of the retailers through which Tempur Sealy recaptured lost Mattress Firm sales are now blocked by Tempur Sealy's restrictive and exclusionary agreements. For example, ████████████ were a significant source of Tempur Sealy's recaptured sales, yet Tempur Sealy now contractually prohibits ██████████████ stores from carrying any other third-party mattress brands except ██████ in-house brand. Having reconciled with Mattress Firm after just a two-year breakup, Tempur Sealy now puts other suppliers reliant on Mattress Firm in a much more precarious position.

99.     Post-acquisition, Tempur Sealy would have compelling reasons to use its control over Mattress Firm to restrain premium mattress competition. Tempur Sealy's history of attempts to keep other premium mattress competitors out of Mattress Firm speaks volumes about Tempur Sealy's incentives. Tempur Sealy's stated desire to use the Proposed Acquisition to block competition further shows that Tempur Sealy's incentives would remain unchanged post-acquisition.

> iv.     **Mattress Firm's Suppliers Are Among the Most Important Competitors in the Premium Mattress Market, Making Foreclosure Particularly Rewarding for Tempur Sealy**

100.    The premium mattress market is highly concentrated and has only a small number of competitors, none of which has anywhere close to Tempur Sealy's commanding market share. Within this limited field, the most significant premium mattress suppliers competing with Tempur

Sealy for floor space in multi-vendor retailers—Serta Simmons and Purple—depend on Mattress Firm for much of their overall wholesale revenue. As such, Tempur Sealy's control over Mattress Firm would immediately put those two companies at significant risk.

101.    Mattress Firm has been a major battleground for Tempur Sealy's competition with both Serta Simmons and Purple. Tempur Sealy has employed a range of tactics to take share from both competitors in Mattress Firm. In 2022, for example, Tempur Sealy decided to █████ ████████████████ lock up additional Mattress Firm slots ████████████████████ ████████████████████████████████████████████ And after Tempur Sealy's ███████████████████████████████████, Tempur Sealy was forced to compete with Purple. As Purple's expansion continued, Tempur Sealy created a "MFRM Ground Attack" plan intended to thwart Purple at the Mattress Firm stores where Purple's products performed best.

102.    Tempur Sealy's focus on Purple even prompted it to develop a new mattress product containing a gel-like wafer specifically designed to compete with Purple. Tempur Sealy intended for this product, referred to as a "Purple fighter," to be a lower-cost alternative to Purple.

103.    Tempur Sealy's aggressive tactics used in response to Serta Simmons, Purple, and others show that each of these suppliers is competitively significant. By limiting Serta Simmons' and Purple's access to Mattress Firm and by blocking Casper's prospects, Tempur Sealy could obstruct competition from a majority of its main rivals in the premium mattress market. Without the competition created by these premium mattress suppliers, Tempur Sealy would have less incentive to compete on price, quality, and innovation. As a result, millions of Americans would likely face higher prices, lower quality, and fewer choices.

### v. Tempur Sealy Would Reap Significant Financial Benefits by Favoring Its Own Products and Disadvantaging Rivals at Mattress Firm Stores

104.    Post-acquisition, Tempur Sealy would face compelling financial incentives to favor its own products at Mattress Firm over products from other mattress suppliers. Sales of Tempur Sealy products through Mattress Firm would be much more profitable to the combined firm, because Tempur Sealy would realize both the wholesale margin and the retail margin on those sales. By contrast, if Mattress Firm continues to sell products from rival suppliers, Tempur Sealy will only earn the retail margin from those sales, while its competitors will earn the wholesale margin. This economic reality likely would lead the combined firm to shift Mattress Firm's sales to Tempur Sealy products at the expense of other suppliers.

105.    Multiple independent investment banks that analyzed the Proposed Acquisition likewise concluded that Tempur Sealy would generate greater profits by favoring its own products in Mattress Firm's stores. Jefferies Financial Group ("Jefferies") advised its clients that acquiring Mattress Firm would give Tempur Sealy "an opportunity to serve its largest competitor a 'gut shot' by siphoning off distribution of Serta Simmons product in the largest US mattress retailer." Jefferies projected that "as brand mix shifts to [Tempur Sealy]" the combined firm would generate more than ███████ in incremental revenue. And KeyBanc projected that Tempur Sealy's share of Mattress Firm's sales revenue would surge to ██ percent, generating ███████ in additional revenue for the combined firm.

106.    Tempur Sealy made similar statements to investors. In a meeting with Fidelity Investments, for example, Tempur Sealy stated that increasing its share of Mattress Firm's sales by just ██ percent could yield █████████ in "additional profit," according to Tempur Sealy's internal notes from the meeting.

      vi.      **Tempur Sealy's Approach to Retailer Acquisitions Further Shows Its Incentive and Ability to Disfavor Other Premium Mattress Suppliers**

107.    This is not the first time that Tempur Sealy has sought to acquire mattress retailers to harm competition. In evaluating potential acquisitions of mattress retailers, Tempur Sealy typically analyzes the potential to grow sales of its own products ███████████████. Indeed, as part of its "Retail Acquisition Framework," Tempur Sealy's strategy is to "increase[] its share on the retailer's floor" following an acquisition.

108.    Consistent with this framework, in evaluating a potential acquisition of a California-based retailer, Tempur Sealy's CEO wrote that "[i]f we owned them, I assume we would kick SSB [Serta Simmons] off and pick up, say, $12 million in sales." "Would be easy to use to drive manufacturing profits by kicking SSB [Serta Simmons] out," he wrote in an email the following day. In another email regarding potential retail acquisition targets, Tempur Sealy's CEO instructed his executives to "[g]o after shops with strong SSB [Serta Simmons] BOS [balance of share]." And in a text message to other Tempur Sealy executives, Tempur Sealy's CEO suggested "let's buy someone in a market where we are underserved. Kick SSB [Serta Simmons] out."

| SR | Steve Rusing | 3/5/2021, 11:32 AM |
|----|-----------------|--------------------|
|    | Received signed contract from Value City this morning—$20m hit to SSB | |

| ST | Scott Thompson | 1:21 PM |
|----|-----------------|---------|
|    | So who is next? | |
| SR | Steve Rusing | 1:35 PM |
|    | Not anybody of significance | |
| ST | Scott Thompson | 1:37 PM |
|    | Understand......let's buy someone in a market where we are underserved. Kick SSB out. | |
| SR | Steve Rusing | 1:39 PM |
|    | Have the list of candidates from my team. Let's discuss next week. | |

109.    Tempur Sealy's approach to operating its Sleep Outfitters business is also consistent with its preference to disfavor rival mattress suppliers. Sleep Outfitters is a U.S. mattress

retailer with more than one hundred stores, primarily in Alabama, Kentucky, and Ohio, which Tempur Sealy acquired in bankruptcy in 2019. According to a 2022 board of directors presentation, Tempur Sealy's strategic rationale for acquiring Sleep Outfitters was in part to "protect[] market share in [the] southeastern US." Although Sleep Outfitters sold some non-Tempur Sealy mattresses before the acquisition, Tempur Sealy has operated the company as a TSI-only retailer and has never added a non-Tempur Sealy mattress brand to Sleep Outfitters' floors.

B.   **The *Brown Shoe* Factors Indicate the Proposed Acquisition May Substantially Lessen Competition in the Market for Premium Mattresses**

110.   The factors for analyzing vertical acquisitions articulated by the Supreme Court in *Brown Shoe Co. v. United States*, 370 U.S. 294 (1962), also establish that the Proposed Acquisition may substantially lessen competition. These factors include: (1) the nature and economic purpose of the Proposed Acquisition; (2) the combined firm's market power in the industry; (3) the likelihood and degree of potential foreclosure; (4) a trend towards industry consolidation; and (5) increased barriers to entry.

111.   The nature and economic purpose of the Proposed Acquisition is to "[e]liminate [f]uture [c]ompetition" and "[b]lock new [c]ompetition," in the words of Tempur Sealy's CEO. Several transaction-related documents back up the CEO's statement. Acquiring Mattress Firm would give Tempur Sealy "[m]aximum control over a critical retail channel partner" and would "further build[] a competitive moat." Tempur Sealy may slash mattress SKUs by a third or more and serve "fewer vendors," damaging competition and consumer choice. And the transaction would enable Tempur Sealy to "push [Serta Simmons] completely out the door at [Mattress] Firm." When analyzing the Proposed Acquisition, many investors home in on the potential for Tempur Sealy to benefit by displacing its competitors in Mattress Firm, rather than the various deal rationales claimed publicly by Tempur Sealy.

112.     Post-acquisition, the combined firm's market power would be substantial. Tempur Sealy would be both the country's largest mattress supplier and its largest mattress retailer, and it would tower over the next-largest companies in terms of scale, revenue, and profitability. The combined firm would also be able to leverage its strengths to undermine competition. At the wholesale level, Tempur Sealy would continue to supply half or more of premium mattress sales, and it would continue to leverage the Tempur-Pedic brand to hold share at other retailers and keep its top competitors out. At the retail level, Tempur Sealy would control by far the largest distribution channel, and it would have multiple tools at its disposal to harm other mattress suppliers.

113.     The likelihood and degree of potential foreclosure is significant, as shown by Tempur Sealy's internal documents, its past attempts to exclude other suppliers from Mattress Firm, and the projections of third-party investors. Because ■ percent of U.S. consumers visit Mattress Firm during the course of their purchase journey, according to both parties' internal estimates, a supplier denied access to Mattress Firm could lose enormous exposure to end consumers. The likelihood and degree of foreclosure is further exacerbated by Tempur Sealy's restrictive and exclusionary contracts with retailers, which deny suppliers access to many small and midsize retailers that they would otherwise rely on to reach consumers.

114.     The Proposed Acquisition would exacerbate a trend toward consolidation in the mattress industry. Tempur Sealy became the largest mattress supplier through the 2013 merger of Tempur-Pedic and Sealy, while Serta Simmons became the second-largest supplier through the 2008 merger of Serta and Simmons. Around the same period, Mattress Firm more than tripled in size through at least 18 acquisitions of other retailers. Following the consolidation across the supplier and retail levels in the mattress industry, some companies are now turning to vertical

integration. Tempur Sealy acquired Sleep Outfitters in 2019, gaining control over a hundred retail stores and choosing to exclude rival mattress suppliers from the stores rather than lowering costs by including them. More recently, Ashley acquired Resident Home, the supplier of Nectar brand mattresses.

115.     The Proposed Acquisition would raise the already high entry barriers in the premium mattress market by preventing other premium mattress suppliers from growing through Mattress Firm. One Tempur Sealy investor advised Tempur Sealy's CEO to acquire Mattress Firm for that exact reason: he explained to the CEO in an email that "[w]e also think that removing Mattress Firm's retail distribution from the grasp of others would dramatically raise the barriers to entry in the industry and make it nearly impossible for rival brands to achieve scale." As both Tempur Sealy and Mattress Firm recognize, Mattress Firm's decision to carry Purple mattresses in 2017 was instrumental to Purple's growth. Post-acquisition, the combined firm would have no incentive to "king make" any future mattress suppliers. The cost and burden of negotiating and managing supply agreements with hundreds of small retailers across the country is far higher than managing a single agreement with Mattress Firm, which would significantly impede the ability of other premium mattress suppliers to achieve meaningful scale.

## ABSENCE OF COUNTERVAILING FACTORS

### A.     Any Entry or Expansion Will Not Be Timely, Likely, or Sufficient

116.     Barriers to entry are high for premium mattress suppliers as well as large-scale brick-and-mortar mattress retailers. Respondents cannot demonstrate that new entry or expansion by existing firms would be timely, likely, or sufficient to offset the anticompetitive effects of the Proposed Acquisition.

117.     Premium mattress suppliers face several barriers to entry and expansion, including: (a) creating and maintaining a strong mattress brand; (b) establishing manufacturing capabilities;

and (c) gaining distribution through third-party brick-and-mortar retailers, many of which are locked up by Tempur Sealy's restrictive and exclusionary contracts.

118.     The Proposed Acquisition would further raise the already high barriers to entry for premium mattress suppliers by blocking access to the most competitively significant mattress retailer in the United States, Mattress Firm.

119.     The barriers for a mattress retailer or a mattress supplier to establish a sizeable brick-and-mortar retail store network are also high. Each retail store costs several hundred thousand dollars to open, according to Tempur Sealy's estimate. It would take several years at a minimum for a mattress supplier to build its own retail network that comes anywhere close to Mattress Firm's scale.

120.     Several mattress suppliers, such as Purple, have stated that opening their own brick-and-mortar stores is costly and burdensome. Some suppliers do not possess the necessary expertise. Sleep Number spent a substantial amount of money building its brick-and-mortar store network over many years, and most of its growth occurred when Mattress Firm was a much smaller retailer.

**B.     Respondents' Alleged Efficiencies Are Insufficient and Do Not Outweigh the Competitive Harm**

121.     Respondents cannot demonstrate verifiable and merger-specific efficiencies sufficient to rebut the strong evidence that the Proposed Acquisition may substantially lessen competition or tend to create a monopoly in the relevant market. Specifically, Respondents will be unable to show that any purported efficiencies (i) produce substantial competitive benefits that could not be achieved without the merger under review, (ii) are verifiable using reliable methodology and evidence, (iii) would, in a short time, create benefits that would prevent the risk of a substantial lessening of competition in the relevant market, and (iv) do not result from the anticompetitive worsening of terms for the merged firm's trading partners.

122.     In fact, regardless of the degree of foreclosure caused by the Proposed Acquisition, the combined firm may be incentivized to raise prices of Tempur Sealy products because through vertical integration it will earn a retail margin even if the customer purchases a non-Tempur Sealy product instead. The combined firm's incentive to raise prices will offset any efficiencies, such as the elimination of double marginalization, that may be shown by Respondents.

C.     **No Commitments or Agreements Made by Tempur Sealy Will Offset the Competitive Harm**

123.     Recognizing the Proposed Acquisition's potential to damage competition, Respondents have proposed a hodgepodge of potential "fixes," including divesting around three percent of Mattress Firm's stores and holding a small percentage of Mattress Firm slots open for other mattress suppliers. But neither of those proposals, whether considered individually or in aggregate, are sufficient to mitigate the Proposed Acquisition's harm to competition.

124.     Tempur Sealy has also negotiated several post-closing supply agreements with mattress suppliers that would take effect upon the closing of the Proposed Acquisition. But the supply agreements do not require the combined firm to continue to display and sell mattresses from those suppliers and do not prevent Tempur Sealy from limiting those suppliers' access to Mattress Firm. Accordingly, the post-closing supply agreements do not alleviate the Proposed Acquisition's harm to competition.

## LIKELIHOOD OF SUCCESS ON THE MERITS, BALANCE OF EQUITIES, AND NEED FOR RELIEF

125.     Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), authorizes the Commission, whenever it has reason to believe that a proposed acquisition is unlawful, to seek preliminary injunctive relief to prevent consummation of the acquisition until the Commission has had an opportunity to adjudicate the acquisition's legality in an administrative proceeding. In deciding whether the requested relief is in the public interest, the Court must balance the likelihood of the

Commission's ultimate success on the merits with the weight of the equities. The principal public equity weighing in favor of issuance of preliminary injunctive relief under Section 13(b) is the public's interest in effective enforcement of the antitrust laws. To the extent private equities affecting only Defendants' interests are even relevant at this stage, they should be afforded little weight and cannot tip the scale against a preliminary injunction.

126.    The FTC is likely to succeed in proving that the effect of the Proposed Acquisition may be substantially to lessen competition or tend to create a monopoly in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18, or Section 5 of the FTC Act, 15 U.S.C § 45, and that the Proposed Acquisition constitutes an unfair method of competition in violation of Section 5 of the FTC Act.

127.    The equities weigh strongly in favor of preliminary injunctive relief. Should the Commission rule, after the full administrative trial, that the Proposed Acquisition is unlawful, reestablishing the status quo would be difficult, if not impossible, if the Proposed Acquisition has already occurred in the absence of preliminary relief. Allowing the Proposed Acquisition to close before the completion of the administrative proceeding would enable the combined firm to, among other things, begin altering Mattress Firm's operations and business plans, accessing Mattress Firm's sensitive business information and entering into, amending, or canceling contractual relationships on behalf of Mattress Firm. Moreover, in the absence of relief from this Court, substantial harm to competition would likely occur immediately, even if it were feasible to obtain an effective divestiture remedy following the administrative proceeding.

128.    The Proposed Acquisition does not implicate any other equities sufficient to overcome the public's strong interest in effective enforcement of the antitrust laws.

129.     Accordingly, the equitable relief requested here is in the public interest.

WHEREFORE, Plaintiff FTC respectfully requests that the Court:

   a.   Enter the parties' stipulated temporary restraining order;

   b.   Preliminarily enjoin Defendants from taking any further steps to consummate
        the Proposed Acquisition, or any other acquisition of stock, assets, or other
        interests of one another, either directly or indirectly;

   c.   Retain jurisdiction and maintain the status quo until the administrative
        proceeding initiated by the Commission is concluded; and

   d.   Award such other and further relief as the Court may determine is appropriate,
        just, and proper.

Dated: July 2, 2024                              Respectfully submitted,


Of counsel:                                      */s/ Allyson M. Maltas*
                                                 ALLYSON M. MALTAS
HENRY LIU                                        Attorney-in-Charge
Director                                         DC Bar No. 494566 *(Pro Hac Vice)*
Bureau of Competition                            Federal Trade Commission
                                                 Bureau of Competition
RAHUL RAO                                        600 Pennsylvania Avenue, NW
Deputy Director                                  Washington, DC 20580
Bureau of Competition                            Tel.: (202) 326-3646
                                                 Email: amaltas@ftc.gov
SHAOUL SUSSMAN
Associate Director for Litigation                *Counsel for Plaintiff Federal Trade Commission*
Bureau of Competition

ANISHA DASGUPTA
General Counsel
Federal Trade Commission

STEPHEN RODGER
Deputy Assistant Director
Bureau of Competition

ARTHUR DURST
XUAN (ELLEN) GONG
CLIFFORD SUN HWANG
MATTHEW E. JOSEPH
LAURA KRACHMAN
NOEL MILLER
RICHARD MOSIER
JEANETTE PASCALE
ADAM PERGAMENT
AMY RITCHIE
STEPHEN RODGER
WILLIAM SOHN
ETHAN D. STEVENSON
JEANANN TABBAA
MAGGIE YELLEN


Attorneys
Federal Trade Commission

## CERTIFICATE OF SERVICE

I hereby certify that on July 2, 2024, I electronically filed a true and correct copy of the foregoing document using the CM/ECF system of the United States District Court for the Southern District of Texas.

I further certify that I served the foregoing document on the following counsel via electronic mail:

D. Bruce Hoffman
Cleary Gottlieb Steen & Hamilton LLP
2112 Pennsylvania Avenue NW
Washington, DC 20037
Telephone: (202) 974-1500
Email: bhoffman@cgsh.com

*Counsel for Defendant Tempur Sealy International, Inc.*

Sara Y. Razi
Simpson Thacher & Bartlett LLP
900 G Street NW
Washington, DC 20001
Telephone: (202) 636-5582
Email: sara.razi@stblaw.com

*Counsel for Defendant Mattress Firm Group, Inc.*

/s/ Allyson M. Maltas
Allyson M. Maltas
Attorney-in-Charge