# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| Federal Trade Commission, | Civil Action No. 4:24-cv-02508 |
| Plaintiff, | |
| | |
| vs. | Judge Charles Eskridge |
| | |
| Tempur Sealy International, Inc., *et al.*, | |
| Defendants. | |

# Defendants' Corrected Response to Plaintiff's Motion for Preliminary Injunction

# Table of Contents

Introduction ................................................................................................. 1

Background ................................................................................................. 7

Argument ................................................................................................. 10

   I.   Even accepting the FTC's theory, the merger will not harm competition. ................................................................................ 13

     A.   The FTC's contrived market should be rejected. ........................... 13

     B.   Mattress Firm is not critical to "premium" mattress competition. ................................................................................ 16

     C.   The FTC makes no serious attempt to show consumer harm. ....... 26

     D.   The maximum potential foreclosure is far below enforcement thresholds. ................................................................................. 27

   II.   The FTC has not shown that the merged firm will foreclose rivals. ........................................................................................ 28

     A.   Mattress Firm will continue to be a multi-brand retailer. ............. 28

     B.   Tempur Sealy's prior acquisitions corroborate its plan for Mattress Firm. ........................................................................... 34

     C.   Tempur Sealy has no reason to upend Mattress Firm's multi-brand model. .................................................................... 36

     D.   The FTC's snippets cannot counter objective evidence. ................ 39

     E.   Tempur Sealy's commitments make the FTC's theory even more implausible. ....................................................................... 42

     F.   The FTC's passing reliance on *Brown Shoe* is misplaced. ............. 44

   III.   Economic analysis shows that the transaction will benefit competition. ............................................................................... 46

   IV.   The public interest and the equities disfavor the requested injunction. ............................................................................... 48

Conclusion ............................................................................................... 49

## Table of Authorities

**Page(s)**

<u>**Cases**</u>

*Alberta Gas Chems. Ltd. v. E.I. Du Pont de Nemours & Co.*,
826 F.2d 1235 (3d Cir. 1987) ................................................... *passim*

*Apani Sw., Inc. v. Coca-Cola Enters., Inc.*,
300 F.3d 620 (5th Cir. 2002) ................................................... 28

*Brown Shoe Co. v. United States*,
370 U.S. 294 (1962) ................................................... 27, 28

*Brunswick Corp. v. Pueblo Bowl-O-Mat*,
429 U.S. 477 (1977) ................................................... 13

*Comcast Cable Commc'ns, LLC v. FCC*,
717 F.3d 982 (D.C. Cir. 2013) ................................................... 12

*Crouse-Hinds Co. v. InterNorth, Inc.*,
518 F. Supp. 416 (N.D.N.Y. 1980) ................................................... 27, 45

*Dillon Materials Handling, Inc. v. Albion Indus.*,
567 F.2d 1299 (5th Cir. 1978) ................................................... 25–26

*Fruehauf Corp. v. FTC*,
603 F.2d 345 (2d Cir. 1979) ................................................... *passim*

*FTC v. Cmty. Health Sys.*,
No. 5:24-cv-00028, 2024 WL 2854690 (W.D.N.C. June 5, 2024) ................... 11

*FTC v. Meta Platforms Inc.*,
654 F. Supp. 3d 892 (N.D. Cal. 2023) ................................................... 11

*FTC v. Microsoft Corp.*,
681 F. Supp. 3d 1069 (N.D. Cal. 2023) ................................................... 10–11, 28, 39

**Page(s)**

*FTC v. RAG-Stiftung,*
436 F. Supp. 3d 278 (D.D.C. 2020).............................................. 11, 43

*FTC v. Thomas Jefferson Univ.,*
505 F. Supp. 3d 522 (E.D. Pa. 2020) ................................................. 11

*FTC v. Weyerhaeuser Co.,*
665 F.2d 1072 (D.C. Cir. 1981)........................................................ 49

*Hester v. French,*
985 F.3d 165 (2d Cir. 2021) .............................................................. 10

*Illumina, Inc. v. FTC,*
88 F.4th 1036 (5th Cir. 2023) ................................................. *passim*

*It's My Party, Inc. v. Live Nation, Inc.,*
811 F.3d 676 (4th Cir. 2016)..................................................... 13–14

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.,*
551 U.S. 877 (2007) ................................................................. 41, 44

*Murrow Furniture Galleries, Inc. v. Thomasville Furniture Indus.,*
889 F.2d 524 (4th Cir. 1989)............................................................. 14

*Omega Env't, Inc. v. Gilbarco, Inc.,*
127 F.3d 1157 (9th Cir. 1997).................................................... 4, 24

*Roy B. Taylor Sales, Inc. v. Hollymatic Corp.,*
28 F.3d 1379 (5th Cir. 1994)............................................................... 4

*Starbucks Corp. v. McKinney,*
144 S. Ct. 1570 (2024)...................................................................... 10

*United States v. Abbott,*
110 F.4th 700 (5th Cir. 2024) ........................................................ 11

*United States v. Anthem, Inc.,*
855 F.3d 345 (D.C. Cir. 2017)......................................................... 45

**Page(s)**

*United States v. AT&T,*
310 F. Supp. 3d 161 (D.D.C. 2018)............................................................ *passim*

*United States v. Booz Allen Hamilton, Inc.,*
No. 22-cv-1603, 2022 WL 9976035 (D. Md. Oct. 17, 2022) ...................... 12, 38

*United States v. UnitedHealth Grp. Inc.,*
630 F. Supp. 3d 118 (D.D.C. 2022)....................................................... 37–38, 42

## Rules and Statutes

15 U.S.C. § 14.................................................................................................... 27–28

15 U.S.C. § 53(b) ........................................................................................... 10, 11

## Other Authorities

4A Phillip Areeda & Herbert Hovenkamp, *Antitrust Law*
(5th ed. 2020)..................................................................................................... 27–28

11 Phillip Areeda & Herbert Hovenkamp, *Antitrust Law* (5th ed. 2020)....... 28

ABA Section of Antitrust Law, *Antitrust Law Developments*
1 § D(2)(b) (9th ed. 2022) .................................................................................. 28

Concurring Op. Comm'r Wilson, *In re Illumina, Inc,* No. 9401 (FTC),
https://www.ftc.gov/system/files/ftc_gov/pdf/d09401wilsonconcurring
opinion.pdf ...................................................................................................... 44–45

Howard Ruben, *Ashley Home acquires Nectar mattress owner Resident
Home*, Retail Dive (Mar. 7, 2024), https://www.retaildive.com/news/
ashley-home-acquires-resident-nectar-dreamcloud/709587/........................... 22

Kristi Waterworth, *What Is a Competitive Moat?*, The Motley Fool
(Jun. 17, 2024), https://www.fool.com/terms/c/competitive-moat/.................. 40

Purple Investor Presentation (July 27, 2017), https://www.sec.gov/
Archives/edgar/data/1643953/000121390017007952/f8k 072717ex99-
1_globalpartnr.htm................................................................................... 22–23

**Page(s)**

Tempur Sealy International, Inc., 2023 Annual Report (Form 10-K)
(Feb. 16, 2024), https://investor.tempursealy.com/static-files/cc1ef308-
3901-4bc7-8a2a-13a94b83bfab ........................................................................ 8

## Introduction

Vertical mergers are nearly always procompetitive. Tempur Sealy's vertical merger with Mattress Firm is no different. The objective evidence and economic analysis show that this merger will make Tempur Sealy a more efficient competitor, its rivals will respond by competing harder, and—most importantly—consumers will benefit. Nonetheless, the FTC asks this Court to block this merger based on a disfavored downstream-foreclosure theory that has not worked for the government in over 60 years.

The FTC does not claim any loss of horizontal competition—the primary concern of antitrust merger law. Nor does it claim that the merger will have any impact on the vast majority of mattress manufacturers, retailers, or sales. Instead, the FTC asserts that the merger will affect a triply narrow slice of the mattress industry: only "premium" mattress sales, only at Mattress Firm, and for only the few non-Tempur Sealy suppliers who sell there (really, Serta Simmons and Purple). This sliver of a sliver of a sliver of a case boils down to at the absolute most *de minimis* foreclosure even in the FTC's gerrymandered "premium" market. The FTC cannot show this miniscule foreclosure will harm competition. And, there won't be any foreclosure, because that would make no sense and is inconsistent with Tempur Sealy's actual post-merger plans. Instead, the merger will increase competition.

1

_First_, antitrust law only bars mergers that are likely to "substantially" lessen competition. _Illumina, Inc. v. FTC_, 88 F.4th 1036, 1051 (5th Cir. 2023). But as the FTC concedes, many "premium" mattress manufacturers do not even use Mattress Firm, including Sleep Number (the ████████ largest), Saatva, Avocado, Casper, and others. In fact, removing every competitor's "premium" mattresses from Mattress Firm would only foreclose ███ of retail distribution for the FTC's "premium" market as depicted below (and even less when Tempur Sealy's remedies are considered). That is too small to present a competitive concern. _See Alberta Gas Chems. Ltd. v. E.I. Du Pont de Nemours & Co._, 826 F.2d 1235, 1245 (3d Cir. 1987).

**Maximum Foreclosure Possible[1]**



By contrast, in *Illumina*—the Fifth Circuit's recent opinion addressing a foreclosure theory—the merged firm had 100% market share of a gene-sequencing technology that was essential for rivals to produce a downstream clinical-testing product. 88 F.4th at 1051. So "even if other customers did learn about Illumina's foreclosing behavior and therefore wanted to take their business elsewhere, they would have nowhere else to turn." *Id.* at 1053. Other courts addressing both vertical mergers and identical issues under Section 3 of

---

[1] Calculated on a volume basis. "TSI brands" refers to sales of Tempur Sealy products at Mattress Firm, which are excluded from any possible foreclosure. *See Alberta,* 826 F.2d at 1245 (market share of the acquiring company's supply to the acquired firm is not part of the foreclosure). "MFRM private label brands" refers to sales of Mattress Firm's own "premium" private label beds and are likewise excluded.

the Clayton Act—which is worded almost identically to Section 7 under which the FTC proceeds—have repeatedly rejected foreclosure claims with similar— and considerably higher—alleged foreclosure. *E.g.*, *Omega Env't, Inc. v. Gilbarco, Inc.*, 127 F.3d 1157, 1162–63 (9th Cir. 1997).

<u>Second</u>, "the principal objective of antitrust policy is to maximize consumer welfare," *United States v. AT&T*, 310 F. Supp. 3d 161, 193 (D.D.C. 2018), "not [to protect] competitors," *Roy B. Taylor Sales, Inc. v. Hollymatic Corp.*, 28 F.3d 1379, 1382 (5th Cir. 1994). Yet the FTC does not get around to addressing consumers until page 40 of its 48-page preliminary-injunction motion, and even there it just waves its hand at the issue with a single paragraph reciting its expert (Dr. Das Varma), Dkt. 142 at 40–41, whose predications are unfounded and contradict the FTC's theory (he finds that rivals *benefit* from losing access to Mattress Firm).

Fundamentally, the FTC is trying to protect Serta Simmons and Purple, not consumers or competition. *See* Dkt. 142 at 41 (defining "[f]ull [f]oreclosure" as "SSB & Purple"). But antitrust law does not let federal agencies redistribute competitive advantages between rivals. In any event, these competitors will be just fine. Even just focusing on what the FTC calls "premium" mattresses, Serta Simmons sells only about ▮▮▮▮ of its premium mattresses, which are only ▮▮▮ of its overall sales, through Mattress Firm. Purple sells only ▮▮▮ of its premium mattresses through Mattress Firm (▮▮▮▮▮▮▮▮▮▮

4

█)—comprising only █ of its overall sales. Dr. Israel Rep. 27. It is thus not surprising that, *after* the merger was announced, Serta Simmons's CFO told a bankruptcy court under oath that it projected that its net sales would grow by 30% between 2023–2027, ██████████ █. FTC-SSB-00001737.

*Third*, although ignored by the FTC, overwhelming documents and testimony show that Tempur Sealy plans to run Mattress Firm as a multi-brand retailer, modeled the transaction that way, and made that plan clear to Mattress Firm's Board and employees, Tempur Sealy's investment banker (JP Morgan), its Board of Directors, its lenders, and the entire investor community.

Indeed, Tempur Sealy has no reason to do otherwise. Mattress Firm's success is founded on its multi-brand strategy. Post-merger, roughly half of the merged entity's revenue would be from Mattress Firm's retail sales. Tempur Sealy would not jeopardize half of its post-merger revenue on an unplanned, long-shot foreclosure scheme. This contrasts sharply with *Illumina*, where the merged firm would have made *eight times* as much money from clinical testing as it would from gene sequencing and thus would be willing to withhold its monopoly gene-sequencing technology from clinical-testing rivals. 88 F.4th at 1053.

The FTC makes much of the fact that today, as a manufacturer, Tempur Sealy competes aggressively to displace its rivals at retailers. Of course it does. But, under *Illumina*, the Court should focus not on how Tempur Sealy behaved

pre-merger, when it made its money not as a major retailer, but at rival manufacturers' expense. Rather, the focus should be on what Tempur Sealy will do when half of its sales come from being a retailer whose success comes from being multi-brand. The answer is that Tempur Sealy will do what it did with its similar acquisitions of multi-brand retailers Dreams and SOVA— continue the successful multi-brand strategy (and make money by selling rivals' mattresses).

Moreover, Tempur Sealy has committed to divest nearly 200 stores to accelerate the already-rapid growth of Mattress Warehouse, and to preserve at minimum ███ of Mattress Firm's slots for third-party mattresses priced at ████████████████████████████████████████████████████ ███████████████████████████. It also has entered post-closing supply agreements with several suppliers, guaranteeing access to the Mattress Firm floor. If Tempur Sealy had some plan to harm competition by kicking rivals off Mattress Firm's floor, those commitments would thwart that plan.

Instead of confronting these facts, the FTC falls back on soundbites— several of which the FTC manipulates. For example, the FTC includes a screenshot of a slide but crops out the part contradicting the FTC's argument, and cites *its own attorney's* deposition question as if it were evidence while omitting the witness' contrary answer. *See infra* at 32–33, 38–39. Manipulated or not, the FTC's snippets cannot meet its burden to overcome the

overwhelming evidence that Tempur Sealy's plan is to run Mattress Firm as a multi-brand retailer. *See AT&T*, 310 F. Supp. 3d at 208 (rejecting similar attempt by government to use "snippets" from defendants' documents in a "trial by slide deck").

*Fourth*, economics confirms this merger is procompetitive. Consistent with standard vertical merger analysis, Dr. Israel's report shows the merger: (1) reduces the merged firm's costs and makes it a more effective competitor, (2) does not create an incentive to foreclose rivals, (3) induces rivals to become more efficient, and (4) benefits consumers. Dr. Das Varma's contrary model not only contradicts the FTC's own arguments but is unmoored from the facts of the industry.

The Court should deny the FTC's requested preliminary injunction.

## Background

*The parties and industry*

Mattresses, including "premium" mattresses, are sold through tens of thousands of retail stores across the United States, including mattress-specialty stores, furniture stores, department stores, and big-box retailers. *See* Compl. ¶ 76. Many suppliers also sell directly to consumers, including two of the three leading "premium" suppliers: Tempur Sealy and Sleep Number. Online mattress sales are rapidly growing, with one brick-and-mortar retailer calling them an "existential threat" and estimating that Amazon sells over 30%

7

of all mattresses in the US. ████ Dep. 26:22–25, 27:21–22. Tempur Sealy tries to be "wherever the consumer wants to shop," selling through its own stores and website, third-party websites, and in retailers of every kind. Tempur Sealy International, Inc., 2023 Annual Report at 6 (Form 10-K) (Feb. 16, 2024).[2] Mattress Firm competes in the crowded retail space largely by its multi-brand strategy. Dament Dep. 60:6–8.

_The proposed transaction_

In May 2023, Tempur Sealy agreed to purchase Mattress Firm for approximately $4 billion. That valuation—and the resulting Board of Directors' approval—was based on the assumption that Mattress Firm would continue to be a multi-brand retailer. Tempur Sealy has consistently communicated this to Mattress Firm, investors, lenders, and internally. For example, this investor presentation announcing the transaction touts Mattress Firm's multi-brand floor:

---

[2] https://investor.tempursealy.com/static-files/cc1ef308-3901-4bc7-8a2a-13a94b83bfab.

8

**Tempur Sealy Investor Presentation[3]**



The merger will bring Tempur Sealy closer to its customers, enhance innovation, eliminate double marginalization, and yield other procompetitive benefits, including saving ~$100 million over the next few years. Rao Dep. 20:13–14.

---

[3] TEMPUR-LIT-00301085 at -1091.

9

## Argument

"A preliminary injunction is an extraordinary equitable remedy that is never awarded as of right." *Starbucks Corp. v. McKinney*, 144 S. Ct. 1570, 1576 (2024). This is especially true here, where the requested relief is "preliminary" in name only. *See Hester v. French*, 985 F.3d 165, 176 n. 39 (2d Cir. 2021) (applying a "higher standard"). As the FTC recently conceded, a federal court preliminary injunction "almost always obviates the need for further administrative proceedings." FTC's Response to Mot. to Continue, Tempur Sealy Int'l, Inc., FTC Docket No. 9433.

To obtain an injunction, the FTC must make a "clear showing" that (1) it is likely to succeed on the merits and (2) the public interest and equities favor an injunction. *See Starbucks*, 144 S. Ct. at 1575; 15 U.S.C. § 53(b) (removing irreparable-injury requirement for the FTC).

The FTC asks for a lighter burden because, it says, this Court merely plays an adjunct role to the administrative proceedings. *See* Dkt. 142 at 9–10. Not so. The FTC's administrative proceedings are unconstitutional, as Defendants will address in more detail in the pending action raising that issue. *See* Compl., *Tempur Sealy Int'l, Inc. v. FTC*, No. 4:24-cv-03764 (S.D. Tex. Oct. 4, 2024). Moreover, the FTC's administrative proceedings do not turn courts into rubber stamps; instead, courts conduct "a rigorous analysis," *FTC v. Microsoft Corp.*, 681 F. Supp. 3d 1069, 1084 (N.D. Cal. 2023), and often deny

10

the FTC's requests.[4] Further, the text of Section 13(b) (15 U.S.C. § 53(b)) confirms that the FTC must establish a likelihood of success on the merits; the provision that a court "may" grant a preliminary injunction incorporates traditional equitable rules for injunctions. *See United States v. Abbott*, 110 F.4th 700, 719–20 (5th Cir. 2024) (*en banc*).

To establish a likelihood of success, the FTC must show "that the proposed merger is likely to substantially lessen competition." *Illumina*, 88 F.4th at 1051. It is not enough to show *possible* harm; the FTC must establish that harm is *likely*. *AT&T*, 310 F. Supp. 3d at 189; *see Fruehauf Corp. v. FTC*, 603 F.2d 345, 352 (2d Cir. 1979). And it is not enough to show *any* harm; it must be *substantial*. *Illumina*, 88 F.4th at 1058. It also is not enough to show that *competitors* would be harmed; the FTC must show harm to *consumers*. *See AT&T*, 310 F. Supp. 3d at 193. In assessing whether the FTC has met its burden, this Court "must consider both the positive and negative impacts on consumers by balancing the pro-consumer, positive elements of the merger against the asserted anticompetitive harms." *Id.* at 193.

---

[4] *E.g., Microsoft*, 681 F. Supp. 3d 1069; *FTC v. Cmty. Health Sys.*, No. 5:24-cv-00028, 2024 WL 2854690 (W.D.N.C. June 5, 2024); *FTC v. Meta Platforms Inc.*, 654 F. Supp. 3d 892 (N.D. Cal. 2023); *FTC v. Thomas Jefferson Univ.*, 505 F. Supp. 3d 522 (E.D. Pa. 2020); *FTC v. RAG-Stiftung*, 436 F. Supp. 3d 278 (D.D.C. 2020).

The FTC attempts to meet its burden by arguing that the merged entity will have the "ability and incentive" to remove rival suppliers from Mattress Firm. *See Illumina*, 88 F.4th at 1051. This is necessary but not sufficient. Merely having the ability to foreclose "in the most technical sense" "does not establish that [the merged entity] would be able to impair the competitive process." *AT&T*, 310 F. Supp. 3d at 251, n.59. Merely establishing an "incentive to engage in anticompetitive conduct [] without any demonstration as to the probability of acting on that incentive" is not enough. *AT&T*, 310 F. Supp. 3d at 252, n.61; *United States v. Booz Allen Hamilton, Inc.*, No. 22-cv-1603, 2022 WL 9976035, at *7 (D. Md. Oct. 17, 2022) ("[A]n incentive is just the first step along the way to evaluating whether or not there's an effect."). The FTC must show that substantial competitive harm is likely. *See Illumina*, 88 F.4th at 1052–53.

Here, the FTC faces a heavy burden. "[V]ertical integration 'is ubiquitous in our economy and virtually never poses a threat to competition when undertaken unilaterally and in competitive markets.'" *Comcast Cable Commc'ns, LLC v. FCC*, 717 F.3d 982, 990–91 (D.C. Cir. 2013) (Kavanaugh, J., concurring) (quoting a leading antitrust treatise, 3B Phillip Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 755c). Indeed, courts have repeatedly recognized that vertical mergers are usually *procompetitive*. *E.g.*, *Fruehauf*, 603 F.2d at 351; *Alberta*, 826 F.2d at 1244; *AT&T*, 310 F. Supp. 3d at 197. For this reason,

there are no shortcuts in this vertical-merger challenge; the FTC "must make a fact-specific showing" that the merger is likely to substantially harm competition. *Illumina*, 88 F.4th at 1057.

To do so, the FTC must do more than show that a few mattress suppliers would be worse off if they lost access to Mattress Firm. *See Brunswick Corp. v. Pueblo Bowl-O-Mat,* 429 U.S. 477, 488 (1977). The FTC must show that *in general* mattress suppliers' competitive viability would be so undermined that *consumers* would suffer. *See Fruehauf*, 603 F.2d at 358–59.

# I.   Even accepting the FTC's theory, the merger will not harm competition.

As discussed in Section II, Mattress Firm will remain a multi-brand firm post-transaction. But even if Tempur Sealy removed third-party brands from Mattress Firm, it would not substantially harm competition.[5]

## A.   The FTC's contrived market should be rejected.

The FTC loses even under its proposed "premium" market, as discussed below. But its market definition is also contrived and implausible.

The FTC must define a relevant market that "correspond[s] to the commercial realties of the industry." *Illumina*, 88 F.4th at 1048–49. The FTC cannot "gerrymander its way to an antitrust victory without due regard for

---

[5] Although the FTC briefly mentions so-called "partial foreclosure," Dkt. 142 at 2, it never develops that argument and has thus waived it. Regardless, because complete foreclosure cannot harm competition, any partial-foreclosure claim would fail.

market realities." *See It's My Party, Inc. v. Live Nation, Inc.*, 811 F.3d 676, 683 (4th Cir. 2016).

Here, the FTC alleges that harm will occur only in a sliver ▮▮▮▮▮ of the mattress market: so-called "premium" mattresses, which the FTC defines as those priced at $2,000+. *See* Dr. Israel Rep. 17. But the evidence does not support that constricted definition.

Mattresses priced $2,000+ serve the same function, have similar features, and are made from the same materials as many mattresses priced below $2,000. ▮▮▮▮▮ Dep. 60:9–17; ▮▮▮▮▮ Dep. 141:20–25. Where, as here, the product at issue is priced along a "spectrum," pricing distinctions "are economically meaningless," and "[c]ourts have repeatedly rejected efforts to define markets by price variances." *Murrow Furniture Galleries, Inc. v. Thomasville Furniture Indus.*, 889 F.2d 524, 528 (4th Cir. 1989).

Although mattress suppliers and manufacturers sometimes use "premium" as a shorthand, they are inconsistent about what that means, identifying the starting point for "premium" anywhere from $1,000 to $5,000.[6] Witnesses were consistent, however, that this is an arbitrary way of sorting mattresses. *See* ▮▮▮▮▮ Dep. 60:2–17; ▮▮▮▮▮ IH 20:14–22; ▮▮▮▮▮ IH 70:7–8;

---

[6] ▮▮▮▮▮ IH 96:3–4, ▮▮▮▮▮ Dep. 37:17–38:4, and ▮▮▮▮▮ Dep. 16:17–20 ($1,000); ▮▮▮▮▮ at -3778 ($1,500); ▮▮▮▮▮ Dep. 59:25–60:1, ▮▮▮▮▮ Dep. 35:12–36:9 ($2,500); ▮▮▮▮▮ Dep. 31:21–24 ($3,000); ▮▮▮▮▮ at -1842, -1857 ($4,000); ▮▮▮▮▮ Dep. 26:4–14 ($5,000).

██████ IH 68:8–12; ██████ Dep. 39:25–40:8. The other vague differences between "premium" and "non-premium" mattresses alluded to by the FTC, Dkt. 142 at 15, are irrelevant: "two products need not be identical to be in the same market; rather, the question is merely whether they are similar in character or use." *Illumina*, 88 F.4th at 1049–50.

Given the plethora of "premium" definitions, one might wonder why the FTC picked $2,000+. The answer is that it maximizes Mattress Firm's "premium" market share (albeit only at ██████ thus allowing the FTC to maximize possible foreclosure (albeit only at ██████ If "premium" means $1,000+, Mattress Firm has only ██████ market share. If it means $1,500+, Mattress Firm has only ██████ If "premium" means $3,000+, Mattress Firm has only ██████ Dr. Israel Rep. 46.

This shows not only that the FTC's market definition is arbitrary but also that the alleged ██████ market share and ██████ foreclosure share for Mattress Firm, inadequate as they are, are the best the FTC can do. While the FTC's case flounders even using its arbitrary price cutoff, it tips further into irrelevance if that line inches either up or down.

Regardless, the FTC does not come close to showing that the merger is "likely" to "substantially" harm competition even within its market.

**B.    Mattress Firm is not critical to "premium" mattress competition.**

Many successful mattress manufacturers—premium or otherwise—do not, and many *never have,* sold through Mattress Firm. *See AT&T*, 310 F. Supp. 3d at 202 (rejecting the government's argument that a product was necessary for competition in part because competitors "have successfully operated, and continue to operate" without that product); ▮ Dep. 42:2–3 (there are ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮). Sleep Number, one of the largest "premium" mattress manufacturers, has not used Mattress Firm in many years and instead sells its mattresses itself. *See* Dkt. 142 at 5; SN00009113. Saatva, with $▮ million in mostly-premium annual mattress sales, sells directly to consumers and has never used Mattress Firm. ▮ Dep. 13:25–14:9, 51:15–24, 71:10–20, 78:23–79:3. Avocado, a quickly growing premium mattress manufacturer with more than $▮ million annual sales, has never sold through Mattress Firm and rejected Mattress Firm's overtures. ▮ Dep. 14:4–7, 85:21–23; ▮ Dep. 42:12–23.

By even the FTC's calculation, only ▮ of "premium" mattresses are sold through Mattress Firm. Dr. Israel Rep. 46. That number drops to ▮ once Tempur Sealy's and Mattress Firm's own mattresses are excluded from the foreclosure analysis, as they must be. Dr. Israel Rep. 10; *see Alberta*, 826 F.2d at 1245 (market share represented by the acquiring company's existing

supply to the acquired firm is not part of foreclosure). That ███ is the

*maximum* "foreclosure" effect of the merger.

### Mattress Firm's Share of Premium Mattress Sales[7]



### Mattress Firm's Share of Premium Mattress Sales Excluding Tempur Sealy and Mattress Firm's Own Brands[8]



---

[7] Dr. Israel Rep. 8.

[8] *See* Dr. Israel Rep. 10.

This case is thus the *opposite* of *Illumina*. The Fifth Circuit found possible competitive harm there because Illumina had *100%* of a gene-sequencing technology indispensable for a downstream clinical test; foreclosed rivals "would have nowhere else to turn." 88 F.4th at 1053. Far from having nowhere else to turn, most mattress manufacturers have *already* turned elsewhere—as have even suppliers that actually use Mattress Firm for any significant premium sales, namely Serta Simmons and Purple. Dr. Israel Rep. 34. In 2022, Serta Simmons sold ▮▮▮ "premium" mattresses somewhere *other* than Mattress Firm. Dr. Israel Rep. 34. For Purple, as the below chart from Defendants' economic expert (Dr. Israel) shows, by 2023, ▮▮▮ of its "premium" mattresses were sold somewhere other than Mattress Firm. Dr. Israel Rep. 28.

19



The Court need not guess about the impact to competition if a premium-mattress supplier at Mattress Firm were kicked out because it has already happened—to Tempur Sealy. In 2017, with little warning, Mattress Firm and Tempur Sealy abruptly ended their supply relationship. But as Dr. Israel's economic analysis shows, in less than two years Tempur Sealy ███████ ████████████████████████████████████████ of its Mattress Firm revenues. Dr. Israel Rep. 54, 62. Tempur Sealy did this by shifting to other retailers, increasing advertising, helping retailers open new stores, and selling more itself,     including     opening     its     own     Tempur-Pedic     stores.

TEMPUR-FTC-32817606. Thus, when it lost Mattress Firm, Tempur Sealy competed harder. And whatever happened to Tempur Sealy, the FTC offers no evidence that the breakup had *any* effect on competition or consumers. *See* Dr. Israel Rep. 58–59.

     If Serta Simmons or Purple were kicked out of Mattress Firm, they too would simply need to compete harder, and they too would be able to recapture any lost sales through other channels[9]—now armed with all the advertising and marketing dollars previously allocated to Mattress Firm. *See* Moore Dep. 82:9–20. That sort of sales realignment is not a competitive concern. *Fruehauf*, 603 F.2d at 353; *Alberta*, 826 F.2d at 1246. Indeed, they would probably do *better* than Tempur Sealy because they, unlike Tempur Sealy, have had advance warning—they've known about this merger since at least ███████ ████████████████████████████████████. FTC's Second Suppl. Obj. and Resp. to Def.s' First Rogs at 4; ████████ Dep. 23:8–13.

     In fact, since the merger announcement, ████████████████████████ ██████████████, opening up opportunities for competitors. Dr. Israel Rep. 29–30. For example, ████████████████████████████ stopped selling Tempur

---

[9] █████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████
█████████████████

Sealy mattresses exclusively and added Serta Simmons. ███████ ███████. ███████ which operates ██ US stores, recently did likewise. Dr. Israel Rep. 29–30. Ashley acquired Nectar mattresses to expand its own mattress offerings, and plans ████████████████████████ ███████████████████████.[10] ██████ sales have improved as other mattress retailers respond to the merger by boosting their offerings of non-Tempur Sealy brands. ██████ Dep. 110:4–10.

Boxed in by its own low market-share calculation and the fact that the breakup did not harm competition, the FTC falls back on snippets, puffery, and speculation.

*First*, seizing on a handful of email comments, the FTC labels Mattress Firm a "kingmaker." *E.g.*, Dkt. 142 at 2. But Mattress Firm has made no kings. The only rival manufacturers who sell a material volume at Mattress Firm are Serta Simmons and Purple (though both sell only a small portion of their "premium" mattresses there). And Purple—which has only ██ of the FTC's "premium" mattress market (Dkt. 142 at 5)—was ████████████ ██████████████████. *See* MFRM-16499283. By the time Purple entered Mattress Firm's floor, it already had annualized net revenue of $187

---

[10] Howard Ruben, *Ashley Home acquires Nectar mattress owner Resident Home*, Retail Dive (Mar. 7, 2024), https://www.retaildive.com/news/ashley-home-acquires-resident-nectar-dreamcloud/709587/; ██████ Dep. 32: 7–24. 171:16–22.

million. Purple Investor Presentation (July 27, 2017).[11] The FTC cites ███████

███████████████ email that Mattress Firm "made" Purple a "dynamic

disruptor." Dkt. 142 at 7 (citing ████████████). But ██████ testified that

he did *not* mean that Mattress Firm had done something for Purple that other

retailers could not. ████████ IH 37:2–5, 37:12–13, 39:11–15. And whatever

████████ meant in his ████████████████ email, the fact is that Purple's growth

and profits are not remarkable, Purple doesn't credit Mattress Firm for its

success, and its reliance on Mattress Firm has dwindled. DeMartini Dep.

166:1–8, 21–23; PURP-LIT003092.

   *Second,* the FTC highlights that Mattress Firm sometimes assists in

product development. Dkt. 142 at 30. But so do Macy's, Raymour & Flanigan,

City Furniture, Rooms to Go, Sit 'N Sleep, Denver Mattress, and others.[12]

Mattress Firm does not have ████████████████." ██████ Dep. 20:5–7.

---

[11] https://www.sec.gov/Archives/edgar/data/1643953/000121390017007952/f8k
072717ex99-1_globalpartnr.htm.

[12] ████████ Dep. 59:19–60:18 (████████ Saarie Dep. 47:11–49:7 (████████████
████████); ████████ Dep. 77:23–79:4; (████████████); ████████ Dep. 196:16–
197:3 (████████████); ████████ Dep. 112:23–114:6 (████████████████);
████████ Dep. 256:6–257:1 (████████ receives feedback from Rooms to Go and Denver
Mattress "similar" to Mattress Firm's feedback); ████████████████████████
(detailing feedback ████████ received from Ashley, Raymour & Flanigan,
Rooms to Go, Denver Mattress, HOM Furniture, and Mor Furniture).
████████ Dep. 31:10–32:13 (████████ obtains product feedback from
retailers); ████ Dep. 52:8–25 (same for ████████████

And clearly "premium" mattress suppliers do not need Mattress Firm's assistance, since many don't sell at Mattress Firm.

Moreover, Section 7 of the Clayton Act "is not about protecting [Tempur Sealy's] rivals from any and all competitive pressures they would experience should the merger go through." *AT&T*, 310 F. Supp. 3d at 211. The FTC's theory is premised on the idea that the merger must be blocked if rivals cannot find *one* mattress-specialty retailer that has the exact same supposed benefits as Mattress Firm. But those rivals can turn to many other retailers who collectively sell far more premium mattresses than Mattress Firm. The FTC's economic expert (Dr. Das Varma) complains that this "is like saying the only skyscraper in a city of low-rise buildings is not tall because the combined height of the other buildings exceeds the skyscraper's height." Dr. Das Varma Rebuttal Rep. ¶ 44. In fact, the FTC's theory is like saying a rival will have nowhere to live if it cannot get what the FTC apparently believes is the penthouse. Rivals "are free to sell directly, to develop alternative distributors, or to compete for the services of the existing distributors. Antitrust laws require no more." *Omega*, 127 F.3d at 1163.

███████████████████████████████████████████████

███ "have an incentive to oppose a merger that would allow [Tempur Sealy] to increase innovation while lowering cost." *AT&T*, 310 F. Supp. 3d at 214. ███

███████████████████████████████████████████████

█████████   Shortly after this merger was announced, Serta Simmons' then-CFO submitted a sworn declaration to the court overseeing Serta Simmons' bankruptcy projecting that Serta Simmons' net sales would increase by 30% between 2023–2027. FTC-SSB-00001737 at -1759. Serta Simmons' 30(b)(6) witness testified that those projections "████████████████████████████ ██████████████████████████████████████████████████████████████████" ████ Dep. 33:23–25. In other words, ██████████████████████████████ ██████████████████████████████████████ it was assuring the bankruptcy court that it would *grow* ██████████████████.

Likewise, ██████████ Purple ████████████████████████████████ █ told investors that "Mattress Firm stores are some of the least productive for [Purple]," and "the downside potential of losing [share at Mattress Firm] would be limited." TEMPUR-FTC-70061053. ██████████████████████████████ its statements to investors are corroborated by the data, which reflect that Purple went from selling ████ of its "premium" mattresses at Mattress Firm in 2019 to ████████ in 2023. Dr. Israel Rep. 27.

*Fourth*, the FTC also references guaranteed-slot-provisions in incentive agreements between Tempur Sealy and some retailers. But it offers no evidence of how many such provisions exist, what their terms are, or what percentage of the market they affect, if any. *See Dillon Materials Handling, Inc. v. Albion Indus.*, 567 F.2d 1299, 1305 n.19 (5th Cir. 1978) (existence of

exclusive arrangements with distributors and proof of the defendant's "market share and dollar volume" was "inadequate" "without any proof of the breadth of exclusive dealing" or "what portion … of the market had been pre-empted").

In any event, these provisions have little to no foreclosing effect. Where they exist, they are part of *incentive* agreements for cooperative advertising money, *see* Dkt. 142 at 36, not *supply* agreements for mattresses—which means that retailers need not fear losing access to Tempur Sealy mattresses if they terminate or renegotiate them. And in fact, they are easily terminable, short in duration, and often terminated or modified in the ordinary course. *See, e.g.*, TEMPUR-FTC-70061083. Further, Tempur Sealy has also ███████████ ████████████████████████████ Tempur Sealy's Suppl. Resp. to Pls' Interrogatory No. 2.

## C. The FTC makes no serious attempt to show consumer harm.

The FTC also fails by never meaningfully explaining how any foreclosure of mattress suppliers (let alone the tiny foreclosure at issue) would translate into consumer harm. The FTC does not meaningfully address consumer harm until page 40 of its 48-page brief, ultimately devoting only one paragraph to reciting Dr. Das Varma's view that requiring ██ of premium mattresses to be sold somewhere other than Mattress Firm would cause prices on *all* premium mattresses to increase *annually* by ████████████. Dkt. 142 at 40-41. As explained in Section III, that conclusion is nonsense, and the FTC has nothing

else (including not even trying to show that the Tempur Sealy/Mattress Firm breakup harmed consumers).

### D. The maximum potential foreclosure is far below enforcement thresholds.

In considering downstream-foreclosure vertical-merger challenges, courts ask: how much of the market will be foreclosed? *Brown Shoe Co. v. United States*, 370 U.S. 294, 328 (1962); *Alberta*, 826 F.2d at 1244–46; *Fruehauf*, 603 F.2d at 360; *Crouse-Hinds Co. v. InterNorth, Inc.*, 518 F. Supp. 416, 431 (N.D.N.Y. 1980). "[O]nly where foreclosures reach monopolistic proportions—or threaten to do so—does a vertical merger become troublesome." *Alberta*, 826 F.2d at 1244 (summarizing Areeda); *see Fruehauf*, 603 F.2d at 358–60.

Here, the maximum possible foreclosure of an all-mattress market is ▮▮▮▮ Dr. Israel Rep. 11. That is *de minimis*. *Alberta*, 826 F.2d at 1245 (1.8% was *de minimis*). And *de minimis* foreclosure cannot violate Section 7. *Id.*; *Brown Shoe*, 370 U.S. at 329.

Even using the FTC's gerrymandered premium market yields only ▮▮▮ foreclosure (even less considering Tempur Sealy's commitments). This fares no better. *See Alberta*, 826 F.2d at 1246 (collecting vertical-merger cases rejecting market foreclosures of 5.8% and 8.8%). Indeed, analogous caselaw requires a *minimum* foreclosure of 30-40% to challenge exclusive-dealing contracts under

Section 3 of the Clayton Act, 15 U.S.C. § 14, which is worded almost identically to Section 7 of the Clayton Act, addresses an identical theory of harm and should be interpreted similarly. *See* 4A Phillip Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 1004 (5th ed. 2020); 11 Areeda, *supra.*, ¶ 1821c1; *Brown Shoe*, 370 U.S. at 321, n.36; *Apani Sw., Inc. v. Coca-Cola Enters., Inc.*, 300 F.3d 620, 626 (5th Cir. 2002); ABA Section of Antitrust Law, *Antitrust Law Developments* 1 § D(2)(b) (9th ed. 2022). The FTC's ███████ foreclosure claim comes nowhere close.

## II.   The FTC has not shown that the merged firm will foreclose rivals.

The FTC must show more than that Tempur Sealy "may" or "could" remove other brands from the floor. *See* Dkt. 142 at 2. It must show that foreclosure is "likely." *Illumina*, 88 F.4th at 1048. It fails.

### A.   Mattress Firm will continue to be a multi-brand retailer.

As the FTC says, "[t]he best way to predict this acquisition's impact on future competition is to look at the expectations of Tempur Sealy's Board Members, executives, shareholders, and other investors." Dkt. 142 at 11. From 2021 to today, those expectations have consistently been that Mattress Firm will be a multi-brand retailer post-transaction. *See Microsoft*, 681 F. Supp. 3d at 1091 (relying on the fact that the defendant's "witnesses consistently testified there are no plans to [engage in foreclosure]" in rejecting government vertical-merger challenge). The FTC never acknowledges, much less addresses,

this evidence in its motion; indeed, it was so intent on trying to build a counter-narrative based on soundbites that it barely inquired into much of this evidence during its investigation and discovery.

## Timeline

| | |
|---|---|
| May 2021 | Scott Thompson tells Mattress Firm CEO John Eck that if the firms merged Tempur Sealy would not remove other brands, pointing to a then-soon-to-be-acquired multi-brand retailer (Dreams) that "would run as [an] independent company" with "[n]o pressure" to sell Tempur Sealy.[13] |
| February 2022 | Even before JP Morgan (Tempur Sealy's banker) was retained, Scott Thompson instructed JP Morgan by email that Tempur Sealy was interested in Mattress Firm as a multi-brand retailer that would sell "all brands successfully," just like Dreams and SOVA.[14] |
| May 2022 | Tempur Sealy's Board of Directors is presented with a valuation model assuming that Mattress Firm would remain a multi-brand retailer.[15] |
| June 2022 | Tempur Sealy's "Strategic Rationale" evaluation of the deal explains that "Mattress Firm would be run on a stand-alone basis while utilizing Tempur Sealy's global reach."[16] |
| August 2022 | Tempur Sealy sends Mattress Firm a formal Indication of Interest, in merging, making clear: "[w]e envisage that Mattress Firm would continue to operate with great autonomy as an independent, multi-brand retailer, much in the way that Dreams conducts its operations in the UK."[17] |

---

[13] TEMPUR-FTC-34093643.
[14] TEMPUR-FTC-31536799 at -6800
[15] TEMPUR-FTC-70045041.
[16] TEMPUR-FTC-34067920 at -7921.
[17] TEMPUR-FTC-34610429.

| | |
|---|---|
| January 2023 | Tempur Sealy's Board of Directors is presented with a valuation model assuming that Mattress Firm would remain a multi-brand retailer.[18] |
| February 2023 | Tempur Sealy's Board of Directors is presented with a valuation model assuming that Mattress Firm would remain a multi-brand retailer.[19] |
| April 2023 | Tempur Sealy's Board of Directors is presented with a valuation model assuming that Mattress Firm would remain a multi-brand retailer.[20] |
| May 2023 | Tempur Sealy's Board of Directors is presented with a valuation model assuming that Mattress Firm would remain a multi-brand retailer.[21] |
| | Tempur Sealy's Board of Directors votes to approve the merger based on the multi-brand model.[22] |
| | Shortly after the merger deal is announced, Tempur Sealy stresses Mattress Firm's multi-brand floor to investors.[23] |
| | Tempur Sealy prepares internal talking points explaining that "[a]fter closing, Mattress Firm will operate as a separate business unit … [s]imilar to prior acquisitions."[24] |
| August 2023 | Scott Thompson tells then-Serta Simmons CEO: "We expect to run a multi branded floor and would be interested in retailing Serta Simmons products."[25] |

---

[18] TEMPUR-FTC-35894197.

[19] TEMPUR-FTC-35894212.

[20] TEMPUR-FTC-35894267.

[21] TEMPUR-FTC-35894299.

[22] TEMPUR-FTC-31889184.

[23] TEMPUR-LIT-00301085 at -1091.

[24] TEMPUR-FTC-31365170 at -5175; TEMPUR-FTC-31554562 at -4565 ("Well-diversified platform generating sales through multiple key brands.").

[25] TEMPUR-FTC-34618567.

| September 2023 | Scott Thompson tells Purple: "After we close the Mfirm transaction, we plan on a multi branded floor. Same strategy we successfully run at Dreams in the UK."[26] |
| October 2023 | Tempur Sealy tells its lenders that Mattress Firm "will be operated as a separate business unit with autonomy over their merchandising decisions and sales floor."[27] |
| November 2023 | Scott Thompson touts to investors that "Tempur Sealy has signed numerous post-closing supply agreements with existing Mattress Firm suppliers …, [which] are consistent with our expectation for Mattress Firm to continue as a multibranded retailer post closing."[28] |
| June 2024 | Tempur Sealy emphasizes Mattress Firm's "broad assortment of leading national brands" providing a "diverse range of innovative consumer solutions" in a rating-agency presentation.[29] |

The FTC's theory is premised on the radical notion that Tempur Sealy has been, for years, lying to Mattress Firm, lenders, investors, and itself. The true explanation is that, as Tempur Sealy has said, Mattress Firm will remain a multi-brand retailer post-transaction.

Instead of acknowledging the actual modeling presented to the Board for this transaction throughout 2022 and 2023, the FTC relies on a *2015* pitch deck prepared by outside investment bankers. *See* Dkt. 142 at 19-20. This near-decade-old deck was not relied upon in evaluating this merger. Rao Dep. 96:18.

---

[26] TEMPUR-FTC-34858517.
[27] TEMPUR-LIT-00050053 at -0054
[28] TEMPUR-LIT-00095408 at -5417-18; TEMPUR-LIT-00301085 at -1091-93.
[29] TEMPUR-LIT-00125294 at -5309.

And the FTC's screenshot crops out the part of the slide that notes that if Tempur Sealy replaced other brands at Mattress Firm, "[c]onsumers may respond negatively to limited brand selection." TEMPUR-FTC-31564317 at -4370.

**FTC Screenshot (Dkt. 142 at 20)**



**Full Slide (omission highlighted)**



The FTC also points to a 2021 "accretion model" prepared when Tempur Sealy first began considering an acquisition, which assumed a ▮ balance of share at Mattress Firm and a ▮ balance of share everywhere else. Dkt. 142 at 25. As Tempur Sealy's CFO (Rao) testified, this was simply a stress test or "what-if." Rao Dep. 55:1–4. *See AT&T*, 310 F. Supp. 3d at 210 (disregarding this sort of "what-if" as "a far cry" from evidence that anticompetitive effects are "likely"). In any event, even if it happened, this small "realignment of existing market sales"—which assumes that rivals displace Tempur Sealy at other retailers—does not show competitive harm. *Fruehauf*, 603 F.2d at 360.

The FTC also points to what it calls Tempur Sealy's "Retail Acquisition Framework." Dkt. 142 at 37 (citing TEMPUR-FTC-31048577). In fact, this

"Framework" slide was not from a Tempur Sealy document. It was from a draft presentation prepared by an ███████ ████████ before Tempur Sealy actually used this slide with any investors, it removed the language ████████████████████████████████████████) on which the FTC relies. TEMPUR-FTC-31371375 at -1407; *see AT&T*, 310 F. Supp. 3d at 208 ("statements in a slide deck that were contained in a preliminary draft and were subsequently removed" had "minimal" "probative value").

## B. Tempur Sealy's prior acquisitions corroborate its plan for Mattress Firm.

Merger cases are often challenging because they require the Court to predict the future. *See AT&T*, 310 F. Supp. 3d at 190. But that task is easier here because Tempur Sealy has previously acquired two multi-brand mattress retailers which, years later, remain multi-brand. *See id.* at 215 (relying on evidence of "prior, similar transactions").

In 2021, Tempur Sealy acquired Dreams—a U.K. multi-brand mattress retailer with a UK presence similar to Mattress Firm's US position. At his deposition, Dreams CEO Jonathan Hirst testified that Dreams has been "given almost total autonomy to run Dreams as we choose fit to do so" and described Tempur Sealy's relationship with Dreams as "management by arm's length." Hirst Dep. 22:12–13, 22:20–23:3. After the acquisition, Scott Thompson told Hirst that "[w]e want you to continue to run Dreams in the way that you have

for the previous 10, 11 years," and Hirst testified that "I'm pleased to say, nearly three years on from the acquisition, Tempur has been very true to their word, so this concept of arm's length management has really run true." Hirst Dep. 22:22–23:3.

The FTC complains that Dreams eventually added more Sealy mattresses, but omits that *after the acquisition* Dreams rejected Sealy until Tempur Sealy developed an innovative "███████" technology enabling mattresses to ███████████████████. Hirst Dep. 85:1–8, 85:19–86:11. That innovation—not any Tempur Sealy command—was why Dreams added more Sealy mattresses to the floor while reducing the slots for two low-volume, unpopular brands. Hirst Dep. 93:20–94:6, 99:21–25. Dreams remains multi-brand to this day.

Similarly, in 2018, Tempur Sealy acquired SOVA, a prominent multi-brand mattress retailer in Scandinavia. Six years later, SOVA continues to be a multi-brand retailer.

Mostly ignoring these transactions, the FTC focuses on Tempur Sealy's acquisition of bankrupt Sleep Outfitters' stores. But when acquired, Sleep Outfitters was already essentially a Tempur Sealy-only retailer, with 95% of sales from Tempur Sealy brands. Post-acquisition, Sleep Outfitters dropped one small brand based on "the price point, the quality, and the lack of

profitability," Buster IH 68:8–13, and the fact that upfront payments would have been required to continue retailing it.

Contrary to the FTC's suggestion, *see* Dkt. 142 at 38–39, the antitrust laws neither require a retailer to freeze the floor at the acquisition, nor to perpetually offer poor products. Sleep Outfitters' and Dreams' decisions to replace some less-popular with more-popular brands offers no support for the FTC's foreclosure theory. More telling is the fact that years after their acquisitions, Dreams and SOVA remain multi-brand.

## C. Tempur Sealy has no reason to upend Mattress Firm's multi-brand model.

As *Illumina* explains, "the degree to which [the post-merger firm] has an incentive to foreclose . . . depends upon the balance of two competing interests"—the firm's "interest in maximizing its profits" at Mattress Firm as a retailer and the firm's "interest in maximizing its profits" as a manufacturer by selling more Tempur Sealy mattresses. 88 F.4th at 1052. In *Illumina*, the answer was easy: Illumina would make *eight times* as much money on the clinical tests as on the gene-sequencing platform over which it held a complete monopoly, so it was incentivized to stop making that platform available to clinical-testing rivals. *Id* at 1053. Here, the answer is also easy. After the merger, Tempur Sealy will derive about *half* of its revenue from *Mattress*

36

*Firm's retail*, and would not risk that by trashing the strategy that made Mattress Firm attractive in the first place.

Mattress Firm's multi-brand strategy and reputation is key to its success, as reflected in its testimony, strategy documents, and customer surveys. *See, e.g.*, Eck Dep. 203:5–8; Dament Dep. 60:6–8; TEMPUR-FTC-35949081 at -9145 (███ of shoppers considered Mattress Firm because it "[o]ffer[ed] the mattress brand I wanted"); MFRM-05763577 at -3590; MFRM-06158496 at -8513-14; MFRM-07403085 at 6; MFRM-17528064 at -8065; MFRM-17595853 at -5860. As the FTC admits, buying a mattress is a big purchase, Dkt. 142 at 3, and so customers research mattresses online, shop multiple stores before purchasing, often come into Mattress Firm looking for a particular brand (or a wide assortment of brands), and can go elsewhere if Mattress Firm does not have what they want. *See* MFRM-07419407 at -9411, -9443; Dr. Israel Rep. 25–27, 84, n.153; ███ Dep. 155:15–16; ███ Dep. 52:14–16. Retailers lacking mattresses consumers seek will lose business to retailers carrying those products. *See* ███ Dep. 51:23–53:8; ███ Dep. 90:21–91:5; ███ Dep. 62:14–63:5.

Tempur Sealy has no reason, and has made no plans, to "uproot its entire business strategy." *See United States v. UnitedHealth Grp. Inc.*, 630 F. Supp. 3d 118, 141 (D.D.C. 2022); *AT&T*, 310 F. Supp. 3d at 251 ("The Government simply fails to explain why [the defendant] would jeopardize—much less

37

jettison—the … model on which [it] depends."). Nor does Tempur Sealy have a reason to ruin the multi-brand reputation that Mattress Firm has spent four decades cultivating. *Booz Allen*, 2022 WL 9976035, at \*7 (defendants' reputational interests provided countervailing incentives); *UnitedHealth*, 630 F. Supp. 3d at 141 (same); *see Illumina*, 88 F.4th at 1052–53 (weighing the counterincentives of lost business and reputational harm against the incentive to foreclose).

Further, Tempur Sealy's brands benefit from having other traffic-driving brands on the floor. *See* ██ Dep. 93:10–12; ██████ Dep. 182:15–16. In one of the FTC's exhibits, Mattress Firm CEO John Eck writes that "█████████ ██████████████████ ██████████ ████ " MFRM-05732467 (emphasis added). The same is true of ███████ . *See* ████ Dep. 33:2–6; ██ Dep. 83:10–16. That Tempur Sealy would continue selling other brands at Mattress Firm is hardly unusual. Ashley, a multi-brand retailer that has its own Ashley Sleep mattresses and recently acquired Resident Home and its Nectar mattresses, ████████████████████████████████████████████ 92:14–93:10.

The FTC cites Aubrey Moore's (Tempur Sealy's Vice President, Investor Relations, Insights, & Analytics) deposition for the proposition that gains at Mattress Firm would outweigh losses elsewhere. Dkt. 142 at 25 (citing Moore Dep. 103:3–16). But the FTC cites only *its own attorney's* question, as if that

38

were evidence. Moore's *answer* to that question explained that "we are not assuming any change in balance of share revenues due to the acquisition of Mattress Firm. Mattress Firm was expected to operate as a separate business unit within the company." Moore Dep. 103:22–104:3. And Dr. Israel's report confirms that Tempur Sealy would lose money if it foreclosed other brands. Dr. Israel Rep. 80.

### D.    The FTC's snippets cannot counter objective evidence.

After a nearly two-year investigation involving millions of documents, the FTC has failed to identify a single document from either Tempur Sealy or Mattress Firm stating that the post-acquisition plan is to remove other brands from Mattress Firm and replace them with Tempur Sealy products, nor identified any evidence of the detailed planning necessary for the massive work any such scheme would require. *See Microsoft*, 681 F. Supp. 3d at 1091. Instead, the FTC resorts to a handful of soundbites and off-point evidence of robust horizontal competition.

For example, the FTC points to a handwritten note from Tempur Sealy CEO Scott Thompson on a copy of a JP Morgan deck for a May 2022 Board Meeting (over a year before the deal was signed) that, among other scribblings, stated "eliminate future competition" and "block new competition." *See* TEMPUR-FTC-34850587. But although the underlying *deck* was "presented to Tempur Sealy's Board of Directors," *see* Dkt. 142 at 8, the scribblings were not,

nor was there any discussion of these notes at the Board meeting. Thompson Dep. 59:4–12. The *AT&T* court, in rejecting a government vertical-merger challenge, rebuffed a similar maneuver. *AT&T*, 310 F. Supp. 3d at 209–10.

The FTC's other fragments fare no better. For example, the FTC makes much of a handful of references to a "competitive moat," like one plucked from an October 2021 JP Morgan pitch deck (drafted almost 18 months before the deal signed). Dkt. 142 at 21–22. But this commonplace business-school lingo simply means something that makes a company a better competitor, not foreclosure.[30] *See AT&T*, 310 F. Supp. 3d at 203 (rejecting government reliance on a "marketing phrase"). There is no doubt this transaction will make Tempur Sealy a better competitor—for example, by lowering its costs and making it more innovative. Section 7 "is not about protecting … rivals from any and all competitive pressures they would experience should the merger go through." *See AT&T*, 310 F. Supp. 3d at 211.

In any event, no "moat" references or scribbles can overcome the unambiguous evidence that (1) Scott Thompson told both Mattress Firm (the target) and JP Morgan (Tempur Sealy's investment banker) that Tempur Sealy was interested in Mattress Firm as a multi-brand retailer; (2) the transaction

---

[30] Kristi Waterworth, *What Is a Competitive Moat?*, The Motley Fool (Jun. 17, 2024), https://www.fool.com/terms/c/competitive-moat/; Thompson Dep. 78:3–22.

was valued on that basis; (3) Tempur Sealy's Board was consistently presented with that valuation; (4) the Board voted to approve the merger based on this valuation; (5) Tempur Sealy rolled out the merger to investors as a multi-brand model; and (6) Tempur Sealy told its lenders, rating agencies, future suppliers, and everyone else that Mattress Firm would be multi-brand.

Phrases like "block competition," "world domination" and "dominate the US market" make for good soundbites in a government brief. *See* Dkt. 142 at 21–24. But none of those snippets were part of a *plan* to foreclose and none of them stand up against the weight of contrary evidence. In the end, "snippets" of documents are of little relevance and "a trial by slide deck leaves much to be desired!" *AT&T*, 310 F. Supp. 3d at 208.

The FTC's remaining arguments boil down to a claim that, as a mattress supplier prior to the merger, Tempur Sealy has aggressively competed with rival suppliers for floorspace at Mattress Firm and other retailers. *See* Dkt. 142 at 27 (price competition with Serta Simmons); *id.* at 28 (floorspace competition with Purple); *id.* at 34 (floorspace competition with Casper). All suppliers, when competing just as suppliers, fight for retail floor space.

This vigorous horizontal interbrand competition, though, is the very thing the antitrust laws are designed to protect. *See Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 878 (2007). And *Illumina* teaches it is *post*-merger incentives that matter. *See* 88 F.4th at 1053. After this merger,

41

Tempur Sealy will make billions of dollars—over half of its revenue in all—from Mattress Firm's retail. So, just like Mattress Firm does today, Tempur Sealy will be incentivized to maintain a retail floor including the various mattress brands, from multiple suppliers, that customers want.

### E.   Tempur Sealy's commitments make the FTC's theory even more implausible.

Competition-promoting commitments need only prevent "substantial," not "any," harm and need not recreate the premerger status quo. *Illumina*, 88 F.4th at 1058. To be clear, the merger poses no threat to competition. Regardless, Tempur Sealy has made various commitments that put the FTC's theory to bed.

*First*, Tempur Sealy has agreed to divest nearly 200 stores to Mattress Warehouse, almost doubling the reach of that fast-growing mattress-specialty retailer. In assessing a divestiture, courts consider (1) the likelihood of the divestiture, (2) the experience of the divestiture buyer, (3) the scope of the divestiture, (4) the independence of the buyer from the merging seller, and (5) the purchase price. *UnitedHealth*, 630 F. Supp. 3d at 135. Here, the FTC does not contest the first, second, or fourth factors. *See* Dkt. 142 at 44–45.

Instead, the FTC says the divestiture "doesn't create another competitor … comparable to Mattress Firm." Dkt. 142 at 44. But it does not need to. This is not a horizontal merger where a competitor is being eliminated

42

and must be replaced. As the Fifth Circuit held in *Illumina*, Defendants are not required to show that commitments "would negate [any] anticompetitive effects … entirely," only that they "*sufficiently mitigate[]* the merger's effects such that it was no longer likely to *substantially* lessen competition." 88 F.4th at 1059. Here, the divestiture will provide Serta Simmons, Purple, and other suppliers nearly 200 additional non-Mattress-Firm stores through which to sell mattresses, jump start Mattress Warehouse's growth into new regions by expanding its geographic footprint, and even further reduce the already *de minimis* total possible foreclosure by cutting the number of Mattress Firm stores.

Although the FTC complains about the low purchase price, Dkt. 142 at 45, this is common in merger divestitures. "[T]o state the obvious, a potential buyer of an asset sold to facilitate a merger under scrutiny … has enormous leverage over the seller because it knows the seller must divest the asset quickly to proceed with the merger." *RAG-Stiftung*, 436 F. Supp. 3d at 307. And the FTC offers no evidence to support its baseless claim that there is some doubt about "Mattress Warehouse's commitment to running the stores long-term." Dkt. 142 at 45. Rather, Mattress Warehouse's CEO has testified that the divestiture gives Mattress Warehouse "███████████████████████████ ████████████████████████████████████████████████." Papettas Dep. 103:12–19.

*Second,* Tempur Sealy has committed for the next five years to reserve at least ▮▮ of Mattress Firm's floor—approximately ▮▮ slots on average per store—for third-party mattresses priced $▮▮▮▮ Mattress Firm devotes an average of ▮▮ slots per store for such mattresses now, but they are already mostly for Tempur Sealy. Serta Simmons today takes only ▮▮ of those slots on average, and Purple takes ▮▮ Thus, Serta Simmons and Purple currently have an average of ▮▮ "premium" slots per Mattress Firm store and Tempur Sealy is committing to reserve ▮▮ slots for third-party mattresses priced $▮▮▮ nearly ▮▮ of what Serta Simmons and Purple already have.

*Third*, Tempur Sealy has executed post-closing supply agreements with Purple, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, and ▮▮▮▮▮▮▮▮▮▮.

Cumulatively, these commitments reduce the FTC's incredibly shrinking foreclosure case to near invisibility.

## F.   The FTC's passing reliance on *Brown Shoe* is misplaced.

The FTC also argues that it succeeds under the so-called *Brown Shoe* factors. Reflecting the weight this argument deserves, the FTC spends about a page on it. *See* Dkt. 142 at 39–40.

Supreme Court precedent regarding vertical restraints has evolved significantly since 1962, *see Leegin*, 551 U.S. 877, and "there is no '*Brown Shoe* standard' in modern antitrust analysis." Concurring Op. Comm'r Wilson 1–2,

*In re Illumina, Inc*, No. 9401 (FTC).[31] More bluntly: "It would be overhasty to say that the *Brown Shoe* opinion is the worst antitrust essay ever written …. Still, all things considered, *Brown Shoe* has considerable claim to the title." *United States v. Anthem, Inc.*, 855 F.3d 345, 376 (D.C. Cir. 2017) (Kavanaugh, J., dissenting) (quoting Judge Bork).

Even if *Brown Shoe* applies, as discussed above, the FTC would still *first* need to establish that a significant share of the market was foreclosed—which it cannot do. *See Crouse-Hinds*, 518 F. Supp. at 431. The FTC also loses under the remaining *Brown Shoe* factors.

*First,* the nature and purpose of the transaction is, as discussed, procompetitive. *Second,* as discussed, the likelihood and scope of foreclosure is tiny. *Third,* barriers to distribution entry are low, including because premium-mattress suppliers can and do sell directly to customers. *Fourth,* the FTC has not attempted to establish what market share is necessary for scale, much less that the merger is likely to prevent other suppliers from achieving it. *Fifth*, the FTC's motion does not attempt to establish that there is a trend toward vertical concentration or oligopoly. *Sixth*, the proposed transaction does not eliminate potential competition by one of the merging parties, nor does the FTC argue that it will. *Seventh*, as explained above, the merged entity will not have

---

[31] https://www.ftc.gov/system/files/ftc_gov/pdf/d09401wilsonconcurring opinion.pdf.

significant market power as a retailer in even the FTC's preferred "premium" market. *Eighth*, as discussed above, there are numerous other competing purchasers and methods of distribution.

## III.   Economic analysis shows that the transaction will benefit competition.

Consistent with standard economic theory, Defendants' expert, Dr. Israel, concludes that this vertical merger, like most vertical mergers, will be procompetitive.

Standalone manufacturers and retailers "each apply their own markups (reflecting their own margins) in pricing their products," which "are incorporated into the final price that consumers have to pay." *AT&T*, 310 F. Supp. 3d at 197. Eliminating this "double marginalization," as this merger does, is a "procompetitive … standard benefit associated with vertical mergers." *Id.*

Applying this standard principle, Dr. Israel incorporates the specific facts of this industry and this merger into a quantitative model and finds that the transaction will increase consumer welfare. He concludes that under any plausible assumptions the vertically integrated firm will be incentivized to improve its products through innovation, improve retail experience, and increase the effort it puts into selling mattresses, and rivals will respond by competing harder. Dr. Israel Rep. 104; *see also, e.g.*, ▮▮▮▮ Dep. 24:9–13 (the merger would make ▮▮▮▮▮▮ compete harder). This is procompetitive.

By contrast, Dr. Das Varma's analysis teeters precariously on a set of implausible assumptions disconnected from the facts, and contradicts the FTC's theory of harm.

*First,* Dr. Das Varma claims that Tempur Sealy lost sales *shortly after* the Tempur Sealy/Mattress Firm breakup. But he ignores that Tempur Sealy then responded by competing harder for floor space at other retailers, so by the time Tempur Sealy and Mattress Firm reunited, Tempur Sealy had actually ███████████ and recaptured ███████████████████. Dr. Israel Rep. 53-57. Moreover, there is no evidence that the breakup harmed consumers. Indeed, following the breakup, ███████████████████ ███████████████████ ██████ █████—the opposite of what Dr. Das Varma's model predicts should happen. Dr. Israel Rep. 59-61.

*Second,* Dr. Das Varma's model relies on assumptions that rig the game. Dr. Das Varma assumes away the elimination of double marginalization—the "standard benefit associated with vertical mergers," *AT&T*, 310 F. Supp. 3d at 197—by pretending that mattress suppliers and retailers all act as if they are in permanent joint ventures, splitting a fixed and never-changing share of revenues. Dr. Israel Rep. 74. There is no support for this.

Similarly, Dr. Das Varma assumes that consumers—who in the real world extensively research purchases, visit multiple stores, and often have strong brand preferences—are so passively manipulated by retailers that they

behave irrationally. According to his model, a consumer who leaves a retailer because they did not find the non-Tempur Sealy brand they were looking for will forget their preferences by the time they get to the next retailer and buy whatever is on the floor—including the Tempur Sealy mattress that they could have bought at Mattress Firm. Dr. Israel Rep. 77-78. This assumption flies in the face of the facts. Dr. Das Varma relies so heavily on these counterfactual assumptions that relaxing any of them reverses his results and predicts that the merger would lead to lower prices and consumer benefits. Dr. Israel Rep. 76-80.

Finally, Dr. Das Varma's model contradicts the FTC's case. The FTC claims that the merger will so severely harm Tempur Sealy's rivals that they will no longer be able to effectively compete. But Dr. Das Varma's model predicts that every rival supplier will *increase* its profits post-merger. Dr. Israel Rep. 13. It can't be the case that every rival will do better, but somehow still be less able to compete.

## IV.   The public interest and the equities disfavor the requested injunction.

Separate from the FTC's failure to make a clear showing that it is likely to succeed on the merits, the FTC also has not established that the equities favor a preliminary injunction. To the contrary, an injunction would harm public equities by preventing this procompetitive merger.

Almost as an aside, citing testimony that ██████ voluntarily stopped sharing information about its "████████████" with Mattress Firm, the FTC frets that without a preliminary injunction, Tempur Sealy will obtain access to rivals' "competitively sensitive" information. Dkt. 142 at 47; ██████ Dep. 226:12–16; 249:21–23. But the FTC does not explain what this is, why it is sensitive, or how the merger would give Tempur Sealy access to something that ██████ is no longer sharing. Nor does the FTC explain why, if this was important, a simple firewall of the type common in vertical mergers would not suffice. Dkt. 142 at 47-48.

The FTC's injunction will also harm private equities. *See FTC v. Weyerhaeuser Co.*, 665 F.2d 1072, 1083 (D.C. Cir. 1981). The merging parties have spent millions of dollars and thousands of hours on the merger, the FTC's investigation, and the divestiture. The parties have already been in limbo for 17 months. Granting the FTC's preliminary injunction would destroy all of that.

## Conclusion

The Court should deny the FTC's preliminary-injunction motion.

Dated: November 1, 2024

Respectfully submitted,

*/s/ Ryan A. Shores*
*Attorney-In-Charge*

Ryan A. Shores
D. Bruce Hoffman
Daniel P. Culley
Matthew I. Bachrack
Blair W. Matthews
Jacob M. Coate
Gabriel J. Lazarus
CLEARY GOTTLIEB STEEN &
HAMILTON LLP
2112 Pennsylvania Ave., NW
Washington, D.C. 20037
202-974-1500
bhoffman@cgsh.com
rshores@cgsh.com
dculley@cgsh.com
mbachrack@cgsh.com
bmatthews@cgsh.com
jcoate@cgsh.com
glazarus@cgsh.com

Heather S. Nyong'o
CLEARY GOTTLIEB STEEN &
HAMILTON LLP
650 California St.
San Francisco, CA 94108
415-796-4400
hnyongo@cgsh.com

Lina Bensman
CLEARY GOTTLIEB STEEN &
HAMILTON LLP
One Liberty Plaza
New York, NY 10006
212-225-2000
lbensman@cgsh.com

Alex B. Roberts
Federal Bar No. 865757
Texas State Bar No. 24056216
aroberts@beckredden.com
Garrett S. Brawley
Federal Bar No. 3311277
Texas State Bar No. 24095812
gbrawley@beckredden.com
Lena Silva
Federal Bar No. 3608019
State Bar No. 24104993
lsilva@beckredden.com
Maryam Ghaffar
Federal Bar No. 3710605
Texas State Bar No. 24120847
mghaffar@beckredden.com

BECK REDDEN LLP
1221 McKinney Street
Suite 4500
Houston, TX 77010
Tel: (713) 951-3700
Fax: (713) 951-3720

*Counsel for Tempur Sealy International, Inc.*

/s/ *Sara Y. Razi*
*Attorney-In-Charge*

Sara Y Razi
N. Preston Miller
Lindsey C. Bohl
Nicholas Ingros
Avia Gridi
Geoffrey I. Schmelkin
SIMPSON THACHER &
BARTLETT LLP
900 G. Street, N.W.
Washington, D.C. 20001
Tel: (202) 636-5500
Fax: (202) 636-5502
sara.razi@stblaw.com
preston.miller@stblaw.com
lindsey.bohl@stblaw.com
nicholas.ingros@stblaw.com
avia.gridi@stblaw.com
geoffrey.schmelkin@stblaw.com

Michelle E. Gray
State Bar No. 24078586
S.D. Tex. Bar No. 892270
mgray@foglerbrar.com
Deborah C. Milner
State Bar No. 24065761
S.D. Tex. Bar No. 971677
cmilner@foglerbrar.com

FOGLER, BRAR, O'NEIL & GRAY
LLP
2 Houston Center
909 Fannin Street, Suite 1640
Houston, TX 77002
(713) 481-1010
(713) 574-3224 (Fax)

*Counsel for Mattress Firm Group Inc.*

## CERTIFICATE OF WORD COUNT

Pursuant to this Court's Rule 18(c), I certify that the motion contains 9,360 words excluding the case caption, table of contents, table of authorities, signature block, and certificates.

*/s/ Ryan A. Shores*
Ryan A. Shores

## CERTIFICATE OF SERVICE

I hereby certify that on November 1, 2024, I electronically filed a true and correct copy of the foregoing document using this Court's CM/ECF system, which will send a notice of electronic filing to all counsel of record.

I also certify that I caused an unredacted copy of the foregoing document to be served via email to:

> apergament@ftc.gov; amaltas@ftc.gov; cwint@ftc.gov; dallen1@ftc.gov;
> ialbright@ftc.gov; kpasupula@ftc.gov; tmartin@ftc.gov; ytucker@ftc.gov;
> aritchie@ftc.gov; adurst@ftc.gov; chwang@ftc.gov; estevenson1@ftc.gov;
> jtabbaa@ftc.gov; jpascale@ftc.gov; lkrachman@ftc.gov; myellen@ftc.gov;
> mjoseph1@ftc.gov; nmiller2@ftc.gov; rmosier@ftc.gov; srodger@ftc.gov;
> wsohn@ftc.gov; xgong@ftc.gov

*/s/ Ryan A. Shores*
Ryan A. Shores

# EXHIBIT
# (FTC-SSB-00001737)

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

|  |  |  |
|---|---|---|
| | § | |
| In re: | § | Chapter 11 |
| | § | |
| **SERTA SIMMONS BEDDING, LLC,** | § | Case No. 23-90020 (DRJ) |
| ***et al.,*** | § | |
| | § | (Jointly Administered) |
| Debtors.[1] | § | |
| | § | |

DECLARATION OF JOHN LINKER IN SUPPORT
OF CONFIRMATION OF JOINT CHAPTER 11 PLAN OF
SERTA SIMMONS BEDDING, LLC AND ITS AFFILIATED DEBTORS

I, John Linker, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury that the following is true and correct:

1.      I am the Chief Financial and Operations Officer of Serta Simmons Bedding, LLC ("**Serta Simmons Bedding**").  Serta Simmons Bedding, together with certain of its affiliates, including Dawn Intermediate, LLC ("**Dawn Intermediate**" and, collectively, the "**Company**" or the "**Debtors**") is one of the leading manufacturers and marketers of bedding products in North America, operating various bedding manufacturing facilities across the United States and Canada. I am knowledgeable about and familiar with the Company's business and financial affairs.

2.      Before joining Serta Simmons Bedding, I served as Executive Vice President and Chief Financial Officer of JELD-WEN Holding, Inc., a leading global manufacturer of windows and doors, from November 2018 through March 2022.  Prior to that, from 2012 to

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Dawn Intermediate, LLC (6123); Serta Simmons Bedding, LLC (1874); Serta International Holdco, LLC (6101); National Bedding Company L.L.C. (0695); SSB Manufacturing Company (5743); The Simmons Manufacturing Co., LLC (0960); Dreamwell, Ltd. (2419); SSB Hospitality, LLC (2016); SSB Logistics, LLC (6691); Simmons Bedding Company, LLC (2662); Tuft & Needle, LLC (2158); Tomorrow Sleep LLC (0678); SSB Retail, LLC (9245); and World of Sleep Outlets, LLC (0957). The Debtors' corporate headquarters and service address for these chapter 11 cases is 2451 Industry Avenue, Doraville, Georgia 30360.

November 2018, I held other leadership roles at JELD-WEN Holdings, Inc. in investor relations, corporate development, and treasury.  Prior to that, I held corporate development and finance leadership roles in the Aerospace Systems Division of United Technologies Corporation (and its predecessor, Goodrich Corporation), and earlier in my career, I was an investment banker with Wells Fargo Securities and a consultant for Accenture.  I have a Bachelor of Arts in Economics and Comparative Area Studies from Duke University, and a master's degree in business administration from Duke University's Fuqua School of Business.

3.      I submit this declaration (the "**Declaration**") in support of the *Modified First Amended Joint Chapter 11 Plan of Serta Simmons Bedding, LLC and Its Affiliated Debtors*, dated May 14, 2023 (Docket No. 874) (including any exhibits, schedules or supplements thereto and as may be amended, modified, or supplemented from time to time in accordance with the terms thereof, the "**Plan**"),[2] including without limitation the agreements and other documents set forth in that certain supplement to the Plan filed April 21, 2023 (Docket No. 692) and May 13, 2023 (Docket No. 869) (as may be further modified, amended, or supplemented in accordance with the Plan, and together with prior-filed versions, the "**Plan Supplement**").  I am generally knowledgeable about and familiar with the terms and provisions of the Plan and the Plan Supplement and incorporate both the Plan and Plan Supplement here in their entirety for purposes of this Declaration.

4.      Except as otherwise indicated, the facts set forth in this Declaration (or incorporated by reference herein) are based upon my personal knowledge, my review of relevant documents, information provided to me by employees working under my supervision, my opinion

---

[2]    Capitalized terms used but not defined herein have the meanings ascribed to them in the Plan, Disclosure Statement, or Plan Supplement (each as defined herein), as applicable.

based upon experience, knowledge, and information concerning the Company's operations and financial condition, my own reasonable inquiry, and/or my discussions with the Company's other officers, directors, and restructuring advisors, including professionals at Weil, Gotshal & Manges LLP ("**Weil**"), Evercore Group L.L.C. ("**Evercore**"), and FTI Consulting, Inc. ("**FTI**" and, together with Weil and Evercore, the "**Advisors**").  If called upon to testify, I will testify to the facts set forth in this Declaration.

5.       I am knowledgeable and familiar with the Debtors' business and financial affairs, the circumstances leading to the commencement of these chapter 11 cases, and the terms of the Plan.  Based on my personal involvement in the negotiation and implementation of the transactions embodied in the Plan and these chapter 11 cases, as well as my discussions with the Finance Committee, the Board, the Advisors, and other members of the Debtors' management team, I believe that (i) the Plan was proposed in good faith and (ii) the Debtors, acting through their officers, directors, managers, and Advisors, have conducted themselves in good faith and fairly in relation to the formulation and negotiation of, and solicitation of votes on, the Plan.

## DEVELOPMENT OF THE PLAN

6.       The Plan is the result of extensive good-faith negotiations among the Debtors and key parties in interest, which agreed to support the Plan pursuant to that certain *Restructuring Support Agreement* dated as of January 23, 2023 (as subsequently amended, and including any exhibits, schedules or supplements thereto, and as may be further modified, amended, or supplemented from time to time, the "**RSA**").  The Plan is the culmination of multiple settlements reached with certain of the Debtors' key stakeholders, including (i) an ad hoc group of holders of FLFO Claims and FLSO Claims representing more than 85% of the aggregate outstanding principal amount of Class 3 (FLFO Claims) and 86% of the aggregate outstanding principal amount of Class 4 (FLSO Claims) under the Plan (collectively, the "**Consenting**

3

Creditors"); (ii) Dawn Holdings, Inc., as the sole member, and holder of interests in, Dawn Intermediate, and funds managed by Advent International Corporation, as holder of interests in Dawn Holdings, Inc. (collectively, the "**Consenting Equity Holders**" and, together with the Consenting Creditors, the "**Consenting Parties**"); and (iii) the official committee of unsecured creditors (the "**Creditors' Committee**" and, together with the Consenting Parties, the "**Plan Settlement Parties**").

7.      The Plan provides for a comprehensive restructuring and deleveraging of the Debtors' balance sheet to support the long-term viability of the Company's enterprise.  The proposed restructuring will be effectuated pursuant to the Plan and contemplates, in relevant part, the following:

- A deleveraging of the Debtors' balance sheet from greater than approximately $1.9 billion in total debt to approximately $315 million (including original issue discount, if any) in total debt upon emergence and results in the resolution of certain pending claims against the Debtors brought by certain of the Non-PTL Lenders.

- Repayment in full of the DIP Facility and replacement by an asset-backed revolving credit facility in the amount of $100 million (the "**Exit ABL Facility**").

- Holders of Allowed Other Secured Claims and Allowed Priority Non-Tax Claims will be unimpaired under the Plan.

- Holders of Allowed FLFO Claims shall receive, in full and final satisfaction of such Claims, their Pro Rata share of a new term loan facility in the aggregate principal amount of $315 million (including original issue discount, if any) (the "**New Term Loan**"), equal in amount to the aggregate amount of their Allowed FLFO Claims.

- Holders of Allowed FLSO Claims shall receive, in full and final satisfaction of such Claims, such holder's Pro Rata share of (i) one hundred percent (100%) of the New Common Interests issued on the Effective Date, *less* any New Common Interests distributed to holders of Class 5 (Non-PTL Claims) under the Plan and subject to dilution by the New Common Interests distributed pursuant to a post-emergence equity-based management incentive plan as described in <u>Section 5.12</u> of the Plan (the "**Management Incentive Plan**"), and (ii) the aggregate amount of New Term Loans less

4

amounts distributed on account of Class 3 (FLFO Claims).  Receipt of such consideration shall be effected as described in that certain *Restructuring Transactions Exhibit* attached as <u>Exhibit F</u> to the Plan Supplement (the "**Restructuring Transactions Exhibit**").  *See* Plan Suppl., Ex. F.

- Holders of Allowed Non-PTL Claims shall receive, in full and final satisfaction of such Claims, with a carve out from the collateral (or the value of such collateral) securing the FLSO Claims, such holder's Pro Rata Share of 1% of New Common Interests issued on the Effective Date, subject to dilution by any New Common Interests distributed pursuant to the Management Incentive Plan.

- If a holder of an Allowed Ongoing General Unsecured Claim executes either (i) a trade agreement providing for the continuation of goods or services on the same or better terms as existed as most favorable terms provided to the Debtors in the six (6) months prior to the Petition Date, the form of which is attached to the Disclosure Statement Order (as defined herein) as Schedule 9 thereto (a "**6A Trade Agreement**"), or (ii) a trade agreement pursuant to the *Final Order (I) Authorizing Debtors to Pay (A) Critical Vendor Claims, (B) Lien Claims, (C) 503(b)(9) Claims, and (D) Certain Royalties; and (II) Granting Related Relief* (Docket No. 369) or the *Interim Order (I) Authorizing Debtors to Pay (A) Critical Vendor Claims, (B) Lien Claims, (C) 503(b)(9) Claims, and (D) Certain Royalties; and (II) Granting Related Relief* (Docket No. 106) (a "**CV Trade Agreement**"), and such applicable agreement is in effect as of the Effective Date, such holder of an Allowed Ongoing General Unsecured Claim shall receive, with a carve out from the collateral (or the value of such collateral) securing the FLSO Claims, full payment in the Allowed amount of such Ongoing General Unsecured Claim no later than the date that is sixty (60) days from the later of the Effective Date and the execution of the 6A Trade Agreement or CV Trade Agreement.

- Holders of Allowed Other General Unsecured Claims shall receive, in full and final satisfaction of such Claims, with a carve out from the collateral (or the value of such collateral) securing the FLSO Claims, their Pro Rata Share of the Class 6B Trust Interests, including the Class 6B Cash Contribution, as set forth in the GUC Recovery Allocation Table (each as defined in the Plan).

- Holders of Allowed Intercompany Claims and Allowed Intercompany Interests will be either impaired or unimpaired under the Plan and therefore presumed to either accept or reject the Plan.

- Holders of Other Intercompany Interests shall receive the treatment afforded in the Restructuring Transactions Exhibit.

- Holders of Intermediate Equity Interests shall receive the treatment afforded in the Restructuring Transactions Exhibit.

8.    The Restructuring contemplated by the Plan provides the Debtors with a viable path forward and a framework to successfully exit chapter 11 in a timely fashion with the support of the Consenting Parties.

## PLAN REQUIREMENTS OF SECTION 1129 OF THE BANKRUPTCY CODE

9.    I am aware that the Debtors must demonstrate that the Plan satisfies the requirements of section 1129 of the title 11 of the United States Code (the "**Bankruptcy Code**"). Below I set out facts with respect to certain of those requirements, the events that have occurred throughout these chapter 11 cases, my experience as the Debtors' Chief Financial and Operations Officer, and discussions I have had with the Debtors' Advisors, and other members of the Debtors' management team.  Other facts supporting these requirements are reflected in the Plan and Plan Supplement.

### I.    Section 1129(a)(1): Plan Compliance With Bankruptcy Code Provisions

10.    The Plan provides for the following eleven (11) Classes of Claims and Interests: (i) Class 1 (Other Secured Claims); (ii) Class 2 (Priority Non-Tax Claims); (iii) Class 3 (FLFO Claims); (iv) Class 4 (FLSO Claims); (v) Class 5 (Non-PTL Claims); (vi) Class 6A (Ongoing General Unsecured Claims); (vii) Class 6B (Other General Unsecured Claims); (viii) Class 7 (Intercompany Claims); (ix) Class 8 (Intercompany Interests); (x) Class 9 (Other Intercompany Interests); and (xi) Class 10 (Intermediate Equity Interests.).[3]

11.    The classification structure of the Plan is rational and appropriate because all Claims and Interests within a Class have the same or similar rights against the Debtors.  The

---

[3]    Administrative Claims (including DIP Claims, Professional Fee Claims, Priority Tax Claims, and postpetition Intercompany Claims) have not been classified and are separately treated under the Plan.

Plan provides for the separate classification of Claims and Interests based upon the different legal nature and priority of such Claims and Interests, which classification generally tracks the Debtors' prepetition capital structure and divides the applicable Claims and Interests into Classes based on the underlying instruments, debts, or circumstances giving rise to such Claims and Interests:

- ***Class 1 (Other Secured Claims)***.  Class 1 is comprised of secured claims, other than Administrative Expense Claims, Priority Tax Claims, FLFO Claims, or a FLSO Claims and hold security over specific assets of the Debtors.

- ***Class 3 (FLFO Claims)***.  Class 3 is comprised of holders of Claims arising from, derived from, or in connection to first lien first out term loans held under the PTL Credit Agreement.  While the Claims in Classes 3 and 4 arise out of the same debt instrument, they are separately classified because the holders hold different rights and entitlements hold security over specific assets of the Debtors pursuant to the PTL Credit Agreement and Intercreditor Agreement.  Namely, the Claims in Class 3 are entitled to higher priority under the Intercreditor Agreement.

- ***Class 4 (FLSO Claims)***. Class 4 is comprised of holders of Claims arising from, derived from, or in connection to first lien second out term loans under the PTL Credit Agreement.  As noted above, while the Claims in Classes 3 and 4 arise out of the same debt instrument, they are separately classified because the holders hold different rights and entitlements pursuant to the PTL Credit Agreement and are subordinated to the FLFO Claims pursuant to the Intercreditor Agreement.

- ***Class 5 (Non-PTL Claims)***. Class 5 is comprised of Claims arising from or in connection to principal obligations under the Non-PTL Term Loan Agreement.  Class 5 is classified separately from Classes 3 and 4 because the Claims arise out of a distinct debt instrument, hold different rights and entitlements, and are subordinated to the FLFO Claims and the FLSO Claims pursuant to the Intercreditor Agreement.

- ***Class 6A (Ongoing General Unsecured Claims)***.  Class 6A (Ongoing General Secured Claims) is comprised Claims held by vendors and other trade creditors that are vital to the Reorganized Debtors' go-forward Business Plan.  As discussed above, as a condition to receiving full payment of the Allowed amount of their Ongoing General Unsecured Claim, holders of Class 6A (Ongoing General Unsecured Claims) must execute either (i) a 6A Trade Agreement or (ii) a CV Trade Agreement, which must be in effect as of the Effective Date.  The recoveries available to Class 6A (Ongoing General Unsecured Claims) are being provided as part of a carve out from the collateral (or the value of such collateral) securing the FLSO Claims.

The benefits of this carve out allows the Reorganized Debtors to minimize supply chain disruption and preserve valuable business relationships with vendors and service providers that are vital to the go-forward business plan of the Reorganized Debtors.

- *Class 6B (Other General Unsecured Claims)*. Class 6B (Other General Secured Claims) is comprised of holders of prepetition vendor claims who did not execute a 6A Trade Agreement or otherwise have failed to perform the conditions required to qualify for Class 6A (Ongoing General Unsecured Claims), claims from the rejection of non-residential real property leases, miscellaneous litigation claims, and other unsecured debt. The holders of Class 6B (Other General Unsecured Claims) will not have a go-forward business relationship with the Reorganized Debtors.

- *Class 7 (Intercompany Claims)*. Class 7 (Intercompany Claims) are comprised of Claims against a Debtor held by another Debtor.

- *Class 8 (Intercompany Interests)*. Class 8 (Intercompany Interests) are comprised of Interests in a Debtor held by another Debtor, other than an Interest in Dawn Intermediate or Serta Simmons Bedding.

- *Class 9 (Other Intercompany Interests)*. Class 9 (Other Intercompany Interests) are comprised any outstanding Interests in Serta Simmons Bedding that existed immediately prior to the Effective Date, and any other Intercompany Interests identified as such in the Restructuring Transactions Exhibit filed with the Plan Supplement.

- *Class 10 (Intermediate Equity Interests)*. Class 10 (Intermediate Equity Interests) are comprised of any outstanding Interests in Dawn Intermediate that existed immediately prior to the Effective Date.

## II. <u>Section 1129(a)(2): Debtors Compliance with the Bankruptcy Code</u>

12.     Each of the Debtors has a domicile, a place of business, and property in the United States, facing significant debt maturities in 2023, and therefore each Debtor is eligible for relief under chapter 11 of the Bankruptcy Code.

13.     On March 23, 2023, the Bankruptcy Court entered the Disclosure Statement Order, which approved the Debtors' disclosure statement for the Plan (the "**Disclosure Statement**") as containing "adequate information" in accordance with section 1125(b) of the Bankruptcy Code and approved the Solicitation Package. As detailed in the *Declaration of Emily*

*Young of Epiq Corporate Restructuring, LLC Regarding Voting and Tabulation of Ballots Cast on Joint Chapter 11 Plan of Serta Simmons Bedding, LLC and Its Affiliated Debtors* (Docket No. 779), dated May 4, 2023, (the "**Solicitation Declaration**"), I understand that, in accordance with the solicitation and voting procedures, the Debtors solicited votes from holders of Claims and Interests in the Voting Classes.  *See* Solicitation Decl., ¶ 9.

14.     On May 9, 2023, the Debtors filed an amended Plan reflecting the terms agreed as part of the settlement with the Creditors' Committee (the "**Creditors' Committee Global Settlement**").  In addition, subsequent to filing this Declaration, the Debtors may make certain additional immaterial changes to the Plan prior to the Confirmation Hearing pursuant to section 1127 of the Bankruptcy Code.  I have no reason to believe that any of these modifications to the Plan will require additional disclosures.

### III.   Section 1129(a)(3): Good Faith

15.     I believe the Plan has been proposed by the Debtors in good faith and for the legitimate and honest purposes of reorganizing the Debtors' ongoing business and enhancing the Debtors' long-term financial viability while providing recoveries to certain of the Debtors' stakeholders.  The Plan is the culmination of extensive, good-faith negotiations between the Debtors and the majority of their key economic stakeholders, including the Consenting Parties and the Creditors' Committee.

### IV.   Section 1129(a)(4): Professional Fees Subject to Bankruptcy Court Approval

16.     All payments by the Debtors for services provided to the Debtors during these chapter 11 cases will be subject to approval by the Bankruptcy Court as reasonable in accordance with section 1129(a)(4) of the Bankruptcy Code.  Specifically, Section 2.2 of the Plan provides that Professionals seeking approval by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred after the Petition Date through the

Effective Date must file final applications no later than forty-five (45) days after the Effective Date, unless otherwise ordered by the Bankruptcy Court, thereby giving interested parties adequate time to review the Professional Fee Claims.  Further, Article XI of the Plan provides that the Bankruptcy Court will "retain jurisdiction over all matters arising in, arising under, and related to the chapter 11 cases for, among other things, […] all Professional Fee Claims[.]"  Any other professional fee payments to be made by the Debtors will be made in accordance with the Plan.

**V.**    **Section 1129(a)(5): Information Regarding Proposed Officers and Managers**

17.    The Plan Supplement provides that the Reorganized Board will consist of seven (7) members: (i) the current chief executive officer of Serta Simmons Bedding, and (ii) six (6) additional members the identity of whom will be selected by the Requisite Consenting Creditors in consultation with the Company.  *See* Plan Suppl., Ex. E.

**VI.**    **Section 1129(a)(6): No Rate Changes**

18.    The Plan does not provide for any rate changes by the Debtors.

**VII.**    **Section 1129(a)(11): Feasibility**

19.    It is my understanding, based on discussions with the Debtors' legal advisors, that section 1129(a)(11) of the Bankruptcy Code permits a plan to be confirmed only if it is feasible—*i.e.*, if the Debtors' reorganization is not likely to be followed by liquidation or the need for further financial reorganization.  I believe that the Plan satisfies this standard and, as set forth in Exhibit H to the Disclosure Statement, the Debtors have prepared and filed with the Bankruptcy Court financial projections for the Reorganized Debtors (the "**Financial Projections**") for fiscal years 2023 through 2027.  A true and correct copy of the Financial Projections is also attached hereto as **Exhibit A**.

20.     The management team and I prepared an updated business plan for 2023-2027 (the "**Business Plan**")[4] over a period of several months, and we concurrently worked with the Advisors, including Evercore and FTI, to create the Financial Projections that reflected the Business Plan.  Based on the Financial Projections and my knowledge and judgment, I believe the Debtors' Plan will accomplish the Debtors' goal to emerge in a more financially secure position, that the Debtors will have sufficient resources to make all known payments required pursuant to the Plan, and that confirmation of the Plan is not likely to be followed by liquidation or the need for further reorganization.

21.     The Financial Projections assume (i) that the Plan will be consummated in accordance with its terms, (ii)  that all transactions contemplated by the Plan will be consummated pursuant to the *Order (I) Scheduling Certain Hearing Dates and Deadlines, (II) Establishing Certain Protocols in Connection with Such Hearings, and (III) Granting Related Relief* (Docket No. 267) (the "**Scheduling Order**"), and (iii) a significant delay in confirmation of the Plan may have a significant negative impact on the operations and financial performance of the Debtors including, but not limited to, an increased risk or inability to meet forecasts and the occurrence of higher reorganization expenses.  The Financial Projections were prepared utilizing a number of reasonable and good-faith assumptions based upon the current views and understandings of the Debtors' management, were informed by our current understanding of the conditions in the Debtors' markets, and prepared on a holistic basis.  While the Financial Projections did not assume the Creditors' Committee Global Settlement at the time they were prepared, the terms of that settlement do not materially alter the Financial Projections.  I do not believe that the Financial

---

[4]     The Projection Period includes prepetition period January 1, 2023, through January 22, 2023, and postpetition period January 23, 2023, through December 31, 2027, with an assumed effective date pursuant to the Scheduling Order (as defined herein).

Projections require further modifications or amendments to account for the Creditors' Committee Global Settlement.  I also do not believe that any changes have taken place since the Financial Projections were filed with the Bankruptcy Court that require further modifications or amendments to the Financial Projections.

22.    The Financial Projections include cash forecasts that were developed through an analysis of information as well as management's views on: (i) Debtors' manufacturing, operation, and sales activities; (ii) unit economic impacts resulting from manufacturing footprint optimization and other cost saving initiatives, incremental costs associated with product launches, and one-time costs to support cost saving initiatives; (iii) ongoing, and expected, overhead and advertising costs to support the Debtors' operations; and (iv) other drivers of cash flow, including expected working capital trends, capital investments, taxes, debt service pursuant to the capital structure outlined in the Plan of Reorganization, and restructuring-related professional fees and transaction costs, among others.  After taking into account the expected distributions to be made at emergence pursuant to the Plan of Reorganization, I believe there will be a minimum of $40 million of cash available upon emergence, as well as incremental liquidity available under the Exit ABL Facility.  The level of pre-effective date cash remains subject to variability because of various factors including, but not limited to, (i) the ongoing impact of the COVID-19 pandemic, or a similar pandemic, or even a perceived threat of such an outbreak, which could cause significant disruptions to the Reorganized Debtors' supply chain, manufacturing capability, corporate support infrastructure, or distribution system that could, as a result, adversely impact the ability to produce and deliver products, as well as negatively impact consumer confidence and consumer demand generally, and (ii) the risk of deteriorating economic conditions including economic recession or other adverse economic conditions, including prolonged market volatility, which could cause

However, I believe that the new sources of capital provided by the Exit ABL Financing (or an alternative form of exit financing) will be sufficient to satisfy all of the Debtors' known obligations under the Plan, and provide the Reorganized Debtors with an improved balance sheet that will position the Reorganized Debtors to successfully implement their Business Plan.

23.     I, along with other members of the Debtors' management team and the Advisors, spent significant time meeting, evaluating, and discussing the Business Plan and Financial Projections.  The Debtors also held a number of diligence sessions with the Debtors' key stakeholders regarding the Financial Projections.  The meetings with the Debtors' key stakeholders were conducted in good faith and in the spirit of cooperation in order to develop a viable business plan.

24.     As reflected in the Financial Projections, following emergence from these chapter 11 cases, I believe that the Reorganized Debtors will be in a position to withstand market volatility.  In addition, as further outlined in the Financial Projections, the Reorganized Debtors' capital structure—though subject to change—anticipates the following debt facilities to be in place upon emergence:

- the $100 million Exit ABL Facility, which will replace the DIP Facility on the Effective Date;

- outstanding letters-of-credit in the amount of $28 million;

- the New Term Loan in the aggregate principal amount of $315 million (including original issue discount, if any); and

- the principal outstanding from the capital lease obligations.

25.     In addition to these debt facilities, the Reorganized Debtors expect to have the benefit of a minimum of $40 million in cash at emergence.  I believe that, despite certain assumptions being subject to change and excluding any materially adverse events beyond the

Debtors' control, the Business Plan and Financial Projections are reasonable and provide the Reorganized Debtors with the ability to service their debts as they come due.

26.     I believe that the funded debt that the Debtors will raise in connection with emergence from these chapter 11 cases (along with the funded debt that will be assumed) will be on reasonable terms and will not include such onerous terms that put the Reorganized Debtors at risk for a future reorganization.

27.     I, along with the Debtors' management, Advisors, and employee team have worked diligently to ensure that the Business Plan and Financial Projections provide the Reorganized Debtors with adequate liquidity post-emergence, while also giving the Reorganized Debtors the flexibility to continue to grow and invest in order to maximize the value of the Reorganized Debtors' business.  Based upon my education, prior work experience, and my experience as Chief Financial and Operations Officer of Serta Simmons Bedding, I believe the Financial Projections and the Business Plan upon which it is premised are reasonable and that the Plan is feasible.

## VIII.    Section 1129(a)(14)–(16): Inapplicable Provisions

28.     The Debtors do not have any domestic support obligations, no Debtor is an "individual" as I understand that term to be used in the Bankruptcy Code, and the Debtors are each a moneyed, business, or commercial corporation.

## IX.    Section 1129(b): Cramdown of Non-Accepting Classes

29.     I understand that, pursuant to section 1129(b) of the Bankruptcy Code, a plan may be confirmed notwithstanding the rejection or deemed rejection by a class of claims or interests (*i.e.*, "crammed down") so long as the plan is "fair and equitable" and it does not discriminate unfairly as to the non-accepting class.  Based upon my discussions with the Debtors' legal advisors, I understand that the only Classes to which cramdown is relevant are the Classes

14

that have been deemed to reject the Plan or that voted to reject the Plan: Class 5 (Non-PTL Claims), Class 6B (Other General Unsecured Claims) (except with respect to Tuft & Needle, LLC, at which holders in this Class voted to accept the Plan), Class 9 (Other Intercompany Interests), and Class 10 (Intermediate Equity Interests).  Cramdown may also apply to Class 7 (Intercompany Claims) and Class 8 (Intercompany Interests) in the event such Classes are deemed to reject the Plan.

### A.    Plan Does Not Discriminate Unfairly

30.    Based upon my discussions with the Debtors' legal advisors, I understand that section 1129(b)(1) of the Bankruptcy Code prohibits unfair discrimination, which occurs when similarly situated classes are treated differently without a reasonable basis for the disparate treatment.

31.    As discussed herein, the Debtors have a reasonable basis for separately classifying the Classes of Claims arising from, derived from, or in connection to the Debtors' prepetition debt instruments—*i.e.*, Class 3 (FLFO Claims), Class 4 (FLSO Claims), and Class 5 (Non-PTL Claims)—because each class hold different rights and entitlements pursuant to such instruments and the Intercreditor Agreement, pursuant to which (i) the FLSO Claims are subordinated to the FLFO Claims, and (ii) the Non-PTL Claims are subordinated to the FLFO Claims and FLSO Claims.

32.    With respect to the Debtors' general unsecured Classes, the Debtors have a reasonable business justification for classifying Class 6A (Ongoing General Unsecured Claims) separately because the ongoing vendor and trade creditors comprising Class 6A (Ongoing General Unsecured Claims) are of critical importance in the Reorganized Debtors' Business Plan.  The treatment of Class 6A (Ongoing General Unsecured Claims) has a material impact on the Debtors' day-to-day operations and ultimately weighs heavily on the prospects of achieving the Financial Projections.

15

33.     Further, I understand that in a liquidation scenario, the unsecured holders in Class 6A (Ongoing General Unsecured Claims), and Class 6B (Other General Unsecured Claims) would not be expected to receive any recovery. *See* Talarico Decl. ¶ 20.  The recoveries for these Classes under the Plan are provided as part of a voluntary carve out from the collateral (or the value of such collateral) securing the FLSO Claims.  Accordingly, the Plan's disparate treatment of the general unsecured Classes is an exercise of the Debtors' reasonable business judgment and preserves the enterprise as a going concern while providing all unsecured creditors recoveries substantially in excess of the recoveries they would have received in a chapter 7 liquidation.

34.     Further, based on my understanding of the Plan and discussions with the Debtors' legal advisors, the Plan does not skip or otherwise favor any creditor class at the expense of a "priority" unsecured creditor class or senior class.  As discussed above, the recoveries available to the Class 5 (Non-PTL Claims), Class 6A (Ongoing General Unsecured Claims), and Class 6B (Other General Unsecured Claims) are provided as part of a voluntary carve out from the collateral (or the value of such collateral) securing the FLSO Claims and not on account of any value that would otherwise be entitled to Class 5 (Non-PTL Claims).  For the avoidance of doubt, the recovery of Class 5 (Non-PTL Claims) is itself only available under the Plan as a result of this voluntary carve out, which the Debtors have a reasonable justification for providing, being that these creditors are secured and, even though the value implied by the Valuation Analysis is insufficient to provide a recovery, the Debtors believe a modest recovery through a voluntary carve-out is reasonable to avoid a potential costly valuation dispute.

### B.     Plan Is Fair and Equitable

35.     Based upon my discussions with the Debtors' legal advisors, I understand that section 1129(b)(2) of the Bankruptcy Code requires that a plan be fair and equitable with respect to impaired classes of claims or interests and that this is assessed by whether any holder of

a claim or interest junior to the impaired creditor will receive or retain property under the plan on account of such junior claim or interest.

36.     Here, no Class of Claims or Interests junior to the Classes that are deemed to reject the Plan— Classes 9 (Other Intercompany Interests) and Class 10 (Intermediate Equity Interests)—will receive a recovery under the Plan on account of such Claims or Interests. Additionally, Class 5 (Non-PTL Claims) voted to reject the Plan, and Class 6B (Other General Unsecured Claims) voted to reject the Plan at all but one Debtor entity.  As discussed above, holders in Class 5 (Non-PTL Claims), Class 6A (Ongoing General Unsecured Claims), and Class 6B (Other General Unsecured Claims) are receiving value through a carve out from the collateral (or the value of such collateral) securing the FLSO Claims.  Based on my understanding of the Plan and discussions with the Debtors' legal advisors, Class 5 (Non-PTL Claims), Class 6A (Ongoing General Unsecured Claims), Class 6B (Other General Unsecured Claims), Class 7 (Intercompany Claims), Class 8 (Intercompany Interests), Class 9 (Other Intercompany Interests), and Class 10 (Intermediate Equity Interests) are either under-secured or unsecured, and no junior Class is receiving a recovery under the Plan on account of their Claims.

## X.     Section 1129(c): Plan Is Only Plan Currently on File

37.     The Plan is the only operative chapter 11 plan currently on file in these chapter 11 cases.

## XI.    Section 1129(d): Principal Purpose of Plan Is Not Avoidance of Taxes

38.     The principal purpose of the Plan is not the avoidance of taxes or the avoidance of section 5 of the Securities Act, and no party has objected on any such grounds.

## XII.     <u>Section 1129(e): Inapplicable Provision</u>

39.     Based on my understanding of the Plan and discussions with the Debtors' legal advisors, these chapter 11 cases are not "small business cases" as I understand that term to be defined in the Bankruptcy Code.

### <u>REQUEST FOR WAIVER OF BANKRUPTCY RULE 3020(E)</u>

40.     Any significant delay may have an impact on the Debtors' financial performance and ability to achieve the Financial Projections.  I believe that the Plan represents a fair and equitable compromise by and among the major parties-in-interest in the Chapter 11 Cases and should be consummated as expeditiously as possible and without delay.  In addition, the Debtors' prompt emergence from chapter 11 is required under the Restructuring Support Agreement and will assuage the concerns of the Debtors' customers, vendors, and employees regarding the sustainability and viability of the Reorganized Debtors.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: May 14, 2023
        Charlotte, North Carolina

_____

By:     John Linker
Title:   Chief Financial and
         Operations Officer

## <u>Appendix A</u>

**Financial Projections**

## FINANCIAL PROJECTIONS

**Introduction**

Section 1129(a)(11) of the Bankruptcy Code[16] requires that a debtor demonstrate that confirmation of a plan is not likely to be followed by liquidation or the need for further financial reorganization of the reorganized debtor or any successor to the debtor.  For purposes of demonstrating that the Plan meets this requirement, the Debtors have prepared these projections (the "***Financial Projections***") based on, among other things, the anticipated future financial condition and results of operations of the Debtors.  In conjunction with the Company's advisors, the Company's management team developed and refined the business plan and prepared consolidated financial projections of the Debtors for January 1, 2023, through December 31, 2027 (the "***Projection Period***")[17].

The Financial Projections assume that the Plan will be consummated in accordance with its terms and that all transactions contemplated by the Plan will be consummated pursuant to the Scheduling Motion.  Any significant delay in confirmation of the Plan may have a significant negative impact on the operations and financial performance of the Debtors, including, but not limited to, an increased risk or inability to meet forecasts and the incurrence of higher reorganization expenses.

Although the Financial Projections represent the Debtors' best estimates and good faith judgment (for which the Company's management team believes it has a reasonable basis) of the results of future operations, financial position, and cash flows of the Debtors, they are only estimates and actual results may vary considerably from such Financial Projections.  Consequently, the inclusion of the Financial Projections herein should not be regarded as a representation by the Debtors, the Debtors' advisors, or any other person that the projected results of operations, financial position, and cash flows of the Debtors will be achieved. Additional information relating to the principal assumptions used in preparing the Financial Projections are set forth below.

The Financial Projections are largely based on the Company's long-term forecast developed in December 2022.  In addition to the financial forecast of the Debtors, the Financial Projections incorporate the financial activities of Non-Debtor entities.  Additional information relating to the principal assumptions used in preparing the Financial Projections are set forth below.

The Financial Projections have been prepared by the Company's management team, in conjunction with the Debtors' advisors, FTI Consulting, Inc.  The Financial Projections were not prepared to comply with the guidelines for prospective financial statements published by the American Institute of Certified Public Accountants or the rules and regulations of the SEC, and by their nature are not financial statements prepared in accordance with accounting principles generally accepted in the United States of America.

The Debtors' independent accountants have neither examined nor compiled the accompanying financial projections and accordingly do not express an opinion or any other form of assurance with respect to the Financial Projections, assume no responsibility the Financial Projections, and disclaim any association with the Financial Projections.

---

[16]   Capitalized terms used but not defined herein have the meanings ascribed to them in the Disclosure Statement to which these Financial Projections are attached.

[17]   The Projection Period includes prepetition period January 1, 2023, through January 22, 2023, and postpetition period January 23, 2023, through December 31, 2027, with an assumed effective date pursuant to the Scheduling Motion.

The Financial Projections do not reflect the impact of fresh start reporting in accordance with American Institute of Certified Public Accountants statement of position 90-7 "Financial Reporting by Entities in Reorganization under the Bankruptcy Code."

The Financial Projections contains certain statements that are forward-looking statements and are based on estimates and assumptions and are necessarily speculative.  No representations or warranties are made as to accuracy of any financial information contained herein or assumptions regarding the debtors' businesses and their future results and operations.

The Financial Projections and any forward-looking statements in the Financial Projections are being made by the Debtors as of the date hereof, unless specifically noted.  The Debtors are under no obligation to (and expressly disclaim any obligation to) update or alter the Financial Projections and any forward-looking statements whether because of new information, future events, or otherwise.

**General Assumptions & Methodology**
The Financial Projections for the Debtors are based on the Debtors' 2023 – 2027 business plan as informed by current and projected conditions in the Debtors' markets and were prepared on a holistic basis.  The Financial Projections consist of the following unaudited pro forma financial statements for each year in the Projection Period: (i) projected consolidated statements of operations and (ii) projected consolidated statements of cash flows.

The Company's management team reports and uses the Adjusted EBITDA metric to assess the ongoing performance of the Debtors' core operations, adjusted for certain non-operating and one-time costs.

**Consolidated Statements of Operations Assumptions**
1. Net Sales: Net Sales are primarily derived from (i) sales to customers, net of certain dealer expenses and discounts and (ii) royalty revenues from domestic and international licensees of intellectual property.  The Net Sales forecast is built up at the brand and customer/channel level and is based on management's views of: bedding market growth; assumed competitive dynamics; customer, channel, and product mix; forecasted trends in price inflation; and product launches, among other factors.
2. Cost of Products Sold: Cost of Products Sold primarily represents materials and related procurement costs, labor, and overhead expenses.  Costs of Products Sold are directly correlated to net sales; however, they have been forecast based on management's expectations with respect to: cost inflation; productivity; customer, channel, and product mix; savings resulting from manufacturing footprint optimization and other cost saving initiatives; and incremental costs associated with product launches, among other factors.
3. Selling, General, and Administrative: Selling, General, and Administrative expense is comprised of outbound distribution costs, certain dealer expenses, royalty expenses, media and marketing expense, general and administrative expense, and other operating and one-time costs, among other costs.  One-time costs include costs associated with manufacturing footprint network optimization and costs in support of product development, among other expenses.
4. Amortization of Intangibles: Amortization expense is related to amortization of intangible assets.
5. Restructuring-Related Costs: One-time costs are related to restructuring-related professional fees and transaction costs, among others.
6. Interest Expense: Interest Expense is primarily comprised of interest payments and fees under (i) the Debtors' post-petition DIP Facility and (ii) the Debtors' expected capital structure post-emergence and projected levels of borrowing under the post-emergence Exit ABL Facility.  Interest

Expense is based on the terms contained in the DIP Facility and post-emergence Exit ABL Facility, post-emergence New Term Loan, and Capital Lease Obligations.

7. <u>Income Tax Expense</u>: Income Tax Expense is presented on a cash basis and is calculated based on the Debtors' current effective tax rate applied against projected levels of taxable income. Tax estimates are based only on tax obligations specific to current period income levels. Transaction-specific tax impacts are not included in these projections, including the receipt of potential tax refunds that may be pursued by the Debtors.

**Consolidated Statement of Cash Flows Assumptions**

1. <u>Changes in Working Capital</u>: Accounts receivable, inventory, and accounts payable balances are projected based on historical levels of days of sales outstanding, days of inventory outstanding, and days of payables outstanding. In addition, Changes in Working Capital includes adjustments to reflect historical timing of dealer expense application and the receipt of royalty receivables, as well as the assumed timing of accrued incentive compensation, among other factors.

2. <u>Cash Flows Provided by Investing Activities</u>: Primarily comprised of capital expenditures reflecting (i) capital investments related to optimizing the Company's manufacturing footprint, (ii) capital investments to enhance the Company's enterprise resource planning infrastructure, and (iii) other capital expenditures in support of maintaining the Company's existing assets. Cash Flows Provided by Investing Activities are reflected net of asset sale proceeds.

3. <u>Debt</u>: The Plan contemplates a restructured capital structure for the Debtors consisting of (i) a $125 million Exit ABL Facility, with $28 million of outstanding letters-of-credit, (ii) a $315 million, five (5) year New Term Loan (including OID, if any), and (iii) principal outstanding from the Capital Lease Obligations. The Exit ABL Facility will be subject to a minimum draw to be determined.

| ($ in Millions, unless otherwise noted) | 2023 | 2024 | 2025 | 2026 | 2027 |
|---|---|---|---|---|---|
| **Consolidated P&L** | | | | | |
| **Gross Profit** | | | | | |
| Net Sales | $ 2,060 | $ 2,230 | $ 2,368 | $ 2,515 | $ 2,693 |
| Cost of Sales | (1,254) | (1,330) | (1,396) | (1,475) | (1,567) |
| **Gross Profit** | $ 807 | $ 899 | $ 972 | $ 1,040 | $ 1,126 |
| Selling, General, & Administrative | (790) | (844) | (867) | (907) | (962) |
| Amortization of Intangibles | (56) | (44) | (44) | (44) | (44) |
| **Operating Income / (Loss)** | $ (40) | $ 11 | $ 60 | $ 90 | $ 120 |
| Interest Expense | (30) | (45) | (42) | (42) | (42) |
| Income Tax | (3) | (11) | (22) | (28) | (34) |
| Restructuring Related Costs | (99) | - | - | - | - |
| **Net Income / (Loss)** | $ (172) | $ (45) | $ (4) | $ 20 | $ 44 |
| Interest Expense | 30 | 45 | 42 | 42 | 42 |
| Income Tax | 3 | 11 | 22 | 28 | 34 |
| Depreciation & Amortization | 102 | 90 | 90 | 90 | 90 |
| Restructuring Related Costs | 99 | - | - | - | - |
| Other Adjustments[3] | 42 | 33 | 20 | 19 | 19 |
| **Adjusted EBITDA** | $ 104 | $ 133 | $ 170 | $ 199 | $ 228 |

---

[18]   "Other Adjustments" are comprised of non-income taxes (e.g., property taxes, sales and use taxes) and one-time expenses, including costs associated with manufacturing footprint network optimization and costs in support of product development, among other expenses.

| ($ in Millions, unless otherwise noted) | 2023 | 2024 | 2025 | 2026 | 2027 |
|---|---|---|---|---|---|
| **Consolidated Cash Flow Statement** | | | | | |
| **Cash Flows Provided by Operating Activities** | | | | | |
| **Net Income (Loss)** | $ (172) | $ (45) | $ (4) | $ 20 | $ 44 |
| Adjustments to Reconcile Net Income to Net Cash Provided by Operating Activities: | | | | | |
| Depreciation & Amortization | $ 102 | $ 90 | $ 90 | $ 90 | $ 90 |
| Changes in Working Capital | 6 | (2) | (5) | (3) | (4) |
| **Cash Flow from Operating Activities** | $ (65) | $ 42 | $ 81 | $ 106 | $ 130 |
| **Cash Flows Provided by Investing Activities** | $ (40) | $ (68) | $ (55) | $ (50) | $ (50) |
| **Cash Flows Provided by Financing Activities** | | | | | |
| Amortization of Term Loans | $ (5) | $ - | $ (3) | $ (3) | $ (3) |
| Capital Lease Obligations | (2) | (2) | (2) | (2) | (2) |
| **Cash Flow from Financing Activities** | $ (7) | $ (2) | $ (5) | $ (5) | $ (5) |
| **Net Change in Cash and Cash Equivalents** | $ (111) | $ (28) | $ 21 | $ 51 | $ 75 |
| **Cash and Cash Equivalents - Beginning of Period** | 223 | 112 | 84 | 106 | 157 |
| **Cash and Cash Equivalents - End of Period** | $ 112 | $ 84 | $ 106 | $ 157 | $ 232 |

# EXHIBIT
# (TEMPUR-LIT-00095408)

REFINITIV STREETEVENTS

# EDITED TRANSCRIPT

TPX.N - Q3 2023 Tempur Sealy International Inc Earnings Call

EVENT DATE/TIME: NOVEMBER 02, 2023 / 12:00PM GMT

**OVERVIEW:**

Company Summary

REFINITIV STREETEVENTS | www.refinitiv.com | Contact Us

©2023 Refinitiv. All rights reserved. Republication or redistribution of Refinitiv content, including by framing or similar means, is prohibited without the prior written consent of Refinitiv. 'Refinitiv' and the Refinitiv logo are registered trademarks of Refinitiv and its affiliated companies.

REFINITIV

TEMPUR-LIT-00095408

NOVEMBER 02, 2023 / 12:00PM, TPX.N - Q3 2023 Tempur Sealy International Inc Earnings Call

## CORPORATE PARTICIPANTS

**Aubrey Moore** *Tempur Sealy International, Inc. - VP of IR*

**Bhaskar Rao** *Tempur Sealy International, Inc. - Executive VP & CFO*

**Scott L. Thompson** *Tempur Sealy International, Inc. - Chairman of the Board, CEO & President*

## CONFERENCE CALL PARTICIPANTS

**Atul Maheswari** *UBS Investment Bank, Research Division - Analyst*

**Bradley Bingham Thomas** *KeyBanc Capital Markets Inc., Research Division - MD & Equity Research Analyst*

**Carla Marie Casella Hodulik** *JPMorgan Chase & Co, Research Division - MD & Senior Analyst*

**Jason Daniel Haas** *BofA Securities, Research Division - VP*

**Keith Brian Hughes** *Truist Securities, Inc., Research Division - MD*

**Laura Allyson Champine** *Loop Capital Markets LLC, Research Division - Director of Research*

**Peter Jacob Keith** *Piper Sandler & Co., Research Division - MD & Senior Research Analyst*

**Robert Kenneth Griffin** *Raymond James & Associates, Inc., Research Division - Director*

**Seth Mckain Basham** *Wedbush Securities Inc., Research Division - MD of Equity Research*

**Susan Marie Maklari** *Goldman Sachs Group, Inc., Research Division - Analyst*

**William Michael Reuter** *BofA Securities, Research Division - MD & Research Analyst*

## PRESENTATION

**Operator**

Good day, and thank you for standing by. Welcome to Tempur Sealy's Third Quarter 2023 Earnings Conference Call. (Operator Instructions) Please be advised that today's conference is being recorded.

I would now like to hand the conference over to your speaker today, Aubrey Moore, Vice President, Investor Relations. Please go ahead.

---

**Aubrey Moore** *- Tempur Sealy International, Inc. - VP of IR*

Thank you, operator. Good morning, everyone, and thank you for participating in today's call. Joining me today are Scott Thompson, Chairman, President and CEO; and Bhaskar Rao, Executive Vice President and Chief Financial Officer.

This call includes forward-looking statements that are subject to the safe harbor provisions of the Private Securities Litigation Reform Act of 1995. These forward-looking statements involve uncertainties and actual results may differ materially due to a variety of factors that could adversely affect the company's business. These factors are discussed in the company's SEC filings, including its annual report on Form 10-K and quarterly reports on Form 10-Q.

Any forward-looking statement speaks only as of the date on which it was made. The company undertakes no obligations to update any forward-looking statements. This morning's commentary will include non-GAAP financial measures. Reconciliations of the non-GAAP financial information can be found in the accompanying press release, which is posted on the company's investor website at investor.tempursealy.com and filed with the SEC. Our comments will supplement the detailed information provided in the press release.

And now with that introduction, it's my pleasure to turn the call over to Scott.

2

REFINITIV STREETEVENTS | www.refinitiv.com | Contact Us

©2023 Refinitiv. All rights reserved. Republication or redistribution of Refinitiv content, including by framing or similar means, is prohibited without the prior written consent of Refinitiv. 'Refinitiv' and the Refinitiv logo are registered trademarks of Refinitiv and its affiliated companies.

REFINITIV

TEMPUR-LIT-00095409

NOVEMBER 02, 2023 / 12:00PM, TPX.N - Q3 2023 Tempur Sealy International Inc Earnings Call

**Scott L. Thompson** - *Tempur Sealy International, Inc. - Chairman of the Board, CEO & President*

Thanks, Aubrey. Good morning, everyone, and thank you for joining us on our 2023 third quarter earnings call. I'll start by sharing some highlights from our third quarter performance, and then Bhaskar will review our financial performance in more detail. After that, I will provide an update on our proposed acquisition of Mattress Firm before opening up the call for Q&A.

Today, we are reporting the third best third quarter sales and EPS in the company's history. For the third quarter of 2023, we reported net sales of approximately $1.3 billion and adjusted EPS of $0.77. Our results are approximately consistent with the third quarter of last year despite a more challenging macroeconomic operating background.

The U.S. bedding industry as a whole underperformed our expectations with estimated volume down low double digits in the quarter. We mitigated the impact of the softer than expected U.S. market with solid company performance. It exceeded our expectations on both a relative market performance and year-over-year gross margin expansion. Internationally, the bedding industry and our operations performed in line with our expectations. Overall, despite down markets and the disruption of a major cybersecurity incident in the third quarter, our strong relative performance and cash flow generation demonstrate strong strength of our brands, operations and team. We believe Tempur Sealy is well positioned for continued success.

Turning to highlights for the quarter. First, our industry-leading brands and products continue to resonate with the U.S. consumer, driving our strong performance relative to the broader market. All of our new Tempur products and supporting advertising initiatives are strengthening Tempur's appeal to the premium, wellness-minded consumer. The incremental cooling and comfort innovation of our new lineup of Breeze mattresses generate robust retail advocacy and favorable mix in the quarter compared to the prior year. The lumbar feature, acoustic massage, the Wake Up and Wind Down technologies and our new Smart Base lineup continue to strengthen the value proposition of our adjustable offering, driving an improvement in attachment rates year-over-year.

These innovations drove a 5% increase in Tempur mattress and foundation ASP in the third quarter. Looking ahead to 2024, we expect to complete the full refresh of our U.S. Tempur portfolio by introducing our next generation of Adapt products. We expect strong returns on investments in our new products for years to come.

Over the quarter, we continued to support our new Tempur products and the long-term health of our Tempur brand with continued investments in national and digital Tempur-Pedic advertising. These marketing investments support very solid e-commerce performance and drove an increase in U.S. Tempur search interest year-over-year. Our strategic investment in product distribution and marketing also continued to drive strong performance and expand brand awareness of Stearns & Foster in the U.S. market.

We completed the rollout of our all-new Stearns & Foster mattress collection earlier this year. We continue to see these new products connecting with the premium traditional innerspring consumer, driving sales growth year-over-year. The consumer-centric innovation, elevated design and enhanced step-up opportunities are resonated with premium innerspring customers. We are thrilled that our high-end products are performing well and the ASP of Stearns & Foster product is up double digits from last year.

Additionally, Stearns & Foster search interest and e-commerce traffic were up 50% this year. Clearly, our multiyear strategy for Stearns & Foster is working well for us and our retailers.

Second highlight, our international operation is performing well and driving solid sales growth amid the current macro backdrop. We have successfully launched our new international Tempur lineup in over 90 markets worldwide, completing the rollout in nearly all the key markets in Europe and Asia. The launch is on track and will be substantially completed before the end of the year. The new products are being well received. Additionally, Dreams, our U.K. retail operation is also performing well in both sales, outperforming versus the broader market and has record customer satisfaction.

This quarter's performance demonstrates the strength of our international strategy and team highlighting the long-term opportunity for the international operations.

3

REFINITIV STREETEVENTS | www.refinitiv.com | Contact Us

©2023 Refinitiv. All rights reserved. Republication or redistribution of Refinitiv content, including by framing or similar means, is prohibited without the prior written consent of Refinitiv. 'Refinitiv' and the Refinitiv logo are registered trademarks of Refinitiv and its affiliated companies.



TEMPUR-LIT-00095410

NOVEMBER 02, 2023 / 12:00PM, TPX.N - Q3 2023 Tempur Sealy International Inc Earnings Call

Third, we achieved significant consolidated gross margin expansion year-over-year and are compressing towards normalized margins. After multiple years of COVID overhanging, rapid inflation, macroeconomic disruption pressured margins worldwide, we're pleased to report 340 basis point improvement in consolidated adjusted gross margin year-over-year. Thanks to the successful management of commodity fluctuations, improved supplier contracts and operational improvements. This is a significant step towards driving profitability, which the team remains laser-focused on achieving.

The first driver of our gross margin improvement is our ability to pass on pricing to offset commodity inflation. As you may recall, we experienced approximately 400 basis points of margin compression between 2020 and 2022, as commodity prices increased at a historical pace. Now that pricing changes have been implemented, the commodity prices have started to normalize. You can see the positive results in our reported financial statements.

Additionally, we're optimistic that our scale in the market and our new product innovations will drive further gross margin expansion.

The second driver of gross margin improvement is operational efficiencies. In 2022, we invested approximately $80 million above normal operating levels to ensure we met our customers' needs during periods of supply chain disruptions. While these actions were critical to maintaining and strengthening our third-party retail relationships during the period of uncertainty that put significant pressure on our margins. Beginning in the back half of 2023, operations began to drive year-over-year improvements in supply contracts, labor productivity and logistic efficiencies.

As we look ahead, we'll remain focused on cost reductions and achieving our multiyear operational targets. Third driver to gross margin improvement is our brand and product mix. Our new Tempur and Stearns & Foster products are continuing to resonate with our premium consumers, driving momentum at the high end of the portfolio. We're also seeing a favorable mix benefit as premium consumers are less impacted by the current softness in market.

Lastly, our final highlight is the J.D. Power Award announcement we made this morning. Tempur-Pedic ranked the #1 in customer satisfaction with mattresses online in the J.D. Power 2023 report. We are thrilled to achieve this distinction for the third year in a row for our online mattress category and the fifth consecutive year of winning at least one of J.D. Power's awards.

Now I'll turn the call over to Bhaskar to review our financial statements in more detail.

**Bhaskar Rao** - *Tempur Sealy International, Inc. - Executive VP & CFO*

Thank you, Scott. In the third quarter of 2023, consolidated sales were approximately $1.3 billion, and adjusted earnings per share was $0.77. While these results were slightly below our expectations, we believe we continue to outperform our competitive set in a challenging market. We have approximately $32 million of pro forma adjustments in the quarter, all of which are consistent with the terms of our senior credit facility. These adjustments are primarily related to costs incurred in connection with the planned acquisition of Mattress Firm and the previously disclosed cyber event.

Turning to North American results. Net sales declined 3% in the third quarter. On a reported basis, the wholesale channel declined 4% and the direct channel declined 1%. North American adjusted gross margin improved a very robust 300 basis points to 43.2%, driven by favorable commodities and operational efficiencies, partially offset by deleverage.

North American adjusted operating margin improved 50 bps to 20.3% driven by improvement in gross margins, partially offset by investments in growth initiatives.

Now turning to International. International net sales increased a very solid 12% on a reported basis and 7% on a constant currency basis. As compared to the prior year, our International gross margin improved a robust 320 basis points to 56.6%, driven by commodities, mix and favorable leverage. Our International adjusted operating margin improved 150 basis points to 16.2%, driven by improvements in gross margin, partially offset by investments.

4

REFINITIV STREETEVENTS | www.refinitiv.com | Contact Us

©2023 Refinitiv. All rights reserved. Republication or redistribution of Refinitiv content, including by framing or similar means, is prohibited without the prior written consent of Refinitiv. 'Refinitiv' and the Refinitiv logo are registered trademarks of Refinitiv and its affiliated companies.



Global commodity prices continue to trend largely in line with our expectations. We continue to expect favorable commodity prices for the remainder of the year, though remaining significantly elevated from 2020 levels. In addition to the benefit of favorable commodity markets, we have signed multiple agreements with certain global suppliers who have recognized our scale momentum. These relationships will benefit our gross margins over the long term.

Now moving on to the balance sheet and cash flow items. We have paid down approximately $200 million of debt over the first 9 months of this year. At the end of the third quarter, consolidated net debt was $2.5 billion, and our leverage ratio under our credit facility was 2.9x, within our historical target range of 2 to 3x. We generated third quarter operating cash flow of approximately $230 million. In the last 5 years, the company has realized over $2.5 billion in operating cash flow, proving the business model and providing financial flexibility.

I'm pleased to highlight that over the last few weeks, we have successfully refinanced our credit facilities. With this refinancing, we have meaningfully extended our debt maturities, improved our financial flexibility and increased our potential total senior credit funding, all while maintaining our current cost of funds in what is clearly a tight commercial banking market.

As we previously reported, under the terms of our purchase agreement with Mattress Firm, we have temporarily suspended repurchases under our share repurchase authorization as we work towards the closing of the transaction. Over this interim period between sign and close, we expect to significantly deleverage as we plan to use cash to pay down debt. After the acquisition closes, we anticipate our leverage ratio to be between 3 and 3.25x.

Now turning to 2023 guidance. We now expect adjusted EPS to be in the range of $2.30 and $2.50. We have maintained a $0.20 range, which reflects the global uncertainty. The midpoint of the revised annual guidance is based on sales consistent with prior year. This includes our updated expectation that the U.S. industry volumes will be down low double digits year-over-year versus our prior expectation of high single digits and the execution of our key initiatives, new product launches and the wraparound impact of pricing.

Sales and marketing investments of $20 million to support product launches, and record advertising spend of approximately $480 million as we continue to support our leading brands and new products. All this results in adjusted EBITDA for the year of approximately $885 million at the midpoint of the range, consistent with prior year.

I should point out the adjusted EPS range reflects foreign exchange rates that are unfavorable versus our previous expectations. Our current outlook for 2023 now contemplates an FX headwind, indicating our fourth quarter 2023 adjusted EPS has been reduced $0.04 versus our previous expectations.

Our guidance also considers the following allocations of capital: a quarterly dividend of $0.11, representing a 10% increase relative to 2022 and CapEx of approximately $200 million, which includes $90 million of growth, primarily to fund the completion of our Crawfordsville facility. Going forward, we would expect our CapEx to return to a more normalized level of spend. We think of annualized CapEx as approximately $150 million driven by maintenance spend of $110 million and gross spend of approximately $40 million.

Lastly, I would like to flag a few modeling items. For the full year 2023, we expect D&A of approximately $185 million to $190 million, interest expense of about $130 million on a tax rate of 25% and a diluted share count of 177.5 million shares.

With that, I'll turn the call back over to Scott.

---

**Scott L. Thompson** - *Tempur Sealy International, Inc. - Chairman of the Board, CEO & President*

Thanks. Nice job, Bhaskar. Before opening up the call for questions, let me provide a brief update on our pending acquisition of Mattress Firm. Consistent with our expectations, we are currently responding to the Federal Trade Commission's robust second request, which we expect to complete in the fourth quarter of 2023. We continue to expect the transactions to close in mid to late 2024.

REFINITIV STREETEVENTS | www.refinitiv.com | Contact Us

©2023 Refinitiv. All rights reserved. Republication or redistribution of Refinitiv content, including by framing or similar means, is prohibited without the prior written consent of Refinitiv. 'Refinitiv' and the Refinitiv logo are registered trademarks of Refinitiv and its affiliated companies.

REFINITIV

CONFIDENTIAL                                                    TEMPUR-LIT-00095412

NOVEMBER 02, 2023 / 12:00PM, TPX.N - Q3 2023 Tempur Sealy International Inc Earnings Call

We continue to work closely with Mattress Firm's leadership team. We received high-level updates on numerous topics, including their financial performance. Mattress Firm has an October 3 fiscal year-end and will report their fiscal results when their audit is complete, most likely in early December. Their preliminary results are in line with our expectations.

Finally, I'm pleased to share that Tempur Sealy and Mattress Firm continue to make joint progress in planning for post closing, including solidifying key supplier relations ahead of the expected close. Since announcing the acquisition in May, Tempur Sealy has signed numerous plus closing supply agreements with existing Mattress Firm suppliers and one supply agreement for the company not currently supplying Mattress Firm. These contracts are consistent with our expectation for Mattress Firm to continue as a multi-branded retailer post closing. A few additional discussions regarding supplier relations are ongoing.

In summary, our progress towards the transaction close is on track, and we look forward to joining with the Mattress Firm team. And with that, I'll open up the call for questions. Operator?

## QUESTIONS AND ANSWERS

**Operator**

(Operator Instructions) Our first question comes from the line of Susan Maklari with Goldman Sachs.

**Susan Marie Maklari** - *Goldman Sachs Group, Inc., Research Division - Analyst*

Why don't we start by talking a bit about the demand environment. I think that obviously, things felt a little softer in the quarter than maybe some had anticipated. And appreciating the color you gave in your comments, but can you talk a bit more about how things trended during the quarter? Any sort of -- anything of note in there? And how you're thinking about the business as we progress through the balance of this year?

**Scott L. Thompson** - *Tempur Sealy International, Inc. - Chairman of the Board, CEO & President*

Sure. Thank you for your question, Susan. I mean, first of all, let's not overlook that the International team had good solid growth in the quarter. And I think your question is really more directed towards North America. And then to kind of streamline your question even further, our Mexico operations had a great quarter, and Canada was solid. So kind of ratcheted down our largest market, which is where your question is really focused is the U.S. market.

As far as how the quarter progressed, the same trends that I think we talked about probably in the second quarter we saw in the third quarter, which is in non-holiday periods, the troughs have gotten deeper. And then during holiday periods, we're seeing growth in the market. But the holiday periods haven't been strong enough to offset the trough. So that would be the -- we'll call that in-quarter kind of trend. That's the same trend that we would expect in the fourth quarter. It continues to be what I'd call the normalization of the seasonality that the business used to incur before COVID with maybe slightly deeper troughs and slightly higher peaks during the holiday period.

I think you also kind of asked in general, just like demand. I mean, I think as you well know, the industry has been from a unit standpoint, has been in decline for 9 quarters, making it where we currently are sitting at great recession kind of volumes in the industry that we're working through and ensure some of that has to do with slowdown in the general economy, and we're talking U.S. here in wallet shift. There's probably some minor pullback or pull forward from COVID, although we've never really thought that, that was a big number. I think the biggest thing that the industry is working through is really advertising. And as you know, we've got a lot of smart people and a lot of analytics that go on and look at advertising, both ours and the effectiveness of it, what goes on in the industry and looking at it as we try to understand why the industry is having such a tough slug compared to historical volumes and we're off our trend lines.

REFINITIV STREETEVENTS | www.refinitiv.com | Contact Us

©2023 Refinitiv. All rights reserved. Republication or redistribution of Refinitiv content, including by framing or similar means, is prohibited without the prior written consent of Refinitiv. 'Refinitiv' and the Refinitiv logo are registered trademarks of Refinitiv and its affiliated companies.

REFINITIV

CONFIDENTIAL

If you look at it, manufacturer advertising over the last 3 years is down 40%. And if you look at the retailers, their advertising is down 20%. And yes, that's an issue. But I think probably a bigger issue is when you dive into that reduced advertising and you look at the mix of what people are doing both from a manufacturing standpoint and a retailer standpoint, they've moved from top-of-funnel advertising over the last 3 years to the bottom of the funnel. The manufacturers have moved about 40% of their advertising from the top of the funnel to the bottom, and retailers have also moved probably 40% to 40% plus of their advertising from the top of the funnel to the bottom of the funnel.

So what does that mean? That means we're not putting enough customers in the funnel, triggering their thinking about mattresses and we're all kind of fighting for the few customers that happen to trip into the funnel is what's going on in the industry. If you play with the math, that means total top funnel advertising for manufacturers is down 64%. When you include the decline in advertising plus the mix change, and for retailers, it's down 44%. That is an enormous amount of advertising dollars taken off the top of the funnel. And I think that's the big problem in traffic. I think that's actually the bigger issue than share of wallet and other things that people like to talk about.

Now from our standpoint, we continue to support the industry as a manufacturer in our advertising expense we've not cut. So with us not cutting, you can see the other manufacturers are clearly not helping pull the funnel forward. We have moved some to the bottom of the funnel, and we're looking at that. And what we're doing to help kind of get the industry back on track is we're working with other retailers and major retailers walking them through some of this analysis, talking to them about it and it's resonating with them. And some of the large retailers are relooking at their advertising mix and dollar amount.

**Operator**

Our next question comes from the line of Peter Keith with Piper Sandler.

**Peter Jacob Keith** - *Piper Sandler & Co., Research Division - MD & Senior Research Analyst*

So really nice gross margin expansion. I think the surprise to me and I think from others was the growth in SG&A. And you did reference that you're making some growth investments. So could you unpack a little bit what changed with Q3? Is there anything to accelerate? And maybe detail what some of these growth investments are?

**Bhaskar Rao** - *Tempur Sealy International, Inc. - Executive VP & CFO*

Absolutely. So one of the important things that Scott mentioned is that we want to continue to support our brands and products. So we continue to advertise and what we believe is that, that advertising is showing itself in that we continue to outperform the market and capture share. So a piece of that is going to be advertising. What I would further say is that we remain very positive and constructive on our own doors, specifically our Tempur retail store strategy.

And as you can imagine, those are very unique type of shopping experiences that have unique locations, very long tail on those. We've identified those opportunities. So as you think about the investments in those stores, that's what's flowing through selling and marketing as well. Outside of that and as we think about those things, those things are going to continue to pay dividends as you think about growth in the out years. We are going to invest in future growth.

**Scott L. Thompson** - *Tempur Sealy International, Inc. - Chairman of the Board, CEO & President*

Yes. I mean that's consistent with what we said. We did not pull back what I'd call short-term things to worry about quarter's earnings. When we look at the market share gains we're getting and what we're doing as far as strengthening our competitive position, we felt like those investments, we should continue to make them. And they're advertising and there are some new stores at Tempur and those take some start-up costs and stuff. But we stayed on track with our growth plan.

REFINITIV STREETEVENTS | www.refinitiv.com | Contact Us

©2023 Refinitiv. All rights reserved. Republication or redistribution of Refinitiv content, including by framing or similar means, is prohibited without the prior written consent of Refinitiv. 'Refinitiv' and the Refinitiv logo are registered trademarks of Refinitiv and its affiliated companies.



CONFIDENTIAL

TEMPUR-LIT-00095414

NOVEMBER 02, 2023 / 12:00PM, TPX.N - Q3 2023 Tempur Sealy International Inc Earnings Call

**Operator**

Our next question comes from the line of Bobby Griffin with Raymond James.

**Robert Kenneth Griffin** - *Raymond James & Associates, Inc., Research Division - Director*

Bhaskar, clearly, a very dynamic market here. I'm not asking really for 2024 guidance. We'll all make our own predictions. But when you look at this year and you kind of look out played out, can you maybe highlight a few of the aspects that might not repeat from a cost standpoint in 2024 that we should keep in mind? And then on the other side, is there things coming in 2024 that we should also model in that maybe didn't occur this year from a product investment standpoint or anything about that just to help us think about the flow in and flow out of costs and expenses next year?

**Scott L. Thompson** - *Tempur Sealy International, Inc. - Chairman of the Board, CEO & President*

Sure. I'll start, and then Bhaskar will probably enhance it and clean it up. I think the one thing that jumps to mind and it's really a highlight for the quarter is the operational efficiencies that we're beginning to flow through the financial statements. Look, the last few years, we're really a mess in operations because of supply chain issues, commodity changes, an AX conversion, staffing issues. I mean, look, the operating team has done a great job in a very tough operating environment. Well, all that's kind of normalized. And we're back to focusing like we used to do historically on driving efficiencies. We're getting back on our metrics. And this is really the first quarter that you're beginning to see that in the margins.

So that's an internal issue, and I'm optimistic that you're going to continue to see that in 2024. I think you can also see one of the big highlights is the International sales group. As we've talked about this [cube] project, which again took a lot of energy from operations and got them not off focus from an efficiency standpoint. We're through that project. So I'm expecting some operating efficiencies internationally, plus the product is resonating in the marketplace.

I think it was like a 12% growth, give or take, Bhaskar, for the international group. And think about that. This is a high-end product in the international market at a time of geopolitical complications, we'll call it. So we're thrilled. This is higher ASP product and it's resonating. We'd expect to get leverage in the international operation from sales. Bhaskar, what are they just off the top of your head?

**Bhaskar Rao** - *Tempur Sealy International, Inc. - Executive VP & CFO*

I think all those are the right way to think about it, a number of growth initiatives to drive the top line and then the operations or from a gross margin standpoint, we should see those tailwinds continue.

**Operator**

Our next question comes from the line of Jason Haas with Bank of America.

**Jason Daniel Haas** - *BofA Securities, Research Division - VP*

Scott, in light of your comments to a previous question, I'm curious if you could say what you think is needed for the industry to get back to more normalized unit levels? Do you think we need to see a pickup in industry advertising? Do we need to see more housing turnover? Is it just going to take time? What do you think is key to get there?

REFINITIV STREETEVENTS | www.refinitiv.com | Contact Us

©2023 Refinitiv. All rights reserved. Republication or redistribution of Refinitiv content, including by framing or similar means, is prohibited without the prior written consent of Refinitiv. 'Refinitiv' and the Refinitiv logo are registered trademarks of Refinitiv and its affiliated companies.

REFINITIV

CONFIDENTIAL                                                                                    TEMPUR-LIT-00095415

NOVEMBER 02, 2023 / 12:00PM, TPX.N - Q3 2023 Tempur Sealy International Inc Earnings Call

**Scott L. Thompson** - *Tempur Sealy International, Inc. - Chairman of the Board, CEO & President*

Yes. I think we all fell in love with low funnel advertising and some others pulled back on their advertising hoping to draft on other people. I think the betting is an industry that you have to trigger the customer to think about. People don't wake up 1 day and say let's go buy a bunch of beds. And the industry is very successful when it advertises. And so I think it's primarily a lack of advertising by people and probably a mix -- a little bit of a mix fine-tuning.

I think I would also point to, if you look at what Tempur Sealy has done. I mean, look, it's not any secret. We've gathered a lot of market share. And you see that in our Stearns & Foster product where we've done higher than historical advertising dollars in there. So we've proven that advertising works. Yes, the product is great. Sales team is great. But you got to have the advertising in there. And so, yes, I think advertising is the key. You'll hear retailers talk about traffic. And that is the issue, and everybody needs to get back to working a little bit on the top funnel and getting people in the funnel rather than waiting to try the last minute, grab them off their purchase journey at the end. Things like manufacturers slot -- bind slots or doing spiffs. Those kind of dollar investments are all just fighting over the customers in the marketplace and aren't productive. And they really aren't something that Tempur Sealy has done. We've had some other manufacturers try to work that angle.

---

**Operator**

Our next question comes from the line of Seth Basham with Wedbush Securities.

---

**Seth Mckain Basham** - *Wedbush Securities Inc., Research Division - MD of Equity Research*

I was hoping for a little bit more color around the supply agreements you were talking about. So the new supply agreements that you're signing with existing suppliers or even one new supplier you mentioned, are these beneficial to you because of the proposed acquisition of Mattress Firm? Or are those independent? And how should we think about the benefits to gross margin from these into 2024?

---

**Scott L. Thompson** - *Tempur Sealy International, Inc. - Chairman of the Board, CEO & President*

Yes. Let me talk about those. I mean we're buying Mattress Firm. It has other suppliers, and we decided it would be advantageous to go ahead and sign some post-merger supply agreements with those suppliers. Why did we think that? One is some of these suppliers, Mattress Firm is their largest customer, and it creates an uncertainty in their minds. Some of them need to refinance their debt. Some of them just need to figure out their staffing. Some of these products have long lead times. And so in order to have a stable market, it seemed appropriate to go ahead and both parties come together, make sure we have a medium in the minds and contractually arrange what that looks like. So it's good for them. It's also good for us because it gives us certainty that we're not going to have any supply disruptions.

And with the contracts we've signed, we've got enough non-Tempur Sealy suppliers to have a multi-branded mattress firm floor and service our customers. It also gives the Mattress Firm folks the RSA's comfort that they're going to have some of the non-Tempur Sealy products that they love to market. It also is friendly from an FTC standpoint. To the extent if the FTC has concerns, that suppliers are going to get shut out. It's not consistent with our business plan, overseas at Dreams or anywhere else. It's not our business plan here. But we've got contracts also we put in place to demonstrate that our business plan is being executed.

---

**Operator**

Our next question comes from the line of Brad Thomas with KeyBanc Capital Markets.

---

9

©2023 Refinitiv. All rights reserved. Republication or redistribution of Refinitiv content, including by framing or similar means, is prohibited without the prior written consent of Refinitiv. 'Refinitiv' and the Refinitiv logo are registered trademarks of Refinitiv and its affiliated companies.

**REFINITIV**

CONFIDENTIAL

TEMPUR-LIT-00095416

NOVEMBER 02, 2023 / 12:00PM, TPX.N - Q3 2023 Tempur Sealy International Inc Earnings Call

**Bradley Bingham Thomas** - *KeyBanc Capital Markets Inc., Research Division - MD & Equity Research Analyst*

Scott, I was hoping I could get a little bit of your kind of first blush and how you're thinking about the industry as you look out to 2024. Obviously, some of the leading indicators of the health of the consumer, like ramping student loan payments could be a headwind. Obviously, interest rates are going higher. Housing has been slower. So curious your early take on 2024. And if the industry stays challenged, can you help us think about how Tempur might change strategy, if at all, in that kind of environment?

**Scott L. Thompson** - *Tempur Sealy International, Inc. - Chairman of the Board, CEO & President*

Sure. Look, and we certainly see and agree that there are some headwinds in 2024 and don't want to underestimate those or let you think we've got our head in the sand. Those are all good points of why the macro should be some headwinds in there. But if you look at the industry, we're already so far on the bottom from historical standpoints. That I think that we -- we probably are in good shape. I think some of this is self-inflicted from our execution from an industry standpoint on advertising. So I've used the term bouncing around the bottom. Probably the industry took a little bit of a step down, probably bounced a little further down in the bottom. But I think you either get in 2024 bouncing around the bottom or you get this slow recovery that we've been looking for in the industry.

What does that mean for Tempur Sealy? I see nothing going on in the marketplace that would make me think that we would not continue to take market share. And so without -- I don't know what 2024 looks like yet, we haven't finished our budgeting. But I think even if it's a -- we'll call it a softer overall market, I think our market share gains will help offset issues there. And then as I mentioned earlier on the call, we've got some internal issues that we're in control of from a cost standpoint that I think gives us some optimism as to, we'll call it, EPS when you get down there. Top line is going to be a little more volatile to look at. But I think we feel relatively comfortable going into 2024 with more details coming when it's appropriate.

**Operator**

Our next question comes from the line of Atul Maheswari with UBS.

**Atul Maheswari** - *UBS Investment Bank, Research Division - Analyst*

Scott, a question that we keep getting from investors who are taking a fresh look at the TPX story, is that who is TPX gaining all the share from and why is it gaining share? So really a 2-part question. Can you provide some color on the who and then on the why, how is the product and marketing strategy of TPX different? And then related to that, Scott, where is the incremental opportunity to continue to gain share given your already robust share position in the U.S.? And then what is the risk that some of your competitors might ultimately catch up the ones who have been disrupted?

**Scott L. Thompson** - *Tempur Sealy International, Inc. - Chairman of the Board, CEO & President*

Sure. Good detailed question. First of all, I don't want to get the International market. So first of all, just internationally, taking a large amount of share, obviously, with what we reported this quarter. Lots of competition there. So we're not going to talk about it because it takes us all day to go through each country. So I think your question really is more pointed towards the U.S., okay? So I'm going to focus on the U.S., but let's not forget, internationally, we're taking a good bit of share all around the world.

So when you go to the U.S., I apologize for a second, I think this is I think we're taking share from everybody. I think there might be a smaller player somewhere in the group. But I think we think the industry was down, call it, low double digits. I think that's not far off what our friends over at Leggett. I think as others report their numbers, we can kind of solidify and perfect that number. And so if you'd call the industry, let's just call it down 10% for talking terms.

And in the U.S., Bhaskar, we were down like 1 or 2?

REFINITIV STREETEVENTS | www.refinitiv.com | Contact Us

©2023 Refinitiv. All rights reserved. Republication or redistribution of Refinitiv content, including by framing or similar means, is prohibited without the prior written consent of Refinitiv. 'Refinitiv' and the Refinitiv logo are registered trademarks of Refinitiv and its affiliated companies.

REFINITIV

CONFIDENTIAL

NOVEMBER 02, 2023 / 12:00PM, TPX.N - Q3 2023 Tempur Sealy International Inc Earnings Call

**Bhaskar Rao** - *Tempur Sealy International, Inc. - Executive VP & CFO*

Give or take 3.

---

**Scott L. Thompson** - *Tempur Sealy International, Inc. - Chairman of the Board, CEO & President*

Something like that. So if you play with the numbers, that means that other competitors had a really tough time. When I sit on sales calls, I don't hear another competitor taking share from us. So I'm going to say we're taking a little bit of share from probably most everybody. At some point, and I've said this in the past, the share gains probably will reduce as a percentage because our base is bigger and their base is smaller. But by then, I would expect that the industry also is probably in recovery. But no, I think there's still further share gains. We've got some stuff in the works and I would expect from what I've seen 2024 that we would take share in the U.S. and certainly take share internationally.

When you kind of asked about how are we doing it and what's our secret sauce? I mean, look, it's not too big a secret. It's -- we put the money in the beds with great product. We don't cut corners. We don't optimize to the detriment of our retailers or to our customers and our product. We invest in our people, and our sales force has been very stable and productive and our marketing departments and our staff have been very stable. We invest in people in good times and bad times.

We believe in advertising, it drives the industry. And we've been advertising significantly and will continue to advertise. And we make what I think at times are the long-term decision over the short-term decision. In this quarter, there were some decisions that we made during the quarter that I think will pay dividends to us in 2024. And we don't have discussions about optimizing quarters. We have discussions about optimizing our competitive position. So hopefully, that's helpful.

---

**Operator**

Our next question comes from the line of Keith Hughes with Truist.

---

**Keith Brian Hughes** - *Truist Securities, Inc., Research Division - MD*

I had a question on International. Amongst that 7% organic growth, can you talk about how Dreams bed versus [that]? And we're starting to feel the influence of the new product launches. Is there enough out there to be affecting the numbers.

---

**Scott L. Thompson** - *Tempur Sealy International, Inc. - Chairman of the Board, CEO & President*

Yes. Thank you for that direct question because it's actually a great story. As you may know, the U.K. market is really tough. I mean the U.K. market from a retail standpoint for durable good and home is a very tough market, maybe one of the toughest that we're experiencing around the world. And the Dreams team has done a fabulous job. They actually had growth in sales in the quarter, which is what I just told you, should indicate they had significant market share gains. They continue to be able to hit their acquisition, EBITDA budget and the team has done it with outstanding execution.

So on the product standpoint, there's new products coming to the U.K. They actually do not have the new Tempur product really the only major market that doesn't have it because there's some special fire requirements in the U.K. So it takes a little -- they are always last on it. So they'll actually start gearing up in the first part of next year for what I'll call the new Tempur beds. They've got some other new product coming. They make a good bit of their own product, their own plant. But they're still dealing with a tough market, but boy, they have really done which from a Harvard business study, you would want people to do, which is in a tough market. Really solidify their competitive position.

---

REFINITIV STREETEVENTS | www.refinitiv.com | Contact Us

©2023 Refinitiv. All rights reserved. Republication or redistribution of Refinitiv content, including by framing or similar means, is prohibited without the prior written consent of Refinitiv. 'Refinitiv' and the Refinitiv logo are registered trademarks of Refinitiv and its affiliated companies.

REFINITIV

CONFIDENTIAL

TEMPUR-LIT-00095418

**Bhaskar Rao** - *Tempur Sealy International, Inc. - Executive VP & CFO*

And outside of Dreams, the new product is resonating with the consumer, and we saw nice growth outside of Dreams as well in a very tough market.

---

**Operator**

Our next question comes from the line of Laura Champine with Loop Capital.

---

**Laura Allyson Champine** - *Loop Capital Markets LLC, Research Division - Director of Research*

I appreciate the commentary that Mattress Firms met your internal expectations, but not being privy to those. Can you just give us a sense of how they're tracking versus the industry, which I think you commented that Tempur believes the mattress industry was down low double digits in the quarter?

---

**Scott L. Thompson** - *Tempur Sealy International, Inc. - Chairman of the Board, CEO & President*

Yes. Let me put some words around it, but I appreciate that I'm also trying to respect my future partners. But look, I think I would say -- I guess, I could say these words. Mattress Firm has -- the industry has been worse than we expected. That's very clear from our previous comment. And Mattress Firm actually has performed better than we would have expected in this particular U.S. economy. I think that probably helps reconcile you to what you're trying to work on. But no, they've done well. We'll let them report. And we're certainly thrilled to have them join the company.

---

**Operator**

Our next question comes from the line of Carla Casella with JPMorgan.

---

**Carla Marie Casella Hodulik** - *JPMorgan Chase & Co, Research Division - MD & Senior Analyst*

You commented on commodities and how they're improving or normalizing a bit, but there are still some that are well above the pandemic. Can you just break it down a little bit in terms of what some of the key commodities that you're seeing?

---

**Scott L. Thompson** - *Tempur Sealy International, Inc. - Chairman of the Board, CEO & President*

Absolutely. So the way I think about that is just from a framing standpoint is that we indicated historically that we've been able to cover the cost of the commodity inflation through taking price. However, from a mathematical standpoint, that created a margin, meaning the math issue, approximately 400 basis point.

So sitting here today, we think we're -- there's still about half of that to go. The way I think about from a commodity overall standpoint, is really puts and takes. Everything is definitely off its peaks and whether that be chemicals, lumber, steel, et cetera. However, if you look at where we started this journey, there's still a way to go. However, commodities in and of itself is not the story is that there's also another component of that story, which is we continue to work with our suppliers, our major suppliers to make sure that they understand the potential from a company standpoint and the momentum that we have.

So yes, we've seen some tailwinds from commodities over the last couple of bits. However, what we've also done is that we've entered into very constructive win-win contracts and relationships with our existing suppliers to ensure that the gift keeps on giving, not only from a commodity standpoint, but as a relationship, a strategic relationship to see benefits from an EBITDA standpoint.

12

©2023 Refinitiv. All rights reserved. Republication or redistribution of Refinitiv content, including by framing or similar means, is prohibited without the prior written consent of Refinitiv. 'Refinitiv' and the Refinitiv logo are registered trademarks of Refinitiv and its affiliated companies.

**REFINITIV**

CONFIDENTIAL

TEMPUR-LIT-00095419

NOVEMBER 02, 2023 / 12:00PM, TPX.N - Q3 2023 Tempur Sealy International Inc Earnings Call

**Operator**

Next question comes from the line of William Reuter with Bank of America.

**William Michael Reuter** - *BofA Securities, Research Division - MD & Research Analyst*

There's clearly a little bit of concern about lower income and middle income customers that may be experiencing increasing debt levels. I was wondering if you could talk a little bit about how your sales breakdown between different demographics? And if you're seeing some of those trends start to impact your results?

**Scott L. Thompson** - *Tempur Sealy International, Inc. - Chairman of the Board, CEO & President*

Sure. Consistent with the last few quarters, there's no question that the entry-level customer is challenged. We have the higher end products are doing well and growing, call it Stearns & Foster and Tempur and especially high-end Tempur. And where you see real pressure, again, we're talking U.S. is in the entry-level customer, which would be our entry-level Sealy product, Sealy Posturepedic big markets doing better. But we would share that, that the entry-level customer is really not active in the current market.

**Operator**

Our next question comes from the line of Seth Basham with Wedbush Securities.

**Seth Mckain Basham** - *Wedbush Securities Inc., Research Division - MD of Equity Research*

I just have a follow-up. You guys talked about being on track to respond to this quarter. Is that timing at all longer than previously expected? I thought you'd be done with responding to that by now.

**Scott L. Thompson** - *Tempur Sealy International, Inc. - Chairman of the Board, CEO & President*

I would say, look, it's a complicated process, obviously. I think we have provided the government with over 1 million documents, just to be clear. We've always said that we would be substantially complete in the fourth quarter. We're off probably maybe 2, 3 weeks probably from the original time line at the very start.

**Operator**

Thank you. At this time, I'd like to hand the conference back to Mr. Scott Thompson for closing remarks.

**Scott L. Thompson** - *Tempur Sealy International, Inc. - Chairman of the Board, CEO & President*

Thank you, operator. To our over 12,000 employees around the world, thank you for what you do every day to make the company successful. To our retail partners, thank you for your outstanding representation of our brands, to our shareholders and lenders, thank you for your confidence in leadership -- in the leadership of the company and its Board. This ends today's call, operator. Thank you.

**Operator**

This concludes today's conference call. Thank you for your participation. You may now disconnect. Everyone, have a wonderful day.

REFINITIV STREETEVENTS | www.refinitiv.com | Contact Us

©2023 Refinitiv. All rights reserved. Republication or redistribution of Refinitiv content, including by framing or similar means, is prohibited without the prior written consent of Refinitiv. 'Refinitiv' and the Refinitiv logo are registered trademarks of Refinitiv and its affiliated companies.

REFINITIV

CONFIDENTIAL

TEMPUR-LIT-00095420

**NOVEMBER 02, 2023 / 12:00PM, TPX.N - Q3 2023 Tempur Sealy International Inc Earnings Call**

**DISCLAIMER**

Refinitiv reserves the right to make changes to documents, content, or other information on this web site without obligation to notify any person of such changes.

In the conference calls upon which Event Transcripts are based, companies may make projections or other forward-looking statements regarding a variety of items. Such forward-looking statements are based upon current expectations and involve risks and uncertainties. Actual results may differ materially from those stated in any forward-looking statement based on a number of important factors and risks, which are more specifically identified in the companies' most recent SEC filings. Although the companies may indicate and believe that the assumptions underlying the forward-looking statements are reasonable, any of the assumptions could prove inaccurate or incorrect and, therefore, there can be no assurance that the results contemplated in the forward-looking statements will be realized.

THE INFORMATION CONTAINED IN EVENT TRANSCRIPTS IS A TEXTUAL REPRESENTATION OF THE APPLICABLE COMPANY'S CONFERENCE CALL AND WHILE EFFORTS ARE MADE TO PROVIDE AN ACCURATE TRANSCRIPTION, THERE MAY BE MATERIAL ERRORS, OMISSIONS, OR INACCURACIES IN THE REPORTING OF THE SUBSTANCE OF THE CONFERENCE CALLS. IN NO WAY DOES REFINITIV OR THE APPLICABLE COMPANY ASSUME ANY RESPONSIBILITY FOR ANY INVESTMENT OR OTHER DECISIONS MADE BASED UPON THE INFORMATION PROVIDED ON THIS WEB SITE OR IN ANY EVENT TRANSCRIPT. USERS ARE ADVISED TO REVIEW THE APPLICABLE COMPANY'S CONFERENCE CALL ITSELF AND THE APPLICABLE COMPANY'S SEC FILINGS BEFORE MAKING ANY INVESTMENT OR OTHER DECISIONS.

©2023, Refinitiv. All Rights Reserved.

REFINITIV STREETEVENTS | www.refinitiv.com | Contact Us

©2023 Refinitiv. All rights reserved. Republication or redistribution of Refinitiv content, including by framing or similar means, is prohibited without the prior written consent of Refinitiv. 'Refinitiv' and the Refinitiv logo are registered trademarks of Refinitiv and its affiliated companies.

**REFINITIV**

# EXHIBIT
# (TEMPUR-LIT-00301085)



# Tempur Sealy International (TPX) to Acquire Mattress Firm

May 9, 2023

# Transaction Summary



**Consideration**

- Total purchase price of approximately $4.0B comprising:
  - $2.7B of cash consideration
  - $1.3B of stock consideration, based on 34.2M shares issued at $37.62 per share as of the closing share price on May 8, 2023

**Pro Forma Ownership[1]**

- 83.4% TPX shareholders
- 16.6% Mattress Firm shareholders

**Financial Impact**

- Accretive to adjusted EPS[2] in Year 1
- Increased operating cash flow in Year 1
- Cost synergies of $100M by Year 4[3]

**Financing**

- Expect to fund the cash payment to Mattress Firm shareholders and to repay Mattress Firm's debt using a combination of cash on hand and proceeds from new senior secured and senior unsecured debt
- Net leverage to be between 3.0x-3.25x at closing after giving effect to the transaction. Expect to return to target leverage ratio range of 2.0x-3.0x in the first twelve months after closing.[3]
  - Deleveraging driven by expected strong operating cash flow and adjusted EBITDA[2] growth

**Management and Governance**

- Mattress Firm to be operated as a separate business unit within the Company
- TPX Board to be expanded to include 2 Mattress Firm directors

**Timing and Approvals**

- Anticipated to close in the second half of 2024
- Subject to the satisfaction of customary closing conditions, including applicable regulatory approvals
- Substantially complying with an FTC Second Request and expect to work cooperatively to close the transaction

**TEMPUR✦SEALY**

2

CONFIDENTIAL–FTC v. TEMPUR SEALY/MATTRESS FIRM

# TPX Go-Forward Investment Thesis

- ⊘ Leading, vertically-integrated global company with iconic brands and extensive manufacturing and direct-to-consumer capabilities

- ⊘ Serves $120 billion[3] growing bedding market

- ⊘ Proven historical growth through organic and inorganic initiatives

- ⊘ Proven ability to successfully operate worldwide omni-channel distribution

- ⊘ Legacy of disciplined capital allocation, including dividends, share repurchases, and acquisitions

- ⊘ Seasoned, well-aligned management team with track record of success

**TEMPUR+SEALY**

3

CONFIDENTIAL–FTC v. TEMPUR SEALY/MATTRESS FIRM

TEMPUR-LIT-00301087



**MATTRESS*FIRM*** Overview

4

CONFIDENTIAL–FTC v. TEMPUR SEALY/MATTRESS FIRM

# Mattress Firm Business Highlights

### ✦ Leading Omni-Channel U.S. Retailer

2,300+ brick-and-mortar retail stores integrated with e-commerce and sleep education platforms to enable a seamless consumer purchase journey

### ✦ Strong Consumer Engagement

Robust consumer touchpoints with deep insight into evolving preferences to optimize the consumer purchase journey and sustain consumer loyalty

### ✦ Exceptional Retail Talent

6,200+ highly-trained retail sales associates facilitate an educational and effective end-to-end consumer purchase journey

### ✦ Diversified Product Offering

Leading brands and complementary private labels provide a range of innovative consumer solutions

### ✦ History of Sales and Adjusted EBITDA Growth[2]

+14% sales CAGR and +53% adjusted EBITDA[2] CAGR from FY 2019 – FY 2022

TEMPUR✦SEALY

5

# Mattress Firm Overview

## Company description

- A leading U.S. mattress specialty retailer

- Operates an integrated omni-channel platform that allows consumers to personalize their purchase journey

- #1 retailer of several leading national bedding brands and complementary private labels

- Approximate 8% share of the North America bedding industry[3]

## Geographic footprint[4]



■ Wholly-owned locations   ■ Wholly owned locations + franchised locations   ▨ Franchised locations

| | Ending Store Count | Sales Per Store[6] | Sales | Adjusted EBITDA[2] | Adjusted EBITDA Margin[2] | Website Visitors |
|---|---|---|---|---|---|---|
| FY'19 ended 10/1/2019[5] | 2,534 | 1.2M | $3.0B | $153M | 5.2% | 27M |
| | -205 | +0.6M | +$1.2B | +$279M | +520 bps | +32M |
| TTM ended 3/28/2023 | 2,329 | 1.8M | $4.2B | $432M | 10.4% | 59M |

Trailing twelve-month performance as shown throughout this presentation is for Mattress Firm's four fiscal quarters ended 3/28/2023 and Tempur Sealy's four fiscal quarters ended 3/31/2023.

TEMPUR✦SEALY

6

TEMPUR-LIT-00301090

# Mattress Firm's Diversified Product Offerings

**Retails broad assortment of leading national brands and complementary private labels, providing a diverse range of innovative consumer solutions at broad price points**

**Tempur Sealy Brands and Private Label**

- A leading retailer of Tempur-Pedic®, Sealy®, and Stearns & Foster® branded products
- Retails Sleepy's® private label bedding manufactured by Tempur Sealy

**Other Leading Brands and Private Labels**

- A leading retailer of Beautyrest®, Nectar®, Serta®, Simmons®, Tuft & Needle®, and Purple® branded products
- Retails Sleepy's® and tulo® private label bedding manufactured by third-party OEM

**Tempur Sealy and Mattress Firm Combined Sales by Brand[7]**
TTM 3/31/23



Other Brands and Private Labels
34%

TPX Brands and Private Labels
66%

CONFIDENTIAL–FTC v. TEMPUR SEALY/MATTRESS FIRM    TEMPUR-LIT-00301091



# Transaction Rationale

8

TEMPUR-LIT-00301092

# Accelerates Direct Sales Channel Expansion



| TPX North America<br>TTM 3/31/23 Sales by Channel | Pre-Acquisition | Post Acquisition[7] |
|---|---|---|
| Wholesale | 87% | 35% |
| Direct | 13% | 65% |

| TPX Consolidated<br>TTM 3/31/23 Sales by Channel | Pre-Acquisition | Post Acquisition[7] |
|---|---|---|
| Wholesale | 77% | 35% |
| Direct | 23% | 65% |

TEMPUR+SEALY

9

TEMPUR-LIT-00301093

# Transaction Rationale

**1** Expands consumer touchpoints to enhance ability to keep pace with evolving consumer preferences

**2** Accelerates U.S. omni-channel strategy, enabling a seamless consumer experience

**3** Simplifies consumer purchase journey, reducing friction at each touchpoint

**4** Aligns new product development and testing, facilitating consumer-centric innovation

**5** Streamlines operations and enhances supply chain management, resulting in operational efficiencies

**6** Drives adjusted EPS[2] accretion

TEMPUR+SEALY

10

TEMPUR-LIT-00301094

# ① Expands Consumer Touchpoints

**Combined consumer touchpoints enhance opportunities to keep pace with evolving consumer preferences, drive brand awareness, and broaden avenues for developing lifetime relationships with consumers**



TEMPUR✚SEALY                                            11

CONFIDENTIAL–FTC v. TEMPUR SEALY/MATTRESS FIRM                                            TEMPUR-LIT-00301095

# ② Accelerates Omnichannel Retail Strategy

**Accelerates TPX's U.S. omni-channel strategy to enable a seamless consumer experience**

| | TEMPUR+SEALY<br>North America Direct Channel | **MATTRESS FIRM** | TEMPUR+SEALY \| MATTRESS FIRM |
|---|---|---|---|
| **Direct channel sales**<br>TTM 3/31/23 | $491M | $4.2B | +849% |
| **Brick & mortar stores**<br>As of 3/31/23 | 227 | 2,329 | +1,026% |
| **Retail sales associates**<br>As of 3/31/23 | 558 | 6,267 | +1,123% |
| **Brick- & mortar and e-commerce traffic[8]**<br>TTM 3/31/23 | 29M | 65M | 225% |

CONFIDENTIAL–FTC v. TEMPUR SEALY/MATTRESS FIRM                    TEMPUR-LIT-00301096

# ③ Simplifies Consumer Purchase Journey

**Highly-trained retail and customer service teams sales associates combined with manufacturing interface, reduce friction along the purchase journey**







## Pre-Purchase

* **Drives awareness** through blended advertising share of voice
* **Facilitates** more targeted marketing efforts
* **Enhances consumer understanding** of bedding innovation

## Point of Purchase

* **Creates an integrated omni-channel ecosystem** that meets consumers where they are
* **Combines over 6,800 retail customer service teams** highly trained to support the consumer purchase journey

## Post Purchase

* **Accelerates continuous feedback loop** through sleep tracking and education apps and other platforms to enhance ongoing engagement
* **Expands customer service capabilities** to facilitate improved consumer outcomes

CONFIDENTIAL–FTC v. TEMPUR SEALY/MATTRESS FIRM

# ④ Facilitates Consumer-Centric Innovation

**Aligns new product development and testing to facilitate a more targeted end-to-end innovation approach**

- **Increased consumer touchpoints** drive ability to bring targeted, cutting-edge innovation to market that better aligns to consumer needs
- Provides **opportunity to invest in, test and refine product nationwide**, driving further refinement of new product throughout development process
- Aligns investments in sleep technology to **further innovation in the bedding category**
- Shared operating metrics provide for **incremental investments in innovation**

**Key Innovation Focus Areas**

 Snoring

 Support

 Climate

 Sleep Tracking

 Natural

 Comfort

CONFIDENTIAL–FTC v. TEMPUR SEALY/MATTRESS FIRM          TEMPUR-LIT-00301098

# ⑤ Streamlines Operations and Enhances Supply Chain Management

**Enhanced visibility to consumer demand creates opportunities for agile and fortified supply chain management while expanded scale and vertical integration drive operational efficiencies**

- Increases scale and enhances operating metrics to drive **incremental investments in supply chain innovation**

- **Leverages the combined scale and vertically integrated infrastructure** across logistics, transportation, warehousing, supply chain planning, sourcing, and product development to drive operational efficiencies and streamline order-to-delivery

Expect to incur $25M in both Years 2 and 3 to achieve synergies[3]



CONFIDENTIAL–FTC v. TEMPUR SEALY/MATTRESS FIRM                    TEMPUR-LIT-00301099

# Drives Adjusted EPS Accretion



Acquisition expected to be **accretive to adjusted EPS**[2] before synergies in the first year post close

Adjusted for the impact of run-rate synergies, this acquisition is expected to deliver low double digit adjusted EPS[2] accretion

Expect run-rate cost synergies of $100M[3]

| | TEMPUR✦SEALY TTM ended 3/31/23 | MATTRESS FIRM TTM ended 3/28/23 | TEMPUR✦SEALY MATTRESS FIRM TTM ended 3/31/23 |
|---|---|---|---|
| Consolidated Sales[7] | $4.9B | $4.2B | $8.2B |
| Adjusted EBITDA[2] | $855M | $432M | $1,287M |
| Capex | $298M | $106M | $404M |

Accretion is calculated on adjusted EPS[2], which excludes the impact of transaction amortization and one-time costs.

TEMPUR✦SEALY

16

# Transaction Valuation & Capital Allocation

17

CONFIDENTIAL–FTC v. TEMPUR SEALY/MATTRESS FIRM

TEMPUR-LIT-00301101

# Transaction Valuation

|  | **MATTRESS FIRM** | |
|---|---|---|
|  | Pre-Synergies<br>TTM ended 3/28/2023 | Post Synergies<br>TTM ended 3/28/2023 |
| **Purchase Price** | **$4.0B** | **$4.0B** |
| Adjusted EBITDA[2] | $432M | $432M |
| Run-Rate Synergies | $0M | $100M |
| **Pro Forma Adjusted EBITDA[2]** | **$432M** | **$532M** |
| **Multiple** | **9.3x** | **7.5x** |

## Historical Adjusted EBITDA[2]



697 — 2021 [10]
550 — 2022
432 — TTM 3/28/23
266 — 2020 [9]

Adjusted EBITDA ($M)　— ─ ─ TTM 3/28/23 Adjusted EBITDA

Mattress Firm's fiscal years ended 9/29, 9/28, and 9/27 for FY 2020, FY 2021 and FY 2022, respectively

## Pricing

- Acquisition represents 9.3x multiple pre-synergies

- See incremental go-forward opportunity as Mattress Firm moves off trough earnings and returns to growth trajectory



⊘ Attractive financially and strategically

CONFIDENTIAL–FTC v. TEMPUR SEALY/MATTRESS FIRM

TEMPUR-LIT-00301102

# Historical Leverage



### Net Debt to Adjusted EBITDA Leverage Ratio[2]

Legacy of flexing our capital allocation strategy to align to market opportunities and macroeconomic conditions

Timeline

**2013** – Tempur-Pedic acquired Sealy

**2015** – Scott Thompson joined TPX as Chairman and CEO

**2016** – Established target leverage range

19

# Capital Allocation Focus Areas



**Maintain Ample Liquidity**



Invest in Organic Growth



**Deleverage**



**Share Repurchases/ Cash Acquisitions**



Continued core investment to drive long-term growth objectives



Deleveraging supported by increased earnings and free cash flow outlook



Expect to return to target net leverage range[1] per TPX credit agreement of 2.0x-3.0x adjusted EBITDA[2] within 12 months post close

CONFIDENTIAL–FTC v. TEMPUR SEALY/MATTRESS FIRM

# TPX Go-Forward Investment Thesis

- ✓ Leading, vertically-integrated global company with iconic brands and extensive manufacturing and direct-to-consumer capabilities

- ✓ Serves $120 billion[3] growing bedding market

- ✓ Proven historical growth through organic and inorganic initiatives

- ✓ Proven ability to successfully operate worldwide omni-channel distribution

- ✓ Legacy of disciplined capital allocation, including dividends, share repurchases, and acquisitions

- ✓ Seasoned, well-aligned management team with track record of success

TEMPUR+SEALY

21

CONFIDENTIAL–FTC v. TEMPUR SEALY/MATTRESS FIRM

TEMPUR-LIT-00301105



# Appendix

22

TEMPUR-LIT-00301106

# U.S. Industry Historical Volume Trends

**U.S. Produced Mattress Units (Units in millions)[11]**



- U.S. produced units declined -24% y/y to 18.7M in 2022
- 2022 saw trough unit demand, with units well below the industry 10-year average of 22.6M
- 2022 unit demand is a significant deviation from the U.S. produced mattress unit CAGR of 2.5% between 2011 - 2021
- Tempur Sealy outperformed the broader U.S. produced industry unit trends in 2022
- Anticipate U.S. produced mattress units will resume growth in the second half of 2023
- Tempur Sealy and Mattress Firm are well-positioned to continue to outperform the industry in 2023 and beyond

| 2022 U.S. Produced Mattress Units Y/Y Trends | | | |
|---|---|---|---|
| Q1 | Q2 | Q3 | Q4 |
| -14% | -34% | -22% | -27% |

CONFIDENTIAL–FTC v. TEMPUR SEALY/MATTRESS FIRM

# Mattress Firm Historical Financial Performance

| (in millions) | FY 2020[10] | FY 2021[11] | FY 2022 | Average FY 2020-2022 | TTM 3/28/23 |
|---|---|---|---|---|---|
| Ending Storecount | 2,419 | 2,353 | 2,342 | | 2,329 |
| Net sales | $ 3,257 | $ 4,393 | $ 4,379 | $4,010 | $4,171 |
| *% Growth* | *9.9%* | *34.9%* | *(0.3%)* | | *(8.9%)* |
| *% Comparable Growth* | *13.0%* | *36.1%* | *(0.2%)* | | *(8.2%)* |
| Adjusted EBITDA[2] | $266 | $697 | $550 | $504 | $432 |
| *% Margin[2]* | *8.2%* | *15.9%* | *12.6%* | | *10.4%* |
| Capex | $ 47 | $97 | $ 131 | $92 | $106 |
| *% sales* | *1.5%* | *2.2%* | *3.0%* | | *2.5%* |

Mattress Firm's fiscal years ended 9/29, 9/28, and 9/27 for FY 2020, FY 2021 and FY 2022, respectively

CONFIDENTIAL–FTC v. TEMPUR SEALY/MATTRESS FIRM

TEMPUR-LIT-00301108

# Mattress Firm Non-GAAP Reconciliations

**Mattress Firm Adjusted EBITDA Reconciliation**

| (in millions) | FY'20 | FY'21 | FY'22 | TTM 3/28/23 |
|---|---|---|---|---|
| Net income (loss) | $ 125.6 | $ (165.1) | $ 533.1 | $ 386.7 |
| Interest expense, net | 122.3 | 54.6 | 71.9 | 89.6 |
| Remeasurement of embedded derivatives [(1)] | (131.7) | — | — | — |
| Loss on extinguishment of debt [(2)] | — | 490.3 | — | — |
| Income tax expense (benefit) | 45.7 | 17.6 | (172.8) | (186.8) |
| Depreciation and amortization | 70.8 | 61.0 | 81.1 | 86.7 |
| EBITDA | $ 232.7 | $ 458.4 | $ 513.3 | $ 376.2 |
| Adjustments: | | | | |
| Impairment of goodwill and intangible assets [(3)] | — | 47.2 | 1.1 | 1.4 |
| Impairment of property and equipment and operating right-of-use assets and loss on disposal of property and equipment [(4)] | 15.0 | 8.6 | 11.7 | 21.9 |
| Inventory reconfiguration initiative [(5)] | 8.6 | — | — | — |
| Special bonus and director fees [(6)] | — | 151.9 | — | — |
| Offering costs [(7)] | — | 3.1 | 6.8 | 0.6 |
| Strategic initiatives [(8)] | 7.4 | 24.7 | 10.8 | 21.3 |
| Restructuring costs [(9)] | 1.8 | 3.5 | 3.9 | 4.1 |
| Legal settlement [(10)] | — | — | (4.5) | (5.8) |
| Amortization of cloud computing arrangements [(11)] | — | — | 6.0 | 11.9 |
| Other [(12)] | — | — | 0.6 | 0.6 |
| Adjusted EBITDA | $ 265.5 | $ 697.4 | $ 549.7 | $ 432.2 |

Mattress Firm's fiscal years ended 9/29, 9/28, and 9/27 for FY 2020, FY 2021 and FY 2022, respectively

CONFIDENTIAL–FTC v. TEMPUR SEALY/MATTRESS FIRM

TEMPUR-LIT-00301109

# Mattress Firm Non-GAAP Reconciliations

(1)   In 2020, Mattress Firm recorded a $131.7 million gain for the remeasurement of the fair value of embedded derivatives within their 2018 Term Loan and 2018 PIK Loan. This gain resulted from changes in their assumptions related to the timing of certain future events which impacted prepayment features within the loans, as they expected to refinance these loans in 2021.

(2)   In 2021, Mattress Firm recorded a $490.3 million loss on extinguishment of debt associated with their 2018 PIK Loan, 2018 Term Loan, 2018 ABL Facility, 2020 Term Loan and 2020 ABL Facility.

(3)   In 2021, Mattress Firm recorded a $47.2 million goodwill impairment charge related to a decline in the long-term forecast for their Other Business reporting unit. The decline was driven by the prolonged impact of COVID-19, which delayed the return of their events and expositions operations, and the impact of a strategic shift in the reporting unit's operations to align with their omni-channel strategy.

(4)   Mattress Firm recorded impairment charges on property and equipment and operating lease right-of-use assets for underperforming stores, and losses on disposal of property and equipment for store closings. In the aggregate, they recorded $15.0 million, $8.6 million, $11.7 million and $21.9 million in 2020, 2021, 2022 and the trailing twelve months ended March 28, 2023, respectively.

(5)   In 2020, Mattress Firm recorded $8.6 million of charges for the reconfiguration of inventory slots in their brick-and-mortar showrooms for new product introductions. Costs incurred included inventory liquidation charges and sales associate incentives.

(6)   In 2021, Mattress Firm recorded a $151.9 million charge for discretionary performance bonuses paid to their eligible employees and non-employee directors, in lieu of adjustments to their outstanding RSU awards. These bonuses related to the exit of bankruptcy and post-restructuring transformation.

(7)   Mattress Firm incurred direct costs associated with an initial public offering strategy and related S-1 filing. They recorded $3.1 million, $6.8 million and $0.6 million of these costs in 2021, 2022 and the trailing twelve months ended March 28, 2023, respectively.

(8)   Mattress Firm incurred costs related to the exploration and development of strategic initiatives and opportunities. They recorded $7.4 million, $24.7 million, $10.8 million and $21.3 million in 2020, 2021, 2022 and the trailing twelve months ended March 28, 2023, respectively.

(9)   Mattress Firm recorded restructuring costs associated with headcount reductions. They recorded $1.8 million, $3.5 million, $3.9 million and $4.1 million in 2020, 2021, 2022 and the trailing twelve months ended March 28, 2023, respectively.

(10)  Mattress Firm recorded gains of $4.5 million and $5.8 million for cash received in legal settlements in 2022 and the trailing twelve months ended March 28, 2023, respectively.

(11)  Mattress Firm recorded $6.0 million and $11.9 million of amortization expense for capitalized cloud computing implementation costs in 2022 and the trailing twelve months ended March 28, 2023, respectively.

(12)  Mattress Firm recorded $0.6 million in fair value adjustments to their convertible notes and non-performance warrants in 2022 and the trailing twelve months ended March 28, 2023, respectively.

Mattress Firm's fiscal years ended 9/29, 9/28, and 9/27 for FY 2020, FY 2021 and FY 2022, respectively

TEMPUR✦SEALY

26

# Tempur Sealy Non-GAAP Reconciliations

| (in millions) | Trailing Twelve Months Ended March 31, 2023 | |
|---|---|---|
| Net income | $ | 410.3 |
| Interest expense, net | | 114.9 |
| Income tax provision | | 105.4 |
| Depreciation and amortization | | 182.2 |
| EBITDA | $ | 812.8 |
| Adjustments: | | |
| Loss from discontinued operations, net of tax [1] | | 0.4 |
| ERP system transition [2] | | 18.7 |
| Restructuring costs and other [3] | | 15.2 |
| Operational start-up costs [4] | | 8.2 |
| Adjusted EBITDA | $ | 855.3 |
| | | |
| Consolidated indebtedness less netted cash | $ | 2,772.7 |
| | | |
| Ratio of consolidated indebtedness less netted cash to adjusted EBITDA | | 3.24 times |

(1)  Certain subsidiaries in the International business segment are accounted for as discontinued operations and have been designated as unrestricted subsidiaries in the 2019 Credit Agreement. Therefore, these subsidiaries are excluded from our adjusted financial measures for covenant compliance purposes.

(2)  In the trailing twelve months ended March 31, 2023, we recognized $18.7 million of charges related to the transition of our ERP system, including labor, logistics, training and travel.

(3)  In the trailing twelve months ended March 31, 2023, we recognized $15.2 million of restructuring costs primarily associated with professional fees to explore strategic acquisition opportunities and headcount reductions related to organizational changes.

(4)  In the trailing twelve months ended March 31, 2023, we recognized $8.2 million of operational start-up costs related to the capacity expansion of our manufacturing and distribution facilities in the U.S., including personnel and facility related costs.

CONFIDENTIAL–FTC v. TEMPUR SEALY/MATTRESS FIRM                    TEMPUR-LIT-00301111

# Forward-Looking Statements

This presentation contains statements that may be characterized as "forward-looking" within the meaning of the federal securities laws. Such statements might include information concerning one or more of the Company's plans, objectives, goals, strategies, and other information that is not historical information. When used in this release, the words "will," "targets," "expects," "anticipates," "estimates," and variations of such words or similar expressions are intended to identify such forward-looking statements. These forward-looking statements include, without limitation, statements relating to the Company's expectations regarding its quarterly cash dividend, share repurchases, adjusted EPS, net leverage, future performance, cost synergies, ability to deleverage after the transaction, integration with our business, personnel and the impact of the anticipated acquisition on the Company's brands, products, customer base, results of operations, or financial position. Any forward-looking statements contained herein are based upon current expectations and beliefs and various assumptions. There can be no assurance that the Company will realize these expectations or that these beliefs will prove correct.

Numerous factors, many of which are beyond the Company's control, could cause actual results to differ materially from any that may be expressed herein as forward-looking statements. These potential risks include risks associated with Mattress Firm's ongoing operations; the ability to successfully integrate Mattress Firm into Tempur Sealy's operations and realize synergies from the transaction; the possibility that the expected benefits of the acquisition are not realized when expected or at all; general economic, financial and industry conditions, particularly conditions relating to the financial performance and related credit issues present in the retail sector, as well as consumer confidence and the availability of consumer financing; the impact of the macroeconomic environment in both the U.S. and internationally on Mattress Firm and the Company; uncertainties arising from national and global events; industry competition; the effects of consolidation of retailers on sales and costs; and consumer acceptance and changes in demand for Mattress Firm's and the Company's products the factors discussed in the Company's Annual Report on Form 10-K for the year ended December 31, 2022. There may be other factors that may cause the Company's actual results to differ materially from the forward-looking statements. The Company undertakes no obligation to update any forward-looking statement to reflect events or circumstances after the date on which such statement is made.

TEMPUR+SEALY

28

# Use of Non-GAAP Financial Information – Tempur Sealy

In this investor presentation and certain of its press releases and SEC filings, the Company provides information regarding adjusted EBITDA, adjusted EPS, net debt, and net leverage, which are not recognized terms under U.S. Generally Accepted Accounting Principles ("GAAP") and do not purport to be alternatives to net income and earnings per share as a measure of operating performance, an alternative to cash provided by operating activities as a measure of liquidity, or an alternative to total debt. The Company believes these non-GAAP measures provide investors with performance measures that better reflect the Company's underlying operations and trends, including trends in changes in margin and operating expenses, providing a perspective not immediately apparent from net income and operating income. The adjustments management makes to derive the non-GAAP measures include adjustments to exclude items that may cause short-term fluctuations in the nearest GAAP measure, but which management does not consider to be the fundamental attributes or primary drivers of the Company's business.

The Company believes that exclusion of these items assists in providing a more complete understanding of the Company's underlying results from continuing operations and trends, and management uses these measures along with the corresponding GAAP financial measures to manage the Company's business, to evaluate its consolidated and business segment performance compared to prior periods and the marketplace, to establish operational goals and management incentive goals, and to provide continuity to investors for comparability purposes. Limitations associated with the use of these non-GAAP measures include that these measures do not present all the amounts associated with the Company results as determined in accordance with GAAP. These non-GAAP measures should be considered supplemental in nature and should not be construed as more significant than comparable measures defined by GAAP. Because not all companies use identical calculations, these presentations may not be comparable to other similarly titled measures of other companies. For more information regarding the use of these non-GAAP financial measures, please refer to the reconciliations on the following pages and the Company's SEC filings.

Adjusted EBITDA
A reconciliation of the Company's GAAP net income to adjusted EBITDA per credit facility (which we refer to in this investor presentation as adjusted EBITDA) is provided on prior slides. Management believes that the use of adjusted EBITDA per credit facility provides investors with useful information with respect to the Company's operating performance and comparisons from period to period as well as the Company's compliance with requirements under its credit agreement.

Adjusted EPS
Management believes that the use of adjusted EPS provides investors with useful information with respect to the Company's operating performance and comparisons from period to period. Forward-looking Adjusted EPS is a non-GAAP financial measure.

Net Debt
Net Debt is defined as GAAP total short- and long-term debt less cash on hand.

Net Leverage
Consolidated indebtedness less netted cash to adjusted EBITDA per credit facility, which the Company may refer to as net leverage, is calculated by dividing consolidated indebtedness less netted cash, as defined by the Company's senior secured credit facility, by adjusted EBITDA per credit facility. The Company provides this as supplemental information to investors regarding the Company's operating performance and comparisons from period to period, as well as general information about the Company's progress in managing its leverage.

CONFIDENTIAL–FTC v. TEMPUR SEALY/MATTRESS FIRM

# Use of Non-GAAP Financial Information – Mattress Firm

While the presentation of non-GAAP financial measures is not in accordance with, or preferable to, GAAP financial data, Mattress Firm's management, board of directors and major stakeholders, as well as securities analysts and ratings agencies, use various non-GAAP financial measures, including Adjusted EBITDA and Adjusted EBITDA Margin, along with the corresponding GAAP financial measures: to assist in monitoring Mattress Firm's ongoing financial performance; including underlying results and trends; particularly in comparison with prior periods on a consistent basis; by excluding items not considered representative of our ongoing operating performance; to supplement GAAP measures of performance in evaluating the effectiveness of Mattress Firm's business strategies and budgeting and capital allocation and investment decisions; to remove items that can vary substantially from period to period, depending on accounting and tax treatments, the book value of assets and the method by which assets were acquired; to support internal planning and forecasting and establish operational goals; and to assist with executive performance evaluations and compensation.

Adjusted EBITDA
Adjusted EBITDA is defined as net income (loss) before interest expense, net, income tax expense (benefit) and depreciation and amortization expense, as further adjusted to exclude impairment of intangible assets, impairment of goodwill, impairment of property and equipment and operating lease right-of-use assets and loss on disposal of property and equipment, loss from debt extinguishments and related adjustments to embedded derivatives, stock and other non-cash compensation, inventory reconfiguration initiative, restructuring costs, net, special bonus and director fees, offering costs, amortization of cloud computing costs, strategic initiatives, and legal settlements.

Adjusted EBITDA margin
Adjusted EBITDA margin is defined as Adjusted EBITDA divided by net revenue.

CONFIDENTIAL–FTC v. TEMPUR SEALY/MATTRESS FIRM

# Footnotes

1) Pro forma ownership is based on shares outstanding at signing.
2) Adjusted EBITDA, adjusted EBITDA margin, adjusted EPS, net debt, and leverage are non-GAAP financial measures. Please refer to the "Use of Non-GAAP Financial Measures Information" on previous slides for more information regarding the definitions of adjusted EBITDA, adjusted EBITDA margin, adjusted EPS, net debt and leverage, including the adjustments (as applicable) from the corresponding GAAP information. Please refer to "Forward-Looking Statements" on a previous slide.
3) Management estimates.
4) Includes Mattress Firm, Sleep Experts, Mattress Discounters, and Rest & Relax retail locations.
5) Tempur Sealy and Mattress Firm resumed their partnership beginning in Mattress Firm's first quarter of FY'20.
6) Sales per store is calculated as Mattress Firm's consolidated omni-channel sales divided by its ending store count for the period.
7) Reflects the elimination of intercompany sales.
8) Includes Tempur Sealy's North American approximate retail traffic for the trailing twelve months ended 03/31/2023, including brick-and-mortar retail traffic of 500k and 28.6M e-commerce visits, and Mattress Firm's approximate retail traffic for the trailing twelve months ended 03/28/2023, including brick-and-mortar retail traffic of 6.1M and 59.4M e-commerce visits.
9) Mattress Firm's FY'20 performance was impacted by significant store closures related to Covid-19.
10) Mattress Firm's FY'21 performance reflects the first full year of Tempur Sealy and Mattress Firm's distribution agreement.
11) Per the Mattress Industry Reports provided by the International Sleep Products Association ("ISPA").

Mattress Firm's fiscal years ended 9/29, 9/28, and 9/27 for FY 2020, FY 2021 and FY 2022, respectively

CONFIDENTIAL–FTC v. TEMPUR SEALY/MATTRESS FIRM                          TEMPUR-LIT-00301115



CONFIDENTIAL–FTC v. TEMPUR SEALY/MATTRESS FIRM

# EXHIBIT
# (CAS-FTC-00005078)

### Filed Under Seal

# EXHIBIT
# (GALFUR-LIT-0000001)

**Filed Under Seal**

# EXHIBIT
# (MFRM-05732467)

**Filed Under Seal**

# EXHIBIT
# (MFRM-05763577)

# Part 1 of 2

**Filed Under Seal**

# EXHIBIT
# (MFRM-05763577)

# Part 2 of 2

**Filed Under Seal**

# EXHIBIT
# (MFRM-06158496)

**Filed Under Seal**

# EXHIBIT
# (MFRM-07403085)

**Filed Under Seal**

# EXHIBIT
# (MFRM-07419407)

### Filed Under Seal

# EXHIBIT
# (MFRM-16499283)

**Filed Under Seal**

# EXHIBIT
# (MFRM-17528064)

**Filed Under Seal**

# EXHIBIT
# (MFRM-17595853)

## Filed Under Seal

# EXHIBIT
# (PURP-LIT002670)

### Filed Under Seal

# EXHIBIT
# (PURP-LIT003092)

**Filed Under Seal**

# EXHIBIT
# (SAATVA_000001841)

**Filed Under Seal**

# EXHIBIT
# (SN00009113)

**Filed Under Seal**

# EXHIBIT
# (TEMPUR-FTC-30113762)

**Filed Under Seal**

# EXHIBIT
# (TEMPUR-FTC-31365170)

**Filed Under Seal**

# EXHIBIT
# (TEMPUR-FTC-31371375)

**Filed Under Seal**

# EXHIBIT
# (TEMPUR-FTC-31536799)

**Filed Under Seal**

# EXHIBIT
# (TEMPUR-FTC-31554562)

## Filed Under Seal

# EXHIBIT
# (TEMPUR-FTC-31564317)

# Part 1 of 5

**Filed Under Seal**

# EXHIBIT
# (TEMPUR-FTC-31564317)

# Part 2 of 5

### Filed Under Seal

# EXHIBIT
# (TEMPUR-FTC-31564317)

# Part 3 of 5

### Filed Under Seal

# EXHIBIT
# (TEMPUR-FTC-31564317)

# Part 4 of 5

**Filed Under Seal**

# EXHIBIT
# (TEMPUR-FTC-31564317)

# Part 5 of 5

**Filed Under Seal**

# EXHIBIT
# (TEMPUR-FTC-31889184)

**Filed Under Seal**

# EXHIBIT
# (TEMPUR-FTC-32817606)

**Filed Under Seal**

# EXHIBIT
# (TEMPUR-FTC-34067920)

**Filed Under Seal**

# EXHIBIT
# (TEMPUR-FTC-34093643)

**Filed Under Seal**

# EXHIBIT
# (TEMPUR-FTC-34610429)

**Filed Under Seal**

# EXHIBIT
# (TEMPUR-FTC-34618567)

## Filed Under Seal

# EXHIBIT
# (TEMPUR-FTC-34850587)

**Filed Under Seal**

# EXHIBIT
# (TEMPUR-FTC-34858517)

**Filed Under Seal**

# EXHIBIT
# (TEMPUR-FTC-35894197)

**Filed Under Seal**

# EXHIBIT
# (TEMPUR-FTC-35894212)

**Filed Under Seal**

# EXHIBIT
# (TEMPUR-FTC-35894267)

**Filed Under Seal**

# EXHIBIT
# (TEMPUR-FTC-35894299)

**Filed Under Seal**

# EXHIBIT
# (TEMPUR-FTC-35949081)

**Filed Under Seal**

# EXHIBIT
# (TEMPUR-FTC-70045041)

**Filed Under Seal**

# EXHIBIT
# (TEMPUR-FTC-70061053)

## Filed Under Seal

# EXHIBIT
# (TEMPUR-FTC-70061083)

**Filed Under Seal**

# EXHIBIT (TEMPUR-LIT-00050053)

**Filed Under Seal**

# EXHIBIT
# (TEMPUR-LIT-00125294)

**Filed Under Seal**

# FTC's Second Supplemental Objections & Responses to Defendants' First Set of Interrogatories (Nos. 10 & 12)

**Filed Under Seal**

# Tempur Sealy's Supplemental Response to Plaintiff's Interrogatory No. 2

**Filed Under Seal**

# Expert Report
# of
# Mark A. Israel,
# Ph. D.

**Filed Under Seal**

# Rebuttal Expert Report of Dr. Gopal Das Varma

**Filed Under Seal**

# Busker (Mattress Firm) Investigational Hearing Transcript Excerpts

**Filed Under Seal**

# Buster (Tempur Sealy) Investigational Hearing Transcript Excerpt

## Filed Under Seal

# Eck (Mattress Firm) Investigational Hearing Transcript Excerpt

**Filed Under Seal**

# Polit (Mattress Firm) Investigational Hearing Transcript Excerpt

**Filed Under Seal**

# Putnam (Mattress Firm) Investigational Hearing Transcript Excerpt

**Filed Under Seal**

# Rusing (Tempur Sealy) Investigational Hearing Transcript Excerpts

**Filed Under Seal**

# Alletto (Bedgear) Deposition Transcript Excerpts

**Filed Under Seal**

# Barra (SleepNumber) Deposition Transcript Excerpt

**Filed Under Seal**

# Bates (Spring Air) Deposition Transcript Excerpt

## Filed Under Seal

# Bercier
# (Sit 'n Sleep)
# Deposition
# Transcript
# Excerpts

### Filed Under Seal

# Dament (Mattress Firm) Deposition Transcript Excerpt

## Filed Under Seal

# Davis
# (Ashley Furniture) Deposition Transcript Excerpts

**Filed Under Seal**

# DeMartini (Purple) Deposition Transcript Excerpts

**Filed Under Seal**

# Eck
# (Mattress Firm)
# Deposition
# Transcript
# Excerpts

**Filed Under Seal**

# Galmidi (Macy's) Deposition Transcript Excerpts

**Filed Under Seal**

# Genender (Serta Simmons) Deposition Transcript Excerpt

**Filed Under Seal**

# Gill (Haverty's) Deposition Transcript Excerpt

**Filed Under Seal**

# Hirst
# (Tempur Sealy)
# Deposition
# Transcript
# Excerpts

## Filed Under Seal

# Hood (Kingsdown) Deposition Transcript Excerpts

## Filed Under Seal

# Koenig (City Furniture) Deposition Transcript Excerpts

**Filed Under Seal**

# McIngvale (Gallery Furniture) Deposition Transcript Excerpt

**Filed Under Seal**

# Megibow (Casper) Deposition Transcript Excerpts

**Filed Under Seal**

# Melville (Saatva) Deposition Transcript Excerpts

**Filed Under Seal**

# Moore (Tempur Sealy) Deposition Transcript Excerpts

**Filed Under Seal**

# Nguyen (Avocado) Deposition Transcript Excerpts

**Filed Under Seal**

# Papettas (Mattress Warehouse) Deposition Transcript Excerpt

**Filed Under Seal**

# Rao
# (Tempur Sealy)
# Deposition
# Transcript
# Excerpts

## Filed Under Seal

# Saarie
# (Raymour & Flannigan)
# Deposition Transcript
# Excerpt

**Filed Under Seal**

# Studner (Rooms to Go) Deposition Transcript Excerpt

**Filed Under Seal**

# Thompson (Tempur Sealy) Deposition Transcript Excerpts

## Filed Under Seal

# Wyn
# (Serta Simmons)
# Deposition
# Transcript
# Excerpt

## Filed Under Seal