**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| FEDERAL TRADE COMMISSION, | |
| *Plaintiff,* | |
| v. | Case No. 4:24-CV-02508 |
| TEMPUR SEALY INTERNATIONAL, INC. | **REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED** |
| and | |
| MATTRESS FIRM GROUP INC., | |
| *Defendants.* | |

**PLAINTIFF FEDERAL TRADE COMMISSION'S REPLY BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

INTRODUCTION AND SUMMARY OF ARGUMENT ..................................................... 1

ARGUMENT ............................................................................................................... 2

I.      Defendants' Ability and Incentive Arguments Disregard the Facts and
        Misstate the Law ............................................................................................ 2

   A.   Defendants' Attempt to Trivialize Their Own Words Fails ........................ 2

   B.   Defendants' Argument That Mattress Firm Will Remain "Multi-Brand" Post-Close
        Is a Red Herring ......................................................................................... 5

   C.   Defendants' Attempts to Minimize the Scale and Importance of Mattress Firm Are
        Unavailing .................................................................................................. 7

      1.   Defendants' Near-Absolute Focus on "Foreclosure Share" Is Improper ............. 7

      2.   Defendants' Share Calculations Are Fatally Flawed ........................... 10

      3.   Defendants Cannot Rewrite the Law on "Foreclosure Threshold" ................... 10

   D.   Defendants' Remaining Ability and Incentive Arguments Also Distort the
        Record ...................................................................................................... 12

   E.   Defendants' Critique and Application of the *Brown Shoe* Factors Lacks Merit .... 13

II.     The Evidence Shows Harm to Competition and Consumers ................................. 13

III.    Defendants Effectively Concede That the Relevant Market Is Premium Mattresses
        in the United States .................................................................................... 15

IV.     Defendants' Opposition Does Not Rebut the Prima Facie Showing of Likely
        Competitive Harm ...................................................................................... 16

   A.   Defendants Have Not Alleged Any Cognizable Efficiencies ................................. 16

   B.   No Commitments or Agreements Made by Tempur Sealy Will Meaningfully
        Reduce the Competitive Harm .................................................................... 17

V.      Defendants' Arguments on the Equities Are Meritless ......................................... 18

CONCLUSION ......................................................................................................... 18

# TABLE OF AUTHORITIES

**Cases**

*Brown Shoe Co. v. United States*, 370 U.S. 294 (1962) ...................................................... 11

*Ford Motor Co. v. United States*, 405 U.S. 562 (1972) ....................................................... 11

*FTC v. Hackensack Meridian Health, Inc.*, 30 F.4th 160 (3d Cir. 2022) .......................... 16

*FTC v. IQVIA Holdings*, 710 F.Supp.3d 329 (S.D.N.Y. 2024) ............................................. 2

*FTC v. Tapestry, Inc.*, 2024 WL 4564523 (S.D.N.Y. Oct. 24, 2024) .................. 2, 3, 15, 16

*Illumina, Inc. v. FTC*, 88 F.4th 1036 (5th Cir. 2023) ................................................... *passim*

*United States v. Aetna Inc.*, 240 F.Supp.3d 1 (D.D.C. 2017) ............................................... 5

*United States v. AT&T, Inc.*, 310 F.Supp.3d 161 (D.D.C. 2018) ......................................... 4

*United States v. Bertelsmann SE & Co.*, 646 F.Supp.3d 1 (D.D.C. 2022) ....................... 15

*United States v. Google LLC*, 2024 WL 3647498 (D.D.C. Aug. 5, 2024) ......................... 3

*United States v. Kimberly-Clark Corp.*, 264 F.Supp. 439 (N.D. Cal. 1967) ..................... 11

*United States v. Sybron Corp.*, 329 F.Supp. 919 (E.D. Pa. 1971) ...................................... 11

## INTRODUCTION AND SUMMARY OF ARGUMENT

Extensive and consistent contemporaneous evidence, including documents written by Defendants' top executives and Board Members, support every key issue in the FTC's Motion for a Preliminary Injunction.  This evidence confirms the FTC is likely to prevail on the merits because Tempur Sealy will have the ability and incentive to use Mattress Firm as both a sword to oust existing rivals, and a shield to defend against future upstarts in the U.S. premium mattress market.  These actions will suppress competition and increase prices for consumers by hundreds of millions annually.  In response, Defendants offer implausible interpretations of those documents, propose new legal standards, and distract with misleading claims.

Most telling about Defendants' Opposition are the arguments and facts it ignores.  Defendants only tangentially challenge that U.S. premium mattresses is a relevant market.  They do not dispute that the market passes the hypothetical monopolist test ("HMT"), and only challenge one element of the *Brown Shoe* test, arguing incredibly the very price point that ***Tempur Sealy*** uses to define "premium" mattresses is "arbitrary," "gerrymandered," "contrived," and "impossible."

Defendants also do not challenge that Mattress Firm is the dominant U.S. mattress retailer, since it is the only national, coast-to-coast, multi-vendor mattress specialty retailer of premium mattresses, orders of magnitude larger than the next multi-vendor mattress retailer.  Instead, Defendants engage in creative arithmetic, attempting to diminish Mattress Firm's importance into a single small number.  That is not what the

law, including binding precedent in *Illumina, Inc. v. FTC*, 88 F.4th 1036 (5th Cir. 2023),

demands.

Contrary to Defendants' self-serving arguments, vertical mergers are not

presumptively procompetitive and can harm competition. Acknowledging her general

views on vertical mergers, Commissioner Melissa Holyoak explained that she voted out

this Complaint "based upon the substantial evidence generated by staff's thorough

investigation, especially the parties' own ordinary-course documents."[1] Those ordinary

course documents continue to carry the day, and the FTC is entitled to an order enjoining

this merger to allow for a full merits trial before the Administrative Law Judge.

## ARGUMENT

### I.     Defendants' Ability and Incentive Arguments Disregard the Facts and Misstate the Law

#### A.     Defendants' Attempt to Trivialize Their Own Words Fails

Defendants claim the copious evidence of Tempur Sealy's incentive and ability to

fully or partially foreclose competitors amounts to "snippets" to be discarded. Opp. at

39. Not so.

The law is clear that Defendants' ordinary course documents should be afforded

substantially greater weight than Defendants' self-serving attempts to minimize their

plain meaning. *FTC v. Tapestry, Inc.*, 2024 WL 4564523, at *59-60 (S.D.N.Y. Oct. 24,

2024); *see also FTC v. IQVIA Holdings*, 710 F.Supp.3d 329, 383, 385 (S.D.N.Y. 2024).

---

[1] https://www.ftc.gov/system/files/ftc_gov/pdf/tempur-sealy-mattress-firm-statement-of-commissioner-holyoak-7-02-2024.pdf

Specifically, contemporaneous documents made *before* litigation are "more compelling evidence of commercial realities" than "convenient litigation assertions." *Tapestry,* 2024 WL 4564523, at *35; *see also United States v. Google LLC*, 2024 WL 3647498, at *41 n.2 (D.D.C. Aug. 5, 2024). Moreover, courts find documents authored or relied upon by high-level executives more compelling. *Tapestry*, 2024 WL 4564523, at *81, *158.

Defendants' attempts to walk away from their own documents strain credulity. For example, they claim that Tempur Sealy's CEO's views that the Proposed Acquisition would "eliminate future competition" and "block new competition" are just "scribblings" that "were not" discussed with the Board. Opp. at 39-40. But Mr. Thompson is the CEO and Chairman of the Board and his thoughts are relevant regardless.

Similarly, Defendants try to discount the Tempur Sealy Board's multiple discussions of using Mattress Firm as a "competitive moat" by citing without explanation an article written nearly three years after Tempur Sealy first used the term. Opp. at 40. But that article explains "having a moat can help protect your castle from rival kingdoms, and the same is true for businesses." PX9063-001.

And the "Retail Acquisition Framework" was prepared by an investor who sat on the Tempur Sealy Board, and subsequently shared by Tempur Sealy's CEO with another Board Member, who responded "[l]ooks like an excellent presentation to me." PX1436-001. That Tempur Sealy sanitized the language ███████████████████ by changing it to ███████████ PX0053-033, is telling, but not for the reasons Defendants think. The framework is also consistent with statements by Tempur Sealy executives describing their approach to other potential retailer acquisitions. Mot. at

40-42 (citing, e.g., PX1752-002 ("[L]et's buy someone in a market where we are underserved. Kick SSB out.")).

The Court should reject Defendants' attempt to rewrite the "ability and incentive" standard required by *Illumina*.  There, the Fifth Circuit noted "myriad ways in which Illumina could engage in foreclosing behavior" and did not require the Commission to elaborate on how defendants would execute their foreclosure strategy.  *Illumina*, 88 F.4th at 1053.  Stringing together footnotes from a lower court decision in another jurisdiction, Defendants argue that establishing the "ability and incentive" to foreclose is "necessary but not sufficient," Opp. at 12 (quoting *United States v. AT&T, Inc.*, 310 F.Supp.3d 161, 251-52 nn.59, 61 (D.D.C. 2018)), and that the FTC must show their "probability of acting," a "plan to foreclose," or even "detailed planning," Opp. at 12, 39, 41.  Defendants are wrong—that is at most *dicta* even in the district court decision, 310 F.Supp.3d at 252 n.61, and is certainly not the law in the Fifth Circuit.

If the FTC had to show Defendants have engaged in "detailed planning" to foreclose competition, Opp. at 39, it might resemble the ███████████████ being undertaken at Mattress Firm.  Although Mattress Firm believes SSB's business is strong, its ██████████████ includes a ████████████████████████████ ████████████████████████████████████████████████████████ ██████████████.  PX2619-002.



*PX2619-002*

### B.    Defendants' Argument That Mattress Firm Will Remain "Multi-Brand" Post-Close Is a Red Herring

Defendants' claims that Tempur Sealy intends to keep Mattress Firm "multi-brand" post-close, Opp. at 28-31, are unavailing.

First, Defendants rely on carefully drafted statements that Tempur Sealy knew would be scrutinized by regulators and potentially a court. These "made for litigation" statements are not as persuasive as private communications. *See, e.g.*, *United States v. Aetna Inc.*, 240 F.Supp.3d 1, 80 (D.D.C. 2017) ("A firm's behavior undertaken with the aim of persuading a court or the government regarding the legality of a merger may not be predictive of how that firm will behave once the court or the government are no longer engaged."). Second, even if this Court were to credit such statements, they are consistent



with the FTC's case.  Tellingly, Defendants do not define the term "multi-brand."

███████████████████████████████████████████████████████████████

██████████████████████████████████████████ IH 39:15-19.  Therefore,

Tempur Sealy could exclude all rivals and still be "multi-brand" ███████████.

      Third, Defendants' claim that Tempur Sealy would not risk "trashing" Mattress

Firm's multi-vendor strategy by foreclosing rival suppliers is based on speculation, not

economics.  Tempur Sealy's incentive to preference its own mattresses at Mattress Firm

post-acquisition are far different than those of an independent Mattress Firm.  Mot. at 28-

30*.*  As Tempur Sealy's VP of Investor Relations explained, ████████████████

███████████████████████████████████████████████████████████████

PX1838-001.  Moreover, Mattress Firm's current "multi-brand" strategy is intended to

promote competition among suppliers.  Mot. at 28-30.  Mattress Firm works to ████████

███████████████████████████████████████████████████████████████

█████████████████████████████████—concerns that evaporate

with Tempur Sealy's ownership.  *Id*.

      Finally, Tempur Sealy's post-acquisition incentives persist even if it does not fully

foreclose all rivals from Mattress Firm and stays "multi-brand."  Here, as in *Illumina*, 88

F.4th at 1053, "there are myriad ways" Defendants could disadvantage rivals post-close

even if they do not fully foreclose every rival.  Allowing some "traffic-driving" brands to

remain, Opp. at 38, while driving sales to Tempur Sealy mattresses will still increase

Tempur Sealy's profits, harm competition, and increase prices.  Das Varma Rep. ¶336;

*see also* ████████████████ IH 44:16-47:8.  This is exactly what █████ anticipates:

██████████████████████████████████████████████████

████████████████████████████████ Dep. 204:25-205:11.

### C.   Defendants' Attempts to Minimize the Scale and Importance of Mattress Firm Are Unavailing

Defendants ignore extensive real-world evidence showing Mattress Firm's competitive significance and instead posit a new legal test and slice-and-dice transactional data to minimize Mattress Firm's importance. These arguments fail.

#### 1.   Defendants' Near-Absolute Focus on "Foreclosure Share" Is Improper

Defendants incorrectly assert the foreclosure share here is ██ percent. But even if Defendants calculated that share correctly (they do not), focusing on distribution share significantly understates Mattress Firm's competitive significance—which Defendants do not actually dispute.

Defendants do not dispute Mattress Firm is the only multi-vendor specialty mattress retailer with a national footprint and the number one retailer for three of the top four premium mattress suppliers in the U.S. Mot. at 6. Neither do they dispute that Mattress Firm:

- Over-indexes in premium mattresses, which account for ██ of its annual revenue, *id.*;

- Deliberately promotes competition among suppliers, so ██████████████ ████████████████, *id.* at 28-30;

- Spends ████████████████ on advertising, *id.* at 32;

- Offers its suppliers exposure and validation leading to additional sales outside of Mattress Firm, *id.*; or

- Touts it is "███████████████████████████████████" on product development, *id.*

Mattress Firm is not merely the largest specialty retailer of premium mattresses; it towers above competitors.



*Das Varma Rebuttal Rep. Ex. 1*

The overwhelming evidence indicates Mattress Firm offers an unparalleled springboard to market penetration, which is doubtless why Tempur Sealy has tried to

keep rivals off Mattress Firm floors.  Mot. at 30-34.  Moreover, Tempur Sealy has locked up other distribution channels through exclusive agreements.  *Id.* at 34-37.  The Proposed Acquisition would allow Tempur Sealy to use Mattress Firm as both a sword to harm existing suppliers and a shield to defend against future upstarts that threatened Tempur Sealy's dominant position in premium mattresses.

Defendants' attempts to downplay Mattress Firm's significance around the margins are incorrect and irrelevant.  First, this Court need not engage with the cherry-picked citations Defendants supply to support their dubious claims that Purple and SSB do not actually value their relationships with Mattress Firm and are not concerned about the Proposed Acquisition.  Opp. at 24-25.  ███████████ and ████████████ will testify live at the hearing to address those issues.

Further, the existence of premium mattress suppliers that have not and/or currently do not sell to Mattress Firm is irrelevant to any analysis of Mattress Firm's importance.  Only one such supplier—Sleep Number—has more than a ███ percent share in the U.S. premium mattress market, Mot. at 5, and ████████████ will also testify to explain the nuances of ██████████████.

Defendants ignore that Tempur Sealy continues to view Mattress Firm as critical for its own success; it is the cornerstone of Tempur Sealy's ongoing attempt to ████ ██████████████████.  Mot. at 33-34; PX1818-004 ██████████████████████ ██████████████████████████████; PX1372-002 ███████████████ ████████████████████████████████████████████████████ ████████████████████████████████████.

9

## 2.    Defendants' Share Calculations Are Fatally Flawed

Regardless, Defendants misstate the potential foreclosure share.  To arrive at this specious ██ percent figure, Defendants inflate the distribution opportunities for premium mattress suppliers (denominator) while artificially restricting the potential foreclosure at Mattress Firm (numerator).  In the denominator, Defendants include direct-to-consumer retailers—most notably Sleep Number—that do not sell third-party premium mattresses and to which rivals could not turn if foreclosed.  Israel Dep. 287:10-288:6, 292:13-21, 294:7-13.  Excluding those retailers, Mattress Firm accounts for ██ to ██ percent of premium mattress sales.  Mot. at 31.  Defendants also include retailers that by contract sell only Tempur Sealy mattresses.  Israel Dep. 288:7-12.

In the numerator, Defendants exclude Tempur Sealy's sales at Mattress Firm, assuming (based seemingly on a single out-of-circuit case) that Tempur Sealy's Mattress Firm sales are shielded from competition.  *Id.* at 289:20-290:6, 292:13-293:9.  This makes no sense—third-party premium brands compete with Tempur Sealy today for slots and sales at Mattress Firm.  *Id.* at 290:10-291:5.  By removing Tempur Sealy's sales from their calculation, Defendants assume the very harm the FTC alleges: that Tempur Sealy will use Mattress Firm to "further build a competitive moat" to defend itself from existing and upstart competitors.  PX1729-003.

## 3.    Defendants Cannot Rewrite the Law on "Foreclosure Threshold"

Defendants cannot seriously argue that only "monopolistic proportions" of foreclosure can violate Section 7 for a vertical merger.  Opp. at 27.  The ability-and-

incentive standard contains no threshold foreclosure share; it "asks whether the merged firm will have both the ability and the incentive to foreclose its rivals, either from sources of supply or from distribution outlets." *Illumina*, 88 F.4th at 1051. *Illumina* implicated a monopoly, but nowhere did the court hold that only a monopolist's vertical mergers threaten harm.

Moreover, the Supreme Court has rejected any suggestion there is a minimum foreclosure threshold under Section 7; under *Brown Shoe*, if "foreclosure is neither of monopoly nor de minimis proportions, the percentage of the market foreclosed by the vertical arrangement cannot itself be decisive." 370 U.S. 294, 329 (1962); *see also Illumina*, 88 F.4th at 1055 ("There is 'no precise formula' when it comes to applying these factors."). Even if Mattress Firm's ▮ percent market share was the same as a foreclosure share—and it is not—it would be nowhere near *de minimis*. *See Ford Motor Co. v. United States*, 405 U.S. 562, 568 (1972) (condemning vertical merger resulting in "the foreclosure of Ford as a purchaser of about ten per cent of total industry output"). Based on real-world evidence, Mattress Firm dwarfs all other retailers and "no merger between a manufacturer and an independent retailer could involve a larger potential market foreclosure." *Brown Shoe,* 370 U.S. at 331-32; *see also United States v. Sybron Corp.*, 329 F.Supp. 919 (E.D. Pa. 1971) (holding acquisition of dental equipment dealer with 8 percent share violated Section 7 given market realities and concentration at manufacturing level); *United States v. Kimberly-Clark Corp.*, 264 F.Supp. 439 (N.D. Cal. 1967) (enjoining acquisition of "important trade conduit" of large regional chain of paper merchants with 12.5 to 18 percent market share).

### D.    Defendants' Remaining Ability and Incentive Arguments Also Distort the Record

Defendants' argument that foreclosed competitors could easily replace revenue lost from Mattress Firm if they just "compete harder" is irrelevant because it would not prevent consumer harm.  Das Varma Rebuttal Rep. ¶58.  Regardless, Tempur Sealy's assertion it quickly replaced its Mattress Firm sales following the "divorce" is misleading because Defendants inflate Tempur Sealy's recapture success.  Opp. at 20.  Defendants' expert's recapture calculation is based on a flawed methodology that incorrectly attributes Tempur Sealy's increased demand across all retailers to the divorce, Das Varma Rebuttal Rep. Sec. V.A, and contradicts the record.  PX1608-003 (reporting to its lenders in 2019 that "[i]n 2 years, [Tempur Sealy] recaptured 34% of lost MFRM Revenue"); PX1369-002 ███████████████████████████.

Tempur Sealy's claim foreclosed suppliers could recapture sales at other retailers is similarly specious.  Tempur Sealy's President of Sales U.S. testified that apart from one instance Defendants highlight—████████████████████████████████ ████████, which Tempur Sealy calculated as only a ████████████, Opp. at 21-22— Tempur Sealy has seen no other shift of even that magnitude resulting from the Proposed Acquisition.  ██████ Dep. 43:4-8; PX1999-002 ████████████████████.  And exclusive agreements are pervasive enough that he could not say whether there are ██ ██████ contracts with some provision that affects competition by competitors.  ████ Dep. 241:5-242:21.

Defendants also distort the record on its prior acquisitions.  Opp. at 34.

Defendants' claims about Tempur Sealy's acquisition of Dreams ignore that Tempur

Sealy acquired Dreams with the objective of ███████ to the floor—and then did so.

PX1874-009; PX6286-036.  Sleep Outfitters sells only Tempur Sealy brands, and the

Tempur Sealy executive installed as SOVA's chairman expressed plans to ████████

████████████ in SOVA.  PX1868-002.



*PX1868-002*

### E.   Defendants' Critique and Application of the *Brown Shoe* Factors Lacks Merit

Although Defendants criticize the *Brown Shoe* decision, the Fifth Circuit applied

the *Brown Shoe* factors in *Illumina*.  88 F.4th at 1054-55.  Defendants' conclusory claim

the evidence does not satisfy the *Brown Shoe* test lacks merit.  Opp. at 45-46.

## II.   The Evidence Shows Harm to Competition and Consumers

Defendants' complaint the FTC focuses only on harm to SSB and Purple is wrong:

the evidence shows harm to competition, resulting in hundreds of millions in annual harm

to consumers.  Rather, it is *Defendants* who put SSB and Purple front and center because

Tempur Sealy's ordinary course documents show Tempur Sealy focuses on, and competes

most fiercely with, SSB and Purple.  Mot. at 27-28.  Tempur Sealy has more balance of

share and revenue to gain within Mattress Firm—and more to gain competitively—from fully or partially foreclosing those two competitors from Mattress Firm.

Defendants falsely claim the FTC never "meaningfully" explains how foreclosure would translate into consumer harm, Opp. at 26, when, in fact, Dr. Das Varma's foreclosure model specifically addresses consumer welfare.  He predicts price increases in multiple foreclosure scenarios, including partial foreclosure, leading to between $308 and $625 million in annual harm.  Das Varma Rep. Sec. VIII.  Even if Tempur Sealy chose not to foreclose any rivals, the Proposed Acquisition would result in price increases leading to between $279 and $314 million in annual harm.  *Id.*

Defendants' critique of Dr. Das Varma's model, Opp. at 46-48, is grounded in a mischaracterization of the facts.  Dr. Das Varma (i) models consumer decision-making across multiple competing retailers and suppliers; (ii) models multiple scenarios of foreclosure, including partial foreclosure; (iii) allows for EDM; (iv) incorporates Defendants' proposed remedies; and (v) calibrates his model based on actual natural experiment data and commercial relationships.

Conversely, Dr. Israel ignores evidence of Tempur Sealy's ability and incentive to foreclose rivals from Mattress Firm and does not address potential harms from blocking nascent competitors' entry, a loss of innovation, or sharing of competitively sensitive information.  Israel Dep. 81:14-83:16.  Consistent with Defendants' overall approach, Dr. Israel ignores the voluminous evidence showing how the combined firm will *actually* behave in favor of a presumed efficiency from vertical mergers *generally*.  Das Varma Rebuttal Rep. ¶141.

### III.    Defendants Effectively Concede That the Relevant Market Is Premium Mattresses in the United States

Defendants barely engage with market definition and do not cast any doubt on the FTC's showing that the supply of premium mattresses in the United States is a relevant market.  Mot. at 12-18.  Although they complain the market is "contrived and implausible," Opp. at 13, Defendants do not dispute the market passes the HMT.  And, despite a nod to "commercial realities," *id.* at 13-14, Defendants do not attempt to refute the evidence supporting each of the *Brown Shoe* factors.  *Compare* Mot. at 15-17, *with* Opp. at 13-15.

Defendants note premium mattresses "serve the same function" and "are made from the same materials" as other mattresses, Opp. at 14, but "functionally similar products may be in separate product markets, depending on the facts of the case." *Tapestry*, 2024 WL 4564523, at *10; *see* ▮▮▮▮▮ Dep. 123:17-21.  This is not a case where pricing distinctions are "economically meaningless," as Defendants argue.  *E.g.*, Mot. at 14 (Tempur Sealy sought exclusivity at ▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮.

Defendants' arguments disputing premium mattresses generally start at $2,000 are unavailing.  Bizarrely, Defendants argue $2,000 is an arbitrary figure notwithstanding the abundance of evidence Defendants' own documents—not to mention numerous third parties—analyze mattresses above $2,000 as a distinct segment.  Mot. at 14-17.  "Ample precedent supports the government's use of a numerical cutoff to identify a submarket." *United States v. Bertelsmann SE & Co.*, 646 F.Supp.3d 1, 28 (D.D.C. 2022).  That there is

15

some variation in the dollar threshold for the segment does not negate the existence of a

premium mattresses market.  *Tapestry*, 2024 WL 4564523, at *13.

## IV.   Defendants' Opposition Does Not Rebut the Prima Facie Showing of Likely Competitive Harm

### A.    Defendants Have Not Alleged Any Cognizable Efficiencies

Although Defendants tout the alleged procompetitive benefits of vertical mergers,

Opp. at 12, they make no attempt to show any such benefits here and have not met the

efficiencies standard.  *Illumina*, 88 F.4th at 1059.  Defendants have not asserted an

efficiencies defense (ECF 49 at 39-40; ECF 52 at 35-36) and have failed to show any

claimed efficiencies are merger specific and verifiable.  Mot. at 43.  Defendants' expert

Dr. Israel conceded he did not calculate EDM from the Proposed Acquisition, nor did he

separately verify any calculation of EDM by Defendants.  Israel Dep. 77:3-78:5.  Indeed,

Dr. Israel offers no opinions on the cognizability of any efficiencies calculations offered

by Defendants.  *Id*. at 78:13-79:20.

Defendants instead attempt to short circuit those requirements, claiming the

Proposed Acquisition is "procompetitive."  *See FTC v. Hackensack Meridian Health*,

*Inc.*, 30 F.4th 160, 175-76 (3d Cir. 2022) (a "procompetitive benefits argument is an

efficiencies defense").  Dr. Israel presented a theoretical model that is neither merger

specific nor verifiable, untethered from market realities, and was not contemplated in

Defendants' documents.  Das Varma Rebuttal Rep. ¶9.  Indeed, he identifies no evidence

suggesting any plans for improving ███████████ or any lack of ███████████ today at

Mattress Firm.  *See* ECF 170, Israel Rep. Sec. VI.; Israel Dep. 150:5-151:18.  Dr. Israel's

model is based on a single citation—to his own working paper—which he admitted was written (i) only after being retained by Defendants, and (ii) based on his work in this case. Israel Dep. 176:7-177:8, 179:21-180:3, 411:8-412:3.  Dr. Israel conceded he has never applied his model to another merger (or seen such a model used elsewhere).  *Id*. at 184:2-189:4.

### B.    No Commitments or Agreements Made by Tempur Sealy Will Meaningfully Reduce the Competitive Harm

First, Defendants do not dispute their "post-close" agreements ███████████████

███████████████████████████████████.  Nor do Defendants dispute ████████████████████████████████████

████████████████████████.  Mot. at 44.

Second, Defendants fail to address that the divestiture: ████████████████

████████████; includes stores that are "not [in] major metropolitan markets" where premium mattress consumers live in greater numbers; and would leave some suppliers competitively disadvantaged, as ████████████████████████████

████████████████████████.  *Id*. at 44-45.

Third, Defendants do not deny the proposed slot commitment *explicitly permits* partial foreclosure and would allow Tempur Sealy to ████████████ in Mattress Firm, or that through its allocation of slots, there are myriad ways Tempur Sealy could steer sales to its own brands.  *Id*. at 45-46.

Fourth, Defendants fail to address deficiencies in Tempur Sealy's "commitment" to ████████████████████████████████.  *Id*. at 46-47.



## V.       Defendants' Arguments on the Equities Are Meritless

Defendants do not dispute that where, as here, the FTC has shown it is likely to prevail on the merits, no court has denied a Section 13(b) motion for a preliminary injunction on the equities.  Mot. at 47.  Nor do they dispute they will have access to rivals' confidential information upon closing; they also ignore they have ███████████ ████████████████████████████████████████████████ Dep. 196:2-197:24; PX6323-001.  Defendants' public equities argument is based solely on their unsupported claim the Proposed Acquisition is procompetitive, and their unfounded private equities claim merits little weight.  Mot. at 47.

## CONCLUSION

The Court should grant the FTC's motion for a preliminary injunction.

Dated: November 4, 2024

Respectfully submitted,

Of counsel:

HENRY LIU
Director
Bureau of Competition

RAHUL RAO
Deputy Director
Bureau of Competition

SHAOUL SUSSMAN
Associate Director for Litigation
Bureau of Competition

STEPHEN RODGER
Deputy Assistant Director
Bureau of Competition

ARTHUR DURST
XUAN (ELLEN) GONG
CLIFFORD SUN HWANG
MATTHEW E. JOSEPH
KENNAN KHATIB
LAURA KRACHMAN
NOEL MILLER
RICHARD MOSIER
JEANETTE PASCALE
MAIA PEREZ
ADAM PERGAMENT
AMY RITCHIE
WILLIAM SOHN
JEANANN TABBAA
MAGGIE YELLEN

Attorneys
Federal Trade Commission

/s/ Allyson M. Maltas
ALLYSON M. MALTAS
Attorney-in-Charge
DC Bar No. 494566 (*Pro Hac Vice*)
Federal Trade Commission
Bureau of Competition
600 Pennsylvania Avenue, NW
Washington, DC 20580
Tel.: (202) 326-3646
Email: amaltas@ftc.gov

*Counsel for Plaintiff Federal Trade Commission*

**CERTIFICATE OF WORD COUNT**

Pursuant to this Court's Rule 18(c), I certify that the Reply in support of Plaintiff's

Motion for Preliminary Injunction contains 3,954 words excluding the case caption, table

of contents, table of authorities, signature block, and certificates.

> */s/ Allyson M. Maltas*
> Allyson M. Maltas
> Attorney-in-Charge

**CERTIFICATE OF SERVICE**

I hereby certify that I served the foregoing on all counsel of record who have

appeared in this matter via the Court's CM/ECF system on November 4th, 2024.

> */s/ Allyson M. Maltas*
> Allyson M. Maltas
> Attorney-in-Charge

| EXHIBIT INDEX<br>Plaintiff Federal Trade Commission's<br>Reply Brief in Support of Motion for Preliminary Injunction | | | |
|---|---|---|---|
| PX0053* | | | **Transcripts [excerpted]** |
| PX1369 | | | Barra (Sleep Number) IH |
| PX1372* | | | Thompson (Tempur Sealy) IH |
| PX1436* | | | |
| PX1608* | | | DeMartini (Purple) Depo. |
| PX1729* | | | Haverty's Depo. |
| PX1752* | | | Israel Depo. |
| PX1818 | | | Rusing (Tempur Sealy) Depo. |
| PX1838 | | | Thompson (Tempur Sealy) Depo. |
| PX1868 | | | |
| PX1874 | | | **Expert Reports** |
| PX1999 | | | Expert Report of Dr. Gopal Das Varma* |
| PX2619 | | | Rebuttal Report of Dr. Gopal Das Varma |
| PX6286 | | | Expert Report of Dr. Mark Israel** |
| PX6323 | | | |
| PX9063 | | | |
| | | | |
| *Exhibits previously cited in FTC's Motion for Preliminary Injunction. | | | |
| **Exhibit previously cited in Defendants' Opposition. | | | |

# EXHIBIT (PX1369)

**Filed Under Seal**

# EXHIBIT (PX1818)

**Filed Under Seal**

# EXHIBIT (PX1838)

**Filed Under Seal**

# EXHIBIT (PX1868)

**Filed Under Seal**

# EXHIBIT (PX1874)

**Filed Under Seal**

# EXHIBIT (PX1999)

**Filed Under Seal**

# EXHIBIT (PX2619)

**Filed Under Seal**

# EXHIBIT (PX6286)

**Filed Under Seal**

# EXHIBIT (PX6323)

**Filed Under Seal**

# EXHIBIT (PX9063)

Search for a company

▲ S&P 500  +170%  |  ▲ Stock Advisor  +820%  JOIN THE MOTLEY FOOL

ACCESSIBILITY     LOG IN     HELP

The Motley Fool

Our Services     Stock Market News ⌄     How to Invest ⌄     Retirement ⌄     The Ascent ⌄     About Us ⌄     **Top 10 Stocks to Buy Now**

Advertisement



GLOBAL X
by Mirae Asset

Add a New Element To Your Portfolio

COPX  Copper Miners ETF

PROSPECTUS > SEI INVESTMENTS DISTRIBUTION CO.

Home > Terms > C > Competitive Moat

# What Is a Competitive Moat?

By Kristi Waterworth – Jun 17, 2024 at 1:26PM

---

**KEY POINTS**

🔑 Competitive moats give companies a unique business edge, making them attractive to long-term investors.

🔑 Types of competitive moats include cost, cultural, networking, and resource advantages.

🔑 Investors should seek companies with strong competitive moats for potentially safer, sustainable returns.

🚀 Motley Fool Issues Rare "All In" Buy Alert

*Key findings are powered by ChatGPT and based solely off the content from this article. Findings are reviewed by our editorial team. The author and editors take ultimate responsibility for the content.*

---

- Overview
- How to spot one
- Common types
- Why they matter

When the enemy is at your door, having a moat can help protect your castle from rival kingdoms, and the same is true for businesses. A competitive moat is just one type of moat that can help keep your competition at arm's length and your sales strong.



Image source: Getty Images.

## What is a competitive moat?

A competitive moat (Warren Buffet calls these "economic moats") is a major advantage you have over your direct competition. That's pretty vague, but there are so many potential things that could make up your moat that it's hard to be too specific. If there's something that's giving your company a business advantage in your market, it could be your competitive moat.

Advertisement



Hands Down the Best Cash Back Card of 2024

From The Ascent, A Motley Fool Service

**INVEST SMARTER WITH THE MOTLEY FOOL**

Join Over Half a Million Premium Members Receiving...

- New Stock Picks Each Month
- Detailed Analysis of Companies
- Model Portfolios
- Live Streaming During Market Hours
- And Much More

**Get Started Now**

**HOW THE MOTLEY FOOL CAN HELP YOU**



🔵 **Premium Investing Guidance**
Market beating stocks from our award-winning service

🔵 **The Daily Upside Newsletter**
Investment news and high-quality insights delivered straight to your

PX9063-001

A very basic example would be a manufacturing company that has developed a proprietary technology that allows it to produce its products with just as much quality but for 30% less than the competition. That proprietary tech is its competitive moat, keeping the competition at bay since they don't have access to that same tool.







## Prerequisites for competitive moats

It's easy to say that your company has a competitive moat, and then rattle something off like the best service in the area or customers are your top priority. Sadly, these aren't moats at all -- everyone wants to believe they give the best service and that their customers are their top priority.

A competitive moat is something that is unique to your business and that no other direct competitor can offer. So, for you to have a competitive moat, you must have something else: a secure identity.

There are plenty of companies that don't truly have a unique identity but get along just fine, but they also don't have competitive moats. They're indistinct, they're doing what others are doing and have done before them. They're fine, but they're not living the drawbridge life, right?

To have a competitive moat is to have something distinct that sets you apart, and sometimes it takes a lot of soul-searching on the part of the company's leadership to figure out what that is or what it should be.

## Common types of competitive moats

As stated earlier, there are many different types of competitive moats, but they tend to fall within a few categories.

### Networking moats

Networking moats speak to who you know and the networks you've built to protect your service offering. Very large companies often have networking moats, whether those are professional networks, networks of vendors such as Airbnb (ABNB -1.63%), or actual networks of information that no one else has.

### Cost moats

Cost moats refer to different cost-related protections. Obviously, consistent price advantage is a huge moat for a lot of companies, and this is usually achieved with economies of scale. But cost

PX9063-002

moats can also speak to switching costs, which can create an environment where it puts a customer at a disadvantage to switch from your company to a competitor.

For example, when smartphones were still relatively new, Microsoft (MSFT -5.49%) had their own operating system for phones, and anyone who chose a Microsoft phone was often locked out of popular apps. There was a distinct disadvantage to switching to a Microsoft phone from an Apple (AAPL -1.35%) iPhone for this reason.

### Cultural moats

Cultural moats are more about company culture and deeply understood brand identity. Companies like Patagonia and Starbucks (SBUX 0.28%) are household names, but they're also cultural icons that really understand their customers -- and their customers resonate with the brand as a part of their own identity. This can be due to a quirky company that goes viral and then sticks, or due to a more traditional means of becoming a cultural icon through generations of innovation and use.

### Resource moats

Resource moats are about what you own or the collection you've established. This is often in the form of intellectual property or regulatory good fortune. If you have a whole catalog of exceptional patents, for example, that's a resource moat, as would be simply being in the right place at the right time when regulations changed, giving you an accidental monopoly or leg-up when you happened to be in compliance and no one else in your industry was.

## Related investing topics

| | | | |
|---|---|---|---|
| **Are Blue Chip Stocks Safe Investments?** A blue chip is considered a bellwether company, but is it a safe investment? | **Understanding Your Risk Tolerance** Risk tolerance is an important factor in understanding your investment style. | **What is a Fiduciary?** A fiduciary is someone who manages money, assets, or property for a client or beneficiary. | **Are Bank Stocks Safe? The Pros and Cons** The bank itself is a safe place to put your money. But what about bank stocks? |

## Why competitive moats matter to investors

Competitive moats are a stock investor's favorite thing. Because competitive moats give a company an untouchable advantage, they're likely to be companies that can last over the long term. If you're working a buy-and-hold strategy, finding companies with wide moats is like finding chunks of gold in your potting soil mix.

There are lots of great companies for shareholders to buy into, but those with healthy competitive moats are absolute no-brainers when it comes time to choose your investments. There's no such thing as a perfectly safe bet, but these companies are generally about as safe as it gets.

## Where to invest $1,000 right now

When our analyst team has a stock tip, it can pay to listen. After all, the newsletter they have run for over a decade, *Motley Fool Stock Advisor*, has nearly tripled the market.*

They just revealed what they believe are the ten best stocks for investors to buy right now…

**See the 10 stocks**

*Stock Advisor returns as of October 28, 2024.*

Kristi Waterworth has no position in any of the stocks mentioned. The Motley Fool has positions in and recommends Airbnb, Apple, Microsoft, and Starbucks. The Motley Fool recommends the following options: long January 2026 $395 calls on Microsoft and short January 2026 $405 calls on Microsoft. The Motley Fool has a disclosure policy.

Our Guides



**What Is a Conservatorship?**



**What Are Carbon Credits?**



**What Is a Corporation?**



**What Does Cash-on-Cash Return Mean?**



## Premium Investing Services

Invest better with The Motley Fool. Get stock recommendations, portfolio guidance, and more from The Motley Fool's premium services.

**View Premium Services**



Making the world smarter, happier, and richer.

     

© 1995 - 2024 The Motley Fool. All rights reserved.
Market data powered by Xignite and Polygon.io

| ABOUT THE MOTLEY FOOL | OUR SERVICES | AROUND THE GLOBE | FREE TOOLS | AFFILIATES & FRIENDS |
| --- | --- | --- | --- | --- |
| About Us | Stock Advisor | Fool UK | CAPS Stock Ratings | Motley Fool Asset Management |
| Careers | The Ascent | Fool Australia | Discussion Boards | Motley Fool Wealth Management |
| Research | All Services | Fool Canada | Calculators | Motley Fool Ventures |
| Newsroom | | | Financial Dictionary | Motley Fool Foundation |
| Contact | | | | |
| Advertise | | | | |

Terms of Use | Privacy Policy | Disclosure Policy | Accessibility Policy | Copyright, Trademark and Patent Information | Terms and Conditions | Do Not Sell My Personal Information

# Barra (Sleep Number) Investigational Hearing Transcript Excerpts

**Filed Under Seal**

# Thompson (Tempur Sealy) Investigational Hearing Transcript Excerpts

**Filed Under Seal**

# DeMartini (Purple) Deposition Transcript Excerpts

**Filed Under Seal**

# Haverty's Deposition Transcript Excerpts

## Filed Under Seal

# Israel Deposition Transcript Excerpts

**Filed Under Seal**

# Rusing (Tempur Sealy) Deposition Transcript Excerpts

**Filed Under Seal**

# Thompson (Tempur Sealy) Deposition Transcript Excerpts

## Filed Under Seal

# Rebuttal Report of Dr. Gopal Das Varma

**Filed Under Seal**