UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| Federal Trade Commission,<br>　　　　　　　　　　Plaintiff,<br><br>vs.<br><br>Tempur Sealy International, Inc., *et al.*,<br>　　　　　　　　　　Defendants. | Civil Action No. 4:24-cv-02508<br><br>Judge Charles Eskridge |

**Defendants' Notice of Revised Slot Commitment**

During closing arguments, the Court noted that Defendants' slot commitment was lower than what the Court understood to be the slots occupied by premium third-party suppliers today, thus not preserving the pre-merger status quo. To address the Court's concern, Defendants now commit to the Court that, for five years post-closing, Mattress Firm will maintain the current percentage of third-party premium ($1,500+) slots (the "Slot Commitment"). *See* Ex. A (describing the Slot Commitment in further detail). The Slot Commitment is consistent with Tempur Sealy's plan and incentive to keep Mattress Firm multi-branded.

Even without this commitment, the FTC has not proven that the merger is likely to substantially lessen competition in a properly defined relevant market. Moreover, under *Illumina, Inc. v. FTC*, commitments need not preserve the pre-merger status quo or prevent *any* harm to competition. 88 F.4th 1036, 1058 (5th Cir. 2023). Instead, the commitments need only prevent "a *substantial* reduction in competition." *Id.* But Defendants are committed to resolving this Court's concerns so that the merger, which will benefit both competition and consumers, may proceed.

## Background

Before the FTC filed its Complaint, Defendants made various commitments designed to resolve the FTC's concerns, including: (1) the divestiture of 104 Sleep Outfitters stores, 74 Mattress Firm stores, and 7

distribution centers to Mattress Warehouse, Proposed Findings of Fact & Conclusions of Law ("FOF/COL") ¶ 77; (2) post-closing supply agreements with seven suppliers and the pursuit of such an agreement with Serta Simmons, FOF/COL ¶¶ 79, 617, 620; and (3) a slot commitment reserving at least 20% of Mattress Firm's overall slots for third-party brands of any price point, 75% of which for third-party *premium* brands (defined as $1,500+). FOF/COL ¶ 78. The FTC rejected these commitments and never identified what sort of slot commitment would resolve its concerns. *See* 12/16 Tr. 51:15–52:2.

In July 2024, the FTC filed this case, alleging that the merger may harm competition only for so-called "premium" mattresses, which it defined as those priced $2,000+. *See* Compl. ¶¶ 70–76, ECF No. 1. The Court held a two-week evidentiary hearing in November and heard closing arguments on December 16. During those arguments, the Court noted that Defendants' slot commitment did not fully preserve the number of slots currently occupied by third-party premium mattresses at Mattress Firm. 12/16 Tr. 84:7–85:16, 98:4–10, 99:20–100:8, 102:17–21.

To address that issue,[1] and consistent with the post-merger plan and incentives, Defendants are now increasing their slot commitment to, at a

---

[1] *See* 12/16 Tr. 87:19–88:1 ("I'd be happy to hear and receive other things. I don't tell you that you have to do that, but it seems obvious to me, you're hearing my concerns, if you want to talk about that further, you can.").

2

minimum, preserve the percentage of premium ($1,500+) slots currently occupied by third parties for five years post-closing. Ex. A. Each Mattress Firm store has, on average, approximately 38 horizontal slots. Ex. B ("Dament Decl.") ¶ 10. Of those 38 slots, approximately 26.6 slots are currently occupied by "premium" mattresses priced $1,500+. Dament Decl. ¶ 11. Of those 26.6 "premium" slots, approximately 11.4 slots are occupied by third-party mattresses (or ~43% of the premium floor). *Id.* Defendants now commit to preserve that full ~43% for premium third-party mattresses for five years post-closing. Ex. A. This is a significant increase from the ~28%[2] that Defendants had previously committed to reserve for premium third-party mattresses and fully closes the "delta" that the Court identified. *See* 12/16 Tr. 100:3–4. Tempur Sealy will assess compliance annually using procedures to be established with the advice of a nationally recognized independent accounting firm. Ex. A.

Defendants previewed this Slot Commitment to the FTC earlier this week, but the FTC again rejected Defendants' efforts and again refused to identify what would be satisfactory.

---

[2] Defendants had previously committed to reserve 20% of the floor for third-party mattresses (~10 slots), 75% of which would be reserved for $1,500+ third-party mattresses (~7.5 slots), which represented 28% of the premium floor (7.5 slots / 26.6 slots).

3

## Argument

To be clear, no commitments are needed. Like other vertical mergers, this one is procompetitive. *See* FOF/COL ¶¶ 651–654. And the FTC has failed at every step to meet its burden. FOF/COL ¶¶ 682–783. Moreover, under *Illumina*, the defendants' commitments need not preserve pre-merger competition or eliminate *any* harm to competition. 88 F.4th at 1058. Indeed, in *Illumina*, the Fifth Circuit reversed the FTC's attempt to so require as "legal error." *Id.* Instead, this Court must consider whether the cumulative effect of Defendants' commitments (and the merger's procompetitive effects) prevent the merger from *substantially* harming competition. *Id.*; *see FTC v. Microsoft*, 681 F. Supp. 3d 1069, 1090 (N.D. Cal. 2023); *United States v. UnitedHealth Grp., Inc.*, 630 F. Supp. 3d 118, 133 (D.D.C. 2022); *United States v. AT&T, Inc.*, 310 F. Supp. 3d 161, 194 (D.D.C. 2018).

In sum, no commitments are required to make this merger procompetitive, and Defendants' commitments need not preserve the current slots occupied by third-party premium suppliers. Nonetheless, Defendants are committing to the Court to do just that. For five years post-closing, Mattress Firm will, at a minimum, reserve an average of 43% of its premium ($1,500+) slots for third parties. Ex. A. This is approximately the same percentage of slots currently occupied by third-party premium suppliers. Dament Decl. ¶ 11. Put differently, the merged firm is committing to "tie its hands" and "keep [the

floor] where it's at." *See* 12/16 Tr. 84:14–15. Although the law does not require Defendants to go this far, Defendants are doing so to address any lingering concern.

Courts in vertical merger challenges have relied on similar commitments in rejecting government merger challenges. For example, in *Microsoft*, the court credited Microsoft's commitment to continue offering *Call of Duty* to PlayStation and other platforms. 681 F. Supp. 3d 1069, 1090–91 (N.D. Cal. 2023); *see UnitedHealth*, 630 F. Supp. 3d at 146–47 (crediting unilaterally established firewall policy and commitment to protect customers' data, rejecting the government's argument that the policy could be amended or repealed in the future); *AT&T*, 310 F. Supp. 3d at 184, 217 (crediting Defendants' commitment to engage in arbitration to resolve disputes over content availability); *see also United States v. Booz Allen*, No. 22-cv-1603, 2022 WL 9976035, at *7 n.19 (D. Md. 2022) (relying on Defendants' unilateral commitment in a horizontal merger case). Indeed, in *AT&T*, the court noted that the government had previously acknowledged that "especially in cases of vertical mergers, conduct remedies . . . can be a very useful tool to address the competitive problems while preserving competition and allowing efficiencies." *AT&T*, 310 F. Supp. 3d at 169 n.3. Defendants are making a similar commitment here. *See* 12/16 Tr. 88:20–22 ("Tempur Sealy could also

5

unilaterally commit to me as part of the deal, I mean, it could commit that it was going to stay at [the same percentage].").

At closing arguments, the Court compared Defendants' then-overall *slot commitment* (20%) with third-party suppliers' *balance of share* of "premium" mattress units sold at Mattress Firm (approximately 35%). *See* 12/16 Tr. 84:7–85:16. In fact, as explained above, Defendants' previous commitments reserved at least 28% of the premium ($1,500+) floor and third-party mattresses currently occupy 43% of the premium ($1,500+) floor.[3] The Court reached different numbers by considering two different metrics. The slot commitment provides third parties with guaranteed *slots on the floor*, but the third-party *balance of share of sales* will depend upon how many customers choose to buy those third-party mattresses. Put differently, Defendants cannot guarantee third parties a particular balance of share post-close—that is up to customers. But Defendants can guarantee and are guaranteeing a certain percentage of slots on the floor.

The Slot Commitment is anchored to $1,500+, rather than $2,000+, for several reasons. The FTC's counsel agreed during closing that "premium" is on a "continuum" and "not a bright line." 12/16 Tr. 15:13–18. Also, the weight of

---

[3] This original commitment by Defendants was made before the FTC filed this litigation, when it was not yet certain that the FTC's case would focus entirely on premium mattresses. That issue is now resolved, as only premium mattresses are at issue in this case.

6

the evidence indicated that mattresses priced $1,000+ are "premium." FOF/COL ¶¶ 96–101. $1,500+ splits the difference between the FTC's proposed definition and the prevailing industry view. It also captures more third-party slots: there are currently approximately 12 third-party $1,500+ slots per Mattress Firm store vs. approximately 9 third-party $2,000+ slots. Dament Decl. ¶ 12.

Moreover, limiting the Slot Commitment to $2,000+ would exclude key third-party mattresses. For example, Purple CEO Rob DeMartini testified that Purple's mattresses—all of which he deemed "premium"—start at $1,400. FOF/COL ¶ 96. Also, Serta Simmons' Pressuresmart mattress, which is Mattress Firm's "highest unit product across the board,"[4] sells in the $1,500–$2,000 range. Indeed, third parties sell more mattresses priced between $1,500–$2,000 at Mattress Firm than they do mattresses priced $2,000+. Dament Decl. ¶ 5.

The Slot Commitment also guarantees an average percentage of slots across all stores over the fiscal year, rather than a daily specific number of slots for each individual store. Ex. A. This is because Mattress Firm has over 2,318 active stores and ~119,129 total slots. *See* Dament Decl. ¶ 9. That sheer scope—exacerbated by differing numbers of slots per store and differing

---

[4] 11/19 Tr. (Dament) 62:20–21.

product needs by geography—makes a store-by-store commitment unmanageable. Moreover, this will allow Mattress Firm to account for regional differences in mattress preferences. 11/19 Tr. (Dament) 48:8–16. An average percentage of slots across all stores is more administrable and will still guarantee third-party premium suppliers the same level of access to Mattress Firm they have today.

## Conclusion

The Slot Commitment addresses the Court's concern, preserving third-party premium slots at Mattress Firm at the same level they exist today. This goes beyond what is required under *Illumina* and far beyond what is required to rebut the FTC's case, which fails on its own terms. Considering the Slot Commitment, the other commitments, and the FTC's failure of proof, the Court should deny the FTC's preliminary injunction.

Dated: December 27, 2024

*/s/ Sara Y. Razi*  
*Attorney-In-Charge*

Sara Y. Razi  
N. Preston Miller  
Lindsey C. Bohl  
Avia Gridi  
Nicholas Ingros  
Geoffrey I. Schmelkin  

*/s/ Ryan A. Shores*  
*Attorney-In-Charge*

Ryan A. Shores  
D. Bruce Hoffman  
Daniel P. Culley  
Blair W. Matthews  
Matthew I. Bachrack  
Jacob M. Coate

SIMPSON THACHER & BARTLETT LLP
900 G. Street, N.W.
Washington, D.C. 20001
Tel: (202) 636-5500
Fax: (202) 636-5502
sara.razi@stblaw.com
preston.miller@stblaw.com
lindsey.bohl@stblaw.com
avia.gridi@stblaw.com
nicholas.ingros@stblaw.com
geoffrey.schmelkin@stblaw.com

Michelle E. Gray
State Bar No. 24078586
S.D. Tex. Bar No. 892270
mgray@foglerbrar.com
Deborah C. Milner
State Bar No. 24065761
S.D. Tex. Bar No. 971677
cmilner@foglerbrar.com

FOGLER, BRAR, O'NEIL & GRAY LLP
2 Houston Center
909 Fannin Street, Suite 1640
Houston, TX 77002
(713) 481-1010
(713) 574-3224 (Fax)

*Counsel for Mattress Firm Group Inc.*

Gabriel J. Lazarus
CLEARY GOTTLIEB STEEN & HAMILTON LLP
2112 Pennsylvania Ave., NW
Washington, D.C. 20037
202-974-1500
bhoffman@cgsh.com
rshores@cgsh.com
dculley@cgsh.com
mbachrack@cgsh.com
bmatthews@cgsh.com
jcoate@cgsh.com
glazarus@cgsh.com

Heather S. Nyong'o
CLEARY GOTTLIEB STEEN & HAMILTON LLP
650 California St.
San Francisco, CA 94108
415-796-4400
hnyongo@cgsh.com

Lina Bensman
CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, NY 10006
212-225-2000
lbensman@cgsh.com

Alex B. Roberts
Federal Bar No. 865757
Texas State Bar No. 24056216
aroberts@beckredden.com
BECK REDDEN LLP
1221 McKinney Street
Suite 4500
Houston, TX 77010
Tel: (713) 951-3700
Fax: (713) 951-3720

*Counsel for Tempur Sealy International, Inc.*

**Certificate of Conference**

Pursuant to Court Procedure 17(a), I certify that, between December 24 and December 27, 2024, Defendants conferred with the FTC about the Slot Commitment.

<u>/s/ Ryan A. Shores</u>
Ryan A. Shores

**Certificate of Word Count**

Pursuant to Court Procedure 18(c), I certify that the motion contains 1,694 words, excluding the case caption, signature block, and certificates.

*/s/ Ryan A. Shores*
Ryan A. Shores

## Certificate of Service

I hereby certify that on December 27, 2024, I electronically filed a true and correct copy of the foregoing document using this Court's CM/ECF system, which will send a notice of electronic filing to all counsel of record.

*/s/ Ryan A. Shores*
Ryan A. Shores
