**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>*Plaintiff,*<br><br>v.<br><br>TEMPUR SEALY INTERNATIONAL, INC.<br><br>and<br><br>MATTRESS FIRM GROUP INC.,<br><br>*Defendants.* | Case No. 4:24-CV-02508 |

**PLAINTIFF FEDERAL TRADE COMMISSION'S RESPONSE TO DEFENDANTS' NOTICE OF REVISED SLOT COMMITMENT**

Defendants' revised slot commitment has the same basic flaws as the original: it is legally unenforceable, cannot be monitored, and does not prevent Tempur Sealy from disadvantaging its rivals and harming consumers. In fact, this new commitment is ***worse*** in many ways because it explicitly allows Tempur Sealy to judge its own compliance and permits Tempur Sealy to jettison the commitment at its whim. Because Defendants' commitment does not mitigate the Proposed Acquisition's anticompetitive effects, it should be given no weight.

## I. Defendants' New Commitment Is Unenforceable, and Defendants Have No Incentive to Adhere to It

The Court has asked whether this new commitment can "be judicially or administratively considered upon any assertion of a violation." December 29 Order (ECF 485). The answer is "no." The commitment is neither a binding contract with any supplier, nor a binding settlement that can be enforced by the FTC or any court. It remains an unenforceable promise Defendants could break at any time. Proposed Findings of Fact/Conclusions of Law ("FOF/COL") ¶ 395. As such, it is the same type of unenforceable post-merger promise courts have repeatedly rejected. *See, e.g.*, *FTC v. Kroger Co.*, slip op. at 44, No. 3:24-cv-00347 (D. Or. Dec. 10, 2024) ("Courts ordinarily must be skeptical of unenforceable promises, especially those made during an antitrust investigation, because 'promise[s] can be broken at will.'"); *United States v. Bertelsmann SE & Co.*, 646 F.Supp.3d 1, 50 (D.D.C. 2022) ("The Court gives no weight to this unenforceable promise."); *United States v. H&R Block, Inc.*, 833 F.Supp.2d 36, 82 (D.D.C. 2011) (holding a promise "cannot rebut a likelihood of anticompetitive effects"); *FTC v. Cardinal Health*, 12 F.Supp.2d 34, 64–65 (D.D.C. 1998) (similar).

### *A. The Slot Commitment Is Not Contractually Enforceable by Third Parties*

No supplier will have an enforceable contract with Defendants for the new commitment's slots. Defendants conceded this point about the original commitment during closing arguments. 12/16 Tr. 62:3–9 ("So there's no binding contract, if that's the question being asked."). In fact, Tempur Sealy refused to even entertain agreements with suppliers containing slot commitments, despite including slot commitments in many of its

own contracts. FOF/COL ¶¶ 275–76 (refusing to negotiate slot commitment with Serta Simmons); *infra* at 7 (discussing Tempur Sealy's contracts). Other premium mattress suppliers will thus have no legal recourse if Tempur Sealy flouts this commitment. Nor would other suppliers have an incentive to enforce such a commitment, since it does not guarantee slots to any particular supplier.

Defendants' unenforceable commitment to make slots available to unspecified suppliers thus bears no resemblance to the enforceable contractual provisions relied upon by courts in the vertical merger cases they cite. In *United States v. AT&T Inc.*, Turner Broadcasting made an "irrevocable offer" for continued carriage and arbitration to the very distributors DOJ argued could be threatened with foreclosure. 310 F.Supp.3d 161, 184 (D.D.C. 2018). Likewise, in *FTC v. Microsoft Corp.*, Microsoft extended a "binding offer" to its key competitor to provide equal access to Call of Duty for ten years. 681 F.Supp.3d 1069, 1093 (N.D. Cal. 2023).

Defendants' reliance on *United States v. UnitedHealth Group*, 630 F.Supp.3d 118 (D.D.C. 2022), is similarly misplaced. The *UnitedHealth* court did not simply accept a unilateral promise as Defendants suggest, but rather determined UnitedHealth's new guidance regarding its firewall policy was to "memorialize existing practices," that DOJ "offered no conflicting testimony at trial," and that UnitedHealth had the incentive to adhere to its long-established policy. *Id.* at 128, 145–49. Here, by contrast, the record contains no evidence that Defendants would adhere to their commitment.

*B. The Slot Commitment Is Not Judicially or Administratively Enforceable*

Defendants' "commitment" also is designed to avoid judicial or administrative enforcement. An administrative proceeding challenging the Proposed Acquisition's merits under Section 7 of the Clayton Act remains pending. The FTC brought this federal court action to secure a preliminary injunction against the Proposed Acquisition while that merits case proceeds. Accordingly, an enforceable settlement of the FTC's challenge to the Proposed Acquisition should be done through the administrative process where the FTC has brought its Section 7 case.

Under the administrative process, the first step in settling a pending merger challenge is filing a motion to withdraw the matter from administrative adjudication for purposes of considering a proposed settlement. 16 C.F.R. § 3.25(b). Settlement takes the form of a consent agreement approved by the FTC's Commissioners following a public comment period. 16 C.F.R. § 3.25(f). The FTC cannot resolve a pending administrative adjudication merely by agreeing to a "commitment" in a separate federal proceeding. Doing so would ignore the pending administrative proceeding, deprive the public of their right to notice and comment, and avoid approval by the FTC's Commissioners. *See* 16 C.F.R. § 2.34.

Although this process differs from settling litigation brought solely in federal court, it is common practice where the FTC has issued an administrative complaint against a proposed merger. *E.g.*, Joint Stipulation for Dismissal without Prejudice (Document 291), *FTC v. Intercontinental Exchange, Inc.*, No. 3:23-cv-01710 (N.D. Cal. Aug. 7, 2023) (stipulating dismissal of federal court action because "of the significant

progress the parties have made toward a potential resolution of the administrative proceeding" including a consent order "for submission to the Federal Trade Commission"); Joint Motion for Entry of Stipulation (Document 158), *FTC v. Amgen Inc*., No. 1:23-cv-03053 (N.D. Ill. Sept. 1, 2023) (similar). The result is a consent agreement that is (1) legally binding and enforceable by the FTC, (2) allows the FTC to monitor compliance, and (3) often remains effective for ten years or longer. *E.g.*, Decision and Order, *In re Amgen Inc.*, FTC No. 9414 (Dec. 13, 2023) (15-year agreement authorizing FTC to appoint a Monitor to observe compliance). Such terms almost always are necessary, because merging parties have little incentive to take actions to benefit their competitors. *See United States v. Aetna, Inc.*, 240 F.Supp.3d 1, 71 (D.D.C. 2017).

While Defendants imply they sought to discuss this new commitment with the FTC, they have not actually attempted to negotiate any enforceable, binding settlement. Defendants' Notice of Revised Slot Commitment ("Notice") at 3 (ECF 484). If Defendants were serious about settling the FTC's challenge, they could have (a) agreed to extend their self-imposed termination date in their merger agreement to allow the Court to defer ruling on the FTC's motion for a preliminary injunction, and (b) filed a motion with the Commission requesting to withdraw this matter from administrative adjudication.

Rather than following that process, Defendants instead seek to have this Court rely upon their unenforceable promise as a basis to deny the preliminary injunction the FTC requests. This would have the opposite effect of advancing resolution via settlement: it would allow Defendants to consummate their anticompetitive acquisition immediately

without any consent agreement, thereby eliminating their incentive to negotiate a settlement. And without the potential for enforcement and repercussions, Tempur Sealy will have strong financial incentives to abandon any commitment to reserve slots for competitors. FOF/COL ¶¶ 240–241, 245, 249.

## II. The Revised Slot Commitment Is Deficient for Many Other Reasons

Even if it were an enforceable commitment, Defendants' revised slot commitment contains many of the same (and some new) substantive flaws as the original.

***First***, the revised slot commitment adds a new exception Tempur Sealy could unilaterally use to gut the entire commitment: "Minimum Performance Criteria." The new commitment is "subject to the availability of Third Party Mattresses that meet the **Minimum Performance Criteria**," a term defined vaguely to mean "performance requirements generally applicable to suppliers in the mattress industry." Notice Ex. A (emphasis added). While Defendants provide a non-exhaustive list of examples, they do not explain further, and yet again Tempur Sealy will be the arbiter of whether its rivals meet this nebulous "Minimum Performance Criteria." Notice Ex. A. Under this carve-out, Tempur Sealy must follow the slot commitment ***only if*** it decides there are enough premium mattresses available that meet its own definition of "Minimum Performance Criteria." Notably, Defendants make no mention of this new provision anywhere in their Notice, much less explain why it was not included in the original commitment.

***Second***, the new commitment provides lip service to monitoring, except that under these terms ***Tempur Sealy*** will monitor its ***own*** compliance with the commitment: "Tempur Sealy will determine such compliance pursuant to procedures to be established

by Tempur Sealy in conjunction with a nationally recognized accounting firm." Notice Ex. A. While the original commitment failed to address monitoring, the new commitment appoints Tempur Sealy the judge of its own compliance.

***Third***, the terms of Defendants' new commitment, in practice, obstruct ***any*** third party from monitoring compliance—a problem the FTC raised with the original commitment. Motion for Preliminary Injunction, at 46 (ECF 143); FOF/COL ¶ 398. Because the percentage of slots reserved for third parties is calculated company-wide rather than store-by-store, someone who walks into a Mattress Firm will be unable to assess whether Defendants are compliant. Instead, the only evidence of Defendants' compliance will be in an internal Excel spreadsheet purportedly maintained by Mattress Firm, the mechanics of which require a five-page declaration from Mattress Firm's Chief Merchandising Officer to explain. Notice Ex. B. Defendants claim implausibly this commitment is "more administrable," while a store-by-store commitment would be "unmanageable," Notice at 7–8, but that contradicts the evidence. Store-by-store slot guarantees are included in many industry contracts, including Tempur Sealy's contracts with Mattress Firm and several other retailers. *E.g.*, Exs. 13-11 (Mattress Firm); 209-1 (Slumberland); 4854-3 (Mattress Warehouse).

***Fourth,*** as the Court questioned in its December 29 Order, the new commitment's five-year term is far shorter than the typical duration of behavioral remedies imposed in FTC consent agreements, which can extend as long as twenty years. *See* Decision and Order, *In re Northrop Grumman Corp.*, FTC No. C-4652 (Dec. 3, 2018); *see also supra* at 5. Given the hundreds of millions in profit Tempur Sealy could gain by fully or

partially foreclosing rivals, it will have every incentive to terminate the slot commitments after the five-year term is up. FOF/COL ¶¶ 253–254, 351–360.

***Fifth,*** the new commitment does not prevent Tempur Sealy from disadvantaging the suppliers it chooses to floor in Mattress Firm. FOF/COL ¶ 397. Defendants will control many means to "tilt the floor" in their favor, including the selling process, mattress floor placement, sales commission rates, spiffs, inventory levels, and advertising placement. *Id.* ¶¶ 167–184. Tempur Sealy will also have the incentive to "bargain" with its rivals for spots on the floor—essentially gouging them for higher margins in exchange for slots. Indeed, the terms of the "Minimum Performance Criteria" expressly allow Tempur Sealy to disregard third-party mattresses when the rival supplier will not agree to what Tempur Sealy believes are "commercially reasonable financial targets." Notice Ex. A. As demonstrated by Purple's 2022 negotiations with Mattress Firm, the retailer's importance to premium mattress suppliers will leave them with little choice but to acquiesce. FOF/COL ¶ 184.

***Finally***, because the new commitment does not guarantee slots to any particular supplier, it will not stop Tempur Sealy from ousting its chief rivals, and assigning slots to third parties that pose less of a threat. Contrary to Tempur Sealy's claim, the new commitment will do nothing to "tie its hands." Notice at 4. Indeed, Tempur Sealy has repeatedly acknowledged it could kick out Serta Simmons post-acquisition, and Tempur Sealy's CEO remarked "SSB is committing suicide" because the company was not "supportive" of the Proposed Acquisition. FOF/COL ¶¶ 273–280.

## III. Defendants' Post-Hearing, Post-Discovery Commitment Prejudices the FTC

Finally, Defendants' post-hearing commitment prejudices the FTC because the FTC had no opportunity through discovery or at the hearing to show this particular commitment is flawed. *See* Transcript of Pre-Hearing Conference, *FTC v. Ardagh Group*, No. 13-1021 (D.D.C. Sept. 24, 2013), at 29 (declining to consider divestiture proposal made three weeks before hearing because there was insufficient time to "thoroughly investigate[]" the proposal); *Chemetron Corp. v. Crane Co.*, 1977 WL 1491 (N.D. Ill. Sept. 8, 1977), at *7 (declining to consider divestiture proposal made during hearing).

For example, had Defendants proposed their new commitment before the hearing, the FTC could have introduced exhibits and elicited testimony on the commitment's defects, such as the extent to which Defendants can rely on the undefined "Minimum Performance Criteria" to circumvent the commitment. The record contains no evidence about what this new provision means or how it will operate in practice. Instead, the FTC must now rely on short, expedited briefing using an evidentiary record developed when Defendants were offering a different commitment.

Denying a preliminary injunction based on this new commitment would be highly prejudicial to the FTC and could encourage future merging parties to delay remedy proposals until after the close of evidence. Evaluation of Defendants' new commitment should instead occur in the upcoming administrative hearing, where both sides can build a record that takes this commitment into account. *See* 16 CFR § 3.43 (evidentiary rules in administrative adjudications).

## CONCLUSION

Defendants' revised slot commitment remains unenforceable, unmonitorable, and incapable of protecting competition and consumers. The Court should disregard this new commitment and grant the FTC's motion for a preliminary injunction.

Dated: January 3, 2025

Respectfully submitted,

*/s/ Allyson M. Maltas*

Allyson M. Maltas
Attorney-in-Charge
DC Bar No. 494566 *(Pro Hac Vice)*
Federal Trade Commission
Bureau of Competition
600 Pennsylvania Avenue, NW
Washington, DC 20580
Tel.: (202) 326-3646
Email: amaltas@ftc.gov

*Counsel for Plaintiff*
*Federal Trade Commission*

**CERTIFICATE OF WORD COUNT**

Pursuant to this Court's Rule 18(c), I hereby certify that this Response contains 2,193 words excluding the case caption, signature block, and certificates.

*/s/ Allyson M. Maltas*
Allyson M. Maltas
Attorney-in-Charge

**CERTIFICATE OF SERVICE**

I hereby certify that I served the foregoing Response on all counsel of record who have appeared in this matter via the Court's CM/ECF system on January 3, 2025.

*/s/ Allyson M. Maltas*
Allyson M. Maltas
Attorney-in-Charge