United States District Court
Southern District of Texas
**ENTERED**
February 26, 2025
Nathan Ochsner, Clerk

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | | |
|---|---|---|
| FEDERAL TRADE COMMISSION, | § § | CIVIL ACTION NO 4:24-cv-02508 |
| Plaintiff, | § | |
| | § | |
| | § | |
| vs. | § | JUDGE CHARLES ESKRIDGE |
| | § | |
| | § | |
| TEMPUR SEALY INTERNATIONAL, INC, and MATTRESS FIRM GROUP INC, | § § § § | |
| Defendants. | § | |

## OPINION AND ORDER
## DENYING MOTION FOR PRELIMINARY INJUNCTION

Tempur Sealy International, Inc, and Mattress Firm Group Inc have entered into an agreement and plan of merger. The Federal Trade Commission found reason to believe that their merger may substantially lessen competition. It thus commenced an administrative proceeding on the merits. And it commenced this action to preliminarily enjoin the merger pending completion of its own proceeding.

For the reasons specified below, the motion for a preliminary injunction is denied. The record doesn't support the requested finding of a relevant antitrust product market with respect to "premium" mattresses, defined simply as mattresses priced at $2,000 and above. Nor does it suggest that the subject merger is likely to substantially lessen competition. To the contrary, the structural changes from the proposed merger don't mean that rivals will indeed be foreclosed, and any potential foreclosure won't lead to anticompetitive effects in this very competitive market. The merger's effect here (like most

vertical mergers) is instead likely to be either neutral or procompetitive, with the cumulative effect of certain remedial commitments attendant to the merger reasonably addressing any lingering concerns.

## TABLE OF CONTENTS

1. Background ................................................................. 4
   a. The parties .......................................................... 4
      i. Federal Trade Commission ............................ 4
      ii. Tempur Sealy .............................................. 5
      iii. Mattress Firm ............................................. 6
   b. Industry background ............................................ 7
   c. Recent industry history ...................................... 10
      i. Exclusion of Tempur Sealy from
         Mattress Firm floor ................................... 10
      ii. Prior acquisitions by Tempur Sealy ............. 11
      iii. Bankruptcy proceedings of
         Serta Simmons ........................................... 12
   d. The proposed acquisition ................................... 16
   e. This action ........................................................ 20
2. Legal standards ......................................................... 23
   a. Section 7 of the Clayton Act .............................. 24
   b. Section 13(b) of the FTC Act ............................. 27
3. Relevant market ........................................................ 29
   a. Product market .................................................. 30
      i. Industry or public recognition as
         separate economic unit .............................. 31
      ii. Peculiar characteristics and uses
         of product ................................................. 38
      iii. Unique production facilities ....................... 41
      iv. Distinct customers .................................... 41
      v. Distinct prices .......................................... 44
      vi. Sensitivity to price changes ...................... 46
      vii. Specialized vendors ................................... 47
   b. Hypothetical monopolist test .............................. 49
   c. Geographic market ............................................. 53
   d. Conclusion ........................................................ 56

4.  Competitive impact ...................................................57
    a.  Ability and incentive ........................................ 58
        i.  Ability ....................................... 59
        ii. Incentive .................................... 64
    b.  *Brown Shoe* factors ....................................71
        i.   Nature and economic purpose
             of arrangement ...................................72
        ii.  Likelihood and size of foreclosure ............... 73
        iii. Barriers to entry ........................... 74
        iv.  Trend toward vertical concentration........... 77
        v.   Elimination of a competitor ......................... 77
        vi.  Market power ............................... 77
        vii. Conclusion ................................. 78
    c.  Extent of effect on or harm to competition
        and consumers .........................................78
        i.   Potential for increase in price
             to consumers .................................. 79
        ii.  Potential for market foreclosure
             of competitors ............................... 86
             (a)  Multiplicity of suppliers and
                  retailers in mattress industry ............... 86
             (b)  Extent of possible market foreclosure ... 91
        iii. Potential for partial foreclosure ................. 99
        iv.  Natural experiments and recent history.....103
    d.  Remedial commitments......................................107
        i.  Divestiture of certain stores ........................108
        ii. Balance-of-share commitments ..................109
    e.  Conclusion............................................111
5.  Balance of equities ....................................112
    a.  Public interest.....................................112
    b.  Private interest...................................113
6.  Conclusion ..........................................115

### 1. Background

Rule 52(a)(1) of the Federal Rules of Civil Procedure provides, "In an action tried on the facts without a jury or with an advisory jury, the court must find the facts specially and state its conclusions of law separately. The findings and conclusions may be stated on the record after the close of the evidence or may appear in an opinion or a memorandum of decision filed by the court." Rule 52(a)(2) further states, "In granting or refusing an interlocutory injunction, the court must similarly state the findings and conclusions that support its action."

It's thus a mandatory requirement upon a district court to make findings of fact and conclusions of law when granting or refusing a preliminary injunction. Charles Alan Wright & Arthur R. Miller, 9C *Federal Practice & Procedure* §2576 (West 3d ed 2024 update); see also *Ali v Quarterman*, 607 F3d 1046, 1048 (5th Cir 2010). But as to factual findings, this "exacts neither punctilious detail nor slavish tracing of the claims issue by issue and witness by witness." *Century Marine Inc v United States*, 153 F3d 225, 231 (5th Cir 1998), quoting *Burma Navigation Corp v Reliant Seahorse M/V*, 99 F3d 652, 656 (5th Cir 1996). The rule is instead satisfied where the findings present the reviewer with "a clear understanding of the basis for the decision." Ibid.

To the extent that any factual finding that follows reflects or is better understood as a legal conclusion, it is also deemed a conclusion of law. Likewise, to the extent that any legal conclusion reflects or is better understood as a factual finding, it is also deemed a finding of fact.

#### a. The parties

##### i. Federal Trade Commission

The Federal Trade Commission is an administrative agency of the United States government established, organized, and existing pursuant to the FTC Act, 15 USC §§41 et seq, with its principal offices in Washington, DC. The FTC is vested with authority and responsibility for

enforcing Section 7 of the Clayton Act, 15 USC §18, and Section 5 of the FTC Act, 15 USC §45, among others.

### ii. Tempur Sealy

Tempur Sealy International, Inc (referred to as *Tempur Sealy* or *TSI*) is a publicly traded corporation headquartered in Lexington, Kentucky, formed by the 2013 merger of Tempur-Pedic International and Sealy Corporation. At present, it's primarily a mattress manufacturer and is the world's largest bedding provider. Ex 5601 at 21 (June 2024 TSI presentation to rating agencies); see also 11/13 (Rao, TSI) 109:20–24; Dkt 52 at ¶27 (TSI answer). Tempur Sealy North America accounts for approximately eighty percent of Tempur Sealy's global revenues. 11/18 (Buster, TSI) 100:20–22.

Tempur Sealy sells mattresses under the brand names of Tempur-Pedic, Sealy, and Stearns & Foster. Tempur-Pedic and Sealy are by sales revenue the two most popular brands of mattresses in the United States. Dkt 52 at ¶25 (TSI answer).

Tempur Sealy sells its mattresses through a number of different commercial channels.

First, it primarily sells its mattresses at wholesale to mattress retailers. Ex 6500 at 23 (FTC expert report, showing that TSI sells nearly ninety percent of its mattresses on wholesale basis to independent retailers). With pertinence to the acquisition at hand, Mattress Firm accounts for nearly ███ percent of Tempur Sealy's wholesale revenue. Dkt 52 at ¶55 (TSI answer).

Next, it also sells directly to consumers in two ways. One is through its e-commerce channel. 11/13 (Rusing, TSI) 220:25–221:2. Another is Tempur-Pedic retail stores (essentially being a single-vendor mattress specialty retailer), of which there are 115 in the United States. 11/18 (Buster, TSI) 106:24–107:5.

Last, Tempur Sealy has acquired other mattress retailers. These are detailed further in a following subsection. But in sum, they include (i) Sleep Outfitters and Sleep Outfitters Outlet in the United States, which is

now a Tempur Sealy-only mattress retailer, acquired out of bankruptcy in 2019, (ii) Sova in Sweden, which remains a multi-vendor mattress retailer, acquired in 2018, and (iii) Dreams in the United Kingdom, which also remains a multi-vendor retailer, acquired in 2021.

### iii. Mattress Firm

Mattress Firm Group Inc (sometimes referred to as *MFRM*) is a privately owned mattress specialty retail chain headquartered in Houston, Texas. Dkt 49 at ¶24 (MFRM answer). It operates over 2,300 brick-and-mortar stores and sixty-three distribution centers across the United States. Id at ¶¶1, 28; 11/13 (Eck, MFRM) 228:23–229:1, 230:13–23. Mattress Firm grew and expanded nationwide through acquisitions. It has acquired at least thirteen other mattress retailers since 2010, including Sleepy's in 2016, which alone added one thousand stores. Dkt 49 at ¶53 (MFRM answer).

The typical Mattress Firm store is approximately 3,500 square feet with approximately thirty-eight horizontal slots. 11/18 (Eck, MFRM) 10:2–5. Its stores also often have additional mattresses displayed in vertical slots, typically at the back of the stores. 11/18 (Eck, MFRM) 68:13–14; 11/12 (DeMartini, Purple) 112:15–23.

Mattress Firm is a "multi-vendor" mattress specialty retailer, meaning that it carries mattresses from multiple suppliers across a range of brands. 11/19 (Dament, MFRM) 16:20–23. Testimony by Mattress Firm executives established that having multiple suppliers and brands is "essential" to its business model. For example, see 11/18 (Eck, MFRM) 7:7–9, 7:18–20, 53:4–14.

Mattress Firm offers mattresses across a wide variety of technologies, price points, and product features, with the average price being approximately $1,300. Id at 11:7–19. About eighty percent of all mattress units sold at Mattress Firm—representing about sixty percent of its revenue—are priced below $2,000. Id at 11:24–25; 11/19 (Dament, MFRM) 18:19–23.

Of note, Mattress Firm went through relatively recent bankruptcy proceedings, entering in 2018 and exiting in January 2019. 11/25 (Neu, TSI) 14:13–15, 48:12–13; 11/13 (Busker, MFRM) 216:14–19. It emerged from bankruptcy as a more competitive retailer overall with increased sales per store. 11/13 (Eck, MFRM) 232:18–233:5. Even so, the recency of such proceedings evinces at least some concern as to its going-forward potential absent this (or another) acquisition or merger. For example, see Ex 2103 at 1 (TSI email between executives noting that acquisition of MFRM could "derisk the enterprise").

> b.  Industry background

Testimony and evidence in this action involved reference to or detail regarding a broad array of mattress suppliers, including Tempur Sealy, Serta Simmons Bedding, LLC (referred to as *Serta Simmons* or *SSB*), Purple Innovation Inc, Avocado Mattress LLC, King Koil Manufacturing West, LLC, Kingsdown, Incorporated, Spring Air Mattress Co, and others. 11/13 (Busker, MFRM) 193:1–13 (listing brands carried by Mattress Firm). It also established that the mattress industry has been "prone to disruption," including by relatively recent entrants like Purple, Casper, Nectar, Saatva, and Helix. 11/25 (Neu, TSI) 31:2–11; Ex 4794 at 33 (MFRM 2023 Board presentation, summarizing recent history of "disruptor" brands). Whether a new or established entrant, those supplying mattresses at higher price points believe having a physical presence with a retailer is important to the ultimate consumer-purchase decision. See 11/12 (DeMartini, Purple) 99:21–100:7 (stating that consumers have lower expectations for mattresses under $1,000, but few are willing to buy more expensive mattress on internet without touching it). Thus, several of the "disruptor" brands sought to expand beyond their direct-to-consumer roots and began selling through retailers. See 11/13 (Busker, MFRM) 189:2–12 (detailing entry of Purple onto Mattress Firm floor), 199:10–200:14 (discussing rejected bid for Casper to sell through Mattress Firm).

Mattresses are sold through various channels, including mattress-specialty stores, furniture stores, department stores, online, and direct-to-consumer. 11/25 (Israel, Defense expert) 130:14–131:15; see also 11/13 (Studner, Rooms to Go) 18:19. These channels all compete at least in some respects against one another. 11/18 (Papettas, Mattress Warehouse) 178:2–3 (Mattress Warehouse competes with "[a]nyone that sells something you could sleep on"); 11/21 (Galimidi, Macy's) 12:15–19 (same for Macy's). And with respect to mattress retailers, there are literally thousands. 11/18 (Eck, MFRM) 12:17–18. Many "have a very similar selection, [and] in some cases, the same mattresses." Id at 14:17–20.

The only mattress suppliers who sell a significant number of mattresses at Mattress Firm are Tempur Sealy, Serta Simmons, and Purple. See 11/19 (Dament, MFRM) 46:1–5, 46:19–47:23; Ex 5840 at 7 (MFRM 2024 strategy presentation). Pertinent to the market alleged here as *relevant* (and defined and discussed elsewhere below), more than half of "premium" mattresses (that is, at prices higher than $2,000) sold at Mattress Firm are from Tempur Sealy. For example, with respect to that price point in 2022, Mattress Firm sold on the order of 368,000 from Tempur Sealy, ███████ from Serta Simmons, and ██████ from Purple. PDX6 at 18 (Defense expert slide deck). Other evidence established that as-defined "premium" mattresses account for only fifteen percent of the overall mattress market. PX0507 at 11 (Defense expert report).

Mattresses have a variety of price points and have varying degrees of features. In seeking price consistency, mattress suppliers may use a Minimum Advertised Price (or *MAP*), which typically sets an advertised price floor, and/or a Unilateral Pricing Policy (or *UPP*), which sets a specific price. Dkt 52 at ¶40 (TSI answer). Tempur Sealy uses UPP for Tempur-Pedic and Stearns & Foster mattresses. Ibid.

Selling mattresses—both at wholesale and at retail—is highly competitive. 11/12 (Rusing, TSI) 225:6–13; 11/19

(Thompson, TSI) 136:8–9; 11/20 (Nguyen) 76:4; 11/18 (Eck, MFRM) 14:15–20. Mattress retailers compete on price, mattress selection, and service. 11/18 (Eck, MFRM) 13:14–14:1, 19:5–16; 11/19 (Dament, MFRM) 49:11–15. But floor space at retailers is a particular constraint, being limited by available square footage. See Portillo (MFRM) IH 55:5–15. And so, mattress suppliers compete hard for such space. 11/19 (Thompson, TSI) 136:1–2; see also id at 163:11–20 (fighting for floor space is "zero-sum game"). Slot competition often includes the offering of financial incentives, which can include employing strategies intended to maintain high retailer margins. Dkt 52 at ¶37 (TSI answer). Indeed, mattress manufacturers incentivize retailers to sell their mattresses through larger retail margins. See 11/19 (Dament, MFRM) 66:5–12 (testifying that Purple's significantly lower margin made it difficult to sell).

The purchase of a new mattress can be infrequent and expensive. Dkt 52 at ¶33 (TSI answer). And customers don't necessarily know or appreciate the differences and distinctions between mattress manufacturers and their various available lines and brands. 11/13 (Eck, MFRM) 247:11–12. Retail sales associates at mattress retailers are thus an important link in the retail-sales chain to help customers find the mattress that fits their needs. Cook (MFRM) Dep 105:1–18 (retail sales associates play influential role because consumers aren't familiar with mattress category); 11/13 (Eck, MFRM) 247:6–12 (customers need retail sales associates to guide them through process); 11/12 (DeMartini, Purple) 96:7–25 (noting importance of retail sales associates).

Mattress manufacturers and retailers can also drive demand, including through advertising and innovation. Koenig (City Furniture) Dep 51:20–21 (advertising "drive[s] bedding traffic"); Megibow (Casper) Dep 73:17–21 (advertising increases sales); see 11/13 (Busker, MFRM) 198:6–13 (suppliers investing in visual store displays and advertising drives "consumer engagement").

### c.   Recent industry history

Several points of recent history in the mattress industry came to light in these proceedings that have meaning to the merits, while also making clear how fiercely competitive and wildly unpredictable life in this market can be. These include (i) the exclusion of Tempur Sealy by Mattress Firm during the 2017 to 2019 years, to which they refer as *the divorce*, (ii) three prior acquisitions by Tempur Sealy of other mattress retailers, and (iii) the concern Serta Simmons purports to express in these proceedings, as compared to contradictory representations made during its own recent bankruptcy proceedings.

### i.   Exclusion of Tempur Sealy from Mattress Firm floor

Tempur Sealy now seeks to acquire Mattress Firm. But in January 2017, contract renewal negotiations broke down following a disagreement between them on the allocation of revenue, leading Mattress Firm to entirely remove Tempur Sealy from all of its stores nationwide. 11/19 (Thompson, TSI) 144:16–20, 145:1–21, 159:15–160:2; see also Dkts 3 at ¶57 (unredacted complaint) & 52 at ¶57 (TSI answer). This continued into the second half of 2019, when Mattress Firm relented in the face of its own financial difficulties and invited Tempur Sealy back into its stores. 11/19 (Thompson, TSI) at 161:17–162:7; see also 11/13 (Busker, MFRM) at 193:14–194:22 (discussing 2019 negotiations); Ex 4730 (MFRM, discussing proposed terms of 2019 MFRM/TSI supply agreement); 11/20 (Das Varma, FTC expert) 128:7–129:10.

At the time of exclusion in 2017, Mattress Firm represented twenty-one percent of Tempur Sealy's sales. 11/12 (Rusing, TSI) 238:15–16. But even during this termination interval, Tempur Sealy didn't suffer catastrophic loss. It instead competed vigorously by redirecting its efforts and funds to sell mattresses through new channels. 11/19 (Thompson, TSI) at 160:1–13. These efforts included (i) revamping its US business plan, (ii) seeking out new retailers, while providing them "co-op funds" to open new stores and to advertise their products,

(iii) offering promotional money to retailers to "drive" its mattresses, (iv) opening its own direct-to-consumer stores, and (v) starting to sell directly to consumers online. Id at 160:1–161:16; see also 11/12 (Rusing, TSI) 239:2–19, 241:11–242:3 (describing plan as "Serta Simmons and Mattress Firm versus Tempur Sealy and other retailers").

By the time cooperative sales relations returned in 2019, Tempur Sealy had achieved a recapture rate over one hundred percent and more than recaptured its profitability. 11/25 (Israel, Defense expert) 144:16–22; 11/19 (Thompson, TSI) 162:15–18; 11/20 (Das Varma, FTC expert) 213:22–214:6; see also Ex 5980 (Defense expert graphic showing recapture rate). As a result, Tempur Sealy now partners with over five thousand retailers, allowing it to sell mattresses in over twenty-six thousand retail locations. Ex 4647 at 19 (TSI 2023 quarterly investor presentation); see also 11/25 (Israel, Defense expert) 111:11–13 (observing TSI stayed in new stores sought out during time excluded from MFRM).

### ii.  Prior acquisitions by Tempur Sealy

Tempur Sealy has three times acquired mattress retailers that are at least in nominal respects akin to the vertical integration here at issue. These are the acquisitions of (i) Sleep Outfitters and Sleep Outfitters Outlet in the United States, (ii) Sova in Sweden, and (iii) Dreams in the United Kingdom.

*As to Sleep Outfitters and Sleep Outfitters Outlet,* Tempur Sealy acquired them out of bankruptcy in April 2019. 11/19 (Thompson, TSI) 94:17–19. Today, there are approximately one hundred Sleep Outfitters locations, with roughly fifteen additional Sleep Outfitters Outlet stores. 11/18 (Buster, TSI) 108:4–16, 111:1–7. At the time of acquisition, the stores were largely a "Tempur-Sealy only" chain, selling Tempur-Pedic, Sealy, and Stearns & Foster mattresses, along with a less than five percent share of a small third-party brand called Symbol. 11/19 (Thompson, TSI) 94:20–95:9, 96:21–23; 11/18 (Buster, TSI) 108:17–22. It's uncontested that these stores haven't

carried anything other than Tempur Sealy mattresses since at least July 2019. Dkt 456 at 7 (joint submission).

*As to Sova in Sweden,* Tempur Sealy acquired it in 2018. It is a twenty-store, high-end, multi-branded mattress retailer. 11/19 (Thompson, TSI) 172:7–13; Montgomery (TSI) Dep 19:7–17, 20:1–3, 115:16–18. Sova has continued to run as an independently managed subsidiary since acquisition. Id at 12:11–17 (Tempur Sealy manages Sova at "arm's length," with decisions "in terms of its operating environment" being "sole responsibility of the Sova management"). And it remains a multi-branded retailer. Id at 35:8–36:9. Of note, the Scandinavian market is markedly different from the United States, with sales typically entailing complete bedding systems (including bed frames and toppers) as part of the local consumer expectation. Id at 37:1–20.

*As to Dreams in the United Kingdom*, Tempur Sealy acquired it in 2021. It is a 212-store, vertically integrated, multi-branded mattress retailer. 11/21 (Hirst, Dreams) 99:5–17. It is also the largest mattress specialty retailer and second-largest bedding manufacturer in the United Kingdom. Id at 100:21–101:10. Its CEO testified that Dreams has been maintained as an entirely separate business unit, without interference or instruction by Tempur Sealy. Id at 104:15–105:15 (describing Dreams as managed at "arm's length" with "total autonomy").

### iii. Bankruptcy proceedings of Serta Simmons

Serta Simmons is Tempur Sealy's largest rival on the Mattress Firm floor, particularly with respect to higher-end mattresses. See PDX5 at 19 (FTC expert report), citing Ex 5022 (FTC expert chart showing revenue shares by brand); see also Ex 5840 at 7 (MFRM 2024 strategy presentation, showing SSB to be second largest supplier by sales during recent quarter). Its Chairman of the Board testified in these proceedings quite emphatically that Tempur Sealy could take measures including "kicking us off the floor completely" at Mattress Firm, and that the transaction poses an "existential threat" to Serta Simmons.

11/19 (Genender, SSB) 258:16–19, 259:6. It's thus important to understand the wider context of its own, recent bankruptcy proceedings and its conduct with respect to the challenged acquisition.

The details of the proposed transaction follow in the next subsection. But Serta Simmons learned of it in Fall 2022. 11/20 (Genender, SSB) 30:23, 31:4. By coincidence, it filed for Chapter 11 bankruptcy protection in the Southern District of Texas shortly after in January 2023. Id at 30:14–15; see *In re Serta Simmons Bedding, LLC*, No. 23-90020 (Bankr SD Tex 2023); see also *In re Serta Simmons Bedding, LLC*, 2024 WL 5250365, at *5 (5th Cir).

In March 2023, Serta Simmons created "Project Artemis" to evaluate what would happen if the merger were approved. 11/19 Sealed (Genender, SSB) 30:3–5; see also Ex 2509 (Project Artemis presentation). Later that month, Serta Simmons submitted a "feasibility plan" to the bankruptcy court, wherein it predicted that its sales would actually *grow by five percent* for the next five years predicated in part on the assumption that it would *increase* its sales at Mattress Firm. See Exs 5896 at 242 (SSB disclosure statement, five-year projection) & 2502 at 56–57 (SSB March 2023 management presentation, showing same five-year projection and specifying assumption of "[s]hare gains at Retailer #1"); see also 11/20 (Genender, SSB) 36:15–39:7, 40:1–21, 47:22–57:16 (confirming SSB assumed growth at MFRM as represented to bankruptcy court while aware of merger). To be clear, growth at Mattress Firm was a "key part" of the Serta Simmons plan, which identified various risk factors—*without* identifying removal from the Mattress Firm floor as one of them. 11/20 (Genender, SSB) at 40:22–41:15.

On May 9, 2023, Tempur Sealy publicly announced the proposed acquisition of Mattress Firm. Id at 43:6–8. Five days later, on May 14th, Serta Simmons asked the bankruptcy court to approve its feasibility plan. Id at 44:17–19. The affidavit in support stated that no material changes "have taken place since the financial projections were filed with the bankruptcy court that require further

modifications or amendments to the financial projections." Ex 4401 at 12. On June 14, 2023, the bankruptcy court approved the bankruptcy plan, explicitly relying on the feasibility plan and affidavit. Dkt 1071 at 15, *In re Simmons Bedding, LLC*, No 23-90020 (Bankr SD Tex) (order).

In short, throughout its restructuring, Serta Simmons *never* expressed concerns about the merger to the bankruptcy court or updated its feasibility plan to reflect possible removal from Mattress Firm. 11/20 (Genender, SSB) 54:11–20. This was of considerable concern to the Court. When directly asked to explain how such representations could possibly have been made during bankruptcy proceedings within this same courthouse, the Chairman had no coherent response. Id at 57:2–16.

It's also relevant to other aspects of the FTC's challenge here. The timing of the Serta Simmons bankruptcy reflects that it was in an objectively precarious financial position at the very time Tempur Sealy announced and pursued the subject acquisition of Mattress Firm. Even so, Tempur Sealy determined to offer Serta Simmons the same post-merger agreement offered to other mattress suppliers, being a one-year extension of its existing agreement with Mattress Firm. 11/19 (Thompson, TSI) 143:19–144:4, 149:7–10. Tempur Sealy also later increased that offer to provide for even greater reassurance, prospectively agreeing to extend Serta Simmons' ongoing supply agreement with Mattress Firm for two years. Ex 3620 at 2 (TSI, offer letter).

Serta Simmons rejected the offer. 11/18 (Thompson, TSI) 222:24–223:6. It instead countered with demand for a ten-year contract, along with volume and slot commitments, agnostic sales associate incentives, confidentiality firewalls, and a non-disparagement provision. See Ex 3617 at 1 (email exchange including SSB Chairman and TSI CEO). To this, Tempur Sealy declined to counter. 11/19 (Thompson, TSI) 145:22–146:17. The Tempur Sealy CEO explained that the Serta Simmons demand amounted to "asking for billions of dollars of

14

guaranteed revenue, non-cancelable, with no performance from a company that is right off bankruptcy and not financially stable." Id at 147:22–25.

The Chairman of Serta Simmons testified that such proposal was merely an opening offer, with further negotiations expected. 11/19 Sealed (Genender, SSB) at 42:13–43:8. But Tempur Sealy quite clearly owed no such counter—or even any explanation. One party to an arm's length transaction is entirely free to reject offers without counter. And nothing prevents the rejected party from itself seeing the light of reason and making its own, improved proposal. Restatement (Second) of Contracts §36 (1981); Timothy Murray, 1 *Corbin on Contracts* §2.20 (Lexis 2024).

Serta Simmons instead became actively involved in these FTC proceedings in opposition to the proposed acquisition. Not surprisingly, statements by rivals generally aren't of particularly persuasive value, given evident self-interest in blocking a vertical integration that will make the merged firm more competitive. See *United States v AT&T*, 310 F Supp 3d 161, 211–12 (DDC 2018); see also *FTC v Microsoft Corp*, 681 F Supp 3d, 1069, 1093 (ND Cal 2023) (finding FTC "heavy reliance" on rival's testimony "unpersuasive"). That is true here to an unusually extreme degree. Indeed, to the extent relevant to analysis of the merits below, it is expressly determined that the testimony of the Serta Simmons Chairman was self-serving and lacked objective industry evidence in support. It thus came with no credibility whatsoever and cannot stand as factual support for any contention by the FTC in this action.

This in turn means that supposed fear by Serta Simmons of foreclosure from the Mattress Firm floor is overstated and lacks credibility. And further, given that Serta Simmons is the chief rival supplier to Tempur Sealy on the Mattress Firm floor, this conclusion extends equally to the testimony of all other rival suppliers, to the extent that they stated expectation of being removed outright from the Mattress Firm floor. Compare 11/12 (DeMartini,

Purple) 120:20–22 (testifying Purple doesn't expect to be wholly removed from Mattress Firm floor). And last, it means that it wasn't Tempur Sealy who was in any way unreasonable in seeking a post-closing supply agreement with Serta Simmons, but Serta Simmons itself.

The timing of this testimony also had wider implications for perception of the FTC's economic case. The Serta Simmons Chairman testified immediately in advance of the FTC's two experts. The fact that Serta Simmons represented to the bankruptcy court that it expected, once reorganized under the protection of the bankruptcy laws, *five percent growth* over the coming years based on the assumption that it would gain share at Mattress Firm entirely undermined their opinions and statistics presented. It instead became quite clear that their economic opinions didn't align with market realities as perceived by the main industry participant allegedly at risk of foreclosure.

### d.   The proposed acquisition

Mattress Firm reached out to Tempur Sealy and others about a potential sale as far back as mid-2021. 11/19 (Thompson, TSI) 166:12–24. The codename at Tempur Sealy for the proposed acquisition of Mattress Firm was *Project Lima.* 11/13 (Rao, TSI) 45:22–24. Mattress Firm used the same codename for its dual-track exploration of either an initial public offering or a merger. 11/18 (Eck, MFRM) 46:5–7.

In May 2023, Tempur Sealy agreed to purchase Mattress Firm for approximately $4 billion. 11/13 (Rao, TSI) 92:6–11. The terms are set out in an *Agreement and Plan of Merger* dated May 9, 2023. Ex 5521. The shareholders of Tempur Sealy will own approximately eighty-three percent of the combined firm after the acquisition. Dkts 3 at ¶29 (unredacted complaint) & 52 at ¶29 (TSI answer). If this acquisition is allowed to go forward, Tempur Sealy will transform from being primarily a manufacturer of mattresses to primarily a retailer, as approximately sixty-five percent of the combined entity's revenue will then come from the retail

side. 11/13 (Rao, TSI) 110:12–16; Ex 5601 at 21 (June 2024 TSI presentation to rating agencies).

The acquisition plan anticipates after closing that Tempur Sealy and Mattress Firm (along with Dreams in the United Kingdom) will exist as subsidiaries under a holding company with the likely name of *Somnigroup*. 11/19 Sealed (Thompson, TSI) 7:2–14. At least two (and perhaps more) of the current members of the Tempur Sealy Board of Directors will be on the combined entity's Board. 11/25 (Neu, TSI) 32:12–15, 39:4–16. It's also expected that the Chairman and CEO of Somnigroup will be Scott Thompson, Tempur Sealy's current CEO. 11/19 Sealed (Thompson, TSI) 10:22–24.

This structure will proceed on what was described as a "weak holding company" / "strong subsidiary" model. 11/19 Sealed (Thompson, TSI) 7:21–23. And so, Mattress Firm after closing will operate as a separate business unit with autonomy over merchandising decisions. 11/13 (Moore, TSI) 161:9–11, 167:19–21. It was explained that this would seek to ensure that "decisions are made close to customers" and that the subsidiaries are accountable for their business. 11/19 Sealed (Thompson, TSI) 7:21–23.

Under the proposed framework, the CEO of Mattress Firm would report to the CEO of Somnigroup. Id at 9:14–24; Ex 4933 at 7 (presentation at May 2024 joint executive meeting of TSI and MFRM). Talking points that the Tempur Sealy CEO prepared for a 2023 call with Tempur Sealy investors stated, "Mattress Firm will work closely with our Tempur Sealy team in North America to optimize consolidated results." Ex 5541 at 3. And according to an anticipated incentive plan on compensation, ███████████ ████████████████████████████████████████████ ████████████████████████████████████████. 11/19 Sealed (Thompson, TSI) 12:11–23; Ex 4933 at 12.

No determination has yet been made regarding the management team of Mattress Firm. An organizational chart in a preliminary slide deck regarding the deal indicated that Scott Thompson will be CEO of the going-forward Mattress Firm. Id at 13. While that may eventually

be the final result, testimony established that this was just a placeholder, with no actual decision having been made. 11/18 Sealed (Buster, TSI) 19:10–15; 11/19 Sealed (Thompson, TSI) 9:14–10:5. Testimony also indicated that Steve Rusing (currently President of US Sales for Tempur Sealy) and John Eck (current President of Mattress Firm) remained possible options. See 11/12 (Rusing, TSI) 213:24–214:2; 11/18 (Eck, MFRM) 78:3–15.

Other terms of the acquisition reflect an agreed divestiture of certain stores to Mattress Warehouse. Mattress Warehouse is a multi-brand retailer that is the second-largest independent mattress-specialty retailer in the country with over three hundred stores. 11/18 (Papettas, Mattress Warehouse) 161:7–12. Divestiture to Mattress Warehouse would include over one hundred Sleep Outfitter stores, seventy-four Mattress Firm stores, and seven distribution centers. 11/18 Sealed (Papettas, Mattress Warehouse) 27:9–15.

Testimony from Tempur Sealy witnesses asserted at least five benefits and efficiencies that would follow from the acquisition of Mattress Firm.

- o *First,* the proposed transaction will bring Tempur Sealy closer to customers, thus promoting innovation and benefiting consumers. 11/13 (Rao, TSI) 106:19–24.

- o *Second,* increasing Tempur Sealy's sales from third-party brands will diversify its own risk. 11/19 (Thompson, TSI) 202:3–13.

- o *Third,* the acquisition will reduce costs and eliminate certain margins required at present by sales both from Tempur Sealy (as wholesale supplier to Mattress Firm) and Mattress Firm (as retailer to consumers). 11/13 (Rao, TSI) 59:16–17; 11/25 (Israel, Defense expert) 90:19–91:4, 156:5–20; see also Ex 2913 (TSI 2023 "synergies" presentation).

- o *Fourth,* it's anticipated that Tempur Sealy's workers will benefit by streamlining operations

18

and making manufacturing more predictable. 11/19 (Thompson, TSI) 197:10–25.

o *Fifth,* the acquisition is expected to ensure stability at Mattress Firm at a time when many retailers are going bankrupt. 11/25 (Neu, TSI) 13:21–14:18.

During the evidentiary hearing, Tempur Sealy confirmed a commitment to reserve at least twenty percent of Mattress Firm's slots for third-party brands for five years, of which seventy-five percent would be for mattresses priced above $1,500. 11/19 (Thompson, TSI) 228:19–23, 229:2–3; Dkt 194 at 50 (TSI response). Following questions asked of counsel during closing arguments, Defendants gave notice of a revised commitment to maintain the current percentage of third-party premium mattress slots priced at $1,500 and above for five years post-closing. Dkt 484 at 2, 3–4 (notice). That commitment translates to about forty-three percent of Mattress Firm's premium slots being filled by third-party mattresses. Id at 4; see Dkt 484-1 (revised slot commitment).

Tempur Sealy has also executed post-closing supply agreements with mattress suppliers such as Purple, Leggett & Platt, Bedgear, Ashley Furniture, Resident Home, Sherwood, and Kingsdown. 11/19 (Thompson, TSI) 126:24–129:9. Those agreements generally suspend pre-existing termination-for-convenience provisions for one year. Id at 125:22–24, 205:13–15. As mentioned, no agreement similar could be reached with Serta Simmons. Id at 146:14–147:6; 11/19 Sealed (Genender, SSB) 41:16–43:8. But again, it was clear from testimony that this was only because Serta Simmons took an unreasonable negotiating position for a no-termination provision of ten years, even though it had only just re-emerged from its own bankruptcy proceedings in June 2023. See Ex 3617 at 1 (email exchange including SSB Chairman and TSI CEO).

e. This action

Tempur Sealy and Mattress Firm announced their agreement and plan of merger on May 9, 2023. Dkt 3 at ¶29 (unredacted complaint). The FTC found reason to believe that the merger may substantially lessen competition, and its Commissioners voted 5–0 to commence an administrative proceeding to take up the antitrust merits on July 2, 2024. Id at ¶16. The FTC filed its complaint seeking to enjoin the acquisition the same day. The parties shortly thereafter stipulated to a temporary restraining order by which "the parties agreed to extend the date before which Defendants will not close the Proposed Acquisition until after the expected date by which the Court will rule on the preliminary injunction." Dkt 4 at 2 (unopposed motion for entry of stipulated TRO); see also Dkt 42 (order).

This matter was then litigated in a distinctly efficient, cooperative, and professional manner. Counsel deserve genuine commendation in this respect. Voluminous discovery proceeded over a scant nine weeks. With very little need for oversight or attention from the Court, this ultimately entailed around six thousand exhibits and forty-five depositions (in addition to the testimony from nearly two dozen witnesses during earlier investigation hearings by the FTC).

The evidentiary hearing proceeded over seven trial days from November 12th to November 25th of 2024. The following witnesses testified live, in the following order:

- o Rob DeMartini (Purple, Chief Executive Officer);

- o Steven Rusing (Tempur Sealy, President of US Sales);

- o Jon Studner (Rooms to Go, Vice President of Merchandising);

- o Bhaskar Rao (Tempur Sealy, Chief Financial Officer);

- o Aubrey Moore (Tempur Sealy, Vice President of Investor Relations, Insights, and Analytics);

- o Phillip Busker (Mattress Firm, Executive Vice President of Merchandising) (deposition excerpts read into record);
- o John Eck (Mattress Firm, Chief Executive Officer);
- o Melissa Barra (Sleep Number, Chief Sales and Services Officer);
- o Cliff Buster (Tempur Sealy, Chief Executive Officer, North America);
- o Bill Papettas (Mattress Warehouse, Chief Executive Officer);
- o Ann Dament (Mattress Firm, Chief Merchandising Officer);
- o Scott Thompson (Tempur Sealy, Chief Executive Officer);
- o Mark Genender (Serta Simmons, Chairman of the Board);
- o Vy Nguyen (Avocado, Co-Chief Executive Officer);
- o Dr. Gopal Das Varma (FTC, principal expert economic witness);
- o Sarah Galmidi (Macy's, Mattress Buyer);
- o David Binke (King Koil, Chief Executive Officer);
- o Kevin Hearle (FTC, expert economic witness on efficiencies of merger);
- o Jonathan Hirst (Dreams, Chief Executive Officer);
- o Richard Neu (Tempur Sealy, Lead Director (Independent) of Board of Directors); and
- o Dr. Mark Israel (Defense expert economic witness).

Testimony was also designated and received from depositions or prior FTC investigational hearing, as follows:

o   Eugene Alletto (Bedgear, Chief Executive Officer);

o   Kimberly Anderson (Costco, Vice President & Manager, General Merchandise);

o   Emilie Arel (formerly of Casper, Chief Executive Officer);

o   Nicholas Bates (Spring Air, President & Chief Executive Officer);

o   Nelson Bercier (Sit 'n Sleep, President);

o   Irv Blumkin (Nebraska Furniture Mart, Chief Executive Officer);

o   Tyrone Coleman (Tempur Sealy, Vice President of Sales, North Division);

o   Christopher Cook (Mattress Firm, Member of Board of Directors);

o   Gregory Cremeans (Tempur Sealy, Division Vice President);

o   Kelly Davis (Ashley Furniture, Vice President of Marketing);

o   Richard Diamonstein (Paramount, Managing Director);

o   Alicia Foreman (Purple, Vice President of Corporate Strategy);

o   John Gill (Havertys Furniture, Executive Vice President, Merchandising);

o   Christopher Holloway (Amazon, General Manager, Amazon Home);

o   Frank Hood (Kingsdown, President & Chief Executive Officer);

o   Jim Kehoe (Tempur Sealy, Vice President of Sales, West Division);

o   Keith Koenig (City Furniture, Chief Executive Officer);

o   Kenny Larson (Slumberland, President & Owner);

- o   James "Mattress Mac" McIngvale (Gallery Furniture, Owner);
- o   Joe Megibow (Casper, Chief Executive Officer).
- o   Arthur Melville (Saatva, Chief Operating Officer);
- o   David Montgomery (Tempur Sealy, Global Business Strategy and Development);
- o   Michael Moran (Wayfair, Senior Category Manager);
- o   Tom Polit (Mattress Firm, Vice President of Merchandising Strategy);
- o   Mike Poppe (Sleep Outfitters, President & Chief Executive Officer);
- o   Luis Portillo (Mattress Firm, Vice President— Divisional Sales);
- o   Jody Putnam (Mattress Firm, Chief Retail Officer);
- o   Bradley Rodgers (Ashley Furniture, Senior Vice President of Bedding Division);
- o   Holly Saarie (Raymour & Flanigan, Bedding Buyer);
- o   Jason Shapiro (formerly of Wayfair, General Manager, Category Management); and
- o   Lisa Wyn (formerly of Serta Simmons, Chief Financial Officer).

Upon the close of evidence, the parties were directed to confer and submit prior to closing arguments a set of joint proposed findings of fact and conclusions of law, in a manner making clear their areas of disagreement. Dkt 140 (order). They did so. Dkt 456 (joint submission). Closing arguments were then heard on December 16, 2024. See Dkt 476 (minute entry).

### 2.   Legal standards

The acquisition at issue is one of vertical integration— a successful manufacturer and supplier of mattresses wishes to acquire a nationwide retailer of mattresses.

Antitrust law recognizes that vertical mergers—unlike horizontal mergers—do "not eliminate a competing buyer or seller from the market." *Fruehauf Corp v FTC*, 603 F2d 345, 351 (2d Cir 1979), citing Phillip E. Areeda & Donald F. Turner, 2 *Antitrust Law* ¶527a at 376 (1978). A well-respected treatise on the topic notes that "[e]very firm from the largest monopolist to the tiniest competitor is vertically integrated to one degree or another," and thus "injury to competition should never be inferred from the mere fact of vertical integration." Phillip E. Areeda & Herbert Hovenkamp, 3B *Antitrust Law* ¶755a at 3 (5th ed 2022). What's more, "vertical integration is ubiquitous in our economy and virtually never poses a threat to competition when undertaken unilaterally and in competitive markets." *Microsoft*, 681 F Supp 3d at 1088, quoting Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Principles and Their Application* ¶755c (online ed May 2023); see also *Comcast Cable Communications, LLC v FCC*, 717 F3d 982, 990–91 (DC Cir 2013) (Kavanaugh, J, concurring).

The burden upon the FTC here isn't an impossible one. But the inquiry must proceed with recognition that "academics, courts, and antitrust enforcement authorities alike" have repeatedly recognized that vertical mergers may serve to benefit competition and consumers. *AT&T*, 310 F Supp 3d at 193; for example, see *Fruehauf Corp*, 603 F2d at 351 (noting vertical merger "does not . . . automatically have an anticompetitive effect . . . [and] may even operate to increase competition"); *Alberta Gas Chemicals Ltd v E.I. Du Pont De Nemours & Co*, 826 F2d 1235, 1244 (3d Cir 1987) (observing that "respected scholars question the anticompetitive effects of vertical mergers in general"). At bottom, for vertical mergers to raise antitrust concerns, the merged firm must gain such substantial market power as to render the relevant market non-competitive. Areeda & Hovenkamp, 3B *Antitrust Law* ¶756a at 9–10.

### a. Section 7 of the Clayton Act

The pertinent portion of Section 7 of the Clayton Act provides:

> No person shall acquire, directly or indirectly, the whole or any part of the stock or other share capital and no person subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of one or more persons engaged in commerce or in any activity affecting commerce, *where* in any line of commerce or in any activity affecting commerce in any section of the country, *the effect of such acquisition*, of such stocks or assets, or of the use of such stock by the voting or granting of proxies or otherwise, *may be substantially to lessen competition*, or to tend to create a monopoly.

15 USC §18 (emphasis added).

The Fifth Circuit in *Illumina, Inc v FTC* recently resolved an FTC action challenging vertical integration under Section 7 of the Clayton Act. 88 F4th 1036 (5th Cir 2023). It observed that courts evaluate such claims under "a burden-shifting framework" that traces to a prior decision of the District of Columbia Circuit. Id at 1048; see *United States v Baker Hughes, Inc*, 908 F2d 981, 982–83 (DC Cir 1990). The analysis proceeds as follows:

- o The FTC "bears the initial burden to 'establish a prima facie case that the merger is *likely* to *substantially* lessen competition in the relevant market.'"

- o "If a prima facie case is made, 'the burden shifts to the defendant to present evidence that the prima facie case inaccurately predicts the relevant transaction's probable effect on future competition or to sufficiently discredit the evidence underlying the prima facie case.'"

- o "If such a rebuttal is provided, 'the burden of producing additional evidence of anti-competitive effects shifts to the government, and merges with the ultimate burden of

persuasion, which remains with the government at all times.'"

Id at 1048 (emphasis added), quoting *United States v AT&T, Inc*, 916 F3d 1029, 1032 (DC Cir 2019).

This isn't as compartmentalized as it sounds. The Fifth Circuit's statement of applicable standards in *Illumina* concludes, "This framework is applied flexibly—'in practice, evidence is often considered all at once and the burdens are often analyzed together.'" Ibid, quoting *Chicago Bridge & Iron Co NV v FTC*, 534 F3d 410, 424 (5th Cir 2008). Such approach will largely be taken here, to the extent in line with the approach of the briefing and evidence presented by the parties themselves.

The FTC observes in its motion that the intent of Section 7 is to arrest anticompetitive mergers "in their incipiency," thus requiring a prediction of the merger's likely impact on future competition. Dkt 143 at 8–9, quoting *United States v Philadelphia National Bank*, 374 US 321, 362 (1963) (cleaned up); see also *FTC v Procter & Gamble Co*, 386 US 568, 577 (1967) (vertical mergers tested by same standard). True. But even so, *Illumina* makes clear that the above framework ultimately places the burden on the federal government to establish two things to warrant intervention pursuant to Section 7.

*First*, the FTC must show that the merger is *likely* to harm competition. *Illumina,* 88 F4th at 1048; *AT&T,* 916 F3d at 1032. This means that the harm must be "sufficiently probable and imminent to warrant relief." *AT&T*, 310 F Supp 3d at 189–90. A "mere possibility" isn't enough. *United States v UnitedHealth Group Inc*, 630 F Supp 3d 118, 129 (DDC 2022); *AT&T*, 916 F3d at 1032.

*Second*, the FTC must show that the harm would be *substantial*. *Illumina*, 88 F4th at 1058. Merely showing that *some* harm would occur is insufficient. See *UnitedHealth*, 630 F Supp 3d at 152; see also *Illumina*, 88 F4th at 1058–59. "[T]o grant injunctive relief under the Clayton Act, the Court *must* conclude that the Government

has introduced evidence sufficient to show that the challenged transaction is likely to lessen competition substantially." *AT&T*, 310 F Supp 3d at 189 (emphasis original). And the requisite harm must be to competition and consumers, not competitors. See *Brunswick Corp v Pueblo Bowl-O-Mat*, 429 US 477, 488 (1977); *Roy B. Taylor Sales, Inc v Hollymatic Corp*, 28 F3d 1379, 1382 (5th Cir 1994); *AT&T*, 310 F Supp 3d at 193.

   b. Section 13(b) of the FTC Act

  In its most recent Term, the Supreme Court observed, "A preliminary injunction is an 'extraordinary' equitable remedy that is 'never awarded as of right.'" *Starbucks Corp v McKinney*, 144 SCt 1570, 1576 (2024), quoting *Winter v Natural Resources Defense Council, Inc*, 555 US 7, 24 (2008). It was likewise emphatic that, "absent a clear command from Congress, courts must adhere to the traditional four-factor test" for granting a preliminary injunction. Ibid. It thus stated:

> The default rule is that a plaintiff seeking a preliminary injunction must make a clear showing that "he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."

Ibid, quoting *Winter*, 555 US at 20, 22.

  The pertinent aspect of Section 13(b) of the FTC Act provides as follows:

> *Whenever the Commission has reason to believe—*
>
> (1) *that any person, partnership, or corporation* is violating, or *is about to violate, any provision of law enforced by the Federal Trade Commission*, and
>
> (2) *that the enjoining thereof* pending the issuance of a complaint by the Commission

27

and until such complaint is dismissed by the Commission or set aside by the court on review, or until the order of the Commission made thereon has become final, *would be in the interest of the public—*

the Commission by any of its attorneys designated by it for such purpose may bring suit in a district court of the United States to enjoin any such act or practice. Upon a proper showing that, *weighing the equities and considering the Commission's likelihood of ultimate success, such action would be in the public interest,* and after notice to the defendant, a temporary restraining order or *a preliminary injunction may be granted* without bond . . . .

15 USC §53(b) (emphasis added).

Such language omits reference to irreparable injury, thus altering the traditional four-factor test. But it just as plainly left in place the requirements as to a likelihood of success on the merits and a favorable balance of public and private equities—a conclusion bolstered by direct linkage of those requirements to the phrase "may be granted." See *United States v Abbott*, 110 F4th 700, 719–20 (5th Cir 2024, *en banc*).

The FTC cites a recent decision by the District of Oregon, which in some respects rejected argument that the traditional four-part test applied to preliminary injunctions sought pursuant to Section 13(b). See Dkt 456 at 158–59, citing *FTC v Kroger Co*, 2024 WL 5053016 (D Or). And so, the FTC suggests that in applying this test, "a certainty, even a high probability, need not be shown, and any doubts are to be resolved against the transaction." Dkt 456 at 154, citing *FTC v Penn State Hershey Medical Center*, 838 F3d 327, 337 (3d Cir 2016) (cleaned up).

Nothing in Fifth Circuit precedent supports such indulgence. And the argument must be rejected as

28

irreconcilable with both the plain text of Section 13(b) and *Starbucks*. Indeed, the flat rejection by the Supreme Court of the request "to apply the traditional criteria in a less exacting way" could scarcely have been more robust: "There is an obvious difference between having the Board show that it is 'likely' to succeed on the merits and having it show only that its theory of the case is 'substantial and not frivolous,' without having to convince the court that its theory is likely meritorious." *Starbucks*, 144 SCt at 1578; see also *Abbott*, 110 F4th at 719–20. Likewise, the "default rule" stated as to the necessity of the plaintiff—here, the FTC—to make "a clear showing" also pertains. *Starbucks*, 144 SCt at 1576, quoting *Winter*, 55 US at 20, 22.

   3.   Relevant market

"Determination of the relevant product and geographic markets is a necessary predicate to deciding whether a merger contravenes the Clayton Act." *United States v Marine Bancorporation, Inc*, 418 US 602, 618 (1974), citing *Brown Shoe Co v United States*, 370 US 294, 324 (1962) (quotation and citation omitted). This requires definition of "the 'line of commerce' and the 'section of the country' where the relevant competition occurs." *Illumina*, 88 F4th at 1048, quoting 15 USC §18.

Market definition requires "a pragmatic, factual approach." *United States v Anthem Inc*, 236 F Supp 3d 171, 193 (DDC 2017), aff'd 855 F3d 345 (DC Cir 2017), quoting *Brown Shoe*, 370 US at 336. This means in some circumstances that a relevant market "cannot be measured by metes and bounds." *Anthem*, 236 F Supp 3d at 193, quoting *Times-Picayune Publishing Co v United States*, 345 US 594, 611 (1953) (cleaned up). Indeed, the Supreme Court recognizes "some artificiality" in delineating any boundaries and that "fuzziness" is "inherent" in defining any market. *Philadelphia National Bank*, 374 US at 361 n 37; see also Areeda & Hovenkamp, 2B *Antitrust Law* ¶530d at 257 (agreeing that approximations are "unavoidable").

Even so, this burden is on the FTC alone as part of its *prima facie* case. *Illumina*, 88 F4th at 1048; see also *FTC v*

29

*RAG-Stiftung*, 436 F Supp 3d 278, 291 (DDC 2020) (discussing *Baker Hughes* burden-shifting framework). Defendants need neither specify nor seek to offer proof of an alternative relevant market. Instead, failure by the FTC to prove a relevant market requires denial of a requested preliminary injunction. *FTC v Tenet Health Care Corp*, 186 F3d 1045, 1051 (8th Cir 1999).

### a. Product market

The FTC in its complaint stated the relevant product market without clarity as "premium mattresses." For example, see Dkt 3 at ¶¶70–76. Its motion for preliminary injunction later specified that such mattresses are those priced $2,000 and above. See Dkt 143 at 20.

"The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it. However, within this broad market, well-defined submarkets may exist which, in themselves, constitute product markets for antitrust purposes." *Brown Shoe*, 370 US at 325. The Fifth Circuit observes that "the relevant product market must 'correspond to the commercial realities of the industry.'" *Illumina*, 88 F4th at 1048–49, quoting *Brown Shoe*, 370 US at 336. And while "perfect fungibility isn't required" for products to be in the same market, reasonable interchangeability is. *Microsoft*, 681 F Supp 3d at 1087, quoting *Gorlick Distribution Center, LLC v Car Sound Exhaust System, Inc*, 723 F3d 1019, 1025 (9th Cir 2013) (citation omitted).

The Fifth Circuit in *Illumina* considered and determined the relevant product market there by employing "the '*Brown Shoe*' methodology, which looks to certain 'practical indicia' of market demarcation." *Illumina*, 88 F4th at 1049. The Supreme Court in *Brown Shoe* listed seven such factors, being "industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." Ibid, quoting *Brown Shoe*, 370 US at 325.

In post-trial submissions, the FTC offered no conclusions of law as to unique production facilities, sensitivity to price changes, and specialized vendors, thus conceding their inapplicability. See Dkt 456 at 169–72; but see Dkt 143 at 22–23 (FTC motion arguing specialized vendors). Even so, not all of the *Brown Shoe* practical indicia must be present to find a relevant market. See *Illumina*, 88 F4th at 1049–51 (finding relevant product market based on *Brown Shoe* indicia of particular characteristics and uses, distinct customers, and distinct pricing strategy). The focus instead remains on the "commercial realities of the industry." Id at 1048–49, quoting *Brown Shoe*, 370 US at 336.

### i.   Industry or public recognition as separate economic unit

As a threshold matter, courts have recognized that "price and quality differences may play an important role in defining market boundaries where such tiering comports with commercial realities." *FTC v Tapestry Inc*, 2024 WL 4647809, at *11 (SDNY) (collecting cases). And were the question simply whether industry participants recognize segments in the mattress market, with a higher-end segment being recognized as "premium," the answer would easily be in the affirmative. For mattress industry participants plainly divide the mattress market into segments. The problem for the FTC is that it here defines the relevant market—upon which its expert economist later constructs his models—based dependently upon a specific price point of $2,000 and above. The evidence on the whole doesn't support a bright-line distinction of that sort based so rigidly on price.

The International Sleep Products Association (or *ISPA*) undertakes public policy, research, education initiatives, and events with and on behalf of members within the larger bedding industry. The FTC elicited testimony indicating that ISPA's mattress segments are "generally recognized in the mattress industry." 11/13 (Eck, MFRM) 238:25–239:14. While that may be true, its segments don't readily align at all with the FTC's proposed definition.

Instead, ISPA identifies four segments, being *value* (ranging up to $500), *promo* (from $500 to $1,000), *premium* (from $1,000 to $2,000), and *luxury* (from $2,000 and up). Exs 901 at 5 & 4794 at 15 (MFRM charts adopting ISPA classifications); 11/13 (Eck, MFRM) 238:25–239:14. An ISPA board member confirmed that it's the "luxury" segment that starts at $2,000. 11/21 (Binke, King Koil) 33:4–34:20.

It's thus a bit curious that ISPA specifies the "premium" segment to start at $1,000 even as the FTC seeks that denomination for a relevant product market at or above $2,000. To be sure, the FTC does sponsor proof that Tempur Sealy itself in some ways recognizes that market segment in several ways. For example:

- o Tempur Sealy calculates its share in the market for mattresses above $2,000. Ex 402 at 1 (TSI data summary, indicating Tempur-Pedic commands "roughly 48% of the above $2k market"); 11/13 (Moore, TSI) 132:17–133:8; Ex 4620 at 1 (internal TSI email noting "Tempurpedic is the dominant industry market share leader in the premium price point (+$2k) segment").

- o It analyzes growth in the $2,000 and above market, including that "the premium segment above $2,000" has grown "seven times faster than the industry as a whole." Ex 4982 at 2:06–19 (video of Rusing describing "the premium segment" as "above $2,000"); 11/12 (Rusing, TSI) 171:21–24; Ex 4589 at 7 (internal TSI 2024 analysis noting positive category momentum "at the premium tier (+$2K)").

- o It states to its investors in presentations that it targets a $2,000 and above mattress segment. Ex 400 at 8 ("$2,000+ premium segment has grown more rapidly than $1,000–$2,000 segment" and depicting four mattress segments, including "$2k+").

Certain other witnesses testified generally, though not completely, in accord. For example, see 11/19 (Genender, SSB) 250:12–22 (segments include "value," "mid-core," and "premium," with latter priced $2,000 and above); Ex 2502 at 17, 18 (SSB internal presentation, tracking industry sales above $2,000); Koenig (City Furniture) Dep 59:10–60:1 ("good, better, best," with "best" segment focusing on mattresses $2,000 and above); Larson (Slumberland) Dep 35:24–36:17 (similar); Davis (Ashley Furniture) Dep 37:2–12 ("2,000 and above"); 11/18 (Papettas, Mattress Warehouse) 163:2–10 ($2,000 to $3,000, and $3,000 and above); 11/21 Sealed (Galimidi, Macy's) 9:10–10:2 ($2,000 and above); Gill (Havertys) Dep 23:2–7 ("over 2,000").

But the evidence of Tempur Sealy's usage was itself inconsistent. See Exs 6500 at 22 (FTC expert report, including internal TSI slide labeling "premium" as starting at $2,199) & 2110 at 6 (Fall 2022 TSI investor presentation, noting TSI "focuses on the premium segment of the mattress market" and depicting Tempur-Pedic as "Premium" and priced at $2,449 to $7,999). Indeed, what became evident through the testimony of numerous other witnesses is that many in the industry identify a price *lower than* $2,000 as the relevant threshold for a "premium" mattress, with most indicating a threshold nearer to $1,000 and above. See Foreman (Purple) Dep 60:15–20 ($1,000 and above); 11/21 (Binke, King Koil) 41:22–42:9 ("premium" is $700–$1,300 and "ultra-premium" is $1,300–$2,300); & 11/13 (Studner, Rooms To Go) 31:4–11 (no usage of "premium" but refers to "prestigious" as $1,299 and above).

The following exhibit summarizes how several other mattress and furniture companies define "premium" as a segment:



Ex 5973 (Defense expert graphic).

Perhaps most critically, the need to consider and include a lower price threshold (if the intention is to define the market by price alone) is reinforced by the approach of at least two of Tempur Sealy's main competitors. The Chief Sales and Services Officer of Sleep Number referenced in passing a "premium" market. When asked by the Court to define her understanding of the term, she stated this to be $1,000 and above, which she believed consistent with the "general industry definition." 11/18 Sealed (Barra, Sleep Number) 8:16–22; see also 11/18 (Barra, Sleep Number) 86:14–15 (defining "premium category of mattresses" "roughly as anything over $1,000"). In similar fashion, the Chief Executive Officer of Purple testified that Purple considers all of its mattresses to be "premium," with its collection starting at $1,400. 11/12 (DeMartini, Purple) 84:1–3, 138:4–14.

And just as critically, Mattress Firm's own approach undermines the FTC's contention. It uses the four ISPA categories noted above. See Exs 901 at 5 (MFRM chart adopting ISPA classifications), 4740 at 15 (MFRM classification) & 4794 at 15 (same); see also 11/13 (Eck, MFRM) 238:25–239:14 (confirming MFRM chart adopts

ISPA categories). This means that Mattress Firm internally defines "premium" mattresses as those priced between $1,000 and $2,000. 11/13 (Eck, MFRM) 241:4–6; see also Portillo (MFRM) IH 51:24–52:15 (labeling "premium" mattresses as between $1,000 and $2,000, and "luxury" mattresses as $2,000 and above).

All of this aligns with other evidence that established more persuasively that a definitional approach by mere price-band classifications is arbitrary. 11/13 (Studner, Rooms To Go) 35:7–23 ("kind of like an arbitrary line we drew"); 11/13 (Eck, MFRM) 239:25–240:4 (following ISPA categories is "just an internal mechanism that we follow" as "easiest way to follow"); Hood (Kingsdown) Dep 40:7–8 ("not a hard and fast standard"); Alexander (Costco) IH 28:17–29:4 (no "systematic category"). Even the expert testimony by both economists on this was quite imprecise. Defendants' economist didn't "quibble" with the notion that there's "a high-end mattress that's different from lower-end mattresses," and that "you could talk about these higher end mattresses." 11/25 (Israel, Defense expert) 97:1–13. But that doesn't establish that a meaningful break point exists at $2,000. And while the FTC's expert claimed that "more documents" supported $2,000 versus $1,000 and above, this carried no weight because he couldn't describe any methodology towards such conclusion, he couldn't remember how many documents favored one definition over another, and he didn't log his results. 11/20 (Das Varma, FTC expert) 224:12–225:9.

The FTC attempts to downplay the fact that industry participants label mattress segments in differing ways. Dkt 143 at 22 (stating that some also call segment "high-end," "best," or "luxury"). And it's true, universal use of a particular term isn't required. For example, see *United States v Bertelsmann SE & Co KGAA*, 646 F Supp 3d 1, 32 (DDC 2022) (adopting category even though "no one in the industry" used government's term); *FTC v Wilh. Wilhelmsen Holding ASA*, 341 F Supp 3d 27, 51–52 (DDC 2018) (granting definition despite defendants not using term). But at minimum, "clear evidence" must exist to

otherwise demonstrate that industry participants recognize the market segment. *Bertelsmann*, 646 F Supp 3d at 32; compare *Tapestry*, 2024 WL 4647809, at *20 (finding that handbag industry recognized categories of "accessible luxury" and "affordable luxury"). The FTC presented no such *clear evidence* here.

Nor should the ultimate point of the inquiry be forgotten—reasonable interchangeability. The FTC sponsors nothing definitive to warrant the conclusion that "reasonable interchangeability of use or the cross-elasticity of demand" between putative *premium* and *luxury* segments doesn't exist. *Brown Shoe*, 370 US at 325. But that's quite important here, where the FTC wants to define a *premium* segment at $2,000 and above, where both ISPA and Mattress Firm define such segment to begin at $1,000, with *luxury* pertaining to $2,000 and above. Indeed, the many and varied approaches summarized above as to price-points used by mattress suppliers themselves to distinguish high-end mattresses alone suggests interchangeability, at least at some level. Likewise, in terms of practical reality, witnesses testified (not surprisingly) that customers themselves shop across price points. 11/21 Sealed (Galimidi, Macy's) 4:22–5:9; Saarie (Raymour & Flanigan) Dep 36:3–37:6.

Evidence in this case also shows that the exact same mattress can be in or out of the FTC's proposed market depending solely on the identity of the retailer—not the mattress itself. The following shows a wide range of prices for a particular type of Purple mattress in a single, given month at different retailers, as drawn from data provided by the FTC's expert:

| Average Retail Price of Discontinued Purple Hybrid Premier 3 - Queen Size (Sep. 2023) | | |
|---|---|---|
| Retailer | Average Retail Price | Premium |
| Mattress Firm | $2,594 | ✓ |
| Denver Mattress | $1,528 | ✗ |
| Perez Mattress | $1,300 | ✗ |
| Rooms To Go | $1,140 | ✗ |
| Mattress Warehouse | $675 | ✗ |
| Purple Stores and All Other Rival Retailers | $1,999 | ✗ |

Ex. 5972

Source: Dr. Das Varma's Rebuttal Report backup materials: Purple Direct Store Sales (2018-2024).dta, Purple Direct Online Sales (2017-2024).dta, American Signature Sales Data (2023-2024).dta, D&A Mattress Sales (2015-2024).dta, Denver Sales Data (2023-2024).dta, Jordan's Sales Data (2022-2024).dta, CY 2023 MF Transaction Data.dta, Mattress Warehouse Sales (2015-2024).dta, Perez Mattress Sales (2015-2024).dta, Raymour Sales Data (2020-2024).dta, Rooms To Go Sales Data.dta, Rooms To Go Sales Data (2023PY-2024).dta, Slumberland Sales Data (2017-2024).dta.

Exhibit 5972 (Defense exhibit, drawn from FTC expert materials).

For the industry or public recognition factor, courts don't require that industry participants agree on the same descriptive term to find that a relevant market exists. See *Tapestry,* 2024 WL 4647809, at *20 (stating that "uniform terminology is not required"). But the participants at least have to agree on what *products* the description actually applies to. Yet the above chart indicates that it's simply the pricing predilection of mattress *retailers* at a given moment that dictates whether any *particular* mattress is within or outside of such segment.

This case is thus unlike the recent *Tapestry* case, for example, where apparently "industry members" and "reams of ordinary-course documents" "frequently and consistently" defined "accessible luxury" in a particular way. Id at 20–21. Indeed, courts have "repeatedly rejected efforts to define markets by price variances" where (like here) the product is priced along a "spectrum," such that pricing distinctions "are economically meaningless." *Murrow Furniture Galleries, Inc v Thomasville Furniture Industries*, 889 F2d 524, 528 (4th Cir 1989), quoting *In re Super Premium Ice Cream Distribution Antitrust*

*Litigation*, 691 F Supp 1262, 1268 (ND Cal 1988); see *Brown Shoe*, 370 US at 326 (rejecting attempt to exclude "low-priced" shoes from product market, finding it "unrealistic to accept" that "men's shoes selling below $8.99 are in a different product market from those selling above $9.00").

Despite some evidence in its favor, there was no clear industry recognition of a "premium" market that should be defined as mattresses priced $2,000 and above. As such, this *Brown Shoe* factor ultimately doesn't support the FTC's proposed product market definition.

ii.   Peculiar characteristics and uses of product

Courts have in some circumstances recognized the "high end" of broad markets as distinct submarkets. *Bertelsmann*, 646 F Supp 3d at 28–29 (collecting cases); id at 33 ("anticipated top-selling books" had "more substantial marketing, publicity, and sales support; authors who are prominent or have a track record of success; and higher advances"); *FTC v Whole Foods, Inc*, 548 F3d 1028, 1037, 1039 (DC Cir 2008) (premium, natural, and organic supermarkets); *O'Bannon v National Collegiate Athletic Association*, 7 F Supp 3d 955, 987–88 (ND Cal 2014) (elite football and basketball recruits). And again, were the question simply whether there is a "high end" market segment pertinent to mattresses, the answer would be affirmative.

But the FTC defines that "high end" almost entirely based upon a price point. There was no sustained attempt—other than in the most general sense—to establish uses and characteristics peculiar to mattresses priced above $2,000 from those priced below.

*As to uses,* the simple fact is that mattresses of all prices have the same use. Compare *FTC v Meta Platforms Inc*, 654 F Supp 3d 892, 915 (ND Cal 2024) (citations omitted) (presence of "distinct core functionality" can indicate peculiar characteristic).

*As to characteristics,* mattresses can have better (or more refined, or more durable) features and quality as they get more expensive. 11/12 (DeMartini, Purple) 85:6–11. But these characteristics aren't special or unique to mattresses priced at $2,000 and above. Rather, they exist in "degrees" along a spectrum. 11/13 (Studner, Rooms To Go) 21:22; 11/21 Sealed (Galimidi, Macy's) 5:10–6:6; 11/25 (Israel, Defense expert) 102:24–103:5. As already noted, courts have refused to define a separate product market where quality and features exist along a spectrum. For example, see *Super Premium Ice Cream*, 691 F Supp at 1268; *Murrow Furniture Galleries*, 889 F2d at 528.

Again, this is markedly different from recent action in *Tapestry*. The FTC there demonstrated "a significant difference in the materials and craftsmanship commonly used in accessible-luxury handbags compared to mass-market handbags," most prominently being "genuine materials," particularly "genuine leather." 2024 WL 4647809, at *12. By comparison, lower-priced "mass-market handbags" were made of "lower-quality and nonleather materials such as polyurethane." Ibid. True, the FTC also presented (as here) some very generalized differences between the two tiers of purses, such as "better trims and just better construction." Ibid. But it was the presence of distinctive "genuine materials" that differentiated "accessible-luxury handbags" from lower-quality synthetic offerings. Ibid. No such defining feature is readily apparent here to distinguish mattresses priced above $2,000 from those priced below.

The FTC did establish that premium mattresses priced $2,000 and above have features such as different or better-quality materials, more layers of materials, better construction, and aesthetic design. For example, see Portillo (MFRM) IH 101:10–104:6; 11/18 (Papettas, Mattress Warehouse) 163:11–23; Megibow (Casper) Dep 197:14–198:13; Davis (Ashley Furniture) Dep 37:24–38:11; Gill (Havertys) Dep 23:2–7, 123:12–23; Bates (Spring Air) Dep 88:9–18. But just as notably, and of more pertinence, the evidence showed that there's nothing that clearly

differentiates the features or materials of mattresses priced above $2,000 from those priced below $2,000. Arel (Casper) IH 38:22–25 (no unique characteristics for mattresses above $2,000); Alletto (Bedgear) Dep 139:9–21 (most people "would have a very difficult time to discern the difference between a $1,500 mattress and a $2,500 mattress"); 11/12 (DeMartini, Purple) 83:1 ("commoditized category").

The testimony of the FTC's expert was particularly telling. One of his slides sought to distinguish so-called "premium" from "non-premium" mattresses. A row labeled "specialized features and components" states that the former have "[h]igher levels of pressure relief, cooling comfort, and motion isolation," while the latter have "[l]ower levels *of the same features*." PDX5 at 7 (emphasis added). When pressed whether the "same features" provided the same benefits, he replied that "the benefit of a mattress is not a binary attribute," and that "there are degrees of these benefits that one can get in the mattresses." 11/20 (Das Varma, FTC expert) 221:13–23, 222:7–8. What's more, he didn't attempt to measure the differences in features in mattresses below versus above $2,000 "because the benefit is in the eyes of the beholder." Id at 222:22–23.

Nor would it have been possible to make such a comparison in any practical sense, given that mattresses at and above $2,000—as well as those priced below $2,000—can feature entirely different technologies. 11/18 (Eck, MFRM) 47:8–9 (Mattress Firm offerings include foam, hybrids, and gels); 11/13 (Studner, Rooms to Go) 20:20–21:11 (same at Rooms To Go); Ex 4753 (Tempur-Pedic and Casper specialize in memory foam); 11/12 (DeMartini, Purple) 138:4–8 (Purple features gel grids); 11/18 (Barra, Sleep Number) 82:15–83:3 (Sleep Number features air-adjustable "smart beds"); Ex 5911 at 3 (SSB BeautyRest Black as hybrid mattress).

The market definition sought here by the FTC hinges on sticker price, which of its nature is somewhat disconnected from mattress features. And it leads to

bizarre results in these circumstances. For example, mattresses escalate in price according to size, with twin, full, queen, and king all at ascending prices. Promotional sales and discounts also come and go. Yet under the FTC's market definition, the king-sized version of a mattress priced over $2,000 is in a different market than the queen-sized version of the same mattress if it happens to be priced below $2,000. 11/20 (Das Varma, FTC expert) 219:9–22. In other words, the FTC's definition of a mattress *as a product offering* didn't account for mattress size and merely looked at retail price in a manner disconnected from any other attribute. It's also quite anomalous that a mattress priced above $2,000 is suddenly no longer within the proposed product market if a promotional price takes it below $2,000. Id at 219:4–8. This means that the FTC's proposed definition can move the exact same mattress brand into or out of the product market based *not* on any inherent quality or detail, but instead solely upon its size or the price on a given day.

In sum, the FTC presented no feature or characteristic that was unique to those mattresses in its as-defined "premium" market, save for a retail price at $2,000 and above. That isn't sufficient.

### iii. Unique production facilities

The FTC doesn't contend that premium mattresses have unique production facilities. Dkt 456 at 28. Contrast *Tapestry*, 2024 WL 4647809, at *13–14 (finding that "accessible luxury" handbags have well-established third-party supply chains in Southeast Asia, as distinguished from "true luxury" handbags made primarily in Europe). In any event, testimony showed that suppliers use the same facilities to manufacture all of their mattresses, regardless of segment and whether priced below or above $2,000. 11/20 (Nguyen, Avocado) 85:5–16.

### iv. Distinct customers

The FTC elicited testimony that customers buying so-called "premium" mattresses frequently have particular sleep or health needs. 11/18 (Papettas, Mattress

Warehouse) 163:24–164:8. Testimony also suggested that customers who are "willing to pay" for such mattresses have certain demographic attributes, including a higher income, being thirty years of age or older, and tending to conduct research before making a purchase. Melville (Saatva) Dep 100:18–101:15, 103:16–24; Bates (Spring Air) Dep 89:19–90:3; Gill (Havertys) Dep 119:7–17. But the generality of such propositions undermines any ability to draw a conclusion as to a "distinct" customer base for premium mattresses. For example, testimony made clear that financing was available, thus enabling a broad, less-affluent base of customers to purchase premium mattresses. 11/13 (Eck, MFRM) 246:19–247:2 (testifying that Mattress Firm offers financing to all customers, even on mattresses priced above $2,000); Portillo (MFRM) IH 117:9–118:2 (same).

Consider also the example of Mattress Firm itself. It carries mattresses across all price points, with mattresses priced $2,000 and above accounting for only twenty percent of sales by unit volume. 11/18 (Eck, MFRM) 11:22–25 (eighty percent of Mattress Firm units sold are priced below $2,000). The fact that mattresses priced above and below $2,000 are sold *at the same stores*—with *far more* being sold below that price—belies any idea that those above $2,000 have a distinct customer base. See *Beatrice Foods Co v FTC*, 540 F2d 303, 310 (7th Cir 1976).

Testimony instead established that no distinct group of customers exists as to those who purchase mattresses above $2,000. 11/18 (Eck, MFRM) 11:9–12. Customers instead compare across mattresses priced above and below $2,000 when shopping for a mattress. 11/21 Sealed (Galimidi, Macy's) 5:2–9; 11/13 (Studner, Rooms To Go) 31:16–18. Indeed, a pricing study conducted for the mattress manufacturer Saatva didn't reflect any change in consumer behavior at prices above $2,000. Melville (Saatva) Dep 41:18–22, 49:21–50:1. And of course, as discussed above, the fact that most suppliers consider the "premium" mattress segment to commence somewhere around $1,000 to $1,500 itself undermines any suggestion

42

that customers manifest unique characteristics at $2,000 and above.

The FTC points out that Tempur Sealy chooses denser, more affluent areas for Tempur-Pedic stores, which carry mattresses above $2,000. Dkt 456 at 28, citing 11/18 (Buster, TSI) 107:6–8. That's true as far as it goes, which isn't very far. Nothing about that specifies who those customers actually are. And more importantly, it ignores the main feature of the acquisition at hand, which is that of *Mattress Firm*. As already noted, the vast majority of its sales are of mattresses priced below $2,000—with its stores everywhere also carrying mattresses priced above $2,000. See also 11/18 (Papettas, Mattress Warehouse) 162:21–23 (noting Mattress Warehouse carries mattresses priced below $100 to above $10,000). Mattress Firm thus seeks customers without targeting "particular price points," instead offering "a variety of brands at a variety of price points." 11/18 (Eck, MFRM) 11:7–10. And nothing suggests any post-acquisition plan to close Mattress Firm stores that don't meet the Tempur-Pedic store model. To the contrary, Tempur Sealy testimony established that it's paying $4 billion for a business model premised on a multi-branded floor, which it plans to continue running much the same way. See 11/18 (Buster, TSI) 140:14–21; 11/19 (Thompson, TSI) 191:10–24.

The FTC argues that a distinct submarket can still exist, even though Mattress Firm and other multi-vendor mattress retailers target a wide range of customers, with the attendant cross-shopping by consumers that occurs across different price points. "Despite some functional equivalence," it says, "as a matter of economic reality, the products may be recognized as distinct and, more importantly for antitrust purposes, the prices set by one may not meaningfully constrain the prices set by the others." Dkt 456 at 171, citing *Tapestry*, 2024 WL 4647809, at *36. That can be true in some circumstances. But the testimony here indicates that the relevant "cross-shopping" involves customers considering mattresses that are both above $2,000 and under $2,000. See 11/20 (Das Varma,

FTC expert) 219:4–8. And again, it's already been noted that (i) many reasons can explain why a given mattress could be priced above or below $2,000 that have nothing to do with quality of the mattresses itself or customer preferences in that regard, and (ii) mattress suppliers themselves take very different approaches as to where "premium" quality even begins. At minimum, the FTC fails to disprove that such "cross-shopping" by customers across putative "premium" and lesser mattresses doesn't act as a constraint on price.

The FTC also suggests that branding may be important for customers who buy mattresses priced $2,000 and above. Dkt 456 at 29. That makes sense and isn't surprising. But it again isn't a sharply drawn distinction. Testimony established that branding is also important to customers who buy mattresses priced at $1,000 and above. For example, see 11/18 (Barra, Sleep Number) 86:14–17.

The anecdotal evidence presented suggests, at best, that more affluent customers are often (but not always) the ones who purchase more expensive mattresses. This generalization fails to establish that a distinct, recognized, and/or targeted group of customers in fact exists.

### v. Distinct prices

The Supreme Court has found that "price differentials" between two categories of products is "relevant but not determinative of the product market." *United States v Continental Can Co*, 378 US 441, 455 (1964). It has also "repeatedly held that a price differential alone is insufficient to infer two separate product markets." *HDC Medical, Inc v Minntech Corp*, 474 F3d 543, 547 (8th Cir 2007) (citation omitted). Even so, caselaw supports the potential "use of a numerical cutoff to identify a sub-market." *Bertelsmann*, 646 F Supp 3d at 27–29 (collecting cases, and finding $250,000 threshold for anticipated top-selling books helpful "analytical tool"); see *FTC v Staples, Inc*, 190 F Supp 3d 100, 118 (DDC 2016) (customers who spend $500,000 or more annually on office supplies); *Anthem*, 236 F Supp 3d at 195 (companies with five thousand or more employees); *Wilhelmsen*, 341 F Supp 3d

at 51–54 (customers with fleets of ten or more global trading vessels). Viewed as such, "seemingly arbitrary criteria" can help identify "a segment of a broader industry." *Bertelsmann*, 646 F Supp 3d at 28; see also Areeda & Hovenkamp, 2B *Antitrust Law* ¶534c at 303 (distinct price relationships can create rebuttable presumption that identifiable market exists). As with all of these practical indicia, actual reality and practice matter. See *Brown Shoe*, 370 US at 336–37.

The FTC's expert established that mattresses sold at Mattress Firm priced $2,000 and above are more likely to fall under MAP (previously defined as *Minimum Advertised Pricing*) policies than mattresses priced under $2,000. 11/20 (Das Varma, FTC expert) 143:14–23. For example, in 2023, eighty-nine percent of Mattress Firm's mattress sales priced $2,000 and above were subject to MAP, compared to only nine percent of its mattress sales below $2,000 and to just over eighteen percent of mattress sales priced between $1,000 and $2,000. See Ex 4813 at 4 (internal MFRM email); PDX5 at 16 (FTC expert presentation). Testimony from Mattress Firm witnesses also confirmed that most mattresses priced above $2,000 are subject to either MAP or UPP (previously defined as *Unilateral Pricing Policies*), while most mattresses priced below $2,000 are not. Portillo (MFRM) IH 125:3–22, 51:24–52:15.

Defendants respond that MAP and UPP policies aren't specific only to mattresses priced at $2,000 and above. For example, see 11/21 (Galimidi, Macy's) 24:3–7 (mattresses between $1,000 and $2,000 also often subject to MAP); 11/21 (Binke, King Koil) 44:5–7 (no MAP or UPP policies for any of its mattresses, including those priced above $2,000). But that's accounted for in the percentages themselves, which are quite stark.

Even so, it must be recognized in these circumstances that such argument on the *distinct-prices* factor is in reality but a part of the *widespread-industry-or-public-recognition* factor, given that they both depend upon the same $2,000-and-above price point. The latter has been

considered at length above, and the conclusion remains that the bright-line demarcation at $2,000 sought by the FTC isn't tenable.

### vi. Sensitivity to price changes

The FTC offered no conclusion of law on this factor. Dkt 456 at 170–72; see also Dkt 143 at 21–23 (FTC motion, no argument). But factually, it appears to assert that so-called "premium" mattress customers generally don't consider mattresses priced above $2,000 to be interchangeable with mattresses priced below $2,000. Dkt 456 at 30–31. The sole support is the response by one witness to a question by the Court as to "how often" customers purchasing mattresses priced at $2,000 and above "look at the potential to replace it with a product between 1,000 and 2,000." He responded, "Not very often, no." 11/21 (Binke, King Koil) 45:24–46:4. That is slender support, which is contrary to evidence already noted above that (i) customers shop across price points, and (ii) many mattress suppliers consider the high-end market segment to begin at prices closer to $1,000.

The FTC also notes testimony from its expert that "premium mattresses have limited price sensitivity." Dkt 456 at 31, citing 11/20 (Das Varma, FTC expert) 136:21–137:7. Although not explained, this appears to be based on his review of investor calls immediately after the COVID experience, where he observed that demand for Tempur-Pedic mattresses was "resilient" despite price increases, while demand for Sealy mattresses was somewhat diminished. 11/20 (Das Varma, FTC expert) 231:7–232:24. At best, that's an anecdotal observation concerning market reactions during an unprecedented time in American (and world) history. It doesn't suggest anything about price sensitivity during normal economic times. See 11/25 (Israel, Defense expert) 108:17–25. Regardless, the fact that demand for Tempur-Pedic mattresses was more resilient than demand for Sealy mattresses (which start at $200 and have a median price of $1,000) doesn't necessarily indicate that purchasers of mattresses priced $2,000 and

above are less price-sensitive than purchasers of mattresses under $2,000. Id at 108:5–14.

Such sparing, anecdotal evidence as offered simply isn't sufficient to prove that customer price sensitivity is helpful in establishing the FTC's proposed market. Compare *Beatrice Foods Co*, 540 F2d at 309 (finding price sensitivity to be indicative in instances where products are "sold in clearly separate price groupings that have little or no price sensitivity between them."). This is especially true here, where customer price sensitivity can be offset by retailers in practice offering much lower prices for assertedly "premium" mattresses. See Ex 5972 (Defense exhibit, drawn from FTC expert materials, showing same Purple Hybrid Premium 3 mattress priced everywhere from $675 to $2594).

### vii. Specialized vendors

The FTC offered no conclusion of law on this factor, although it briefly mentioned it in its original motion. Compare Dkt 456 at 170–72, with Dkt 143 at 22–23. Factually, it mustered at least some evidence and testimony establishing that (i) customers "typically" want to "touch and feel" a mattress priced $2,000 and above before buying it, (ii) such mattresses are "primarily" sold at mattress retail stores, furniture stores, and department stores, (iii) big-box stores and mass retailers "typically" don't carry in-store mattresses priced $2,000 and above, and (iv) online retailers have a "touch/feel barrier" and "mostly" sell non-premium mattresses. See Dkt 456 at 32–33 (citing testimony).

The problem again is the lack of precision in making a showing that a price point of $2,000 carries special meaning to those facts. Mattresses above that price represent approximately fifteen percent of the overall mattress market, while mattresses between $1,000 and $2,000 represent thirty-five percent of the market. See 11/25 (Israel, Defense expert) 97:22–98:2. And mattress retailers sell mattresses across a wide variety of price points, with no evidence of specialized retailers dedicated to mattresses priced $2,000 and above.

Indeed, contention that "specialized vendors" exist for mattresses priced above $2,000 is entirely contrary to the very nature of Mattress Firm's business model. As has been repeatedly noted, approximately eighty percent of mattress units sold by Mattress Firm are priced below $2,000. 11/18 (Eck, MFRM) 11:20–25. This is also true more generally, with testimony confirming that the same retailers who sell mattresses priced above $2,000 also sell less expensive mattresses. 11/13 (Studner, Rooms To Go) 11:21–22 ($299 to $5,000); 11/18 (Barra, Sleep Number) 85:7–9 ($999 to $9,999); 11/18 (Papettas, Mattress Warehouse) 162:20–23 (below $100 to over $10,000); Davis (Ashley Furniture) Dep 25:12–16 ($250 to $15,000). And even more broadly, the evidence establishes that mattresses priced $2,000 and above are sold through all channels. Koenig (City Furniture) Dep 72:25–73:19 (furniture stores compete with broad array of channels for mattresses priced $2,000 and above, including Amazon and department stores); see Holloway (Amazon) IH 29:14–23 (mattresses available at Amazon up to at least $4,000).

The FTC did sponsor opinion testimony from its expert that nearly ninety-six percent of mattresses priced at $2,000 and above are likely to be sold through brick-and-mortar stores. See 11/20 (Das Varma, FTC expert) 230:16–23; Ex 5021 (FTC expert bar graph depicting sales in brick-and-mortar stores by price point). Standing alone, that sounds significant. But the same data established that nearly ninety-four percent of mattresses priced $1,000 and above are also sold through such stores, numbers which the FTC's expert conceded "are not that far different." 11/20 (Das Varma, FTC expert) 230:23.

In sum, the *specialized-vendor* factor doesn't support the FTC's proffered market. No witness testified that there are specialized retailers or sales processes for mattresses priced at or above $2,000. And while consumers tend to prefer brief, personal assessment of more-expensive mattresses before purchase, the evidence establishes that such preference starts at a price point of $1,000. 11/12

48

(DeMartini, Purple) 99:24–100:7; 11/25 (Israel, Defense expert) 95:1–2.

b. Hypothetical monopolist test

Courts at times also use what's referred to as a "hypothetical monopolist test" (or *HMT*) to determine whether a relevant market is valid. See *Microsoft*, 681 F Supp 3d at 1086 n 5 (defining test). To be clear, there's "no requirement to use any specific methodology in defining the relevant market." *Optronic Technologies, Inc v Ningbo Sunny Electric Company,* 20 F4th 466, 482 (9th Cir 2021). As such, courts have "determined relevant antitrust markets using, for example, only the *Brown Shoe* factors, or a combination of the *Brown Shoe* factors and the HMT." *Microsoft*, 681 F Supp 3d at 1086, quoting *Meta Platforms Inc*, 654 F Supp 3d at 912 (collecting cases). In the recent *Illumina* decision itself, for example, the Fifth Circuit didn't consider the HMT, instead fully determining the relevant product market by reference only to *Brown Shoe* indicia. See 88 F4th at 1048–50; see also *Geneva Pharmaceuticals Technologies Corp v Barr Laboratories Inc*, 386 F3d 485, 496 (2d Cir 2004) (same); *Lucas Automotive Engineering, Inc v Bridgestone Firestone, Inc*, 275 F3d 762 (9th Cir 2001) (same).

The HMT asks if a single firm that controlled the entire market (as defined by the FTC) could profitably impose a price increase—as opposed to losing so much business in response that the increase would be unprofitable. This is typically calculated as a five percent increase in price that's referred to as a "small but significant and nontransitory increase in price." *Meta Platforms*, 654 F Supp 3d at 919–20. If the price increase would be profitable, then the HMT suggests that the FTC has defined a relevant market accurately. *FTC v IQVIA Holdings Inc*, 710 F Supp 3d 329, 369 (SDNY 2024).

As explained by the FTC's expert, the HMT he employed assessed whether a profit-maximizing hypothetical monopolist of mattresses sold in the United States at a price of $2,000 and above is "able to impose a small, significant, non-transitory increase in price" at a level of

five percent "for at least one of those . . . products in a profitable way," by analyzing whether the "critical loss" (or "threshold") is exceeded by the aggregate diversion ratio. 11/20 (Das Varma, FTC expert) 144:7–17, 145:18–21; see also 11/25 (Israel, Defense expert) 109:25–110:3 (similar explanation).

By this, the FTC's expert calculated a threshold of approximately fourteen percent using Tempur Sealy's margins and a five percent price increase. 11/20 (Das Varma, FTC expert) 146:6–20. He then calculated the aggregate diversion ratio by analyzing the sales that Mattress Firm lost during the time when Mattress Firm excluded Tempur Sealy mattresses during most of 2017 through 2019. Id at 128:13–20, 147:2–9. He believed such exclusion of Tempur Sealy from the Mattress Firm floor to be the best available source for measuring the "substitution pattern between Tempur Sealy mattresses and other premium mattresses that Mattress Firm continued to sell." Id at 132:14–20. And his calculation shows that Mattress Firm retained nearly seventy-two percent of sales during such time, which (adjusted for profit margins) resulted in an aggregate diversion ratio of approximately forty-three percent. Id at 147:17–148:5. That aggregate diversion ratio, he says, "far exceeds" the approximately fourteen percent threshold level of recapture that the hypothetical monopolist of mattresses priced at $2,000 and above would need in order to find it profitable. Id at 147:17–148:12.

The FTC thus contends that such HMT shows that there is a distinct market for mattresses priced at $2,000 and above in the United States. Dkt 456 at 34, citing 11/20 (Das Varma, FTC expert) 134:15–25, 144:3–148:12. Defendants convincingly establish that the HMT analysis is both inappropriate and unreliably implemented, at least as done by the FTC's expert here.

Of most importance, a main feature underpinning the FTC's use of the HMT is its assertion that "[s]upply of premium mattresses in the United States is a candidate market based on qualitative evidence, including that

Tempur Sealy, Mattress Firm, and third parties recognize a distinct price segment above $2,000." Dkt 456 at 30, citing 11/20 (Das Varma, FTC expert) 135:1–144:2, 145:8–17. As exhaustively considered above, this simply isn't a tenable conclusion under the *Brown Shoe* indicia. And courts sensibly give greater weight to lay testimony and documents than expert economic analysis when the former provides a better understanding of market realities. For example, see *FTC v Thomas Jefferson University*, 505 F Supp 3d 522, 553 (ED Pa 2020) (rejecting FTC's use of HMT when econometrics underpinning use didn't align with "commercial realities"); see also Julian O. Von Kalinowski, 2 *Antitrust Laws and Trade Regulation* §24.01 (Lexis 2d 2024 update), citing *Concord Boat Corp v Brunswick Corp*, 207 F3d 1039, 1057 (8th 2000) (expert opinions must align with market realities).

Indeed, rather than define a market based on economic realities, the FTC's expert admitted that he chose the price point of $2,000 *for the very reason* that it gave Mattress Firm the highest market share—*and then worked backwards.* 11/20 (Das Varma, FTC expert) 233:17–20, 234:1–7. To the contrary, the FTC can't use invalid markets to "gerrymander its way to victory without due regard for market realities." *United States v Booz Allen Hamilton, Inc*, 2022 WL 9976035, at *10 (D Md), quoting *It's My Party, Inc v LiveNation, Inc*, 811 F3d 676, 683 (4th Cir 2016); see *United States v United States Sugar Corp*, 73 F4th 197, 205 (3d Cir 2023) (rejecting government's "purely self-serving" market definition).

Other deficiencies derive from the HMT analysis itself. A properly conducted HMT requires a reliable data set, while holding everything constant *apart from* an increase in price for the product being tested, being mattresses priced $2,000 and above. 11/25 (Israel, Defense expert) 110:15–111:10; see *FTC v Arch Coal*, 329 F Supp 2d 109, 123 (DDC 2004), citing US Department of Justice & Federal Trade Commission, *Horizontal Merger Guidelines* §1.21 (1992, as revised in 1997). This the FTC's expert failed to do.

51

*First,* his selected data set was unreliable and self-serving. He putatively specified the timeframe within which Mattress Firm excluded Tempur Sealy as a price-increase proxy. But even though Tempur Sealy didn't re-enter the Mattress Firm floor until the end of June 2019, the FTC's expert only looked through 2018. PX0507 at 58–59 (Defense expert report); 11/25 (Israel, Defense expert) 119:17–24. His rebuttal report explained his view that including such data would "overstate the recapture rate" because "Tempur Sealy sales increased significantly in mid-2018 for reasons likely unrelated to the divorce." Ex 6501 at 46–47. But that's exactly Defendants' point. This exclusion from Mattress Firm caused Tempur Sealy to *actively* seek to increase sales through all other channels once its sales were wholly separate from Mattress Firm. No convincing reason supports omission of the fruits of all such efforts.

*Second,* during the time Mattress Firm excluded Tempur Sealy, it removed *all* Tempur Sealy mattresses, not simply those priced $2,000 and above. And mattresses below $2,000—which account for roughly eighty percent of mattress units sold at Mattress Firm—were also included in the FTC expert's modeling. 11/25 (Israel, Defense expert) 111:2–10. In other words, the model did *not* isolate mattresses priced at $2,000 and above, but instead considered *all* Tempur Sealy mattresses, thus leading the FTC's expert to find a price increase on *all* Tempur Sealy mattresses sold there. Ibid. Likewise, Mattress Firm during that time period made additional efforts to sell *non*-Tempur Sealy mattresses across *all* price points, which is tantamount to a price decrease on those mattresses. Id at 111:11–16.

*Third,* the FTC's expert should have calculated a combined diversion rate no greater than one hundred percent. But these errors led him to calculate a combined diversion rate of one hundred and thirty percent. Id at 119:12–24. As explained by Defendants' expert, the diversion rate stated by the FTC's expert exceeded one hundred percent because a greater number of customers

52

considered premium mattresses during this period, potentially due to advertising or other efforts. Id at 119:20–120:6. But by failing to account for advertising, "attracting new people," and "bringing in new products," what the FTC's expert did was "not a diversion test under a hypothetical monopolist" test, which requires such variables to be isolated and there to "be a price increase and there's a demand reaction." Id at 120:8–24.

*Fourth*, Defendants' expert—unlike the FTC's—observed that wholesale and retail prices aren't in a fixed relationship. Id at 195:14–197:21. He thus contends that the model of the FTC's expert defies market reality because the price set by retailers doesn't march in lockstep with the price set at wholesale. By contrast, Defendants' expert allowed retail and wholesale prices to float independently, reflecting how the market actually works. Id at 199:6–24. By thus reflecting retailers' ability to compete in the market, the model results in an anticipated decrease in prices and increase in efficiencies that may be reinvested in the product. Id at 202:19–203:4, 203:22–204:16; see also Ex 5985 (Defense expert summary table, showing merger will result in total consumer welfare increase of $896 million, total consumer welfare increase per mattress of $181, and decline in weighted-average prices of 15.6 percent).

As noted at the outset, consideration of the HMT isn't even required. Even so, the suggested findings by the FTC derived from its HMT have been considered and found unpersuasive, given that the model's parameters and inputs appear designed to produce the outcome sought, without accord to market realities. Instead, those realities are better addressed according to the *Brown Shoe* indicia, which indicates a higher-end market segment of mattresses commencing much closer to $1,000. And the FTC's expert failed to conduct an HMT with respect to *that* potential market.

c. Geographic market

The relevant market in which to assess the anti-competitive harms of a merger necessarily includes the

53

relevant geographic market, which is the area of competition affected by the merger. The district court in *FTC v Sysco Corp* stated that "'the proper question to be asked . . . [is] where, within the area of competitive overlap, the effect of the merger on competition will be direct and immediate.'" 113 F Supp 3d 1, 48 (DDC 2015), quoting *Philadelphia National Bank*, 374 US at 357. Said another way, the relevant geographic market is "the area in which the seller operates, and to which the purchaser can practically turn for supplies." *Microsoft*, 681 F Supp 3d at 1088 (citation and internal quotations omitted). As with the inquiry into a relevant product market, a relevant geographic market must both "correspond to the commercial realities of the industry and be economically significant." *Brown Shoe*, 370 US at 336–37 (cleaned up).

The FTC argues that the relevant geographic market in which to measure harm to consumers with respect to wholesale competition among mattress suppliers is the United States. Dkt 3 at ¶77 (unredacted complaint, implicitly suggesting wholesale versus retail, given allegation that "[m]attress retailers in the United States source premium mattresses from suppliers across the country"); Dkt 143 at 23 (FTC motion, considering sales and marketing by suppliers to retailers). Supporting evidence for this conclusion includes the fact that:

o Tempur Sealy and other mattress suppliers compete at the national level. See Exs 4589 at 9 (internal TSI 2024 analysis describing national distribution footprint as strength), 3605 at 2 (TSI, discussing strategy "to eventually dominate the US market 3–5 yrs out") & 2502 at 17–22 (SSB, analyzing channel and retailer mix across all retailers nationwide).

o Premium mattress suppliers use national pricing, with premium mattresses being subject to MAP or UPP policies meant to ensure uniform prices across the country. 11/18 (Papettas, Mattress Warehouse) 172:3–6 (noting "retail price goes up the same

54

> everywhere"); 11/20 (Das Varma, FTC expert) 171:19–25 (prices are uniform across retailers and geography).
>
> o   Premium mattress suppliers generally develop their products for the US national market. For example, see 11/12 (DeMartini, Purple) 92:16–23 (Mattress Firm is "only place that we can send our innovation team and get a national view of new product development reaction from the customer"); Ex 2502 at 9 (SSB, displaying "Nationwide Manufacturing Footprint").

But this overlooks the ultimate and necessary touchstone, being evaluation of the effect of the proposed transaction on consumers, not competitors. See *AT&T*, 310 F Supp 3d at 193. Analysis by the FTC's expert ultimately concludes that such harm will occur due to his calculation that consumers will experience an average price increase between 5.7 percent and 15.3 percent, translating to $280 million of additional consumer costs. See Ex 6500 at 8 & n 4 (FTC expert report, with range of projected average price increases based on modeling). The problems with the derivation of that conclusion are discussed elsewhere below. But for present purposes, the FTC offered argument and evidence only as to the relevant geographic market at *wholesale*—not *retail*. And yet, both experts agreed that retail competition is local. 11/20 (Das Varma, FTC expert) 277:10–12; 11/25 (Israel, Defense expert) 131:8–14. Numerous witnesses also testified that competition at retail occurs locally, given that consumers typically buy locally. 11/18 (Eck, MFRM) 14:17 ("highly local business"); Larson (Slumberland) Dep 38:19 ("competition is always local"); see also 11/19 (Genender, SSB) 254:17–19 (stating "mattress distribution is very much tied to geography," given difficulty to "ship it that far, especially on the high end").

In short, the FTC offered no evidence of harm as to consumers on a local basis, with its expert conducting no analysis to estimate what the share of foreclosure would be in any locality. See 11/20 (Das Varma, FTC expert) 277:13–

20. As such, it doesn't appear that the FTC seeks to define a geographic market corresponding to where it would measure harm. And this despite evidence that retailers adjust their prices locally to compete even in the face of MAP and UPP policies. See Ex 5972 (Defense exhibit, drawn from FTC expert materials, summarizing retailers selling Purple Hybrid Premium 3 mattress at widely varying prices); Ex 4764 at 1 (MFRM, discussing how retailer Raymour & Flanigan "is notorious for breaking UPP pricing and MAP promotional guidelines"). In fact, testimony suggests that even Mattress Firm itself strays from strict adherence to such pricing policies. See 11/18 (Papettas, Mattress Warehouse) 174:17–176:10 (recalling discussion with TSI's Steve Rusing on day merger announced, who reassured him acquisition would benefit Mattress Warehouse because TSI could then enforce MAP and UPP at MFRM).

Defendants' expert didn't offer an opinion on geographic market. 11/25 (Israel, Defense expert) 314:25–315:2. But as with relevant product market, the burden here is on the FTC to establish the relevant geographic market in the first instance. This it likewise failed to do.

### d.   Conclusion

The FTC failed to establish a relevant antitrust product market under the *Brown Shoe* practical indicia with respect to "premium" mattresses, defined simply as mattresses priced at $2,000 and above. Resort to the hypothetical monopolist test is also of no avail under the constraints as modeled. And while the evidence indicates that mattress suppliers sell at wholesale as part of a national geographic market, the FTC also failed to convincingly establish a national geographic market that cohered with its theory of consumer harm.

Failure to prove a relevant antitrust market alone requires denial of the preliminary injunction requested by the FTC. *Tenet Health*, 186 F3d at 1053. Given the shortness of time prior to the closing date for the subject acquisition, and to assist the Fifth Circuit on any expedited appeal taken by the FTC, the further analysis that follows

56

with respect to competitive impact proceeds on the assumption that the FTC instead successfully established its proposed relevant product and geographic markets. Even under such assumption, the evidence doesn't support that the subject merger is "likely to substantially lessen competition." *Illumina*, 88 F4th at 1048.

### 4. Competitive impact

Section 7 of the Clayton Act directs courts to analyze whether "the effect of such acquisition *may be* substantially to lessen competition." 15 USC §18 (emphasis added). The Supreme Court observed in *Brown Shoe* that the analysis thus involves "probabilities, not certainties." 370 US at 323; accord *Whole Foods Market*, 548 F3d at 1042; *AT&T*, 310 F Supp 3d at 189. The Fifth Circuit further explained in *Illumina* that courts evaluate the competitive effects of vertical acquisitions using two different standards, being (i) the *ability-and-incentive* standard, "which asks whether the merged firm will have both the ability and incentive to foreclose its rivals," and (ii) the *Brown Shoe* standard, being a set of factors established decades ago by the Supreme Court that provides a distinct, though "overlapping," perspective as to whether a proposed merger is likely to substantially lessen competition. 88 F4th at 1051.

With reference to assessment of the likelihood of success on the merits, the Supreme Court noted in *Starbucks* that "a district court must evaluate any factual conflicts or difficult questions of law." *Starbucks*, 144 SCt at 1578, citing Wright & Miller, 11A *Federal Practice and Procedure* §2948.3 (3d 2013). Contemporaneous business documents are among the strongest evidence in this regard. For example, see *Chicago Bridge*, 534 F3d at 433. And not surprisingly, courts often afford more weight to documents authored by high-level executives. *Tapestry*, 2024 WL 4647809, at *32 n 30, *66. Likewise, ordinary-course documents are to be afforded substantially greater weight than self-serving attempts to minimize their plain meaning. Id at *59–60. Specifically, contemporaneous documents made before the deal came under scrutiny are

"more compelling evidence of commercial realities" than what appear to be "convenient litigation assertions." Id at *35; see also *United States v Google LLC*, 2024 WL 3647498, at *41 n 2 (DDC 2024) (giving "greater weight to the contemporaneous statements contained in the company's internal records" than later trial testimony that declined to ratify those statements). By contrast, the Supreme Court has long recognized the "extremely limited" value of evidence created while a lawsuit was "threatened or pending." *United States v General Dynamics Corp*, 415 US 486, 504–05 (1974); see also *Chicago Bridge*, 534 F3d at 434–35 (same).

The FTC asserts in its proposed findings that these evidentiary standards help it across the board on analysis of the legal merits. Dkt 456 at 162–63. And it does gather considerable aid as to the ability and incentive of Tempur Sealy to foreclose competition post-acquisition. But other ordinary-course documents and industry data wholly undermine its argument as to the ultimate objective of the Section 7 analysis—the potential extent of foreclosure and whether it reflects a substantial lessening of competition.

a.   Ability and incentive

The Fifth Circuit in *Illumina* posed the question as "whether the merged firm will have the ability and incentive to foreclose rivals from sources of supply or distribution to determine whether the merger is likely to substantially lessen competition in the relevant market." 88 F4th at 1051. An unstated dividing point between the parties is whether such *ability* and *incentive* are more properly considered from an objective viewpoint (in mind of natural and obvious economic realities) or from a subjective viewpoint (in mind of the acquiring company's stated thoughts underlying the acquisition and its plans for the aftermath).

The Supreme Court in *Brown Shoe* cited the 1949 House Report for the amendment of the Clayton Act when stating that, while it is "unnecessary for the Government to speculate as to what is in the 'back of the minds' of those who promote a merger," evidence indicating the purpose,

future conduct of the parties, and probable effects of the merger may be considered "where available." 370 US at 329 n 48, citing HR 1191, 81st Cong, 1st Sess 8 (1949) (cleaned up). This recognizes that the private parties are permitted to explain their intentions with respect to a merger and what they believe the effect to be.

But even so, the analysis must then proceed to ascertain *objectively* the antitrust implications. A respected treatise in the field states that subjective intent has a "doubtful theoretical place in antitrust law." Areeda & Hovenkamp, 3B *Antitrust Law* ¶764d2 at 91. This is because the "relevant intent is seldom defined precisely," and conduct can oftentimes be characterized as either pro- or anti-competitive. Id at 92. And even to the extent that intent may be considered, it must be the intent to "dominate a market so as to be able to obtain higher prices," not "the mere intention to prevail over one's rivals." Id at ¶805a at 455.

The Fifth Circuit implicitly confirmed this objective approach in *Illumina*, where it nowhere required a showing of intention or plan to foreclose. See 88 F4th at 1051–55. It instead there noted "myriad ways in which [the subject company] could engage in foreclosing behavior," without requiring the FTC to elaborate on how defendants would execute their foreclosure strategy. Id at 1053. That same approach will thus be taken here.

### i.  Ability

Courts have sensibly concluded that ownership and control over the acquired entity shows the ability to foreclose. See *Microsoft*, 681 F Supp 3d at 1090. Indeed, in *Illumina*, the acquiring company "concede[d] that it would have the ability to foreclose [the acquired company's] rivals post-merger." 88 F4th at 1051.

That's the thrust of the FTC's argument: "As owner of Mattress Firm, Tempur Sealy will be able to remove rival suppliers from its floors, prevent new suppliers from entering, and reduce the number of rival supplier slots." Dkt 456 at 40, citing 11/25 (Israel, Defense expert) 254:20–

255:10. And it mustered evidence suggesting that such ability can manifest itself not only through outright removal of suppliers from the floor, but also in more subtle ways such as differing incentives to retail sales associates, favorable placement or promotion of brands on the floor, and adjustment of inventory levels. See Dkt 456 at 40–42 (citing testimony and evidence).

Also in evidence is a presentation by J.P. Morgan at a meeting of the Tempur Sealy Board of Directors in October of 2021, concerning the proposed acquisition of Mattress Firm. See Ex 3600 at 1–32. Tempur Sealy shortly after that retained J.P. Morgan as the investment banker for the deal. 11/19 (Thompson, TSI) 107:5–108:12. That October 2021 presentation listed the "pros and cons" of the acquisition, with among the "pros" being such points as "[m]aximum control over a critical retail channel partner," "[a]n ability to create unique Tempur Sealy-focused experiences for consumers," and "[e]nhances profitability and further builds a competitive moat." Ex 3600 at 3. This impressed several members of the Board. See Ex 3604 at 2 (Board member text to CEO that "most importantly, I had not considered your thought on mf as a/the critical 'moat'"); Ex 3606 at 2 (Board member text to CEO that "if we buy MF, we'll sell and make more sales and profit, and put a significant strategic gap/moat between us and the competition in terms of sales, distribution, brand strength etc").

Defendants argue that it's nothing more than "a tautology" for the FTC to argue that "the combined firm has the technical ability to remove other brands," contending instead that "ability is better understood as the ability *to harm competition*." Dkt 456 at 189 (emphasis added), citing *AT&T*, 310 F Supp 3d at 206, 251 n 59. In the alternative, they argue that "if ability simply means the technical ability, this Court must still evaluate the merger's *effect* on competition." Ibid, citing *Microsoft*, 681 F Supp 3d at 1090 (emphasis original).

It's plainly correct that the FTC must show substantial harm to competition. See *Illumina*, 88 F4th at 1051. But

60

the parties have properly briefed the potential extent of such harm as its own separate point, which will be addressed as such below. Beyond that, nothing suggests that Tempur Sealy will only have the *technical* ability to remove other mattress suppliers from the Mattress Firm floor post-acquisition and/or to offer their mattresses on potentially less favorable terms. The evidence is instead quite to the contrary.

If nothing else, the breakdown of commercial relations between Tempur Sealy and Mattress Firm during the 2017 to 2019 time period establishes without question the ability of Mattress Firm to wholly exclude even a major supplier from its floor. It's likewise clear that other suppliers such as Avocado and Casper sought to be floored at Mattress Firm to no avail. See 11/20 (Nguyen, Avocado) 96:7–21, 100:25–101:6; Arel (Casper) IH 67:13–68:4; see also Exs 1505 at 2 (Casper) & 1619 at 2 (MFRM),1620 at 1 (MFRM). Indeed, the CEO of Tempur Sealy himself candidly conceded this simple fact of ability, stating, "When you own something, you have the opportunity to run it like you want to run it." 11/19 (Thompson, TSI) 92:8–12. And this was something he'd recognized previously in the regular course of business. See Ex 3627 at 2 (text from TSI CEO in March 2021 when brainstorming potential acquisition of local retailer in Southern California, saying "let's buy someone in a market where we are underserved [and] [k]ick SSB out").

Defendants also attempt to conflate *ability* with an inquiry into Tempur Sealy's state of mind, and more particularly as to whether it has any announced *plan* to move Mattress Firm away from its present existence as a multi-branded retailer. Dkt 456 at 190–91. They contend it doesn't, pointing to such evidence as:

- o The deal valuations for *Project Lima* (the deal codename) indicated a plan to keep Mattress Firm multi-branded, while stating nothing as to an increase in Tempur Sealy's balance of share. Ex 5575 at 13 (*pro forma* of TSI potential acquisition of MFRM); see 11/13 (Rao, TSI)

76:24–79:8 (explaining that *pro forma* reflects TSI assumption that MFRM will be multi-branded). So did later iterations of the deal model. See Exs 5560 (January 2023), 5561 (February 2023), 5563 (April 2023) & 5926 (May 2023). As also did the ultimate fairness opinion by J.P. Morgan. Ex 5926 at 36–39; see 11/13 (Rao, TSI) 89:2–11, 90:11–91:8; 11/25 (Neu, TSI) 12:18–23; 11/19 (Thompson, TSI) 191:4–24.

o Tempur Sealy consistently told investors, lenders, insurers, and the mattress industry itself that it planned to keep Mattress Firm multi-branded. For example, see Exs 5889 at 1 (TSI to MFRM, referencing continuation as "independent multi-brand retailer"), 5639 at 1 (same), 5541 (TSI investor talking points, noting MFRM will "determine and optimize the balance of products on their floor"), 5519 at 7 (TSI investor presentation, stating similarly), 3423 at 2, 3 & 5549 (various TSI emails and texts to Purple and SSB, stating MFRM will continue as multi-branded retailer).

o Tempur Sealy has entered post-merger supply agreements to keep other suppliers and their mattresses on Mattress Firm floors. See 11/19 (Thompson, TSI) 147:17–20 (noting six signed extensions); see Exs 302 (Bedgear), 2309 at 2 (Kingsdown), 4303 (Resident Home), 5678 (Purple), 5962 (Ashley Furniture) & 5963 (Leggett & Platt); see also Ex 5685 (TSI outreach to SSB seeking post-closing supply agreement).

o Tempur Sealy and Mattress Firm witnesses consistently testified that the going-forward plan is to keep Mattress Firm multi-branded after acquisition. For example, see 11/19 (Thompson, TSI) 185:11–16, 225:7–10; 11/25 (Neu, TSI) 26:7–27:4, 63:4–14; 11/13 (Rao, TSI)

100:22–101:5; 11/12 (Rusing, TSI) 249:4–9; Cremeans (TSI) Dep 129:19–130:5; 11/21 (Hirst, Dreams) 108:9–109:7; Cook (MFRM) Dep 79:20–80:6; 11/18 (Eck, MFRM) 51:24–52:1–4.

All of that is well-established. But as noted at the outset, *ability* in this context is better understood to require an objective standard—not something keyed to the vagaries of subjective intent. See Areeda & Hovenkamp, 4A *Antitrust Law* ¶1004 at 162–72 (regarding inquiry into foreclosure in vertical mergers, with focus on merger's likely anticompetitive effect on market and no mention of subjective intent); id at ¶764 at 92 (casting doubt whether intent can be "precisely" defined and aptly accounted for in vertical integration analysis); see also *Fruehauf*, 603 F2d at 352 (stating that Section 7 vertical merger analysis focuses on "whether and how the particular merger in issue may lessen competition").

It's also important to recognize that, at this point of the inquiry, only the FTC's *prima facie* case is under consideration. As such, addressed below is the further, necessary consideration of any potential for substantial harm. This includes not only post-closure supply agreements with rivals, but also Temper Sealy's remedial commitments undertaken to lessen any impact to competition—for example, divestiture of certain stores to Mattress Warehouse and going-forward slot commitments for rival mattresses on the Mattress Firm floor. But such agreements and commitments are neither a positive constraint on, nor a legal impediment to, Tempur Sealy's (for lack of a better word) ability to foreclose competition from its rivals if the acquisition proceeds.

For present purposes, then, the FTC sufficiently establishes the *ability* of the combined firm to treat other mattress suppliers as it deems fit in its discretion going forward on the Mattress Firm floor, up to and including exclusion.

ii. Incentive

Courts evaluating incentive to foreclose look to the acquiring firm's past behavior. *Brown Shoe*, 370 US at 332; see also *UnitedHealth Group*, 630 F Supp 3d at 143 (DDC 2022): "Under Section 7 case law, courts must consult pre-merger conduct and history in making their predictive judgment about the state of post-merger competition." They also focus on whether it would be profitable for the combined firm to foreclose competition. *Illumina*, 88 F4th at 1052–53. In this regard, the Supreme Court holds, "A parent and its wholly owned subsidiary have a complete unity of interest," including a profit-maximization interest. *Copperweld Corp v Independent Tube Corp*, 467 US 752, 771 (1984). "With or without a formal 'agreement,' the subsidiary acts for the benefit of the parent." Ibid; accord *Bertelsmann*, 646 F Supp 3d at 49 (citation omitted): "Companies with multiple divisions must be viewed as a single actor, and each division will act to pursue the common interests of the whole corporation."

The FTC successfully establishes that the combined firm will have a profit-aligned incentive to increase the sales of Tempur Sealy mattresses after acquisition by excluding rivals from the Mattress Firm floor. Ordinary-course evidence confirms both this profit potential and its recognition.

*As to profit motive,* no modeling or documents from any party suggest that it would be *unprofitable* to foreclose rival mattress suppliers in favor of Tempur Sealy. But evidence does indicate its profitability. This includes such evidence as:

- A December 2014 analysis in connection with *Project Gray* (a prior consideration by Tempur Sealy of acquiring Mattress Firm) indicated realization of $120 million in revenue "synergies" from moving to one hundred percent balance of share. Ex 2903 at 4; see 11/13 (Rao, TSI) 41:5–42:16.

64

- o The Project Gray analysis was emailed to a Tempur Sealy finance executive in September 2021 when analysis turned to the current proposed acquisition of Mattress Firm. Ex 2903 at 1. That executive then circulated a *Project Lima Accretion Model* to executives including the CEO, showing that a balance-of-share increase of just five percent at Mattress Firm would generate an additional $57 million in EBITDA and $42 million in net income. Ex 2900 at 3; see also 11/13 (Rao, TSI) 45:11–47:8.

*As to investors in, and analysts of, Tempur Sealy,* Tempur Sealy is a publicly traded company, and its CEO recognizes its investor community as his "boss." 11/19 (Thompson, TSI) 101:18–25; see id at 102:1–4 (CEO talks to them "often" and "considers their opinion"). And they clearly recognize this potential for additive profit. At a minimum, this includes:

- o In June 2023, after a call by the Tempur Sealy CEO with a top investor, the investor inquired about the profitability of increasing the Tempur Sealy balance of share at Mattress Firm by ten percent. Written follow-up stated that a hypothetical increase in TSI "balance of share by 10% [at Mattress Firm] would generate $420M incremental retail sales." Ex 405 at 1–2; see 11/13 (Moore, TSI) 139:8–21, 140:6–142:4.

- o One of Tempur Sealy's top five shareholders is a hedge fund co-founded by a former Tempur Sealy board member. The fund's February 2024 annual shareholder letter stated that the proposed acquisition would "augment the company's growth potential" through "an increased balance of share of Tempur Sealy brands within Mattress Firm stores." That letter circulated to the Board of Directors of Tempur Sealy in May 2024. Ex 4957 at 23

(TSI); see 11/13 (Rao, TSI) 48:19–51:24, 52:23–53:15.

- o A different analyst explained to Tempur Sealy that its "bull case" analysis assumed Tempur Sealy's balance of share in Mattress Firm would grow from approximately thirty-nine percent to sixty percent, "implying a gain of $889M in revenue for [TSI] (shifts from some other supplier that MFRM was just making the retail margin on)," and that "the difference is $151M of gross profit." Ex 4908 at 1 (TSI); see 11/13 (Moore, TSI) 146:2–147:12.

- o In preparing for investor calls regarding the proposed acquisition in May 2022, the Tempur Sealy CEO drafted handwritten notes to himself regarding topics investors had raised with him "verbally and in writing," including items such as "Eliminate Future Competitors," and "Block new Competition." Ex 3602 at 1; see 11/19 (Thompson, TSI) 102:21–103:11, 104:11–14, 105:8–12. The CEO confirmed that the reference to elimination of future competitors was to the fact that some investors favored it as part of the business plan. Id at 105:13–18.

*As to the potential for partial foreclosure,* testimony from current rivals of Mattress Firm credibly established that their brands might not be entirely removed, but their mattresses could receive less favorable sales treatment and/or their allocated slots could be diminished. For example:

- o A Mattress Firm board member recognized that Tempur Sealy owning Mattress Firm would "certainly be concerning" for rival suppliers Serta Simmons and Purple, thus at least implicitly acknowledging the incentive of Tempur Sealy to disadvantage its competitors. Cook (MFRM) Dep 84:19–85:11.

66

- The CEO of Purple was skeptical that, post-acquisition, "brands can be treated equally if a significant portion of them are from, quote, 'inside the family.'" 11/12 (DeMartini, Purple) 108:22–109:13. He also testified, "What I worry about is the unleveling of the playing field that happens with this type of merger . . . I think it is highly unlikely that the system, from the [retail sales associate] all the way up to the merchants making distribution decisions at the retailer, will not understand the potential advantage of overconcentrating their share with their owner." Ibid.

- The Chairman of Serta Simmons noted concern as to "no specificity as to how our products would be merchandised on the floor, and the number, and the way that they were being sold." 11/19 (Genender, SSB) 263:3–13.

*As to present-day competition,* it must be recognized that Tempur Sealy is a fierce—and quite successful—competitor on supply of mattresses across all price groups. It obviously recognizes that it stands to gain based on how well its mattresses sell through Mattress Firm's national retail channel. And its past conduct indicates that it has no qualms against doing so at the expense of its rivals:

- Tempur Sealy considers Purple and Serta Simmons as its two "bitter rival[s]" and identifies them as "premium competitors." Ex 1716 at 1 (internal TSI email); see also 11/12 (Rusing, TSI) 192:18–20.

- As to Purple, Tempur Sealy has asked Mattress Firm to remove it from its floors on multiple occasions. See 11/12 (Rusing, TSI) 184:17–185:6; see also Exs 1702 at 4 (TSI to MFRM in May 2019, asking that Purple "be discontinued in all store formats"), 11 at 1–2 (TSI internal "Wish List" for MFRM negotiations in June 2021, with "[r]emove Purple from the floors" at top of list) & 1704

    at 1 (TSI internal document, outlining plan in March 2021 in which "MFRM drops Purple").

  o As to Serta Simmons, Tempur Sealy decided in 2022 to forgo a price increase in order to lock up more Mattress Firm slots and "block SSB from having meaningful presence if anything at all in premium price points," which would be "[v]ery damaging to [SSB's] profitability." Ex 1711 at 2 (TSI); see also 11/13 (Eck, MFRM) 249:16–250:12, 251:2–252:15 (TSI responding to SSB use at MFRM of incentive funds paid to retail sales associates to sell SSB mattresses).

  o As to Casper, Tempur Sealy reached a "handshake agreement" with Mattress Firm in August 2020 "not [to] floor or sell online Casper mattresses." Exs 4603 at 2 & 4569 at 2; see 11/12 (Rusing, TSI) 180:2–19, 181:20–24. Tempur Sealy has monitored compliance with the agreement and reacted unfavorably when Mattress Firm appeared to be in discussions with Casper in 2022. See 11/12 (Rusing, TSI) 183:16–20; 11/13 (Busker, MFRM) 209:15–210:6; Exs 4606 at 2 & 4645 at 2. And Mattress Firm has never carried Casper. Dkt 49 at ¶8 (MFRM answer).

To be clear, such conduct isn't condemnable in and of itself. It's simply one competitor fulfilling its purpose—to vigorously compete against its rivals, win more market share, and make more money. See Areeda & Hovenkamp, 4A *Antitrust Law* ¶964b at 19: "Antitrust generally presumes that a firm maximizes its profits in the environment in which it finds itself." But for purposes of this part of the analysis, it plainly shows recognition of the *incentive* to foreclose the presence or share of rivals at Mattress Firm.

Defendants push back on such conclusion as to *incentive* in ways similar to their argument on *ability*. They argue that no incentive to foreclose exists because being

multi-branded is essential to Mattress Firm's business model. For example:

- o Mattress Firm testimony established that having a variety of brands is critical to its business model. 11/18 (Eck, MFRM) 50:19–20; Cook (MFRM) Dep 16:17–17:8. And further, this multi-branded business model has been very successful, with the suggestion being that it would be very risky for Tempur Sealy to spend $4 billion only to flip that model on its head. See 11/13 (Rao, TSI) 101:23–25; 11/25 (Neu, TSI) 26:2–6.

- o Mattress Firm witnesses also testified that both Serta Simmons and Purple are of central importance to Mattress Firm's success as a multi-branded retailer, and that efforts to remove them would be disruptive. For example, see 11/19 (Dament, MFRM) 52:7–19 (losing SSB and Purple "would leave a big hole"); 11/18 (Eck, MFRM) 39:15–19 (SSB is "single largest supplier of units"), 19:19–20 (not having it would be "mistake"), 52:10–11 (losing it would be "very difficult, if not devastating"); 11/18 (Eck, MFRM) 46:11–12; 11/13 (Eck, MFRM) 260:22–261:2 (Purple as "essential," with removal as "equally disruptive" to MFRM).

- o Other testimony suggests that customers have distinct brand preferences, meaning that sales are at risk if a variety of brands isn't available. For example, see 11/18 (Buster, MFRM) 140:17–21 (customers as "brand loyal," and MFRM must "continue to run a multi-branded floor to preserve the business model that you're purchasing"); 11/18 (Eck, MFRM) 19:10–12 ("customer is just going to walk out" if preferred brand not available), 53:3–13 (customers "can visit multiple competitors" within "half a mile"); 11/13 (Eck, MFRM)

253:15–17 ("some customers will just walk out the door if we don't have a product that they're looking for").

o   Testimony also suggests that Tempur Sealy will also be at reputational risk within the industry, given deal statements regarding continuation of multi-branded floor model. See 11/12 (Rusing, TSI) 224:19–23, 248:5–11 ("extremely damaging" to reputation, with retaliation risk if representations not honored); 11/25 (Neu, TSI) 83:24–84:6 (removing other brands "not only illogical" but "probably a violation of our fiduciary responsibilities to our various stakeholders").

Defendants also contend that Tempur Sealy's incentives will shift post-transaction, observing that a far larger majority of the combined firm's revenue will be on the retail side. For example, see 11/13 (Rao, MFRM) 106:22–24; 11/19 (Thompson, MFRM) 196:12–15; 11/25 (Israel, Defense expert) 152:22–153:6. And so, for instance, the Mattress Firm CEO testified that removing other brands would "significantly impair" sales and "degrade the results of the company in the short term and the long term." 11/18 (Eck, MFRM) 53:3–14; see also 11/19 (Dament, MFRM) 58:25–59:9 (calling such removal "catastrophic"). Defendants thus argue that there will be "no incentive to trade those [rival] sales to chase a theoretical—but far from certain—increase to its [Tempur Sealy] wholesale revenue." Dkt 456 at 194.

Courts do balance all of the combined firm's post-transaction incentives to determine whether foreclosure is likely. See *UnitedHealth*, 630 F Supp 3d at 141; *Microsoft*, 681 F Supp 3d at 1097. For example, the Fifth Circuit in *Illumina* weighed counterincentives of lost business and reputational harm against incentive to foreclose. See 88 F4th at 1052–53. But it there ultimately found incentive to be clear where the financial upside was obvious. Id at 1053 (observing that merged firm would make eight times more on clinical tests as on sequencing platform over

which it held complete monopoly). So too here. Nothing in what Defendants present above negates the practical and seemingly obvious economic reality—as recognized by Tempur Sealy and its investors and analysts above—that at least the *potential* for financial upside exists upon the exclusion of rivals from the Mattress Firm floor.

Indeed, Defendants on this point argue, "Here, the evidence shows that the merged firm is *unlikely* to engage in foreclosure and even if it did, it would not *substantially harm competition.*" Dkt 456 at 190 (emphasis added). As such, their points on incentive aren't entirely distinct. They instead merge with their overall, separate contention that there cannot be substantial harm to competition from the acquisition of Mattress Firm by Tempur Sealy.

The possible extent of foreclosure remains to be considered. But again, objectively, the FTC has shown that the requisite incentive exists.

### b. *Brown Shoe* factors

The Supreme Court explained in *Brown Shoe* that the "primary vice" of a vertical merger is the potential to foreclose competitors from a segment of the market otherwise open to them, thus acting as a "clog on competition." 370 US at 323–24; see also *Illumina*, 88 F4th at 1051. It also observed that Section 7 imposes "no definite quantitative or qualitative tests." 370 US at 321. Instead, it set out six factors for consideration, being (i) nature and economic purpose of the arrangement, (ii) likelihood and size of foreclosure, (iii) barriers to entry, (iv) trend toward vertical concentration, (v) elimination of a competitor, and (vi) market power. Id at 328–34.

The Fifth Circuit recognized in *Illumina* that "no precise formula" exists as to their application, and that a vertical merger may be unlawful based on "only three of the *Brown Shoe* factors." 88 F4th at 1055, quoting *Fruehauf*, 603 F2d at 353. But to meet its burden, the FTC must explain why and how a particular factor supports a finding that the acquisition is or will ultimately be anticompetitive. *Microsoft*, 681 F Supp 3d at 1099–1100.

i.    Nature    and    economic    purpose    of
arrangement

Defendants state, "The purpose of the transaction is to
bring Tempur Sealy closer to the customer, promote
innovation, reduce cost, and stabilize Mattress Firm. All of
that is procompetitive." Dkt 456 at 201. Evidence and
testimony establish each of these. For example, see 11/19
(Thompson, TSI) 158:9–159:13, 195:23–196:5; 11/25 (Neu,
TSI) 21:18–22:4. But certainly, this doesn't mean that they
must be viewed as the sole and exclusive reasons. The
evidence as to *ability* and *incentive* set out above support
an additional finding that Tempur Sealy can—at least to
some extent—increase its balance of share on the floor of a
significant, national mattress retail chain. See Dkt 143
at 45 (FTC motion).

For its part, the FTC also argues that the acquisition
"will provide Tempur Sealy with 'more control over
distribution' in an industry where the retailer has
considerable influence over the sale of mattresses to
consumers." Dkt 456 at 82, quoting Ex 2103 at 1 (TSI email
between executives); see also Ex 3600 at 3 (presentation to
TSI Board, referencing that benefits include "[m]aximum
control over a critical retail channel partner"). The court in
*Microsoft* aptly rejected a similar argument, noting that
"this would be true in any vertical merger and does not
explain why it demonstrates an anticompetitive purpose."
681 F Supp 3d at 1099–1100. And in particular here, such
argument fails to account for Tempur Sealy's additional
perspective of the competitive landscape. As just noted, it
sees this acquisition as a way to stabilize Mattress Firm,
which recently concluded its own bankruptcy proceedings
in January 2019. Evidence supports this concern. Ex 2103
at 1 (TSI email between executives noting that acquisition
of MFRM could "derisk the enterprise"); see 11/25 (Neu,
TSI) at 14:11–18; 48:12–13. Seen this way, Tempur Sealy's
acquisition of Mattress Firm is in fact a substantial
investment that will stabilize and support an important
retail channel—not forge an arrangement that violates the
law.

The FTC also notes that Tempur Sealy's CEO testified that he is "doing this transaction to make money," with the reason to buy Mattress Firm being to "create shareholder value." Dkt 456 at 82, quoting 11/19 (Thompson, TSI) 226:4–6. This isn't connected to any related argument. It also isn't on its face concerning, even though apparently conveyed as a pejorative. For left unexplained is why wanting "to make money" of itself signals something anticompetitive, as opposed to simply recognizing the very nature of capitalistic motivation. See Areeda & Hovenkamp, 4A *Antitrust Law* ¶964b at 19 (noting that antitrust "generally presumes that a firm maximizes its profits").

Points by both parties here ultimately key to the likelihood and size of potential foreclosure, as addressed in the next factor (and elsewhere by the parties below). But as to this factor on its own, nothing as to the nature and purpose of Tempur Sealy's acquisition of Mattress Firm describes anything unusual about a typical vertical merger. Compare *Illumina*, 88 F4th at 1054 (finding concern where "nature" of transaction was acquisition of downstream customer by "sole-source supplier," and "purpose" was to transform acquiring company's business model to capture downstream market, leading to complete foreclosure in that market).

### ii.   Likelihood and size of foreclosure

The parties reference this factor briefly in their post-hearing submission. See Dkt 456 at 83–84 (FTC analysis), 201 (Defense analysis). They instead devote far more time to their own detailed, separate consideration of *effect on* (as phrased by the FTC) or *harm to* (as phrased by Defendants) competition and consumers in another area of their filing. See id at 85–91 (FTC analysis), 131–54 (Defense analysis).

Given the way the parties present this issue, extended examination of the likelihood and size of foreclosure will defer to their main contentions as to *effect* and/or *harm*. As such, only the short conclusion will be noted here. And that is that this acquisition presents a potential foreclosure share of somewhere between approximately one and nine

percent, which isn't concerning given the competitive nature of the mattress industry on both the supply and retail side. Consideration of barriers to entry next also serves to make this clear.

### iii. Barriers to entry

The FTC suggests that the acquisition will increase already high barriers to entry for putative "premium" mattress suppliers. It argues in this regard that Mattress Firm currently has "kingmaker" relevance in the industry and the ability to propel a brand's recognition and distribution. For example, see Ex 4730 at 2 (MFRM, referencing term "king maker"); 11/13 Eck (MFRM) 233:19–234:8 (explaining handwritten edit to presentation of "kingmaker" as term that "was out there").

There's no doubt that Mattress Firm has carved out for itself an enviable position in the retail channel of the mattress industry. But its self-referential accolades don't make them so, where the evidence puts its actual position in a far less-dominant context. For example, see *AT&T*, 310 F Supp 3d at 203 (recognizing that "marketing phrase[s]" such as "must have" to not be literal in ordinary-course business documents); *Staples*, 190 F Supp 3d at 133–34 (rejecting "lofty vision" statement as not in line with present business conditions).

As detailed elsewhere above, only Tempur Sealy, Serta Simmons, and Purple sell a substantial number of mattresses priced at or above $2,000 through Mattress Firm. See PDX5 at 25 (FTC expert presentation). Yet the "premium" nature of Sleep Number, Casper, Avocado, and Saatva is quite apparent—and never to this point dependent upon Mattress Firm. And King Koil has been successful despite having only one slot in Mattress Firm stores, while at present moving bullishly toward releasing a mattress with "new technology." 11/22 Sealed (Binke, King Koil) 15:23–16:17. It's a simple fact that these rivals can thrive without relying on Mattress Firm because just under seventy-five percent of mattresses priced at or above $2,000 are sold *elsewhere* than Mattress Firm. See Exs 5971 (Defense expert graphic showing Mattress Firm

market share at prices at and above $1,000 and $2,000) & 5023 (FTC expert graphic reflecting same market share for $2,000 price point).

Supposed "kingmaker" status is thus overstated, where the retail channel contains "thousands and thousands" of retail options, in addition to online and direct-to-consumer opportunities. 11/18 (Eck, MFRM) 12:17–18. The termination of relations between Tempur Sealy and Mattress Firm from 2017 to 2019 has been discussed at length above. That experience showed Tempur Sealy's ability to achieve a recapture rate over one hundred percent, while also more than recapturing its profitability, even before it was welcomed back to Mattress Firm. See 11/25 (Israel, Defense expert) 144:16–22; 11/19 (Thompson, TSI) 162:15–18; Ex 5980 (Defense expert graphic showing recapture rate). It did so by competing vigorously through other channels available to it, with no apparent *barrier to entry* preventing it from doing so.

Indeed, to argue the relevance of Mattress Firm with respect to barriers to entry in the relevant product market suggests that the barriers to entry of other retailers to compete *with Mattress Firm* must be considered (being competition at the *retail market*)—rather than mere consideration of the way rival mattress suppliers compete *with each other* (being competition at the *wholesale market*). And there simply aren't meaningful barriers to opening new mattress retail stores or to selling direct-to-consumer.

As to the latter, online sales and marketing is a large and growing fact of life in the mattress industry. See Holloway (Amazon) IH 7:5–12 (noting thousands of mattress retailers on Amazon); Koenig (City Furniture) Dep 27:21–22 (citing Amazon as "existential threat"). This is in fact a channel that Tempur Sealy targeted and expanded when it was excluded from the Mattress Firm floor during 2017 to 2019. 11/13 (Thompson, TSI) 161:8–10 (discussing TSI's "beefed up" "Internet Team" and new effort selling beds through internet).

As to the former, the evidence showed that new mattress retail locations can be opened quickly and cheaply. Bercier (Sit n' Sleep) Dep 75:18–76:11 (could open new store with "couple hundred thousand bucks," "staff it easily," "outfit it easily," and have store open in as little as two weeks); Megibow (Casper) Dep 87:10–15 (Casper "can open them in three or four months"); Saarie (Raymour & Flanigan) Dep 50:4–9 ("about six months").

The FTC attempted to establish that opening retail stores is an expensive, time-consuming proposition. For example, see 11/20 (Nguyen, Avocado) 93:16–23 (opening own store is "capital intensive" and "takes a lot of time"); 11/12 (DeMartini, Purple) 86:13–18 ("close to a million dollars" a store); Melville (Saatva) Dep 58:19–60:9 (approximately $1 million for flagship showroom); 11/18 (Buster, TSI) 107:18–24 (approximately $600,000 for Tempur-Pedic store). But such testimony concerned only single-vendor, specialty retail stores, which seek to sell mainly (or only) high-end mattresses. Such stores are in no way equivalent to Mattress Firm stores, which carry a wide array of mattress price points, eighty percent of which are priced below $2,000. 11/18 (Eck, MFRM Firm) 11:24–25. The evidence thus doesn't support contention that Mattress Firm stores are located in equally high-rent retail locations. To the contrary, it was credibly observed that "multi-brand mattress dealers tend to put themselves in B real estate in the outside of a mall, maybe at the end of the parking lot, something where the rent is less expensive." 11/12 (DeMartini, Purple) 87:6–9; compare id at 155:4–14 (Purple stand-alone "showrooms" are placed "in higher cost locations" because it is "form of advertising").

As observed in a respected treatise, if the proposed acquisition forecloses rivals from one aspect of the retail channel, the combined firm's ability to raise and maintain prices over the long-term fades if barriers to entry are low. See Areeda & Hovenkamp, 4A *Antitrust Law* ¶1011a at 194 (stating that adverse effects from vertical merger are "unlikely" unless substantial barriers to entry exist "in at

least one market and probably both" and such markets are "highly concentrated"); see also id at ¶1004c at 166 (stating that there is "no foreclosure in a competitive market"). Simply put, that is the situation here. As such, barriers to entry don't present any substantial concern.

#### iv.  Trend toward vertical concentration

The FTC doesn't argue this factor. See Dkt 143 at 45–46 (FTC motion). And as noted by Defendants, it also doesn't explain that any potential oligopoly concerns exist at present. See Dkt 194 at 51 (TSI response); see also *Microsoft*, 681 F Supp 3d at 1100 (stating that FTC must "explain how this trend is anticompetitive here").

#### v.  Elimination of a competitor

The FTC also makes no argument on this factor. Given that this is a vertical merger, the proposed transaction of its nature will not eliminate any competitor. Areeda & Hovenkamp, 4A *Antitrust Law* ¶1004e at 171 (emphasizing that, unlike horizontal mergers, vertical mergers don't result in direct elimination of any competition).

#### vi.  Market power

The FTC argues, "No transaction within the bedding industry could create a combined firm with more market power." Dkt 456 at 83. And so, it further contends, "As a result of the combined firm's market power, prices will increase and consumers will pay more." Ibid.

To the extent that suggests an increase of prices to consumer detriment, it's addressed below where separately presented by the FTC. Beyond that, the argument elides—rather than addresses—the question of market power. Indeed, the FTC nowhere even references applicable percentage shares in relation to its argument.

As for Tempur Sealy, it has only a 24.8 percent share of the proposed relevant market at wholesale. See Dkt 456 at 83, citing Ex 5023 at 1 (showing share of MFRM and other retailers). As for Mattress Firm, it has only a 25.1 percent share of the market for mattresses priced $2,000 and above (with Tempur Sealy already comprising 16.3 of that 25.1 percent), with it having just been determined that

thousands of retail competitors exist in an environment of low barriers to entry. See 11/25 (Israel, Defense expert) 136:20–137:4; see also Ex 5977 (Defense expert graphic, showing TSI share of MFRM sales).

The FTC notably cites no testimony from either of its economic experts to support its contention that a troubling amount of market power exists here based on these percentages. It instead merely asserts that as a combined firm, it will "dominate the U.S. Market." Dkt 456 at 83 (internal quotations omitted). To the contrary, the evidence shows that the market for mattresses priced $2,000 and above is competitive at both the wholesale and retail levels. In such competitive markets, theories of market power bringing about competitive harm are "inapt." Areeda & Hovenkamp, 3B *Antitrust Law* ¶756a at 10.

### vii. Conclusion

In sum, the only headway made by the FTC with the *Brown Shoe* factors is the extent to which the nature and economic purpose of the proposed acquisition overlaps with the valid points it made as to its separate address of *ability* and *incentive*. None of the other factors appear to suggest any concern with respect to the acquisition.

### c. Extent of effect on or harm to competition and consumers

As noted above with respect to the second *Brown Shoe* factor, the parties devote considerable argument as to their separate contentions on *effect on* or *harm to* competition and consumers. The FTC posits such topics as potential price increases, threats to innovation, misuse of rivals' proprietary information, and higher barriers to entry. Dkt 456 at 185–86. In addition to responding on those points, Defendants principally argue their view on the possible percentage of the market being foreclosed. Id at 191–200. These will all be addressed here, along with certain "natural experiments" and recent history that aid recognition of market realities.

i.  Potential for increase in price to
consumers

Briefly stated, the FTC's expert constructed a model from which he opined that the subject acquisition would result in substantial harm to consumers through market-wide price increases under scenarios of either full or partial foreclosure by the combined firm. Dkt 456 at 85–88.

To be clear at the outset, the model by the FTC's expert only analyzes the effects on the proposed relevant product market of a "premium" mattress segment priced at $2,000 and above—which market was considered and rejected above. The model is thus unreliable to show anticompetitive harm in a *relevant* product market because no such market has been found to exist. But even taking the model on its own terms, it is flawed.

Specifically, the FTC's expert calculated the effect of the acquisition on sales and prices of mattresses sold at $2,000 and above, while estimating the resulting harm under various scenarios. See 11/20 (Das Varma, FTC expert) 189:11–191:13 (full and partial foreclosure scenarios), 197:19–198:3 (no foreclosure scenario), 198:4–200:3 (bargaining scenario). Under no scenario did he predict prices would decline or hold steady. Graphically presented, his model of full or partial foreclosure scenarios estimated as follows:

| Foreclosure Scenario | Avg Price Increase (%) | Annual Consumer Harm ($) |
|---|---|---|
| Full Foreclosure (SSB & Purple) | 12.7% – 15.3% | $534M – $625M |
| Full Foreclosure (SSB) | 9.3% – 10.7% | $411M – $481M |
| Partial Foreclosure (SSB) | 6.5% – 7.3% | $308M – $352M |
| No Foreclosure | 5.7% – 6.3% | $279M – $314M |
| Partial Foreclosure (Bargaining) | 7.1% | $347M |

PDX5 at 46 (FTC expert presentation); see also 11/20 (Das Varma, FTC expert) 190:12–191:13 (discussing scenarios); Ex 6500 at 17–19 (FTC expert report, discussing same).

The question is whether such model coheres with reality. It must be remembered that "antitrust theory and speculation cannot trump facts, and even Section 13(b) cases must be resolved on the basis of the record evidence in relation to the market and its probable future." *Arch Coal*, 329 F Supp 2d 116–17, citing, among others, *Eastman Kodak Co v Image Technical Services*, 504 US 451, 460–67 (1992). As such, "expert testimony must incorporate assumptions that are 'reasonable' in light of the record evidence. Hewing to that rule is especially important in Section 7 cases." *AT&T*, 310 F Supp 3d at 221. And certainly, the proffered economic analysis should only be credited if it's consistent with the sponsoring party's own factual contentions. See *In re LIBOR-Based Financial Instruments Antitrust Litigation*, 299 F Supp 3d 430, 489 (SDNY 2018) (excluding plaintiffs' expert testimony that was inconsistent with its own allegations).

Defendants point out that the model by the FTC's expert relied on several assumptions contradicted by the record. In particular, they argue that the model fails to

account for the concept of elimination of double marginalization (or *EDM*), which renders the conclusions unreliable. Dkt 456 at 146–48.

EDM occurs when a manufacturer and a retailer vertically integrate, so that the combined firm earns the entire margin on each sale, instead of separate pieces of the margin as to each of two separate firms. See Areeda & Hovenkamp, 3B *Antitrust Law* ¶758 at 31–33. This elimination is a widely accepted benefit of vertical mergers that "lead[s] to lower prices for consumers" and is "procompetitive." *AT&T*, 310 F Supp 3d at 197–98; see also Areeda & Hovenkamp, 3B *Antitrust Law* ¶758a2 at 34: "Consumers are better off for each instance of double marginalization eliminated."

For example, for mattresses currently sold at Mattress Firm, Tempur Sealy makes a wholesale margin, and Mattress Firm makes a (larger) retail margin. As an illustration, Defendants' expert assumed a $3,000 mattress, with the wholesale margin being about $500, and the retail margin being about $2,000. 11/25 (Israel, Defense expert) 158:3–18; see also id at 159:4–21, 162:22–163:15, 165:21–23 (explaining EDM's benefits). The retail margin is so large partially because manufacturers use margins to encourage retailers to engage in effort to sell their mattresses. Id at 90:19–91:12.

Given that the combined firm will make more money on each mattress sold, it has an increased incentive to sell a greater volume of mattresses. Defendants' expert explained that the combined firm can utilize its "double margin" to profitably sell more mattresses post-merger in a number of ways. This includes by *lowering* prices. 11/25 (Israel, Defense expert) 162:22–163:3. For example, post-transaction, the merged firm will determine the price and optimal effort to invest in selling mattresses based on the *combined* margin. Still assuming a hypothetical $3,000 mattress, the merged firm would start from a prospective margin of $2,500—more than either firm made independently. With that higher margin, the merged firm

will have more incentive to make incremental sales than either firm did on its own premerger. Id at 182:14–183:8.

This elimination of double marginalization thus creates downward pressure on prices for the very reason that the combined firm finds it more profitable to sell more product. But in addition to lowering prices (or in combination with some level of price decrease), it can invest in product quality, the in-store experience, or other improvements to drive sales. Id at 163:17–164:16 (identifying capital investment, refitting stores, or better logistics); 11/20 (Das Varma, FTC expert) 243:8–245:1 (identifying lower prices, improved quality, better sales training, or better shopping experience). Or it can use that greater margin to fund financing to enable more customers to buy a mattress—or buy one that is at a higher-price point. 11/25 (Israel, Defense expert) 163:4–10. All of these are procompetitive.

This is, in fact, the experience following a prior Tempur Sealy acquisition of a mattress retailer. The CEO of Dreams in the United Kingdom testified that, after being acquired, it was able to reinvest increased margins into opening new stores, refitting current stores, investing in its factories and warehouses, and replacing trucks and delivery vans. 11/21 (Hirst, Dreams) 130:6–131:21.

Both experts also agreed that EDM occurs in vertical mergers such as this one, and that it puts downward pressure on pricing. 11/20 (Das Varma, FTC expert) 188:9–20; 11/25 (Israel, Defense expert) 162:9–10. They also agreed that retailers influence customers' mattress purchases. 11/20 (Das Varma, FTC expert) 169:1–4; 11/25 (Israel, Defense expert) 176:11–20. And they agreed that EDM can't be modeled on its own and instead must be evaluated along with the other effects of the merger to understand the net impact on the merging firm's incentives. 11/20 (Das Varma, FTC expert) 188:21–189:10; 11/25 (Israel, Defense expert) 167:4–7.

And yet, the model of the FTC's expert rests on at least two incorrect assumptions that effectively assume away EDM.

*First*, the model assumes that all retailers will engage in the same amount of effort to sell a mattress so long as the margin is sufficient to cover the retailer's costs. 11/20 (Das Varma, FTC expert) 267:18–24, 269:15–20. By this, the expert treats retailers as passive actors who will do nothing more or different, thus ignoring the potential for EDM to increase competition. Id at 268:7–16. The evidence contradicts that assumption. For example, testimony established that Purple and Mattress Firm worked to increase Mattress Firm's margin on Purple Mattresses to incentivize greater buy-in by Mattress Firm. 11/19 (Dament, MFRM) 66:3–20. And Serta Simmons offered sales performance incentive funds to motivate such associates to sell their mattresses. 11/18 (Eck, MFRM) 59:25–60:13. But by assuming away the very reason Tempur Sealy and other suppliers pay retailers higher margins, the FTC's expert removes the possibility of EDM from his merger analysis.

*Second*, the FTC's expert assumes that there's a fixed percentage relationship between wholesale and retail margin for mattresses. 11/20 (Das Varma, FTC expert) 273:9–23. This is unsupported, including with respect to the contract between Tempur Sealy and Mattress Firm— the most significant contract for understanding the impact of EDM. That agreement provides a fixed dollar margin, not a percentage margin. See 11/20 (Das Varma, FTC expert) 275:25–276:6 (acknowledging same); see also 11/25 (Israel, Defense expert) 195:25–196:25 (finding same); see also Ex 5965.1 (TSI pricing document showing increases in fixed dollars). Correcting only this assumption about fixed percentages—and instead allowing retailers to negotiate over dollar margins (as they do in the real world)—flips the model to one instead predicting *lower* prices after the acquisition. See 11/25 (Israel, Defense expert) 197:22–198:9.

The model by Defendants' expert made certain adjustments for the above incorrect assumptions, employed a linear demand model, and found that the merger on net would increase consumer welfare by $896

83

million (or $181 per mattress). Ex 5985 (Defense expert summary table); see 11/25 (Israel, Defense expert) 203:6–15. Although it does appear that this model more closely accords to market realities, the question isn't whether the model is accurate in all of its particulars. The failure here is instead one of proof by the FTC, upon whom the burden rests. Indeed, the FTC's expert was unable to explain his model's prediction that upward pricing pressure exceeds downward pricing pressure from EDM. To testify, as he did, that all he can do is "put the numbers in the model and then just see what comes out" doesn't exactly inspire confidence that he accounted for the market and commercial realities of the situation. 11/20 (Das Varma, FTC expert) 266:9–16.

This lack of explanation was particularly disconcerting given the clarity of testimony in this action that mattress retailers compete always and vigorously on price. See 11/18 (Papettas, Mattress Warehouse) 177:24–178:8; 11/18 (Eck, MFRM) 13:10–14:25 (describing competition as "brutal" and the practice of "price scraping" competitors); 11/20 (Nguyen, Avocado) 76:2–4 (competition is "robust"); 11/21 (Galimidi, Macy's) 12:13–14 (the retail marketplace "is a competitive landscape"). And yet the FTC's expert simply assumes that (i) Tempur Sealy will remove rival mattresses from Mattress Firm, (ii) it will then increase its own prices not only there, but everywhere, and (iii) this in turn will lead to price increases not just for Tempur Sealy mattresses at Mattress Firm, but also for all rival suppliers at all other retailers. 11/20 (Das Varma, FTC expert) 192:2–194:3. All of that depends on his further assumption that MAP and UPP policies exist and can be rigidly enforced. Id at 172:16–173:1; 192:17–21 (stating MAP means "supplier is the one who sets the price").

But none of that can be accepted as realistic. A table has already been published above, from the expert's own data, that shows prices in a given month for a single style of Purple Mattress ranging from a low of $675 (at Mattress Warehouse, which has a presence in many states) to $2,594 (at Mattress Firm, which has a presence nationally).

Exhibit 5972 (Defense exhibit, drawn from FTC expert materials). It simply doesn't accord with reality to suggest that prices can't (or don't) vary across retailers, or that retailers can't (or don't) compete on price. Nor is it possible under the model here to query whether such price differentials exist based on stores being in different geographic regions, given the FTC's case itself depends on its supposition of a geographic product market that is nationwide. See Dkts 3 at ¶77 (unredacted complaint) & 143 at 23 (FTC motion).

Also left without satisfactory explanation is why rival suppliers such as Serta Simmons and Purple would respond to unilateral price increases by Tempur Sealy by (apparently, and suddenly) deciding to quit competing on price. See Ex 6500 at 132–33, 135–36 (FTC expert report); 11/20 (Das Varma, FTC expert) 193:18–194:3. Again, the final, sequential assumption is that Serta Simmons, Purple, and all other rivals will use Tempur Sealy's assumed price increase across all retailers as an opportunity to raise their *own* prices in all those other channels—rather than seek to maintain or expand market share by continuing to compete on price. For example, see Id at 193:9–11 (opining that increase in price by TSI at MFRM creates "headroom for Serta Simmons to also raise its price" on its mattresses sold elsewhere). But nothing supports assumption that Tempur Sealy's rivals wouldn't instead use such scenario as an opportunity to gain market share. See Areeda & Hovenkamp, 4A *Antitrust Law* ¶1004c at 166 (explaining "realignment" normally works following vertical merger in competitive market). It's also contrary to real-world evidence. As has already been explained, when Tempur Sealy was effectively foreclosed from Mattress Firm's floor during the termination of their relationship from 2017 to 2019, it competed vigorously across all channels to recapture market share and profitability. And in doing so, prices for putative "premium" mattresses remained unchanged across the industry. See PX0507 at 62–65 (Defense expert report, with regression analysis

confirming that no price increase seen during time of exclusion).

In sum, the FTC relies on expert modeling to argue a danger of price increase in its assumed relevant market, to the detriment of consumers. That model is rejected for the reasons stated above. As such, the FTC fails to establish harm to consumers via price increases due to the nature of the proposed acquisition.

### ii.    Potential for market foreclosure of competitors

As noted, the FTC argues that competition will be harmed if Tempur Sealy is able to foreclose rivals from selling through the nation's largest premium mattress retailer. Dkt 456 at 83. It also asserts that Mattress Firm has an outsized role in the market, despite accounting for only about twenty-five percent of mattress sales priced at $2,000 and above. Id at 45, 50–53.

Tempur Sealy and Mattress Firm defend their planned merger across many fronts. But their central contention is that losing access to Mattress Firm only threatens competition if rivals can't recover sales or don't have other options. Dkt 194 at 22, 26–27 (TSI response). And that in turn implicates their contention that the merger poses inadequate risk of market foreclosure to be accounted as substantial.

### (a)    Multiplicity of suppliers and retailers in mattress industry

Several additional realities of the mattress industry— and the place of Mattress Firm within it—must be understood in this respect. Foremost is the fact that there are numerous channels through which to sell mattresses. As mentioned briefly above with respect to barriers to entry, there are quite literally thousands of mattress retailers in the brick-and-mortar channel alone, including numerous chains with a national presence such as Ashley Furniture and Macy's. 11/18 (Eck, MFRM) 12:17–18 ("thousands and thousands"), 19:13–15 ("there's plenty of places to sell a mattress"); 11/25 (Israel, Defense expert)

131:8–15 (discussing plethora of local mattress retailers); Foreman (Purple) Dep 39:12–13 (noting "a lot of mattress specialty retailers" exist).

But such channels include not simply mattress-specialty retailers, but also department stores, furniture stores, online platforms, direct-to-consumer, and vertically integrated mattress companies. See Davis (Ashley Furniture) Dep 48:17–25 (explaining competition across direct-to-consumer brands, furniture retailers, mattress specialty stores, and department stores); Blumkin (Nebraska Furniture Mart) Dep 33:1–35:13 (explaining competition across mattress-specialty stores, department stores, and online); Holloway (Amazon) IH 7:5–12 (noting thousands of mattress retailers on Amazon). And equally of note is the fact that Tempur Sealy considers its largest competitor to be Sleep Number, which sells directly to consumers solely through its own stores. See 11/19 (Thompson, TSI) 143:1–2; 11/18 (Barra, Sleep Number) 82:7–12 (as vertically integrated company, no use of third-party distributors).

The breadth and robust nature of this competition leads to the conclusion that Mattress Firm isn't the dominant and necessary retail force that the FTC asserts it to be, even if it is the nation's largest mattress retailer. Koenig (City Furniture) Dep 29:23–30:5 (stating that every US mattress supplier "has an enormous number of potential ways to sell their product," with "more options than they ever have had before"). Statistically, the very breadth of these options is why the overwhelming majority of putative "premium" mattress sales occur outside of Mattress Firm, with nearly seventy-five percent of mattresses priced $2,000 and above (and more than eighty-five percent of those above $1,000) selling elsewhere. See Exs 5971 (Defense expert graphic showing Mattress Firm market share at prices at and above $1,000 and $2,000) & 5023 (FTC expert graphic reflecting same market share for $2,000 price point).

In this regard, the specific calculation by Defendants was that only 25.1 percent of all mattresses priced $2,000

and above sell through Mattress Firm. 11/25 (Israel, Defense expert) 136:20–137:4. The FTC was invited to address this calculation if they disagreed, and no contrary evidence appeared. See id at 137:5–8.

Equally clear is the array of successful mattress suppliers at the high end of the market that do *not* rely—principally, or at all—on Mattress Firm for their success. Indeed, only three suppliers annually sell a substantial number of such mattresses at Mattress Firm at a price point at or above $2,000: Tempur Sealy (with about 375,000 units), Serta Simmons (with about ███████ units), and Purple (with about ██████ units). PDX5 at 25 (FTC expert presentation).

As for Serta Simmons, it sells in over 1,000 different retailers. 11/20 (Genender, SSB) 15:23–25. The following chart shows that only ███ percent of its sales come from mattresses priced at or above $2,000 at Mattress Firm, with ██████ those sales (██████ percent) through other retailers and channels—and with nearly ████████████ of its sales (█████ percent) coming from mattresses priced below $2,000. It presents graphically this way:



Ex 5979 (Defense expert graphic).

As for Purple, it sells mattresses only in approximately 1,100 of Mattress Firm's 2,300 stores. 11/12 (DeMartini, Purple) 148:20–22; Dkt 49 at ¶1 (MFRM answer). And only ■■ percent of its sales are from mattresses priced at or above $2,000 at Mattress Firm. Ex 5979. More than ■■ of its overall sales (■■ percent) are of such mattresses sold at other retailers and channels. Ibid; see 11/25 (Israel, Defense expert) 132:21–24 (Purple sold as many mattresses in 2023 through Ashley Furniture and Rooms To Go alone as it did through MFRM). And a very substantial share of its sales (■■ percent) come from mattresses priced below $2,000. It presents graphically this way:



Ex 5979 (Defense expert graphic).

The evidence also established that many successful suppliers of mattresses priced at or above $2,000 "do not sell through Mattress Firm." 11/18 (Eck, MFRM) 41:15–25; see also 11/19 (Dament, MFRM) 77:13–16 ("so many" mattress brands succeeding outside of MFRM); 11/18 (Barra, Sleep Number) 82:7–12 (sales through own stores). Indeed, several such mattress suppliers have rejected Mattress Firm's attempt to floor them. See 11/20 (Nguyen, Avocado) 75:3–9 (Avocado can achieve plans without MFRM), 76:5–77:19 (stating why Avocado decided not to sell through MFRM); 11/18 (Eck, MFRM) 48:12–21 (MFRM was "disappointed" to not partner with Avocado); 11/19 (Dament, MFRM) 77:21–22 (as to Avocado, Kluft, Mercury), 78:2–8 (as to Casper).

And as already noted, vertically integrated mattress suppliers also exist and are successful at a price point at or above $2,000. Sleep Number is one of the most successful

in the country and sells only through its own stores. 11/18 (Barra, Sleep Number) 96:11–19 (based on net sales), 82:7–14 (discussing vertical structure), 84:4–8 (selling only through its 643 stores); see also Ex 4002 (Sleep Number 2024 Form 10-K describing its sales, structure, and strategy). And Saatva is a new entrant with "about 20 of their own stores today and growing, in addition to ecommerce operations," which believes it can be more successful selling direct-to-consumer and in its own showrooms. 11/18 (Buster, TSI) 131:18–23; Melville (Saatva) Dep 79:10–21.

Statistical consideration of the extent of possible market foreclosure follows next. But the foregoing reflects actual market realities. The breadth and depth of these markets—both in terms of mattress supply and mattress retail—strongly suggest that the proposed acquisition of Mattress Firm by Tempur Sealy poses inadequate risk of market foreclosure to be accounted as substantial.

### (b)  Extent of possible market foreclosure

In evaluating customer-foreclosure cases, courts look first to the percentage of the market being foreclosed. For example, see *Alberta Gas Chemicals*, 826 F2d at 1244–46; *Fruehauf*, 603 F2d at 360; *Brown Shoe*, 370 US at 328. And as stated in a respected treatise, "It cannot be emphasized too strongly that 'small' foreclosures cannot impair competition." Areeda & Hovenkamp, 4A *Antitrust Law* ¶1004f at 172.

Tempur Sealy maintained above that it has no ability or incentive to foreclose rivals. But even assuming to the contrary here, Defendants submit persuasive evidence keyed to the foregoing statistics and evidence that the potential extent of *foreclosure share*—being that portion of the market from which other rivals could be excluded—isn't of cognizable concern.

It has just been observed that Defendants' expert established without contradiction that Mattress Firm

accounts for only 25.1 percent of mattress sales priced at or above $2,000. This presents graphically as follows:



Ex. 5976
Source: Corrected Expert Report of Mark A. Israel, Ph. D., Figures 2 and 3.

Ex 5976 (Defense expert graphic).

Tempur Sealy (together with private-label mattresses from Mattress Firm) already accounts two-thirds of those sales—being fully 16.3 of those 25.1 percentage points. This further presents graphically as follows:



Ex 5977 (Defense expert graphic); see also Dkt 194 at 21 (TSI response); 11/25 (Israel, Defense expert) at 134:8–15 (describing calculation).

The foregoing means that, even if the merged firm removed every third-party brand from Mattress Firm, only 8.8 percent of the overall "premium" mattress market—as defined by the FTC—possibly remains at risk of foreclosure. 11/25 (Israel, Defense expert) 134:11–15. And this figure itself overstates the risk of foreclosure. For example, see id at 140:22–141:3 (noting that relevant market defined at price point well below $2,000 decreases MFRM's initial reference share); Ex 5978 (Defense expert graphic showing maximum foreclosure risk as 1.3 percent share across all price points); see also below at section 4.d (Tempur Sealy divestiture and slot commitments with respect to acquisition reduce potential foreclosure share).

A number of challenges to vertical mergers have been rejected on similarly low foreclosure percentages. For example, see *Crane Co v Harsco Corp*, 509 F Supp 115, 125 (D Del 1981) (less than nine percent share insufficient); *Fruehauf*, 603 F2d at 359–60 (less than six percent share insufficient); *Crouse-Hinds Co v InterNorth, Inc*, 518 F Supp 416, 433 (NDNY 1980) (between one and four percent share insufficient); *Alberta Gas Chemicals*, 826 F2d at 1245 (three percent insufficient). And the Fifth Circuit's decision in *Illumina* is again informative, this time by providing a sharp contrast regarding concerns over the extent of possible foreclosure. There, the merged firm would have one hundred percent market share of a DNA-sequencing technology that was essential for rivals to produce a downstream clinical-testing product. 88 F4th at 1051. So "even if other customers did learn about Illumina's foreclosing behavior and therefore wanted to take their business elsewhere, they would have nowhere else to turn." Id at 1053. To the contrary here, mattress suppliers have *numerous* other channels—including *thousands* of other retailers—to turn to in their efforts to ultimately reach consumers.

Even so, the Supreme Court explained in *Brown Shoe* that the size of the share of the market foreclosed "will seldom be determinative," and that between the "extremes," in which "the foreclosure is neither of monopoly nor de minimis proportions, the percentage of the market foreclosed by the vertical arrangement cannot itself be decisive." 370 US at 328, 329. And the FTC is correct to note that no case states an absolute percentage market share or foreclosure share that is *de minimis* under Section 7. For example, see *United States v Kimberly-Clark Corp*, 264 F Supp 439, 462–65 (ND Cal 1967) (enjoining acquisition of "important trade conduit" of large regional chain of paper merchants with somewhere between twelve and eighteen percent market share).

Yet the FTC cites but a single case blocking a vertical merger on so low a foreclosure share as found here. See *United States v Sybron Corp*, 329 F Supp 919, 930–31

(ED Pa 1971) (holding acquisition of dental equipment dealer with up to eight percent share violated Section 7). That result doesn't favorably compare to this matter. Determination there involved dental products and rested largely on a finding that "[b]arriers to entry on the retailing and manufacturing level are significant." Id at 929. But it has been determined above (with respect to the *Brown Shoe* factors) that barriers to entry in both the retail and manufacturing segments of the mattress industry aren't significant. For example, see 11/25 (Neu, TSI) 31:2–11 (mattress industry has been "prone to disruption"); Bercier (Sit 'n Sleep) Dep 75:18–76:11 (could open new store with "a couple hundred thousand bucks," "staff it easily," "outfit it easily," and have store open in as little as two weeks); Megibow (Casper) Dep 87:10–15 (Casper "can open them in three or four months"); Saarie (Raymour & Flanigan) Dep 50:4–9 ("about six months").

The FTC's main contention actually isn't to argue that less than nine percent market foreclosure is one that should always be condemned as a matter of law. It instead argues in the main that the percentage itself is "artificially low." Dkt 456 at 84. It proposes (though in no clear terms) that the foreclosure rate should be viewed as between thirty-two and thirty-five percent.

It arrives at such figures by assuming two things. First, the FTC would eliminate direct-to-consumer and/or vertically integrated suppliers of mattresses priced at or above $2,000 from the overall pool of "premium" mattress sales. Dkt 207 at 13 (FTC reply). This would exclude from the calculation, for example, Sleep Number as a closed single-vendor retailer. Second, after thus increasing Mattress Firm's share of such mattress sales from approximately twenty-five percent to the referenced thirty-two to thirty-five percent, the FTC would then include in its foreclosure percentage that entire amount—rather than omit the majority share of those sales that Tempur Sealy has already won on the Mattress Firm floor. Dkt 207 at 13 (FTC reply); 11/20 (Das Varma, FTC expert) 159:12–17. Neither assumption withstands precedent.

As to the first, all methods for reaching the consumer in the alleged market must be considered, including through direct-to-consumer or vertical integration. *Omega Environmental, Inc v Gilbarco, Inc*, 127 F3d 1157, 1163 (9th Cir 1997); see *Satellite Television & Associates Resources, Inc v Continental Cablevision of Virginia, Inc*, 714 F2d 351, 357 (4th Cir 1983) (same in Section 3 case); see also 11/25 (Israel, Defense expert) 138:21–140:7 (defending approach of including direct-to-consumer channels as viable channel of selling mattresses and obtaining customer input). The market definition of mattresses priced $2,000 and above is one of the FTC's own choosing, which of its nature includes sales through vertically integrated retailers. And where a competitor such as Sleep Number shows that such model can be successful, it must be considered as one available to other rivals.

As to the second, it's proper to exclude from the analysis the current mattress sales by Tempur Sealy and Mattress Firm when assessing the potential for the merger to foreclose competition. As stated by the Second Circuit, "The Clayton Act is concerned with whether an acquisition or merger *itself* may cause antitrust injury." *Geneva Pharmaceuticals*, 386 F3d at 511 (emphasis original). It's thus the merger-specific effects that are relevant for present Clayton Act analysis. See *Alberta Gas Chemicals*, 826 F2d at 1245; see also *United States v Hammermill Paper Co*, 429 F Supp 1271, 1282 (WD Pa 1977) (stating market share already captured by acquiring firm isn't included in foreclosure analysis). In line with this, both experts agreed that existing Tempur Sealy sales (and Mattress Firm private-label sales) must be *excluded* when analyzing the merger-specific effects. See 11/25 (Israel, Defense expert) 137:17–138:11 (explaining foreclosure analysis and applying it to present transaction); Das Varma (FTC expert) Dep on 10/28/24 at 9:17–11:4 (discussing foreclosure calculation in context of TSI acquisition of Dreams). It's thus proper to exclude from the amount subject to potential foreclosure the current portion

of Mattress Firm sales already won on a procompetitive basis by Tempur Sealy.

All of the foregoing goes towards consideration of the extent of possible foreclosure—if it occurs. But that itself isn't even certain. The FTC defines its alleged theory of customer foreclosure as a "risk that Tempur Sealy will use its newfound ownership and power over Mattress Firm to prevent its rival premium mattress suppliers from being able to sell at Mattress Firm." 11/12 (FTC opening statement) 7:22–8:1. But its expert's model suggests that Tempur Sealy would *not* foreclose other manufacturers when assumptions allow for them to bargain with the merged firm, because the bargaining model is the one that would yield the greatest profit. 11/25 (Israel, Defense expert) 95:2–11; see also 11/20 (Das Varma, FTC expert) 200:13–25 (downplaying whether his model is discordant with FTC theory, and stating he is merely attempting to model effect of merger on "competition"). And it's quite clear from the record that Tempur Sealy, Serta Simmons, and Purple can and do bargain with Mattress Firm as to their wholesale placement of mattresses, especially regarding marginal profit. Indeed, these negotiations can even lead to a termination in commercial relationships, as it did when Mattress Firm excluded Tempur Sealy during the 2017 to 2019 time period.

And so, for example, if Serta Simmons and Purple can bargain with Mattress Firm (as they do in the real world), the bargaining model predicts that *the most profitable outcome* for the merged firm is for both of them to stay on the Mattress Firm floor, with a greater balance of share than either has today. Graphically, it presents this way:

## Das Varma Bargaining Model Results

|  | Profit | Revenue | Total Sales | Premium Market Share | BOS at Mattress Firm |
|---|---|---|---|---|---|
| **SSB** | 4.6% ⬆ | 6.6% ⬆ | 10.6% | 7.9% → 8.8% ⬆ | 23.3% → 27.0% ⬆ |
| **Purple** | 12.5% ⬆ | 13.4% ⬆ | 14.7% | 3.5% → 4% ⬆ | 9.5% → 11.8% ⬆ |

Ex 5966 (Defense exhibit sourced from FTC expert rebuttal report); see also 11/20 (Das Varma, FTC expert) 263:3–11 (confirming that SSB would likely stay on floor because MFRM has no incentive to remove it), 264:25–265:2 (confirming that model doesn't show SSB being disadvantaged); 11/25 (Israel, Defense expert) 95:2–11 (opining "most profitable thing to do" under FTC expert model is for MFRM to keep SSB and Purple on floor).

Thus, rather than show *harm* to rival suppliers, this bargaining model predicts that rival manufacturers such as Serta Simmons and Purple will have *higher* revenues and profits post-merger. Ex 5966 (Das Varma "bargaining model" results), citing Ex 6501 at 87 (Das Varma rebuttal report); see also 11/20 (Das Varma, FTC expert) 263:18–264:2, 264:8–17. And remarkably, this accords with the expectation affirmed by Serta Simmons in its recent bankruptcy that it would experience five percent *growth* based in part on increased sales at Mattress Firm, even in mind of this anticipated merger. See Exs 5896 at 242 (SSB disclosure statement, five-year projection) & 2502 at 56–57 (SSB March 2023 management presentation, showing same five-year projection and specifying assumption of "[s]hare gains at Retailer #1").

In the end, argument by the FTC pertaining to market foreclosure doesn't coherently explain the extent to which *this merger* will foreclose other mattress suppliers. This approach being insufficient and one upon which it bears the burden in the first instance, the FTC fails to establish a necessary part of its *prima facie* case regarding the potential illegality of the proposed acquisition.

### iii. Potential for partial foreclosure

The FTC also raises certain arguments that can all generally be viewed under the rubric of partial foreclosure.

One is that, rather than engage in outright removal of rivals from the Mattress Firm floor, Tempur Sealy could diminish only a certain percentage of rival slots and/or sell and promote their brands in less favorable ways. See Dkt 456 at 186 (suggesting ability to reduce SKUs, add incentives to increase Tempur Sealy balance of share, etc). Given the finding above that the potential for full removal of rival suppliers from the Mattress Firm floor won't substantially harm competition, argument of mere diminishment necessarily fails. Regardless, nothing requires rival suppliers to maintain their presence at Mattress Firm if they somehow feel "held captive on the floor, but disadvantaged." 11/12 (DeMartini, Purple) 120:19–22 (expressing concern that Purple would remain but be diminished on MFRM floor); see also id at 115:12–15 (voicing concern about being "deemphasized"). Such rivals instead remain free to make their own business decision to exit Mattress Firm and focus on other retailers that, together, sell roughly seventy-five percent of all mattresses priced at or above $2,000. See Ex 5023.

Another is that, with respect to other retail channels (primarily being other mattress and furniture stores), Tempur Sealy has incentive agreements that commit a certain percentage of their floors to Tempur Sealy mattresses or state that other mattress brands will not be sold. See Dkts 143 at 48, 52–53 (FTC motion) & 456 at 80–81 (post-hearing submission). But the FTC never introduced evidence about what portion of the market those agreements affect. See 11/20 (Das Varma, FTC

expert) 254:1–4. These agreements are also easily terminable, and thus not genuinely constraining beyond a negligible timespan. See 11/12 (Rusing) 230:18–19 (noting that "virtually everyone has a mutual termination for convenience and generally all of them are 30 days"). Tempur Sealy has also committed to phasing out agreements that require retailers to carry only its mattresses and exclude a specifically named supplier. Id at 237:10–16 (stating that such agreements will be phased out over coming year); Ex 4983 at 2–5 (TSI supplemental interrogatory response).

The FTC also contends that the merger risks substantial harm to competition in ways that are even more attenuated—or at least quite difficult to quantify. For example, it argues the potential of the acquisition to chill future innovation and other beneficial collaborations that have otherwise taken place with an independent Mattress Firm. Dkt 456 at 185–86, citing *United States v Anthem*, 855 F3d 345, 360–61 (DC Cir 2017) (noting "threat to innovation" can be "anticompetitive in its own right"); *Federal Trade Commission v Sanford Health*, 2017 WL 10810016, at *7, *13 (D ND) (competition improves quality, convenience, breadth of offering), aff'd 926 F3d 959 (8th Cir 2019). This derives in part from related concern that the acquisition risks misuse by Tempur Sealy of confidential information in the hands of Mattress Firm due to its relations with other suppliers. Dkt 456 at 186.

Testimony did establish that Mattress Firm works cooperatively with suppliers to provide customer feedback, which plays a role in driving innovation. See 11/12 (DeMartini, Purple) 110:22–111:1 (stating that Purple utilizes information from MFRM in its "innovation pipeline"); 11/19 (Dament, MFRM) 22:15–23:19 (discussing MFRM work with SSB product-development team). The concern expressed by Serta Simmons and Purple, then, is that a post-merger Mattress Firm would share confidential financial information and proprietary technology with their rival, Tempur Sealy. 11/19 (Genender, SSB) 266:22–267:12; Ex 3613 at 1 (email from DeMartini to Thompson);

11/19 (Thompson, TSI) 208:24–209:12 (discussing Purple's request for post-merger firewalls and TSI's reassurances in that regard). The FTC also submitted an email revealing the frustration of the Tempur Sealy CEO with the fact that Mattress Firm had a non-disclosure agreement with Serta Simmons limiting access to its financial information. Ex 4819. This by implication suggests concern that the merged parent company could leverage financial information from Serta Simmons to the advantage of Tempur Sealy.

This predicted harm to competition is at least in part predicated on the notion that these rivals have nowhere else to turn for such purposes and input. That simply isn't so. It's again important to recall that the vast majority of mattresses priced $2,000 and above are sold elsewhere than Mattress Firm. The very fact that successful "disruptor" brands (including Purple and Casper) have brought innovative mattresses into the market without prior access to customer input or data from Mattress Firm indicates that working with it isn't a necessary precondition to advancement in sleep technology. And while Mattress Firm is the largest retailer of mattresses across all price points, nothing suggests that its customers are somehow unique. Nor does the evidence suggest that rival suppliers can't (or don't) work with other retailers to obtain consumer feedback to incorporate into their product development, or that aggregate feedback from all of those many other sources isn't of equal value.

Regardless, the FTC never articulated with evidence how this potential would harm *competition*, rather than *competitors*. The Clayton Act serves to protect only the former, not the latter. *United States v Aetna*, 240 F Supp 3d 1, 18 (DDC 2017) (citation omitted). Even if a merger leads to competitors suffering an "injury-in-fact," this doesn't necessarily amount to a "competitive injury." Areeda & Hovenkamp, 3B *Antitrust Law* ¶756a2 at 11; see also *UnitedHealth*, 630 F Supp 3d at 141 (courts reject theories of harm that rest "on speculation rather than real-world evidence"). At bottom, antitrust law is "not about

protecting [particular] rivals from any and all competitive pressures they would experience should the merger go through." *AT&T*, 310 F Supp 3d at 211.

In a similar context, the court in *Microsoft* observed, "Protecting Sony's decision to delay collaboration with Microsoft . . . is not procompetitive." 681 F Supp 3d at 1096. The same is true here. Serta Simmons and Purple remain entirely free to make their own business decision whether to sell through Mattress Firm, and if so, whether to share confidential information. Purple has in fact already elected to sign an agreement with Tempur Sealy extending its relationship with Mattress Firm post-merger. See Ex 5678; 11/12 (DeMartini, Purple) at 121:21–122:3 (discussing rationale for signing agreement). On the other hand, Serta Simmons to this point hasn't. 11/19 (Genender, SSB) 263:18–21. Regardless, there's simply no requirement that these rivals share their confidential and proprietary information with Mattress Firm.

To some extent, too, the stated concerns from rivals in this regard appear exaggerated and self-serving. For example, Purple *already* shares information with Tempur Sealy as a manufacturer. 11/12 (DeMartini, Purple) 118:13–25, 119:18–120:13. Even assuming information it shares with Mattress Firm is of a different nature, Tempur Sealy has committed to establish firewalls to protect such information and would face reputational harm if it misused any confidential information. 11/19 (Thompson, Tempur Sealy) at 142:11–15, 209:3–7, 226:9–15, 226:25–227:3; see also *Microsoft*, 681 F Supp 3d at 1092 (crediting that Microsoft anticipated "irreparable reputational harm" should it foreclose *Call of Duty* from PlayStation); *UnitedHealth*, 630 F Supp 3d at 141 (finding it likely that any effort to lessen competition would require meaningful "sacrifice" of "reputational interest").

In sum, the FTC fails to establish the potential illegality of the proposed acquisition with respect to its theories of partial foreclosure.

### iv. Natural experiments and recent history

"[N]atural experiments . . . are relevant to the merger analysis." *UnitedHealth*, 630 F Supp 3d at 143 (citation omitted). Three such examples of recent history are available here, and each indicates that harm to competition also isn't likely. These are detailed in the Background above, being (i) the exclusion of Tempur Sealy by Mattress Firm during the 2017 to 2019 years, (ii) three prior acquisitions by Tempur Sealy of other mattress retailers, and (iii) the concern Serta Simmons purports to express in these proceedings, as compared to contradictory representations made during its recent bankruptcy proceedings.

*As to the exclusion of Tempur Sealy by Mattress Firm,* it necessarily demonstrates that Mattress Firm simply is *not* a critical sales channel. The evidence shows that Tempur Sealy was able to recover sales and profit elsewhere by revamping its business plan and aggressively competing for business across all the many other channels that remained available. For example, see 11/12 (Rusing, TSI) 239:2–19, 241:11–242:3 (describing "recapture plan" as "Serta Simmons and Mattress Firm versus Tempur Sealy and other retailers"); 11/25 (Israel, Defense expert) 144:16–22 (explaining recapture); 11/19 (Thompson, TSI) 162:15–18 (recapture resulted in profitability exceeding that prior to exclusion). It simply cannot be countenanced that other rivals (including Serta Simmons and Purple) wouldn't be able to achieve similar results if they determined to put in the same level of competitive effort.

What's more, competition wasn't harmed with the exclusion of Tempur Sealy. Rather than experience any increase in prices during this time, the evidence instead shows that mattress prices slightly declined. 11/25 (Israel, Defense expert) 208:13–208:23; PX0507 at 62–65 (Israel expert report, showing regression analysis that confirmed no price increase during termination of relations).

*As to three mattress retailers previously acquired by Tempur Sealy,* courts do look to prior acquisitions as

natural experiments when evaluating the likely future effect of a vertical merger. See *AT&T*, 310 F Supp 3d at 215; *Microsoft*, 681 F Supp 3d at 1092. But notably here, the FTC's expert didn't opine that any of Tempur Sealy's prior vertical acquisitions harmed competition in any respective market. This is likely because the three instances available for consideration hold little predictive value, as none are genuinely fair comparators with the intended acquisition of Mattress Firm.

Sleep Outfitters has just approximately one hundred locations, with roughly fifteen additional Sleep Outfitters Outlet stores. 11/18 (Buster, TSI) 108:11–13, 111:5–7. It's uncontested that neither chain has carried anything other than Tempur Sealy mattresses since at least July 2019. 11/19 (Thompson, TSI) 94:20–95:9, 96:21–23 (noting sales of only Tempur-Pedic, Sealy, and Stearns & Foster mattresses). The FTC suggests that this shows a propensity by Tempur Sealy to convert multi-branded retailers to a "Tempur Sealy-only" model after acquisition. Dkt 456 at 73. But the evidence is that these stores had carried only a small third-party brand called Symbol, which accounted for two percent of sales—without clarity on whether such mattresses were even in the putative relevant product market of mattresses priced $2,000 and above. 11/18 (Buster, TSI) 108:17–22. Such acquisition simply isn't comparable to a retailer the size of Mattress Firm, which generates substantial revenue from a far wider array of premier third-party suppliers like Serta Simmons and Purple. Compare *Microsoft*, 681 F Supp 3d at 1096 (disregarding as irrelevant prior Microsoft acquisitions of two games it made single platform because of differences with *Call of Duty*).

Sova was an even smaller acquisition, being a twenty-store, high-end multi-brand mattress retailer in Sweden. Evidence does establish that Tempur Sealy balance of share has increased since the acquisition. See Ex 603 at 1 (indicating TSI having twenty-five percent share of Sova sales in 2018); see also Ex 607 at 6 (describing further "Tempur BOS gain" in 2021). But Sova without question

remains a multi-branded retailer that Tempur Sealy manages at "arm's length." Montgomery (TSI) Dep 12:11–17, 35:8–36:9. Regardless, there's again an important distinction in size from the proposed acquisition at hand. And the evidence also indicates that the Scandinavian market is dramatically different from the United States, typically entailing the sale of complete bedding systems (including bed frames and toppers) as part of the consumer expectation. Id at 37:1–20. Taken together, all of this means that the Sova acquisition is of little, if any, predictive value.

Dreams was a somewhat larger acquisition in the United Kingdom, being a 212-store, vertically integrated, multi-brand mattress retailer acquired in 2021. 11/21 (Hirst, Dreams) 99:5–17. The post-acquisition results are mixed. For instance, based on a Dreams exhibit, the FTC notes that the balance of share for Sealy mattresses has marginally increased from one percent to six percent from 2022 to 2023. Ex 3201 at 10 (Dreams Fall 2023 quarterly slide presentation). But on the other hand, that same exhibit shows that the balance of share for Tempur-Pedic mattresses has held constant. Ibid. This accords with credible testimony by the Dreams CEO that it has been maintained as an entirely separate business unit, with Tempur Sealy never interfering with its freedom to adjust its floors on a competitive basis. 11/21 (Hirst, Dreams) 104:15–105:2 (also describing Tempur Sealy's management as being at "arm's length"). There's also an important market distinction, being that another United Kingdom mattress company (Silentnight) is itself the largest manufacturer, while also being the second-largest retailer. Id at 99:10–22. That size parity with Dreams introduces a quite dissimilar economic constraint when attempting to predict harm to competition upon the acquisition of Mattress Firm by Tempur Sealy.

*As to the concerns Serta Simmons has expressed in these proceedings as compared to its statements during its own bankruptcy proceedings,* this was exhaustively detailed in the Background. In sum, its Chairman of the

Board testified in these proceedings that Tempur Sealy could "kick[ ] us off the floor completely" at Mattress Firm, and that the transaction poses an "existential threat" to Serta Simmons. 11/19 (Genender, SSB) 258:16–19, 259:6. But in its own bankruptcy proceedings, across a time period within which it was fully apprised of and accounting for this potential acquisition, Serta Simmons represented to the bankruptcy court its expectation as of 2023 that its sales would *grow* by five percent over the next five years, which included assumption that it would *gain* share at Mattress Firm. See Exs 5896 at 242 (SSB disclosure statement, five-year projection), 2502 at 56–57 (SSB March 2023 management presentation, showing same five-year projection and specifying assumption of "[s]hare gains at Retailer #1") & 4401 at 12 (May 2023 affidavit in support of confirmation stating no material change to financial projections that require modification or amendment).

It has already been determined that the Serta Simmons testimony in this proceeding was self-serving, lacking both credibility and objective industry evidence in support. *AT&T*, 310 F Supp 3d at 211–12 (statements by rivals generally aren't of persuasive value, given evident self-interest in blocking vertical integration that will make merged firm more competitive); see also *Microsoft*, 681 F Supp 3d at 1093 (finding FTC "heavy reliance" on rival's testimony "unpersuasive"). It thus cannot stand as factual support for any contention by the FTC in this action.

With pertinence to this aspect of the analysis, it is here expressly determined that the sworn statement of Serta Simmons to the bankruptcy court during those proceedings was truthful and accurate. Real-world evidence and/or expectation thus supports a finding that Tempur Sealy's chief rival on the Mattress Firm floor will likely see sales *grow* over the coming years even if this transaction is allowed to proceed. Stated differently, supposed fear by Serta Simmons or other rivals of foreclosure from the Mattress Firm floor is overstated and doesn't align with apparent market realities.

### d.   Remedial commitments

As part of their rebuttal case, Defendants note certain efficiencies that they contend will arise from the acquisition. Some have been referenced above, for example including the elimination of double marginalization. But in sum, Defendants assert, "The purpose of the transaction is to bring Tempur Sealy closer to the customer, promote innovation, reduce cost, and stabilize Mattress Firm. All of that is procompetitive." Dkt 456 at 201.

These needn't be addressed at length, for if above analysis had reflected price increases to consumers or a concerning level of market foreclosure to competitors, such efficiencies alone likely wouldn't save the proposed acquisition. As the Fifth Circuit in *Illumina* noted, "At bottom, an efficiency defense is very difficult to establish." 88 F4th at 1061. Instead, any efficiency "must be (1) merger specific, (2) verifiable in its existence and magnitude, and (3) likely to be passed through, at least in part, to consumers." Id at 1059. The detail with which the above efficiencies have been submitted isn't sufficient to meet such standard.

Far more important to justification for the acquisition are two remedial commitments that Defendants state will necessarily occur, being (i) divestiture of certain stores to a smaller retailer called Mattress Warehouse, and (ii) reserving a committed percentage of horizontal slots on the Mattress Firm floor for at least five years for third-party mattresses priced $1,500 and above, while also entering various post-close supply agreements with a number of suppliers, with an offer still open to Serta Simmons. See Dkts 143 at 50 (FTC motion), 456 at 19, 153–54 (proposed findings) & 484 at 3–4 (Defense supplemental filing). They contend that together these reduce the total possible foreclosure percentage, while corroborating Tempur Sealy's intent to continue operating Mattress Firm as a multi-branded floor. Dkt 456 at 190–93, 204; see Ex 5542 at 2 (email by TSI CEO to J.P. Morgan stating multi-branded vision for potential MFRM acquisition).

These are properly considered as rebuttal to the FTC's *prima facie* case, had it been established. *Illumina*, 88 F4th at 1057. And in that context, the burden would shift to Defendants to demonstrate that their remedial commitments "sufficiently *mitigated* the merger's effect such that it was no longer likely to *substantially* lessen competition." Id at 1059 (emphasis original). To be effective, such commitments needn't restore the premerger *status quo* or eliminate *any and all* anticompetitive harm; they need only prevent *substantial* harm to competition. See id at 1058.

### i.    Divestiture of certain stores

Tempur Sealy has committed as part of its acquisition of Mattress Firm to divest 104 Sleep Outfitter stores, 74 Mattress Firm stores, 7 distribution centers, and certain commercial office space to Mattress Warehouse. Dkt 484 at 2–3; 11/18 Sealed (Papettas, Mattress Warehouse) 27:25–28:1. These stores are located in places where Mattress Warehouse can operate them profitably, while widely expanding its geographic scope to compete along the eastern United States as well as in Chicago and eastern Wisconsin. See id at 26:4–27:1; 37:7–39:8. When asked whether less might be divested, the Mattress Warehouse CEO stated, "It's possible if there's leases that don't get renewed by the landlord, but there's not very many stores in that population." Id at 28:3–7.

In assessing divestitures, courts consider (i) the likelihood of the divestiture, (ii) the experience of the divestiture buyer, (iii) the scope of the divestiture, (iv) the independence of the buyer from the merging seller, and (v) the purchase price. *UnitedHealth*, 630 F Supp 3d at 135 (citation omitted); see also *Anthem*, 236 F Supp 3d at 222 (to meet burden on divestiture, defendants must demonstrate that any entry by new firms, or expansion by existing firms, will be "timely, likely, and sufficient in its magnitude, character, and scope to counteract a merger's anticompetitive effects").

*First,* the divestiture is certain. *Second,* Mattress Warehouse has extensive experience as a mattress retailer.

*Third,* the divestiture jumpstarts national growth for Mattress Warehouse and gives third parties hundreds of non-Mattress Firm stores in which to sell. *Fourth,* it's undisputed that Mattress Warehouse will be independent of the merged firm. *And fifth,* although the purchase price is low, there is no doubt that Mattress Warehouse intends to use the divested stores. See *RAG-Stiftung,* 436 F Supp 3d at 307: "[T]o state the obvious, a potential buyer of an asset sold to facilitate a merger under scrutiny . . . has enormous leverage over the seller because it knows the seller must divest the asset quickly to proceed with the merger."

In sum, the divestiture guarantees further, reasonable retail alternatives for Serta Simmons, Purple, and other rivals of Tempur Sealy by reducing both Mattress Firm's market share and the already-low total possible foreclosure percentage.

ii.   Balance-of-share commitments

When this action commenced, Tempur Sealy had agreed to reserve at Mattress Firm at least twenty percent of slots on the floor for third-party brands, with seventy-five percent of those being for mattresses priced $1,500 and above. Dkts 143 at 51–52 & 456 at 19; 11/19 (Thompson, TSI) 228:19–25; see also Dkt 484 at 4 n 2 (supplemental filing, noting this translates to approximately 7.5 slots per store). Such commitment would benefit third parties, including those with whom Tempur Sealy has already signed post-closing supply agreements, such as Purple, Leggett & Platt, Bedgear, Ashley Furniture, Resident Home, Sherwood, and Kingsdown. 11/19 (Thompson, TSI) 126:24–129:9.

Even so, the commitment on its face reflected no constraint on Tempur Sealy's ability to increase its own footprint on the Mattress Firm floor by approximately fifteen percent. See PDX6 at 16 (Defense expert presentation, showing TSI balance-of-share at MFRM at about sixty-five percent). The Court inquired sharply about this during closing arguments. The question was in essence: If Tempur Sealy did indeed believe that the

business model at Mattress Firm depended upon continuance as a multi-branded retailer, and that providing a range of suitable options to consumers was important, why wouldn't Tempur Sealy simply commit to maintaining a floor balance closer to the current *status quo*? See 12/16 (closing arguments) 83:23–85:16, 86:7–12.

With the matter under submission, Tempur Sealy eleven days later submitted a notice of revised slot commitment. Dkt 484. It increases the number of slots reserved for third-party mattresses priced $1,500 and above to approximately 11.4 slots per store for five years. Id at 3–4. This amounts to roughly forty-three percent of the slots for this category reserved for third parties. Id at 4. Defendants explain the anchoring of their commitment to a price point at $1,500, given its view that the "premium" market actually starts well below $2,000, and that several premium suppliers (including Purple) sell their mattresses closer to this price point. Id at 7–8.

The FTC objects to submission of this revised commitment after the hearing, while also rejecting it as "legally unenforceable." Dkt 496 at 2–6, 9. It also lodges other critiques, such as (i) the "minimum performance criteria" gives Tempur Sealy too much discretion, (ii) the commitment allows Tempur Sealy to monitor its own compliance, (iii) the five-year period is shorter than typical FTC consent agreements, (iv) Tempur Sealy can still "tilt the floor," and (v) it allows Tempur Sealy to provide slots for third parties that it perceives as "less of a threat." Id at 6–8.

To the contrary, the revised slot commitment indicates remarkable good faith by Tempur Sealy in response to concerns noted by the Court during closing arguments. It isn't prejudicial to receive such information and further commitment when it simply addresses and updates points that have been plainly at issue between the parties for the duration of this litigation. And despite whatever inadequacies the FTC believes this commitment bears, it doesn't change the overall conclusion that this deal, in light of the evidence, is not anticompetitive.

To the extent that the FTC argues that Defendants' commitments aren't enforceable, that issue won't be pre-decided here. Dkt 496 at 2–6. Defendants themselves specifically note that they are making such commitments to influence this Court's decision on an equitable issue committed to its discretion. See Dkt 484 at 6–7. While in no way expected, Defendants would choose to ignore such representations at their own peril. And nothing prevents the FTC or any other aggrieved rival from returning to this Court to test the binding nature of such commitments in a non-advisory posture, if necessary and desired.

To be clear, it's been determined above that the proposed acquisition won't substantially harm competition. But even if assumed to the contrary, Defendants' commitments to divest certain stores and to maintain going-forward slot allocations resolves any lingering concern. Such commitments are of a kind reasonably related to the merits that courts credit in rejecting government merger challenges. For example, see *Microsoft*, 681 F Supp 3d at 1090–91; *UnitedHealth*, 630 F Supp 3d at 146–47. And their cumulative effect is sufficient to prevent the merger from inflicting any substantial harm to competition.

e.    Conclusion

As noted towards the outset, vertical integration "virtually never poses a threat to competition when undertaken unilaterally and in competitive markets." Areeda & Hovenkamp, 3B *Antitrust Law* ¶755c at 6. This has proven to be true here, where the structural changes from the proposed acquisition don't mean that rivals will indeed be foreclosed; any potential foreclosure won't lead to anticompetitive effects in this competitive market; the deal's effect—like most vertical mergers—is either neutral or procompetitive; and the cumulative effect of the remedial commitments made by Defendants reasonably address any concerns on the margins.

In short, the FTC failed to establish that the subject merger is "likely to substantially lessen competition." *Illumina*, 88 F4th at 1048.

111

### 5.   Balance of equities

"The second step in deciding whether to grant a preliminary injunction is to balance the equities." *FTC v Warner Communications Inc*, 742 F2d 1156, 1165 (9th Cir 1984). This entails consideration of both public and private equities. *FTC v Weyerhaeuser Co*, 665 F2d 1072, 1083 (DC Cir 1981).

### a.   Public interest

The parties largely address the public interest in terms derived simply from their view of the above merits. For example, the FTC notes in its motion that "no court has denied a Section 13(b) motion for a preliminary injunction based on weight of the equities where the FTC has demonstrated a likelihood of success on the merits." Dkt 143 at 47, citing *FTC v Peabody Energy Corp*, 492 F Supp 3d 865, 918 (ED Mo 2020) (citation and internal quotation omitted). And it specifically reiterates in its conclusion such arguments as those concerning the sharing of confidential information by rival suppliers with Mattress Firm, which would be at risk of unauthorized disclosure in turn to Tempur Sealy. Dkt 456 at 150–53. By contrast, Defendants argue in response that "an injunction would harm public equities by preventing this procompetitive merger." Dkt 194 at 48; see also *Microsoft*, 681 F Supp 3d at 1100 (noting that public equities may include beneficial economic effects and procompetitive advantages) (citation omitted).

If limited to such arguments, given the rulings above, it follows that the FTC hasn't sufficiently established that the competitive effects of the proposed acquisition will negatively impact the public interest.

Not addressed by either party is the much wider impact that the proposed acquisition will have with respect to consumer access to mattresses *below* the $2,000 threshold set by the FTC to define the proposed relevant product market here. It's undisputed that fully eighty percent of the units sold at Mattress Firm are *below* that price point. See 11/18 (Eck, MFRM) 11:22–25. Yet the FTC's case

entirely disregards the purchasing needs and practices of this surpassingly vast majority of Mattress Firm customers. Is this acquisition ultimately to the benefit of such customers, to their detriment, or neutral? Are they less affluent or more sensitive to price concerns than those buying mattresses priced at or above $2,000? If so, are their interests more worthy of consideration and protection? And at base, shouldn't the interests of that broad segment of the public at least be addressed as part of the balance as part of the public equities?

For their part, Defendants in their response say that the acquisition is procompetitive and will lower prices across the board. Dkt 194 at 13. The absence of *any* position from the FTC on the implications of this deal with respect to lesser-priced mattresses is thus quite notable. For presumably, if the acquisition were antagonistic across other segments, the FTC would have also brought challenge as to that wider basis—or at least explained why not.

On the whole, then, where a vertical acquisition such as this implicates a far wider range of products or services than a much smaller segment targeted as a concern by the FTC, it's appropriate to infer that the acquisition is either neutral or beneficial as to that much wider range. See Areeda & Hovenkamp, 4A *Antitrust Law* ¶1002 at 154 (stating that "most vertical mergers are procompetitive").

For these reasons, it is determined that the proposed acquisition, when considering all of its particulars, is in the public interest.

b.   Private interest

The FTC argues that, to the extent private equities are considered, the court "must afford such concerns little weight" so as not to "undermine section 13(b)'s purpose of protecting the public-at-large, rather than individual private competitors." *FTC v University Health, Inc*, 938 F2d 1206, 1225 (11th Cir 1991) (cleaned up). This is correct. For example, see *Penn State Hershey*, 838 F3d at 352 (while private interests of parties to acquisition

must be considered, "they are not to be awarded great weight"); *FTC v National Tea Co*, 603 F2d 694, 697 n 4 (8th Cir 1979) (purposes of Section 13(b) would be undermined if interests of "individual private competitors" were of greater weight than "public-at-large"). But here, the public and private equities align in favor of the proposed acquisition.

The FTC also argues, "There is 'no reason why, if the [proposed acquisition] makes economic sense now, it would not be equally sensible to consummate the [proposed acquisition] following an FTC adjudication on the merits that finds the [proposed acquisition] lawful.'" Dkt 143 at 54, quoting *Penn State Hershey*, 838 F3d at 353. While expedient, that contention is entirely contrary to the argument and record made elsewhere, where the parties jointly recognize that the decision as to preliminary injunction is—at least in the majority of circumstances—determinative of whether the acquisition will ever close. See *In the Matter of Tempur Sealy International, Inc and Mattress Firm Group Inc*, 2024 WL 4544179, at *1 (FTC filing in related administrative action, agreeing that "federal court preliminary injunction 'almost always obviates the need for further administrative proceedings'"); Dkt 194 at 16 (TSI response, stating that "the requested relief is preliminary in name only") (citation and internal quotations omitted); see also *Microsoft*, 681 F Supp 3d at 1084–85 (noting "short life-span of most tender offers" and that "issuance of a preliminary injunction blocking an acquisition or merger may prevent the transaction from ever being consummated").

To the extent argument by the FTC thus suggests that delay itself *isn't* of private concern, it must be rejected. Corporations have responsibilities to their shareholders, employees, and customers. Major structural shifts cannot remain in limbo for prolonged or indefinite periods of time. Indeed, the FTC itself points to the targeted closing date of February 9, 2025. Dkt 143 at 48 (FTC motion). Such date is quite clearly a core term of the acquisition itself. Paired with it is the fact that the FTC nowhere places a deadline

upon itself by which to conclude its inquiries. Without even an approximation of such date, a *just-close-later* position can't be meaningfully evaluated. And nothing suggests that the private interests of the parties to an acquisition should be so lightly forfeited to the vagaries of an administrative timeline.

Beyond that, the private equities affirmatively disfavor preliminary injunction. Defendants have expended significant resources on the proposed transaction and will by February have forestalled closing for nearly two years to give the FTC time to investigate and seek a preliminary injunction. See Ex 5521 (TSI/MFRM agreement dated May 9, 2023). And they represent that "further delays would likely kill the deal and irreparably injure Defendants." Dkt 456 at 203. This is sufficient to conclude that the loss of the benefits of the acquisition favors the private interest here.

6.   Conclusion

The motion by the Federal Trade Commission to preliminarily enjoin the announced merger of Tempur Sealy International, Inc, and Mattress Firm Group Inc pending completion of its own administrative proceeding is DENIED. Dkt 143.

SO ORDERED.

Signed on January 31, 2025, at Houston, Texas.

Hon. Charles Eskridge
United States District Judge

115